```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                          DEL RIO DIVISION

 3

 4  ENRIQUETA DIAZ,                      *  No. DR-23-CV-60
                                         *
 5         Plaintiff,                    *
                                         *
 6  v.                                   *  NOVEMBER 14, 2023
                                         *
 7  RAMSEY ENGLISH CANTU, ROXANNA RIOS,  *
                                         *
 8  OLGA RAMOS and ROBERTO RUIZ,         *
                                         *
 9         Defendants.                   *  DEL RIO, TEXAS

10  --------------------------------------------------------------

11          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

12             BEFORE THE HONORABLE ALIA MOSES

13             CHIEF UNITED STATES DISTRICT JUDGE

14  --------------------------------------------------------------

15
                          A P P E A R A N C E S
16

17    For the Plaintiff:        Pro Se
                                 BY:  MS. ENRIQUETA DIAZ
18                               820 North Bibb, Apt A-1
                                 Eagle Pass, Texas  78852
19

20

21    For the Defendants:       LAW OFFICES OF JACK R. STERN
                                 BY:  MR. JACK STERN
22                               P.O. Box 4359
                                 Del Rio, Texas  78841
23

24

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by Computer-Aided transcription.
```

1                              **I N D E X**

2

3                                                              PAGE

4    OPENING STATEMENTS BY THE PLAINTIFF:              4

5    OPENING STATEMENTS BY THE DEFENSE:             NONE

6

7

8

9                                    DIR   CROSS   REDIR   RECROSS

10   BY THE PLAINTIFF:

11      MR. GERARDO "JERRY" MORALES      28      38      46       47

12      MR. JAIME IRACHETA               64      78      89       --

13      MS. ENRIQUETA DIAZ               95     100     123      124

14      MR. RAMSEY ENGLISH CANTU        133     186     203       --

15      MR. RICARDO FLORES              208     212      --       --

16

17

18   BY THE DEFENSE:

19      NONE

20

21

22

23

24

25

1                          **E X H I B I T S**

2

3

4    <u>FOR THE PLAINTIFF:</u>

5      1.  Screen shots of text from phone

6      2.  Flash drive of Commissioners Court meeting

7      4.  Declaration of Emergency

8

9

10   <u>FOR THE DEFENSE:</u>

11     1.  Voter's list #1

12     2.  Voter's list #2

13     3.  Water Development Board paperwork

14

15

16                          * * * * * *

17

18

19

20                          **\*\*\* NOTE \*\*\***

21   THIS HEARING CONTAINS SEVERAL BENCH CONFERENCES.  BENCH

22   CONFERENCES ARE DEEMED CONFIDENTIAL AND ARE NOT A PART OF THE

23   OPEN COURT RECORD.  THESE BENCH CONFERENCES HAVE BEEN PLACED IN

24   A SEPARATE **SEALED** TRANSCRIPT, AVAILABLE ONLY TO THE

25   REPRESENTATIVE PARTIES.

1          (10:48:12 A.M., START TIME)

2               THE COURT:  All right.  This is DR-23-CV-60, Enriqueta

3     Diaz versus Ramsey English Cantu, Roxanna Rios, Olga Ramos,

4     Roberto Ruiz.

5               All parties make announcements, please.

6               Go ahead and announce who's present here for each

7     side.

8               MS. DIAZ:  Present, Your Honor.

9               THE COURT:  Okay, Ms. -- so you're -- you're -- give

10    me your --

11              MS. DIAZ:  Enriqueta Diaz.

12              THE COURT:  Okay.

13              MS. DIAZ:  Yes, ma'am.

14              THE COURT:  And for the defense?

15              MR. STERN:  Jack Stern.  I'm present with all the

16    commissioners except Mr. Morales.

17              THE COURT:  Okay.  So where are your -- where are your

18    clients, Mr. Stern?

19              MR. STERN:  Right here.

20              THE COURT:  Okay, you can come sit with your attorney.

21              MR. STERN:  Judge, before we begin, if the plaintiff

22    and I may approach?

23              THE COURT:  You may.  Y'all may both approach.

24              Okay, y'all can't whisper.  We're on the record.

25              You can come up -- come up here to the -- are you

1   asking to come to the bench, Mr. Stern?

2          MR. STERN:  Yes, Your Honor.

3          THE COURT:  You can come up here.  You're -- you're

4   going to come up behind these ladies.

5          MS. DIAZ:  Okay.  Thank you.

6      (10:49:19 TO 10:55:34 A.M., BENCH CONFERENCE)

7          THE COURT:  Okay, the parties admitting and conceding

8   that the Court has jurisdiction over this matter, based on the

9   1983 and supplemental jurisdiction of federal courts, we will

10  proceed with the matter of the preliminary injunction beginning

11  with --

12          Ms. Diaz, are you representing yourself?

13          MS. DIAZ:  Yes, I am, Your Honor.

14          THE COURT:  Okay, then let me have you come to the

15  podium to make an opening statement.

16          MS. DIAZ:  Here, Your Honor?

17          THE COURT:  Yes.

18          MS. DIAZ:  Thank you.

19          THE COURT:  Go ahead.

20          MS. DIAZ:  Okay.

21              OPENING STATEMENTS BY THE PLAINTIFF

22          MS. DIAZ:  Your Honor -- good morning to everyone.  My

23  name is Enriqueta Diaz, and I am the plaintiff on this case

24  before this Court.  And I would like to mention that all this

25  started when Commissioners Court appropriated a

1   24-million-dollar certificate of obligation loan from the Texas

2   Water Development Board; of which 7.2 million would be paid

3   through taxpayers; taxpayers' property taxes.

4           I started raising signatures with voters as the law

5   requires in the State of Texas.  About -- let me see.  I have it

6   here.

7           Around the 21st of October --

8           THE COURT:  You can -- fix the microphone for her.

9   Just -- we're going to fix the microphone.

10          MS. DIAZ:  Thank you.

11          THE COURT:  The acoustics are very strange in this

12  court.  You can -- if you don't speak into the microphone, I

13  can't hear you, but if you get too close, then it's too much.

14  Okay?

15          MS. DIAZ:  Okay.  I'll try.

16          THE COURT:  Okay.  Go ahead.

17          MS. DIAZ:  Okay.  When Commissioners Court -- can you

18  hear me now?

19          THE COURT:  I can hear you.

20          MS. DIAZ:  When Commissioners Court approved following

21  through with a 24-million-dollar certificate of obligation loan,

22  considering that the taxpayers had just had their property

23  values almost doubled -- and we live in a very poverty-stricken

24  community with practically no jobs other than over-the-counter,

25  waitresses, and things like that -- I started a petition with --

1   in the community.  There were a lot of people that got forms and

2   went out getting signatures.

3             On the 10th of October, I presented the petition to

4   Sara Montemayor, who is the county clerk.  And under state law,

5   that is where you submit it.  She immediately contacted Isamari

6   Villarreal, who is the election administrator directly hired and

7   under the supervision of the county judge, Ramsey English Cantu.

8             When I submitted that to Ms. Villarreal and Sara

9   Monetemayor, I specifically asked Ms. Villarreal, since she was

10  immediately under the supervision of the county judge, Cantu,

11  whether she was strong enough to follow through as the law

12  requires.  Because I know that at one time Ms. Villarreal was

13  the tax assessor/collector, an elected official under state law

14  with sole authority to do and not do exactly what the law says.

15  However, she claimed that she was under a lot of stress and

16  intimidation tactics by the previous judge that -- for the

17  longest time she stayed on, and eventually she resigned from the

18  job.

19            Because I've known her all my life, practically, I

20  kept telling her, Why did you fold?  You are not under anybody's

21  supervision but the state.

22            THE COURT:  Okay.  So, Ms. Diaz, this opening

23  statement is to tell me what you -- what evidence you intend to

24  put forward and show today.

25            MS. DIAZ:  The evidence that I'm going to show is the

1  warrant of arrest; the ticket that I got, the citation, which is

2  double jeopardy; and I am also going to -- hold on a second, if

3  I may, Your Honor.

4          The petition that I filed with the district court

5  also on other claims that don't belong in federal court that is

6  pending for a visitation judge.  Both attorneys have recused

7  from the case.

8          THE COURT:  Okay, so there's a pending state matter

9  that was filed when?

10          MS. DIAZ:  The state case?

11          MR. STERN:  Judge, if could help her, I believe they

12  were both the 6th --

13          MS. DIAZ:  I don't have a stamped copy, Your Honor.

14          MR. STERN:  November 6th.

15          THE COURT:  I'm sorry?

16          MR. STERN:  November 6th.

17          THE COURT:  Okay.

18          MS. DIAZ:  November 6th.

19          THE COURT:  Okay.  Well, it was the same date that was

20  filed in this court.

21          MR. STERN:  That's correct, Judge.

22          MS. DIAZ:  Yes.

23          THE COURT:  Okay.

24          MS. DIAZ:  Yes, it was the same day.

25          Your Honor, correct me if I say things that are out

1  of order based on federal law because I'm not an attorney and I

2  am pro se.

3          I submitted the -- the signatures to Ms. Sara -- I

4  mean, to Sara Montemayor.  She stamped them the day that they

5  were accepted, and she immediately handed them over to Isamari

6  Villarreal, the election administrator.  She's the one that

7  handles the election -- what is it -- the voter registration

8  list.

9          Because of the incident she had gone through with

10  the prior county judge, and knowing the way Mr. Ramsey Cantu has

11  been handling the staff, firing people left and right, people

12  are scared.  The employees are scared, Your Honor.  And that was

13  my concern, why I brought this case to your court, to federal

14  court.

15          The -- I asked her if she was afraid that she was

16  going to be harassed by Mr. Cantu, to please let me know now so

17  that I could file a temporary restraining order to leave her

18  alone and do her job.  She advised me that everything would be

19  okay, even though I did see that she was sort of shaking,

20  nervous.  She is a very nice lady, I have to admit.

21          Well, about four days after I submitted the -- the

22  package with 163 pages of signatures, I am up in district court

23  and I'm going down on a break that they recessed, the judge

24  recessed for a few minutes, and one of the girls that works in

25  the election administrator's office made a signal to me as I was

1   coming downstairs and asked me to come into her office.  She was

2   by herself.  So I walked in and I'm asking her if everything's

3   okay.

4            THE COURT:  Okay, you understand this is all based on

5   evidence you intend to put forward today?

6            MS. DIAZ:  Yes, ma'am.

7            THE COURT:  Okay.  All right.

8            MS. DIAZ:  Yes, ma'am.

9            So I asked her if everything was okay, and she said,

10  Yes, we're not having any trouble.

11            As a matter of fact, when I presented the petition,

12  I also presented Isamari with the state statutes in Texas of

13  what she can reject and what she can't, what is allowed and what

14  is not.  I also requested a copy.  I paid close to $500 for a

15  copy of the voter registration list so that we could make sure

16  that the people that were signing were legal registered voters

17  in Maverick County, and so that we could assure that we had

18  enough signatures on the petition in order to stop this

19  24-million-dollar bond issue.

20            About a week later, I get a phone call -- I don't

21  know who called me.  I'll be very honest with you.  But I found

22  out that Judge Cantu had gone into Isamari's office and asked

23  for all the signatures.  So, I followed through, looking for

24  her.  I went to her house.  Like I said, I know her family.  I

25  couldn't find her.  I went back again, couldn't find her.  She

1   was out.  She was out.  She was out.  Eventually I found one of

2   her staff the following day.  Isamari was not there.  I asked

3   her where Isamari was.  She said she stepped out.

4                   I said, Can I talk to you outside?

5                   Because my voice is so hoarse since I was in an

6   explosion, a toxic explosion and my esophagus burned, and I -- I

7   croak a lot when I talk, especially if I'm loud.

8                   So, she came out of the office and I said, I just

9   want to know one thing, did Ramsey Cantu come over here

10  requesting the -- the list of all the signatures?

11                  And she was shaking, she was pale, she said, Yes.

12  Yes, he did.

13                  And I said, Why?

14                  So she just, like, shook her shoulders.  So I left

15  it at that.  I kept on looking for Isamari at her office; she

16  was nowhere to be found.  About four or five days later -- I

17  really don't remember the date -- I was at coffee, and her

18  mother came into the restaurant to pick up some food to go.  And

19  I -- and she -- she came and gave me hug, and she said, Queta,

20  *Lecha Parita's* [ph] in the truck.

21                  I said, Isamari?

22                  She said, Yeah, she wants to talk to you.

23                  So I went outside.  It was raining, as a matter of

24  fact, that day.  And I opened the door and I just looked at her

25  and I said, Why?  Why, Isamari?  Why did you fold?

1          She said, Well, I guess I thought I had the guts,

2     and I don't.  I'm just scared.  What I'm thinking of doing is

3     just resigning.  I'm worthless.

4          And she started cutting herself down.

5          I said, No, you're a valuable person.  You can't be

6     pushed around from your duties.  You cannot be working under

7     harassment.  You need to stand up.

8          She said, Well, he kept reminding me that he's my

9     boss, and that I have to do it.

10          I said, Well, that's okay.  Nothing on you.

11          I said, That's okay.  I understand.

12          And I left it at that.

13          On October the 10th around 11:00 o'clock -- I take

14     it back -- yeah, on the -- on -- on the 10th of -- of October, I

15     turned in the petitions to them, and Commissioners Court had a

16     meeting to approve the bond regardless.  I went to that meeting.

17     Before -- when -- when the judge announced recognizing visitors,

18     I got up and I spoke.  I had signed up.  The judge is very

19     strict about three minutes.  Even though the state law allows

20     you five, he decides that it's only three minutes.  And that's

21     fine.  I'm not going to dispute that.  We'll deal with that at a

22     later time.

23          So, I got up and I spoke for three minutes.  And I

24     addressed Commissioners Court, informing them that they were

25     about to make a decision on the bonds.  And I explained

1    everything that I've said to you right now; that I had even gone

2    to the extreme of buying the voter registration list, that we

3    confirmed the -- the amount of -- of lists that were there.  I

4    also informed Isamari that some of the names had were -- that

5    had signed had no number, no voter registration number.  Because

6    we had looked for that number -- for that person and they did

7    not appear on the voter registration list, so we didn't count

8    those.  There's quite a few of those.

9            So, the meeting starts.  I -- I address

10   Commissioners Court and I'm -- I'm telling them that they need

11   to be careful about what they're going to do, that I know

12   Mr. Cantu is trying very hard to pass this bond regardless, or

13   this loan, and I said thank you, and I sat down.  I didn't say a

14   word whatsoever anymore until the incident occurred.

15           As I'm sitting there on the front seat, on the front

16   row, I'm sitting there quietly, the meeting has started.  I know

17   I cannot interfere once the meeting has started.  I'd been given

18   my time.  That's understood.  The judge turns around and he's

19   asking Isamari to make the presentation, when he's been involved

20   all this time with her.

21           So he asked her -- and you will see, I have a flash

22   drive for you to see it during break.  He's asking her to do the

23   presentation.  Ms. Isamari is explaining what's in the document

24   that I provided to the Court, where she's giving the figures of

25   how many people's signatures there were, how many she accepted,

1  how many were rejected.  And -- and that's all she said for a

2  minute.  When she indicated that she had rejected 600-something

3  out of the 2333 -- on the -- on the document that I provided to

4  the Court, it explicitly states why she rejected them.  Because

5  they were not registered voters, which I know the ones I didn't

6  put any number.  Number two, the ones that were -- were not

7  complete, the information was not complete.  Number three, and

8  the -- you have the -- the document before you.

9          THE COURT:  Exhibit A?

10          MS. DIAZ:  Yes.  It's Exhibit A.  It says on it that

11 she verified this information on October the 27th.  Signatures

12 required, 1,552; signatures submitted, 2,333; signatures not

13 valid, 668.  And then it says, "Not registered, There were

14 either duplicates, they're incomplete, or deceased."

15          Apparently -- and to this day, I don't know who the

16 deceased was, but I can assure you nobody dead signed the

17 petition.  There is a man by the name --

18          THE COURT:  Okay, so the total -- total valid

19 signatures were 1,665, which was about 113 more than required?

20          MS. DIAZ:  More than required.  That is correct,

21 Your Honor.

22          THE COURT:  So why are we here?

23          MS. DIAZ:  Pardon me?

24          THE COURT:  So why are we here if you had the valid

25 signatures?

1          MS. DIAZ:  Because of what happened immediately after

2     the presentation during this same meeting.

3          THE COURT:  Okay.

4          MS. DIAZ:  If I may continue, Your Honor.

5          THE COURT:  Uh-huh.

6          MS. DIAZ:  So this is presented by Isamari.  She's not

7     adding any more, only what is on this black and white document.

8     However, the judge -- and you will see it on the -- on the flash

9     drive that I'm going to present as evidence, you will see where

10    he is going around her, looking at her, and telling her, Isn't

11    that a lot of people that you rejected?  Could you -- could you

12    tell -- could you explain why?

13          I mean, it's odd.  And he's going around, trying to

14    put words into her mouth.  So she, again, repeats the same

15    thing, the same thing that's on the document.

16          Mr. Cantu turns around and says, What about dead

17    people?

18          Well, yeah, there was one deceased.

19          She didn't even use "dead," she used the word

20    "deceased."  There was one deceased.

21          Well, I don't know who the deceased person is that

22    she rejected, but I will say that about three days after the

23    signatures were taken from this person, he had a car accident on

24    Highway 57 and he got killed in the car accident.  If it is that

25    person that they're saying is dead, he was alive when he signed.

1   I've never heard of a dead person signing.

2            So, again, this information was not even brought

3   forth in the discussion that the judge was bringing out; just

4   that there was one dead.

5            Well, I -- I'm always looking at violations of the

6   law, and through the period that Mr. Cantu has been county

7   judge, I have quite a few documents.

8            MR. STERN:  Judge, this is outside -- this is outside

9   of the scope of the hearing.

10            THE COURT:  This is opening.

11            MR. STERN:  Okay.

12            MS. DIAZ:  Can I continue?

13            THE COURT:  Uh-huh.

14            MS. DIAZ:  I have quite a few documents, pictures,

15   where Mr. Cantu has deliberately violated state law during

16   Commissioners Court meetings; conducting four meetings in the

17   barrios without a posted agenda, and so forth and so forth and

18   so on.

19            THE COURT:  And so how does that --

20            MS. DIAZ:  Those are not evidence today.

21            THE COURT:  Okay.

22            MS. DIAZ:  They're not evidence.  That's -- that's for

23   state.  But this is -- I'm saying I've been a thorn on his side

24   from day one.

25            So, I'm sitting there listening to Commissioners

1  Court going on, and all of a sudden -- like I said, I was on the

2  front row, right in front of him -- he looks at me and he's

3  waving the petition or some paper he had, and he's saying, The

4  gall.  The gall of you coming to Commissioners Court and telling

5  us that we're violating the law when all this is fraud and even

6  dead people.

7           And he started on, and on, and on.  And what I

8  did -- because I know that's not true, and I knew where he was

9  coming from.  I knew he was trying to throw out the signatures

10  because he needs those 24 million to pay off the man that -- who

11  owns property in Quemado --

12           THE COURT:  Whoa, whoa, whoa.

13           MS. DIAZ:  -- that paid for his campaign.

14           THE COURT:  Whoa, whoa, whoa.  Back -- okay, back --

15  back up.  Why --

16           MS. DIAZ:  I will.

17           THE COURT:  Say that again.

18           MS. DIAZ:  I said I knew he was very upset --

19           THE COURT:  Okay, but why do they need the 24 million?

20  For what?

21           MS. DIAZ:  There's a gentleman by the name of Ruben

22  Garibay.  He's from Laredo.  He is a very wealthy -- I don't

23  know if he's a millionaire, trillionaire, whatever.  But he's

24  very wealthy.

25           THE COURT:  So what does he need?

1          MS. DIAZ:  Mr. Cantu has given the bridge -- number

2     one -- number one, Mr. Garibay donated thousands of dollars to

3     his campaign for county judge.  Number two, Mr. -- Mr. Cantu

4     voted to approve giving him the airport permit that the county

5     had.  Not the airport, I'm sorry, the bridge.  The county was

6     going to build a third international bridge.

7          THE COURT:  That's all I need is a third international

8     bridge.

9          MS. DIAZ:  And then third, Mr. Garibay owns the

10    property where the water and sewer lines are being laid with the

11    $24 million.  If that's not a conflict with him voting on each

12    issue, then I don't know what is.

13         THE COURT:  But the -- but the bottom line is, though,

14    politicians do get money from contributors, and then they vote

15    on items that may benefit the contributors.  That's not an

16    unusual matter.

17          But my question is -- so the petition was to do

18    what; to have that presented to the voters or --

19         MS. DIAZ:  The petition was --

20         THE COURT:  -- to stop it or what?

21         MS. DIAZ:  -- to stop the loan from the Texas Water

22    Development Board, because the voters rejected it with the votes

23    required of registered voters as the law requires.

24         THE COURT:  Are you saying the petition or an

25    election?

1              MS. DIAZ:  No.  The petition itself requires

2    five percent --

3              THE COURT:  Right.

4              MS. DIAZ:  -- of the registered voters, and that's

5    what was presented.

6              THE COURT:  But the petition was to ask for it to be

7    put to the voters or to --

8              MS. DIAZ:  To be put to the voters on an election.

9              THE COURT:  And has that election occurred?

10             MS. DIAZ:  No.

11             THE COURT:  So the voters yet have not had a chance to

12   say --

13             MS. DIAZ:  They rejected the signatures.

14             THE COURT:  And so by essence they rejected the

15   election?

16             MS. DIAZ:  The rights of the people.  That is correct.

17                So, if I may continue.

18             THE COURT:  Uh-huh.

19             MS. DIAZ:  As he is looking at me, staring at me, and

20   accusing me of theft, of using dead people, and fraud -- the

21   word "fraud" was used two or three times -- I'm smiling at him.

22   I'm not saying a word.  And like I said, the flash drive will

23   show that.

24                I kept smiling at him and then he pointed his finger

25   at me, and he said, And you better not say a word.  You better

1    not.  I'm warning you.  You better not.

2              And he kept on pointing his finger at me.  And I'm

3    smiling.  And all I said was, But I'm not doing anything.

4              You spoke.  Arrest her.  Arrest her.

5              And I said, This is not your jurisdiction.  This is

6    not your jurisdiction, and you are sitting in Commissioners

7    Court.  It is Commissioners Court, it is not the county judge's

8    court.

9              Arrest her.

10             And then Mr. Iracheta here got up -- the one that's

11   getting double dipping -- he approached him at the bench and

12   I -- I did not hear it, but immediately Mr. Cantu said, and put

13   the handcuffs on her.

14             And I kept telling the deputy, He has no

15   jurisdiction.  If you arrest me illegally, you're going to be in

16   trouble, too.

17             THE COURT:  And why were you being arrested?  For

18   what?

19             MS. DIAZ:  Huh?

20             THE COURT:  Based on what I read, you were being

21   arrested for contempt?

22             MS. DIAZ:  That's what he said.  And he not only --

23   when I told the deputy -- we went outside and I said, What are

24   you going to do now?

25             Because I know that if there's a disruption they can

1  escort me out and move me out.  I know that.  But he has no

2  jurisdiction as the county judge in Commissioners Court.  None.

3  To order contempt of court and jail and "arrest her" and put

4  handcuffs, that's abuse of authority.  And that's what I'm

5  fighting in federal court.  So --

6      THE COURT:  Well, that's what -- that's what I have

7  jurisdiction over, which means --

8      MS. DIAZ:  Thank you.

9      THE COURT:  -- I have supplemental jurisdiction over

10 any other state law matters that would normally not have been in

11 federal court.  I can exercise supplemental jurisdiction, of

12 which I have.

13     MS. DIAZ:  Thank you.

14     THE COURT:  So what's before me in a primary

15 jurisdiction -- subject matter jurisdiction is the violation of

16 civil rights complaint.

17     MS. DIAZ:  So -- so I go outside with the deputy -- I

18 go outside with the deputy and he doesn't know what to do.  So I

19 told him, I said, You need to talk to a district judge or

20 somebody that knows the law before you violate my rights, too.

21         So he called for backup.  There were like four or

22 five different deputies that came.  One of them -- I forget his

23 first name.  His last name's Benavides.  He works for one of the

24 district judges.  He's one of the bailiffs.  And he came and

25 approached me and he said, What's wrong?

1          And I said, Well, the -- the judge has lost his mind

2   one more time.

3          So, the -- the deputy that was there -- again, I

4   don't know his name -- he said, He wants her arrested.

5          And I told Benavides -- I said, You need to check

6   with the district judge to see if he has authority or not.

7          So he left, came back, and he said, He has no

8   authority to issue a warrant or arrest or nothing in

9   Commissioners Court.

10          And I said, Okay, so may I leave?

11          No, you can't leave.

12          I said, The moment you tell me I can't leave, I'm

13   being detained, that's an arrest.

14          I said, I'm not fighting you guys, I'm fighting for

15   what's right, what the law allows me to do.  And you telling me

16   I can't leave, that's one.

17          So he left, came back, and he says again that the

18   judge said that Mr. Cantu had no jurisdiction.  So, I said,

19   okay, now for the second time, may I leave?

20          No.  Wait.  Let me go talk to the judge.

21          I assumed he went and spoke with Mr. Cantu and told

22   him that the judge was saying there was no jurisdiction on his

23   authority.  So he comes back and he says, Well, Judge Cantu says

24   to give you a ticket, to give you a citation.

25          I said, Fine.  Give me 10,000 -- the fine.  I'll --

1   I'll deal with it with the court.

2           So, they gave me this ticket, which is not even

3   written correctly.

4           THE COURT:  That's not --

5           MS. DIAZ:  It says here --

6           THE COURT:  That's not an exhibit, is it?

7           MS. DIAZ:  Yes, it -- it was not in there, no, ma'am.

8           THE COURT:  Okay.

9           MS. DIAZ:  But this will be an exhibit.

10          It says here, you -- You are to answer a complaint

11  for the offense of 10:00 p.m. [sic].  That's the ticket that I

12  got.  And as a matter of fact, I was supposed to appear in court

13  this morning, and I'm over here.  So...

14          THE COURT:  We -- we have the Supremacy Clause.  This

15  will save you --

16          MS. DIAZ:  Thank you.

17          THE COURT:  -- from court down there.

18          MS. DIAZ:  So -- so it -- we were yelling at each

19  other.  Anyway, I'm outside now with the police -- with the

20  deputies, and he's -- there was another lady -- again, I don't

21  know her name -- a lady deputy that Benavides is telling her to

22  give me a ticket, which she wasn't even there and she saw

23  nothing.  But she gave me the ticket.  Because everybody's

24  afraid of this man right here (INDICATING), Ramsey English

25  Cantu.  Because he gloats his authority and intimidates

1    everybody.

2            THE COURT:  Okay, well, I'm not worried --

3            MS. DIAZ:  So, now --

4            THE COURT:  -- I'm not worried about him trying to

5    intimidate the Court, so...

6            MS. DIAZ:  So then I'm waiting outside.  I said, Okay,

7    so I got the ticket, now can I go?

8                No, you can't.  Wait.  Let me go talk to the judge

9    again.

10                So, Benavides leaves again --

11            THE COURT:  Do you know --

12            MS. DIAZ:  -- comes back again --

13            THE COURT:  -- do you know which judge he's speaking

14    to, or just speaking to a judge?

15            MS. DIAZ:  I don't know if he's speaking to Ramsey

16    Cantu or to Ms. Flores, the district judge.  I don't know.

17            THE COURT:  Just a judge?

18            MS. DIAZ:  Just a judge.

19            THE COURT:  Okay.

20            MS. DIAZ:  So -- so, I said, Well, I got the ticket

21    now, can I go?

22                No, let me go check again.

23                So I said, Okay, I'm being -- still detained.

24                So I go back again -- I mean, he goes back again,

25    comes out and says, No, you got to let her go.  Just ticket and

1  that's it.

2          I said, Fine.

3          I get the ticket, I get in my car, I go to Skillets

4  to have some coffee, because all this time took around two to

5  three hours that I was outside in the rain.  And after they tell

6  me I can go, Mr. Benavides says I can go, I go to the Skillets

7  to have some coffee and warm up.  I had been there about 10, 15

8  minutes when I get a phone call, and it's Mr. Benavides again.

9  He says, Queta, I'm sorry, but Judge Cantu has issued a warrant

10 for your arrest and I have to process you.

11         I said, Okay.  What do you want me to do?

12         He said, You want to go to the jail, to the

13 detention center?

14         I said, Yeah, I'm drinking coffee.  I'll be over in

15 10, 15 minutes.  So I went to the jail after my coffee.  I go

16 in, the sheriff, he's waiting for me with a document that has

17 also been provided to your court on the order --

18         THE COURT:  That's --

19         MS. DIAZ:  -- from county judge --

20         THE COURT:  -- that's --

21         MS. DIAZ:  Exhibit B, I believe.

22         THE COURT:  Yeah, I've got it.  Exhibit B.

23         MS. DIAZ:  Okay.  And -- I mean, you know what it

24 says.  You are to arrest Enriqueta Diaz for contempt of court.

25         He is the one claiming, filing -- he's the

1    prosecutor, he's the judge.  Where are my due process rights?

2            So what happened, I got the document and I told the

3    sheriff, Sheriff, I -- because he's telling me it's an order

4    from the judge.  I -- I have to follow through.

5            Like I said, everybody's scared.  So I said, Call

6    the judge and find out whether this is a legal document for you

7    to detain me.

8            THE COURT:  And which judge are you talking about?

9            MS. DIAZ:  Flores.

10           THE COURT:  Okay.

11           MS. DIAZ:  Maribel Flores, district judge.

12           So he called her on the phone, and he's talking to

13   her, the speaker's on, reading the document, the whole thing.

14   First paragraph, first thing he told her -- she told him was,

15   That is illegal.  Due process, that's -- that's illegal.  You

16   can't do that.

17           And then she said, Because I'm involved now with all

18   these questions I'm going to have to recuse if it ever comes to

19   district court.

20           I said, I understand that.

21           So, not only is that warrant -- or whatever

22   document, whatever you want to call it, it's not even a legal

23   document.  Not only is it ordering my arrest, he's also

24   sentencing me to 24 hours at the county jail and not when -- not

25   one minute less.  And if anybody -- that's the last paragraph.

1   If anybody alters the order, they will be also -- have to answer
2   to his contempt.  Now he's threatening the sheriff, too.
3   Simple.

4           THE COURT:  So is it -- is this a pending sentence to
5   be executed, so to speak?  Is this 24-hour pending for you to
6   yet still be --

7           MS. DIAZ:  I haven't gone to jail.  They just said
8   they couldn't arrest me, that that document was not legal
9   because he had no jurisdiction to begin with, due process wasn't
10  followed, they couldn't sentence me 24 hours when I haven't gone
11  to court, I haven't gotten a lawyer.  I haven't even gotten a
12  formal complaint, for that matter.

13          So, the Sheriff turned me loose.  However, I was
14  detained.  They did take me to the back to fingerprint me and
15  take pictures, different defendant -- I'm sorry.  Different
16  pictures just in case the -- the ruling from the judge would
17  come back -- well, not ruling, but opinion -- legal opinion
18  would come in that, yes, they could arrest me.

19          The -- the sheriff said, Well, for the sake of time,
20  let's go ahead and get you processed.

21          I said, Fine.

22          So I was not detained in a cell, I was not
23  handcuffed, but I was deprived of my liberty on a false warrant
24  of arrest, double jeopardy.  Because that -- that warrant is for
25  the same offense as the citation.  That's double jeopardy on me.

```
 1              THE COURT:  Well, that one is questionable, Ms. Diaz.
 2    I'm not sure it's double jeopardy because it's the same matter.
 3              MS. DIAZ:  So -- so that is what happened and why we
 4    are here before this Court.
 5              THE COURT:  Okay, let me give the -- let me give the
 6    defendants a chance for opening statements and then you can call
 7    your witnesses.
 8              MS. DIAZ:  Thank you.
 9              THE COURT:  Mr. Stern?
10              MR. STERN:  Out of consideration for the Court, the
11    defendants waive opening statement.
12              THE COURT:  Okay.  So you may call your first witness.
13              MS. DIAZ:  Jerry Morales.
14              THE COURT:  You're going to come right here to get the
15    oath.
16                         GERARDO "JERRY" MORALES,
17    having first been duly sworn, testified to the following:
18
19              THE COURT:  Be sure to speak into the microphone.  We
20    do have bad acoustics in this courtroom.
21              Proceed.
22                         DIRECT EXAMINATION
23    BY MS. DIAZ
24    Q    Good morning.  Could you please state your name.
25    A    Gerardo Morales.
```

```
1    Q    And are you a resident or a citizen of Maverick County?

2    A    I'm a citizen of Maverick County and commissioner over

3    Precinct One in Maverick County.

4    Q    You are a commissioner, elected official?

5    A    Correct.

6    Q    So as a commissioner, can we agree that you attend the

7    Commissioners Court meetings and are aware of what's going on in

8    Commissioners Court?

9    A    That is correct.

10   Q    That is correct.  Thank you.

11              On or about the 10th of October, were you present in

12   a meeting where I was issued a warrant of arrest?

13              THE COURT:  Okay, for the -- for the record, state

14   your name so that "I" is associated with a person.

15              MS. DIAZ:  Oh.

16   Q    (By MS. DIAZ) That I, Enriqueta Diaz, was issued a --

17   issued a warrant of arrest by Ramsey Cantu?

18   A    Yes, I was present that day.

19   Q    Could you tell the Court what you observed.

20   A    My observation that, during the course of the meeting, was

21   that at the time that the presentation was being done by the

22   election administrator, Ms. Isamari Villarreal, the way that it

23   was handled by Judge Cantu was to put words in her mouth; put

24   words in her mouth as to make her believe -- or make the court

25   and the audience believe that something was being done --
```

1          MR. STERN:  Speculation.

2          THE WITNESS:  -- illegal.

3          THE COURT:  Okay.  Hold on.

4          MR. STERN:  Something was said.

5          THE COURT:  Hold on.  Hold on.  Now, you can describe

6    what you saw.  Don't speculate as to why she did it.

7          THE WITNESS:  All right.

8          THE COURT:  Proceed.

9          THE WITNESS:  What I saw is that every time that he

10   was referring to the word "fraud" or that something was illegal,

11   he was looking at Ms. Queta, and he was pointing at Ms. Queta.

12   Q    (By MS. DIAZ) Did you participate in raising the petition?

13   A    That is correct, I participated in that.

14   Q    And could you explain to the -- to the Honorable Court what

15   procedures did you use to get signatures?

16   A    The procedures we used to get signatures was get -- gather

17   volunteers and explain to them what was going on, presented them

18   with an explanation as to why we were require -- requesting the

19   signatures.  And then we would meet at the county lake, follow

20   up collecting signatures that day, and collecting the pages that

21   the volunteers had that they would submit.

22   Q    There was an incident one day when Ms. Kimberly Cantu --

23          I'm sorry.  Now I'm testifying.

24          Are you aware of an incident that occurred at the

25   county lake where the police were called when signatures were

1   being raised?

2   A    Yes, I am aware of that incident.  Unfortunately that day I

3   did set up the trailer that we would use to pick up the

4   signatures, and then I left to my place of employment.  But I

5   was aware of what happened.  When they called me, the police had

6   already left.

7   Q    Mr. Morales, during your time sitting on the -- on

8   Commissioners Court, you were aware, as everybody else, that the

9   petition was being raised and you were part of the person -- of

10  volunteers that were doing this.  Were you aware of any --

11  anybody complaining or being harassed to sign the petition?

12  A    That is correct.  I came out publicly stating that if you

13  were a county employee and that you wanted to sign the -- the

14  petition, to not sign it.  I came out publicly doing that press

15  release because we've seen the retaliation of being terminated.

16          THE COURT:  Okay, wait.  Back up just a second.

17  Explain that last part.

18          THE WITNESS:  I came out publicly stating of what

19  we've witnessed through this administration, and I advised

20  county employees to not sign the petition because I was afraid

21  that they would retaliate against the employees and be

22  terminated.  And that is something that I said publicly on a

23  press release.

24  Q    (By MS. DIAZ) Now, have there been any employees that did

25  not sign that have been informed in any way, shape, or form that

1   they were being harassed if they signed?

2           MR. STERN:  Objection.  Calls for hearsay.

3           THE COURT:  Hearsay's admissible.

4            Proceed.

5           THE WITNESS:  Yes, I'm aware of several employees.

6   And, again, they're afraid of losing their employment, and so

7   they won't come forward.

8           THE COURT:  And -- have --

9           MS. DIAZ:  Have --

10          THE COURT:  Wait.  Back up just a second.

11           They told you what, Commissioner?

12          THE WITNESS:  They told me that they would -- they

13  would support what we were doing in raising signatures to take

14  this to an election, but they were just afraid of being

15  terminated if their name would -- would show up on that petition

16  list.

17           And when I got those three, four, five complaints,

18  that's when I decided to come out and say this publicly, that if

19  you were a county employee, not to sign the petition; that we

20  had enough volunteers out there picking up signatures that it

21  would make it a valid -- and I don't want to -- valid petition,

22  and I didn't want to make those -- put those employees in fear

23  of losing their jobs if they were to sign.

24  Q   Mr. Morales, did anyone call you in reference to the

25  petition itself, whether the county judge or anybody else, any

1 staff from -- from the court, including Mr. Iracheta, whether

2 they had been called to confirm if they -- if employees signed

3 the petition?

4 A    Yes.  I've had three incidents.  One that came

5 specifically -- I was stopped at the local grocery store,

6 Walmart, by a resident of Maverick County, where his daughters

7 were approached by the offices of Mr. Iracheta, wanting to

8 confirm if they had signed the petition.  And this resident was

9 a little bit upset and shaken that he went and signed the

10 petition.  I don't know if he's still a county employee or an

11 ex-county employee, but he was just shaken that they signed the

12 petition and now they were being called by the attorney's office

13 to verify they had indeed signed that petition.

14         MS. DIAZ:  Your Honor, just to bring to your

15 attention, the document that I have on my phone that I

16 previously discussed with you on the bench --

17         THE COURT:  You need it now?

18         MS. DIAZ:  -- has that proof.

19         THE COURT:  You need -- you need it right now?  Right

20 now --

21         MS. DIAZ:  I need it for you to see it.

22         THE COURT:  Okay.  So, let's take -- marshals, let the

23 CSOs know that since she's acting as her own counsel she's

24 allowed to bring her phone in.

25           Let's take a five-minute recess for you to go get

```
 1   your phone and bring it back.

 2               Mr. Morales, stay where you are.  Don't speak to

 3   anyone yet.  You're still under oath.

 4          MS. DIAZ:  Your Honor, will they be notified that I

 5   can get my phone?

 6          THE COURT:  Yes.

 7          MS. DIAZ:  Thank you, ma'am.

 8          THE COURT:  The marshals have let the CSOs know.

 9          MS. DIAZ:  I'll be back.  Excuse me.

10            Am I excused?

11          THE COURT:  You may.

12          MS. DIAZ:  Thank you.

13     (BRIEF PAUSE)

14          THE COURT:  Mr. Stern, I'm going to step down so that

15   you can speak to your clients.

16               Everybody can stay in place.  This is just a real

17   short recess, but I'll step down so --

18          MR. STERN:  No problem.

19          THE COURT:  -- you can speak to your -- your clients.

20          COURT SECURITY OFFICER:  All rise.

21     (11:36:45 A.M., OFF THE RECORD)

22     (11:46:15 A.M., ON THE RECORD.  ALL PARTIES ARE PRESENT.)

23          THE COURT:  All right.  Everybody is -- is back, for

24   the record, in DR-23-CV-60, including the witness.

25               Ms. Diaz, you may proceed with the witness.
```

```
 1                    CONTINUED CROSS-EXAMINATION
 2   BY MS. DIAZ
 3   Q    Mr. Morales, are you familiar with a Mr. Beattie?  Do you
 4   know --
 5   A    Yes, I know him.
 6   Q    Do you -- how do you know him?
 7   A    He is the gentleman that approached me at the grocery
 8   store, at Walmart, that was questioning me about why he was
 9   getting the calls from Mr. Iracheta's office.
10   Q    And -- and is he related to you?
11   A    No.
12   Q    How are you familiar with him?
13   A    That was the second time I had met him.  I had met him once
14   at HEB, where he advised me that what we were doing was great,
15   by raising signatures.  Then a month later, that's when I ran
16   into him and his wife at Walmart.
17   Q    Is he a county employee by chance?
18   A    I know that -- I don't know if he's currently employed or
19   he was employed at that time.
20   Q    Okay.  What else did he inform you?  Can you be a little
21   more detailed in the conversation that took place.
22   A    Yes, that he had gotten a call from one of his daughters,
23   stating that Iracheta's office contacted his daughter, wanting
24   to know if her parents had signed the petition; wanting to check
25   for fraud.
```

1  Q    And was he comfortable with that?  Was he concerned, or how

2  did you --

3  A    No, he was not comfortable with that.  And I advised him

4  that I had no control of what Mr. Iracheta's firm would do.

5            MS. DIAZ:  Your Honor, if I may approach the bench --

6            THE COURT:  You may.

7            MS. DIAZ:  -- I would like to now show you what is on

8  my phone.

9            THE COURT:  Okay.  Well, let me have you and Mr. Stern

10  come up and see what it is y'all are talking about.

11            Come -- approach.

12            MS. DIAZ:  Oh, I'm sorry, I didn't see you over here.

13            THE COURT:  Come up -- come this way (INDICATING).

14       (11:48:25 TO 11:49:46 A.M., BENCH CONFERENCE)

15            THE COURT:  Okay, this will be Exhibit One.

16            MS. DIAZ:  Your Honor, may I approach the witness?

17            THE COURT:  You may.

18            MS. DIAZ:  Thank you.

19            THE COURT:  Okay, identify what you're showing the

20  witness.

21            MS. DIAZ:  The evidence -- excuse me.

22            The evidence that I am presenting is a -- one of the

23  pages from the petition presented.

24            THE COURT:  Okay, so this is Exhibit One that I just

25  admitted as evidence.

1          MS. DIAZ:  And it has been accepted as evidence.

2          THE COURT:  Okay.  So that's what you're showing the

3  witness?

4          MS. DIAZ:  Yes.

5          THE COURT:  Okay.

6          MS. DIAZ:  It will be provided to the Court.

7          THE COURT:  Okay.  Go ahead and ask the question, your

8  question.

9  Q    (By MS. DIAZ) Is that information on that document before

10  you on my phone, does that depict properly and correctly the

11  same information you got from Mr. Beattie?

12  A    This is the second time that I see this.  Mr. Beattie did

13  not provide me any picture nor anything.  He verbally told me

14  what was going on.  But he never showed me, This is what's going

15  on.  He was just explaining to me how Iracheta's law firm called

16  his daughters to ask them if they had signed the petition.

17  Q    So you've never seen this document?

18  A    I've never seen that document.

19          THE COURT:  But it has been admitted already as

20  Exhibit One.

21          MS. DIAZ:  Yes, ma'am.

22          THE COURT:  Okay.  You're being called.

23           Ms. Diaz, you're being called.

24          MS. DIAZ:  I'm sorry?

25          THE COURT:  You're being called.  Turn around.  Look

```
 1   behind you.

 2              MS. DIAZ:  Oh, I'm sorry.

 3                 I have no further questions for the witness, Your

 4   Honor.

 5              THE COURT:  Okay.  Mr. Stern, cross-examination.

 6                 You may have a seat at counsel table so Mr. Stern

 7   can question the witness.

 8                 Go ahead and have -- have a seat at the plaintiff's

 9   table.

10              MS. DIAZ:  I'm sorry, I couldn't hear you.

11              THE COURT:  I said go ahead and have a seat at the

12   plaintiff's table so Mr. Stern can ask questions from the

13   podium.

14              MS. DIAZ:  I needed to call in another witness.  Will

15   that come later?

16              THE COURT:  I -- wait.  Let Mr. -- let Mr. Stern ask

17   questions first.

18              MS. DIAZ:  Thank you very much.

19              THE COURT:  Uh-huh.

20                Mr. Stern?

21                        CROSS-EXAMINATION

22   BY MR. STERN

23   Q    Now, Commissioner, you're aware --

24              MS. DIAZ:  Excuse me.

25              MR. STERN:  I'm sorry, ma'am.
```

1   Q    (By MR. STERN) Sir, your claim is that there was no fraud

2   involved in the taking of the signatures as far as this petition

3   is concerned, correct?

4   A    I never said that.

5   Q    Okay.  Well, how many times can a person sign a petition,

6   the same petition?

7   A    The same petition?

8   Q    Yes, sir.

9   A    One, twice, three times.

10  Q    Okay.  Can you vote three times?

11  A    No.

12  Q    Okay.  So how many times can you sign the same petition?

13  A    Well, like I said, one, two, three.  That's why it's

14  verified.  You throw them out when you verify them.

15  Q    Okay.

16        THE COURT:  Do you throw out all three signatures or

17  the duplicates, the duplicates only?

18        THE WITNESS:  (NO AUDIBLE RESPONSE)

19        THE COURT:  You don't know.

20        THE WITNESS:  I don't know.

21        THE COURT:  Okay.  All right.

22  Q    (By MR. STERN) Now, you're familiar with the petition,

23  correct?

24  A    Yes, I'm familiar.

25  Q    And you were in court when it was presented, right?

```
 1   A    Yeah, but that wasn't presented to me.  It was only
 2   presented to the judge.
 3   Q    Okay.  And you note what was presented to the judge
 4   contained these documents, just like it contained the document
 5   you were just shown?
 6   A    Yes.
 7   Q    Okay.  Now, let's go to this page.  And on October 9th of
 8   2023, you see the signature of Enriqueta Diaz, correct?
 9   A    Correct.
10   Q    Okay.
11            THE COURT:  Enriqueta who, Mr. Stern?
12            MR. STERN:  I'm sorry?
13            THE COURT:  What -- what's the name?  Enriqueta what?
14            MR. STERN:  Ms. Diaz.
15            THE COURT:  Okay.  Ms. Diaz?
16            MR. STERN:  Yes.
17            THE COURT:  Okay.
18   Q    (By MR. STERN) Now I'm going to show you another signature
19   on a different page.  Do you see Ms. Diaz's signature on it?
20   A    Yes.
21   Q    Can you see her printed name over there?
22   A    Uh-huh.
23   Q    And you don't see that these two -- two -- were these two
24   names thrown out?
25   A    I didn't verify it.
```

1  Q    Okay.

2  A    I didn't verify it, but the report said "duplicate," so I

3  would imagine --

4  Q    How many times --

5  A    -- duplicates get thrown out.

6  Q    How many times did you sign the petition?

7  A    I would say once.

8  Q    Okay.  Is that what everybody else did as well --

9  A    I don't know --

10  Q    -- when you were collecting petitions?

11  A    You're asking me if everybody signed once?

12  Q    Yes.

13  A    I would imagine.

14  Q    Okay.  Now, you had a -- people call it a "gathering" or a

15  "rally" in your precinct, correct, to collect petitions?  Is

16  that true?

17  A    No.

18  Q    Okay.  Did you have it on any -- any property you own?

19  A    No.

20  Q    Okay.  Now, what's your relationship with the county judge?

21  A    I'm a Commissioner.

22  Q    I understand, but y'all are on different sides of the

23  political bench, right?

24  A    If you want to say that.

25  Q    Okay.  Did you ever file a -- did you ever have any

1    requests for voter signatures to have him removed?

2    A    Have I?

3    Q    Yes, sir.

4    A    No.

5    Q    Okay.  Anybody on your behalf?

6    A    No.

7    Q    Okay.  Is it your testimony that Enriqueta Diaz's

8    signatures two times on the same petition is legal?

9              THE COURT:  Is what, Mr. Stern?

10             MR. STERN:  Legal.

11             THE WITNESS:  You just --

12             THE COURT:  He's not a lawyer.  He doesn't determine

13   legality, Mr. -- Mr. Stern, I do.

14             MR. STERN:  Oh, I understand that.

15             THE COURT:  So how are you asking him his legal

16   opinion?

17             MR. STERN:  That'd be fine.

18             THE COURT:  Okay.

19             MR. STERN:  Okay.

20   Q    (By MR. STERN) Is it proper?

21             THE COURT:  You're asking it with a different word,

22   Mr. Stern.

23             MR. STERN:  Okay.

24   Q    (By MR. STERN) Is it customary?

25   A    Yes.

```
1   Q    Okay.

2           THE COURT:  It's customary to have multiple

3   signatures; is that --

4           MR. STERN:  Right.

5           THE COURT:  Okay.  I've got it --

6           MR. STERN:  It's customary to have --

7           THE COURT:  I've got it.  Okay.  Go ahead.

8           MR. STERN:  Okay.

9       (BRIEF PAUSE)

10  Q   (By MR. STERN) Have you signed a petition for the removal

11  of the present county judge?

12          THE COURT:  Asked and answered, Mr. Stern.

13          MR. STERN:  I'm sorry, I didn't remember.

14          THE COURT:  That's been asked and answered.

15          MR. STERN:  If you could remind me.

16          THE COURT:  That you asked him if he filed a request

17  for signatures to have the county judge removed, and then asked

18  if he had signed it and he said no to both.

19          MR. STERN:  Okay.  Not a problem.

20  Q   (By MR. STERN) And that is your testimony, correct?

21  A   Yes.

22  Q   Okay.

23          THE COURT:  Is that it, Mr. Stern?

24          MR. STERN:  I'm sorry, ma'am?

25          THE COURT:  Is -- is that it or do you have more
```

```
 1   questions?
 2          MR. STERN:  I may have one more or two more
 3   questions --
 4          THE COURT:  Okay.  Go ahead.
 5          MR. STERN:  -- and that's it.
 6          THE COURT:  Okay.  Go ahead.
 7      (BRIEF PAUSE)
 8   Q    (By MR. STERN) Were voters' signatures collected at the
 9   lake?
10   A    Yes, they were.
11   Q    Okay.  And the lake's in the county?
12   A    Correct.
13   Q    And that's under your care and control, correct?
14   A    Not at the time, but at the time the petition was here, it
15   was.
16   Q    Okay.  Which petition are we talking about?
17   A    The petition to take the 7.2 million-dollar loan to the
18   voters; the valid petition that was presented to the court.
19   Q    And what about the petition for the judge's removal?
20   A    I'm -- I'm not involved in -- you keep mentioning that and
21   I'm not involved in that petition.
22   Q    Okay.  And I'll accept that.
23          THE COURT:  Which removal petition are we talking
24   about, Mr. Stern?  This is not something that I had heard
25   before.
```

1    Q    (By MR. STERN) Is -- is there a petition for the judge's

2    removal circulating?

3    A    I know there's a petition being circulated, collecting

4    signatures for Judge Cantu's removal.  And like I stated, I'm

5    not involved in that.

6                   MR. STERN:  That's all I have.

7                   THE COURT:  Okay.  I have questions.

8                   Commissioner Morales -- and I'll give the parties an

9    opportunity to ask more questions after I ask questions.

10                   Tell me what the role -- because you were talking on

11   both direct and cross-examination about verification of

12   signatures.  Whose role is it to do the verification?

13                   THE WITNESS:  The election administrator.

14                   THE COURT:  Is that Ms. --

15                   THE WITNESS:  Isamari Villarreal.

16                   THE COURT:  Okay.  And do you know what the duties are

17   of the election administrator?

18                   THE WITNESS:  I do know that they're in charge of

19   running the elections, and I do know that when a petition is

20   being submitted that they're in charge of verifying the

21   signatures, they're in charge of finding duplicates, finding

22   not-registered voters, finding deceased, and anything that is --

23   does not make the signature valid -- or the petition valid.

24                   THE COURT:  Okay.  And so is it -- to use Mr. Stern's

25   word, is it customary for anybody other than the election

1  administrator or anybody working for her to make phone calls to

2  verify signatures on petitions?

3          THE WITNESS:  In my 11 years I have never heard that.

4  And we had already gone through a petition that was submitted by

5  Judge Cantu the prior year, and it had the valid signatures and

6  we accepted it.  The Court ruled to accept the petition and take

7  it to the voters.

8          THE COURT:  Ms. Diaz, any follow-up questions of the

9  witness?

10          Do you have any follow-up questions of the witness?

11          MS. DIAZ:  Are you talking to me?

12          THE COURT:  Yes.

13          MS. DIAZ:  Excuse me.

14                    REDIRECT EXAMINATION

15  BY MS. DIAZ

16  Q    Mr. Morales, who is Jaime Iracheta?

17  A    Jaime Iracheta is our elected county attorney, and he's

18  also hired as our legal counsel.

19  Q    Okay.  So at the present time he's holding both positions?

20  A    Correct.

21  Q    Thank you.

22          MS. DIAZ:  I would like to excuse the witness at this

23  time and I would like to call Mr. Iracheta, if I may, Your

24  Honor.

25          THE COURT:  Okay, hold on.  Let me let Mr. Stern -- if

1  he has any recross after my questions and your questions.

2              Mr. Stern?

3          MR. STERN:  I do, Judge.

4          THE COURT:  Hold on, Ms. Diaz, he -- he gets recross.

5                    RECROSS-EXAMINATION

6  BY MR. STERN

7  Q    What laws prohibit a judge, a county judge, from inquiring

8  into the validity of a signature on a petition?

9  A    I -- I don't know that.  Why would I know that?

10 Q    Okay.  So what was improper about a judge inquiring

11 about --

12         THE COURT:  Isn't that my role, Mr. Stern, to

13 determine whether it was proper or improper?  Isn't that what

14 we're doing here today?

15         MR. STERN:  Well, he's an elected official and --

16         THE COURT:  I get it, but I'm assuming he would think

17 it's improper, that's why he's a witness for the plaintiff,

18 right?

19         MR. STERN:  That could be.

20         THE COURT:  So my question is, though, isn't it my

21 role to determine whether they were accepted or rejected under a

22 valid due process process, so to speak?

23         MR. STERN:  Well, the difficulty is that the --

24         THE COURT:  Couldn't you just argue the law?  I mean,

25 the law is the law.

1          MR. STERN:  But the petition passed.  I mean, in other

2     words, it's never -- that's misstated.  The signatures were

3     sufficient --

4          THE COURT:  Okay, but they --

5          MR. STERN:  -- to get the five percent.

6          THE COURT:  -- but if the -- okay, if the signatures

7     were sufficient, why were they not accepted?

8          MR. STERN:  No, the five -- five percent were

9     accepted.  Not all of the signatures were accepted.

10          THE COURT:  I -- I understand.  So there was

11     sufficient signatures for it to be, then -- an election to be

12     called?

13          MR. STERN:  If in fact the heading at the top of their

14     voters' petition had been correct.

15          THE COURT:  I'm sorry, say that again.

16          MR. STERN:  If in fact they had simply said, We want

17     to have an election based upon five percent.  Then the question

18     would be whether or not there was an exception.

19              And if I could just go ahead and introduce

20     Defendant's One and Two through this witness, and then ask him

21     about it, and then the Court will know.

22          THE COURT:  Okay.  Go ahead.  Go ahead.  But in terms

23     of the law, you can just argue the law, Mr. Stern.  You don't

24     have to ask the witness what the law is.

25          MR. STERN:  Okay.

1          MS. DIAZ:  Is this a copy?

2          MR. STERN:  Of course it's a copy.

3          THE COURT:  Okay, y'all can't whisper to each other.

4  You've got to -- you're on the record now, you need to speak

5  loudly for the record.

6          MR. STERN:  Do you have any objections?

7          MS. DIAZ:  No.  No objection.

8          MR. STERN:  Okay.

9          THE COURT:  Okay.

10          MR. STERN:  It's dated -- excuse me.

11          The defendants introduce Defendants' Exhibits One

12  and Two.

13          THE COURT:  Okay.

14          MR. STERN:  Now, can I approach the witness?

15          THE COURT:  You may.

16  Q    (By MR. STERN) Have you ever seen -- not these particular

17  documents, but the petition documents, any of them?

18  A    Yes, I have.

19  Q    Read for the Court what's on top of the document before the

20  people signed.

21  A    The top of the document?

22  Q    Yes, sir.  Please.

23  A    Whereas the undersigned qualified voters believe debt

24  issued without explicit voter approval, in the form of

25  certificates of obligation, shall be reserved for funding

1    unforeseen emergencies; therefore, the undersigned qualified

2    voters of the County of Maverick, Texas, being at least five

3    percent of the qualified voters of the issuer, protest the

4    issuance of $7.2 million certificates of obligation as proposed

5    by Maverick County in the resolution authorizing publication of

6    Notice of Intention to issue certificates of obligation adopted

7    on August 16, 2023, Special Meeting and request that an

8    elected -- election on such issuance be ordered, held, and

9    conducted in the manner provided for bond elections under

10   Chapter 1251, Texas Government Code.

11   Q     Are you here as a witness?

12         THE COURT:  Mr. Stern, I need you at the microphone.

13         MR. STERN:  Apologize, Judge.

14   Q    (By MR. STERN) Are you here as a witness opposing the

15   petition that's in your hand?

16         THE COURT:  How -- how is that relevant,

17   Mr. -- Mr. Stern?

18         MR. STERN:  Well, because what he just read says we're

19   entitled -- We don't think you can issue bonds for certificates

20   of obligation unless you have an emergency.

21         THE COURT:  Uh-huh.

22         MS. DIAZ:  Exactly.

23         MR. STERN:  Okay?

24         MS. DIAZ:  Exactly.

25   Q    (By MR. STERN) Now, my question for you is:  Are you aware

1    of any emergencies that have been declared by the State of Texas

2    in Quemado?

3            THE COURT:  An emergency in Quemado, Mr. Stern --

4            MR. STERN:  Yes.

5            THE COURT:  -- for what?

6            MR. STERN:  For water, which is what the bond is for.

7            THE COURT:  Are you kidding me?  That town has existed

8    since the 1930s without water down there.  What emergency

9    started a week ago?

10            MR. STERN:  The one that the State of Texas Water

11    Board declared.

12            THE COURT:  The Water Board of Texas?  When have they

13    notified and published such an emergency?

14            MR. STERN:  As -- as Commission --

15            THE COURT:  When -- when have they published that?

16    Quemado has existed for many years, and they've never had such

17    an emergency before.  How did it just happen?

18            MR. STERN:  Well, it happened as a result of one of my

19    clients, a Commissioner --

20            THE COURT:  Uh-huh.

21            MR. STERN:  -- is requesting a grant for --

22            THE COURT:  I get it.  But -- so -- so the emergency

23    was declared so the county could get the grant; not because

24    there's a real emergency is from -- what I'm getting from what

25    you're saying, Mr. Stern.

1        MR. STERN:  That's the exact opposite of what I'm

2   saying.

3        THE COURT:  Well, what --

4        MR. STERN:  What I'm saying is the State of

5   Texas Water Development Board --

6        THE COURT:  Uh-huh.

7        MR. STERN:  -- found that there --

8        THE COURT:  When?

9        MR. STERN:  On June 26th of 2023.

10       THE COURT:  Okay.  So when was Quemado -- when did it

11   start to exist?

12       MR. STERN:  Couldn't tell you that, Judge.

13       THE COURT:  Wasn't it 1932?

14       MR. STERN:  Fine.

15       THE COURT:  Okay.  And -- and just in June they

16   figured out there was an emergency of water in Quemado when all

17   of this was going on?

18       MR. STERN:  Apparently so.

19       THE COURT:  Well, it sounds very suspicious to this

20   Court.

21       MR. STERN:  Why is it suspicious?

22       THE COURT:  Because, Mr. Stern, it's pretty obvious

23   what's going on.

24       MR. STERN:  Tell me, Judge, because apparently I'm

25   not --

1          THE COURT:  Well, it was declared an emergency so they

2    could get this going because the people of Eagle Pass were

3    wanting to have an election.  Doesn't that seem pretty obvious

4    to everybody, because it is to me?

5          MR. STERN:  Well, no, Judge.  As a matter of fact --

6          THE COURT:  Mr. Stern, you might sell a lot of stories

7    to this Court, but a water emergency in Quemado as of June of

8    this year is not it.

9          MR. STERN:  Okay.  Well -- okay.

10   Q    (By MR. STERN) Then, is there a health hazard in Quemado?

11         THE COURT:  For what reason?

12         MR. STERN:  Based upon sewage --

13         THE COURT:  Mr. Stern, the same response from the

14   Court.  It's existed since 1932 without sewage.  Why is there

15   just an emergency as of June of this year, apparently?

16         MR. STERN:  Because the only way you can get the

17   grant --

18         THE COURT:  That's the point.

19         MR. STERN:  -- is if there's an emergency.

20         THE COURT:  Okay, so you've answered my question.

21   This is not a real emergency; it's a made-up emergency to get

22   the grant.  That's what it sounds like to the Court.

23            You just admitted this was done on purpose to get

24   the grant money --

25         MR. STERN:  No.

1              THE COURT:  -- not because it really existed.

2              MR. STERN:  Well, how -- how could --

3              THE COURT:  Mr. Stern, Quemado has existed almost a

4    hundred years or more and it's never been an emergency before.

5    How is it that it all of a sudden became an emergency?  Because

6    you wanted the grant money.  So that came after the want for the

7    money.

8              MR. STERN:  But --

9              THE COURT:  Why is that so difficult to see?

10             MR. STERN:  All I know is there's a finding by a state

11   agency --

12             THE COURT:  I get it, Mr. Stern, but the question is

13   whether it's a valid finding now.

14             MR. STERN:  Okay.

15             THE COURT:  Because the facts of the existence of

16   Quemado sort of belie that.  And what notification was given to

17   the people of Quemado of this declaration of emergency that they

18   may have been living under some kind of horrible condition?

19             MR. STERN:  Well, I -- one of my witnesses can testify

20   to that.

21             THE COURT:  Okay.

22             MR. STERN:  But --

23             THE COURT:  They will.  They'll be allowed to do that.

24             MR. STERN:  Okay.  And --

25             THE COURT:  But that's the problem here, and the lack

1   of due process.  That's what I was telling you here at the

2   bench.  There's some due process issues here.  There's a lot

3   going on from what I am seeing and hearing to try to get this

4   through without giving people the opportunity to voice their

5   concerns and petition their governing body of their grievances.

6   So you've got First Amendment, Fifth Amendment and 14th

7   Amendment issues here as well.

8           MR. STERN:  But there's also a state statute that

9   says --

10          THE COURT:  I get it, but they don't super --

11          MR. STERN:  -- if there's an emergency --

12          THE COURT:  -- but they don't supersede the First

13  Amendment, the Fifth Amendment, or the 14th Amendment.  The U.S.

14  Constitution supersedes all that.

15           So the question becomes, though:  Is this a -- is

16  this an emergency by convenience or a real emergency?

17          MR. STERN:  Well, I guess only the State of Texas can

18  tell us.

19          THE COURT:  Well, no, I can tell you that.  Because if

20  it's not a real emergency, and it violates the First, Fifth, and

21  14th Amendments of due process in petitioning your government,

22  then that's going to be in this Court's jurisdiction, by

23  supplemental jurisdiction, isn't it?

24          MR. STERN:  Correct.  But they have had the --

25          THE COURT:  Okay.  So, it's not just the State of

1    Texas.

2          MR. STERN:  Uh-huh.  But the plaintiff has had the

3    right to petition the court --

4          THE COURT:  I understand, but she -- but -- and they

5    petitioned.  And I'm waiting to hear more of what happened.  All

6    I'm hearing right now is they had sufficient signatures to put

7    this matter to a vote and they were denied that.  And -- and --

8          MR. STERN:  Close.  We -- we agree on 90 percent of

9    that.

10          THE COURT:  Okay.

11          MR. STERN:  All I'm saying is that the heading on --

12          THE COURT:  The heading doesn't require -- doesn't say

13    whether or not that requires the county to have an election,

14    Mr. Stern.

15          MR. STERN:  No, but the question is:  What --

16          THE COURT:  What -- what --

17          MR. STERN:  -- did the voters think they were signing?

18          THE COURT:  It doesn't matter.  You want me to

19    speculate as to what the voters thought they were signing?

20          MR. STERN:  Well, if we're not going speculate, but we

21    know --

22          THE COURT:  Well, but the question is this, Mr. Stern.

23    Once you have people raising a concern about that obligation --

24          MR. STERN:  Correct.

25          THE COURT:  -- right, isn't it required to go to the

```
 1  voters, regardless of what the heading says?
 2          MR. STERN:  No.
 3          THE COURT:  What -- what requires --
 4          MR. STERN:  It requires --
 5          THE COURT:  -- that the heading say something
 6  specifically?
 7          MR. STERN:  It's required --
 8          THE COURT:  By what?
 9          MR. STERN:  -- to put it to the voters if they have
10  five percent and there's not --
11          THE COURT:  They apparently had it --
12          MR. STERN:  -- an emergency.
13          THE COURT:  -- but they apparently had it, Mr. Stern.
14          MR. STERN:  No, we agree on that, Judge.
15          THE COURT:  Okay.  So wait just a second.  There was
16  an emergency declared in June, the petition was raised, they had
17  enough qualified signatures, and it was only after that that the
18  emergency was declared by Commissioners Court.
19          MR. STERN:  No, the Commissioners Court --
20          THE COURT:  When did they declare the emergency?
21          MR. STERN:  That would have been at the last meeting.
22  I -- or --
23          THE COURT:  Which is when?
24          MR. STERN:  -- end of November.  But in terms of when
25  the vote --
```

```
 1              THE COURT:  When, Mr. Stern?

 2              MR. STERN:  Excuse me one second.

 3              THE COURT:  Sure.

 4       (BRIEF PAUSE)

 5              MR. STERN:  October 27th, Judge.

 6              THE COURT:  Okay.  That's when the county declared an

 7   emergency?

 8              MR. STERN:  No, that's when -- well, that's when the

 9   Commissioners Court found it was an emergency.

10              THE COURT:  That's what I mean, the county.  I'm

11   sorry.  I -- I say "the county," I mean "Commissioners Court."

12              MR. STERN:  Right.

13              THE COURT:  Is that when they declared the emergency

14   in Quemado?

15              MR. STERN:  Well, that's when they declared that there

16   had been an emergency found by the Texas --

17              THE COURT:  And they --

18              MR. STERN:  -- Water Development Board.

19              THE COURT:  Okay.  And so let me ask a question.  That

20   emergency existed for how long in Quemado?

21              MR. STERN:  I don't live in Quemado, so I can't tell

22   you --

23              THE COURT:  Okay, so how long -- it's an emergency,

24   how long did it exist?

25                  I've got to tell you folks, that does not sound --
```

1  that sounds very suspect.  If it's based on conditions that have

2  existed since the 1920s or '30s and they just got recognized as

3  an emergency, and they got recognized so that this money and

4  these obligations could be approved even after they found out

5  that the citizens wanted an election, it's very suspect.

6        MR. STERN:  Yes.  It would be especially suspect if we

7  had drafted the petition.

8        THE COURT:  The problem is this, Mr. Stern.  There's

9  nothing in the law that requires specific language for the

10  petition to trigger an election, is there?

11        MR. STERN:  That we agree on.  Okay.

12        THE COURT:  Okay.  So if there's no law that requires

13  a specific wording to trigger the election, why are you arguing

14  it?

15        MR. STERN:  Because of the specific wording that they

16  put into it --

17        THE COURT:  I understand, but what --

18        MR. STERN:  -- people signed --

19        THE COURT:  -- but what in the law requires that the

20  petition have a specific wording to trigger the requirement of

21  an election?

22        MR. STERN:  There is no specific --

23        THE COURT:  Okay, so why --

24        MR. STERN:  -- wording requirement.

25        THE COURT:  -- why are you arguing that the language

 1  of it requires it before you can call an election?

 2          MR. STERN:  Because otherwise what they signed makes

 3  no sense.

 4          THE COURT:  I -- not based on what you read to me,

 5  Mr. Stern.  It was clear the people were wanting to be able to

 6  have a voice in the debt obligation based on what you read; that

 7  they were protesting and objecting to it as well, and that an

 8  election should be held.  Essentially.  Not verbatim.

 9          MR. STERN:  Right.

10          THE COURT:  So what's wrong with that language?

11          MR. STERN:  Because they put in their petition --

12          THE COURT:  Mr. Stern --

13          MR. STERN:  -- save an "except" --

14          THE COURT:  -- if that's your argument, it fails.  If

15  it's the wording of the petition, it fails.  Because if there is

16  no statute that requires specific wording for the people to say,

17  "We want an election," once they've reached the signatures, then

18  I'm not sure why y'all are arguing that.  And you're relying on

19  an emergency condition that apparently has existed since Quemado

20  started in the 1920s or '30s but just got recognized for

21  purposes of this debt obligation.

22          MR. STERN:  And perhaps because it's become worse.

23          THE COURT:  Really?  Is there going to be testimony as

24  to that?  Because y'all -- at this point, you could potentially

25  have the Court recused because I could probably testify in those

1    issues, Mr. Stern.

2            MR. STERN:  Uh-huh.

3            THE COURT:  So y'all are fighting an uphill battle on

4    that one, too.

5                So is anybody from the Texas Water Development Board

6    going to come testify as to this so-called emergency?

7            MR. STERN:  No.  We have bond counsel here.

8            THE COURT:  Well, can they testify as to this

9    so-called emergency?

10           MR. STERN:  They can testify whether proper procedures

11   were followed --

12           THE COURT:  Okay.  Well, I may want to hear --

13           MR. STERN:  -- in order to --

14           THE COURT:  -- from the Texas Water Development Board,

15   Mr. Stern, to see why they found an emergency.

16               This is all very suspicious, folks.  I don't

17   understand why the voice of the people, if they've got the --

18   the requisite number of signatures, is being silenced at every

19   avenue.  From what I'm hearing, your latest being the wording of

20   the petition.  I'm not -- I'm not understanding.

21               Let me ask you this, Mr. Stern -- let's finish with

22   this witness because I may have some questions.  And that may --

23   that may help the parties decide what other witnesses may be

24   needed.  How about that?

25           MR. STERN:  Fair enough.

```
1                THE COURT:  Let me have you finish with Mr. Morales.

2                MR. STERN:  Sure.

3                THE COURT:  Are you finished right now with your

4    questions, Mr. Stern?

5                MR. STERN:  Yes, ma'am.  I pass the witness.

6                THE COURT:  Okay.  Any -- any re-redirect, Ms. Diaz,

7    of Mr. Morales?

8                MS. DIAZ:  Your Honor, if I may ask -- if I may get a

9    copy of that document.

10               THE COURT:  Yeah, you will get a copy.

11               MS. DIAZ:  Because I wanted to read something on it.

12               THE COURT:  Oh, Mr. Stern, do you have Exhibits One

13   and Two?

14               MR. STERN:  I'm sorry.  I apologize.

15               THE COURT:  Oh, they're over here -- are they on the

16   stand?

17               MR. STERN:  Yes, ma'am.

18               THE COURT:  They're over here, Ms. Diaz.

19               MS. DIAZ:  Your Honor, the -- I'm going to excuse the

20   witness for now.

21               THE COURT:  You're done?

22               MS. DIAZ:  Yes.  Thank you.

23               THE COURT:  All right.  You may step down.

24                Okay.  Mr. Stern and Ms. Diaz, let me have y'all

25   come up very quickly.  I need to ask y'all some questions.
```

1         (12:18:58 TO 12:36:42 P.M., BENCH CONFERENCE)

2              MR. STERN:  Judge, may I take them outside for this

3    discussion?

4              THE COURT:  Sure.  Absolutely.

5         (PAUSE)

6              THE COURT:  Okay, Mr. Stern, I was just asking about

7    the lunch hour.  I wasn't asking you to discuss the case or

8    what -- anything else.

9              MR. STERN:  I'm sorry about that.  I apologize.

10             THE COURT:  Uh-huh.

11             MR. STERN:  If we could approach, Judge.

12             THE COURT:  Sure.

13             MR. STERN:  Come on, ma'am.

14               Ms. Diaz?

15        (12:44:15 TO 12:46:52 P.M., BENCH CONFERENCE)

16               Mr. Stern, I let Ms. Diaz go to the ladies' room.

17   That's why -- so -- just so you know.

18        (CONTINUED PAUSE)

19             THE COURT:  For the record, Ms. Diaz is back.

20        (CONTINUED PAUSE)

21             THE COURT:  Do you have a number, Mr. Stern?  We can

22   look it up, too.

23             MR. STERN:  That's what I'm trying to get to you.

24             THE COURT:  Okay.  Well, we can look it up, too.

25               Come on up.

```
 1        (12:49:34 TO 1:14:49 P.M., BENCH CONFERENCE)

 2              THE COURT:  Who's your next witness, Ms. Diaz?

 3              MS. DIAZ:  I call on Mr. Jaime Iracheta.

 4

 5                        JAIMI IRACHETA,

 6   having first been duly sworn, testified to the following:

 7

 8              THE COURT:  Okay, let me just also tell you, we've got

 9   bad acoustics in this courtroom, so ahead and speak into the

10   microphone.

11              MR. GURROLA:  Yes, ma'am.  Yes, Your Honor.

12              THE COURT:  Proceed.

13                        DIRECT EXAMINATION

14   BY MS. DIAZ

15   Q    Mr. Iracheta, good afternoon.

16   A    Good afternoon, ma'am.

17   Q    Mr. Iracheta, I'm going to show you what I showed

18   Mr. Morales earlier.

19              May I approach the witness, Your Honor?

20              THE COURT:  You may.  That's Plaintiff's Exhibit One

21   for the record.

22   Q    (By MS. DIAZ) Could you tell the Court if this is a

23   document that you provided with this note on the bottom.  And

24   you're welcome to read it.  Could you read that to the Court.

25   A    Which part?
```

Q      (INDICATING)

A      So I am seeing a photograph here of what appears to be a
copy of a signature of petitions, a -- a page from the petition,
with a message that indicates, Can you verify if that are your
parents' signatures.  We've had a lot of fraud with some of the
documents that are being submitted, so I'm reaching out to
people that I know to verify that it was actually them that
signed.  Some confirm it's them, and others said it wasn't, so
I'm just checking what I can.

Q      Now, can you tell the Court if you sent this.

A      Yes, I did.

Q      And could you tell the Court who this was addressed to.

A      That was sent to a friend of mine, Jenny -- her maiden name
is Beattie.  I was asking because I recognized her parents'
signatures on the document, so I reached out to her to see if
she can verify if that was in fact her parents' signatures.

Q      Now, is Mr. Beattie working for Maverick County?

A      No, he is not.

Q      He's not employed by the county in any way, shape, or form?

A      No.  He has a contract with the county, but is not a county
employee.

Q      What does Mr. Beattie do for the county that he gets a
contract?

A      He works at the Maverick County Airport, and I believe he
sells jet fuel, to my understanding.

1   Q      Thank you.

2          MS. DIAZ:  Let the record reflect that he has

3   identified that this document was provided by him in contacting

4   voters -- registered voters on the petition itself.

5          THE COURT:  Okay, well, the Court has his testimony.

6   Q   (By MS. DIAZ) Mr. Iracheta, it is very apparent by your

7   admission to this that you are involved in an investigation of

8   alleged -- allegations of fraud.

9   A      That is correct.

10  Q      Is that correct?

11  A      That is correct.

12  Q      Okay.  Could I ask you when you got involved in this

13  investigation?  When was fraud brought to your attention as

14  prosecutor, county attorney?

15  A      I don't remember the exact date, but it was after the date

16  that the petition was turned in.

17  Q      And you don't recall when?

18  A      I -- I do not know the exact date, no, ma'am.

19  Q      Okay.  Could you tell this Court what reasons were brought

20  to your attention that it needed an investigation of fraud?

21  What discrepancies, if any, that appeared to you and to whoever

22  that there was fraud?

23  A      It was brought to my attention by the election

24  administrator, and as well as the county judge, that there may

25  have been some forgeries on the petition.  There was multiple

1    instances of signatures that appeared to be signed by the same

2    person and not by the individual.  It was presented to my office

3    to look into further on the criminal aspect.

4    Q    Mr. Iracheta, when there is a petition raised in any

5    community -- and I know you're only familiar with Maverick at

6    this point -- are you aware that people all over the place that

7    are interested in signing petitions take forms and get people to

8    sign the petitions?

9    A    I am aware that that is the practice.

10   Q    Not only one person.

11   A    I am aware that that is the practice, yes.

12   Q    Even though there may be one person leading the pack or the

13   petition drive, this petition was signed and assisted -- or, I

14   should say, being requested by different people throughout the

15   community; do you know that?

16   A    I'm aware that happens, yes.

17   Q    You are aware.

18            Have you -- are you a writing expert?

19   A    I am not.

20   Q    So, what, if anything, are you using to identify fraud?

21   A    There were members of my own family that were on the

22   petition, and I contacted those members of my family and they

23   themselves told me that that was not their signature.

24   Q    Are they employed by the county by any chance?

25   A    They are not.

1   Q     They are not.

2   A     They're not.

3   Q     Do they -- did they tell you who asked them to sign?

4   A     Yes.

5   Q     They did identify.  Did they tell you me?

6   A     Yes.

7   Q     They told you that I did?

8   A     People that worked directly with you.

9   Q     Could you give the names?

10  A     I don't have the name with me.

11  Q     You got absent-minded all of a sudden?

12        MR. STERN:  Objection.  Argumentative.

13        THE COURT:  Don't -- don't get argumentative.  Ask a

14  question.

15  Q   (By MS. DIAZ) Did -- did Isamari Villarreal or Mr. Ramsey

16  Cantu request your assistance in writing?

17  A    No.

18  Q    Were you present at the meeting when the petition

19  signatures were approved by Isamari Villarreal?

20  A    Yes.

21        MS. DIAZ:  Okay, I'm going to address the Court at

22  this time, Your Honor.

23        THE COURT:  Right now go ahead and keep asking him

24  questions.

25  Q    (By MS. DIAZ) There will be a -- when you were present at

```
 1    that meeting that ran out of control, you specifically -- after
 2    I left -- I'm going to go back as to when this happened and
 3    it'll be on that -- on this video.  You specifically -- after
 4    I -- I left the -- the Commissioners' courtroom --
 5              THE COURT:  Okay, "I" being who?
 6    Q    (By MS. DIAZ) -- you --
 7              THE COURT:  "I" being who?
 8              MS. DIAZ:  Pardon me?
 9              THE COURT:  Give your name.
10              MS. DIAZ:  I, Enriqueta Diaz.
11              THE COURT:  Okay.
12              MS. DIAZ:  Okay.
13    Q    (By MS. DIAZ) I, Enriqueta Diaz, left with one of the
14    deputies.  I left the Commissioners Court meeting.  The meeting
15    continued.  And as the -- as the meeting continued, you
16    approached -- or -- or Judge Ramsey Cantu called upon you for
17    legal advice --
18              MR. STERN:  Judge?
19    Q    (By MS. DIAZ) -- and he asked you --
20              THE COURT:  Hold on.  Hold on.
21              MR. STERN:  If she would just ask a question.
22              THE COURT:  Okay, just ask a question.  What's the
23    question?
24    Q    (By MS. DIAZ) Did Mr. Cantu call you?
25    A    Yes.
```

1   Q     And what was his question to you?

2   A     It was on clarification for the commitment order for being

3   held in contempt of court for yourself.

4   Q     Also, did he not -- did he not tell you that there was

5   fraud?

6   A     I don't -- I don't -- regarding what?

7   Q     That there was fraud on the petitions that had been

8   presented?

9   A     Yes.  I testified to that already.

10  Q     And you entered --

11        THE COURT:  Wait.  Let me ask a question.

12        Are you talking about at the meeting or at some

13  other time, Ms. Diaz?

14        MS. DIAZ:  I'm talking about at the meeting on October

15  the 10th.

16        THE COURT:  During this conversation, is what you're

17  asking about?

18        THE WITNESS:  You mean October 30th?

19  Q     (By MS. DIAZ) I'm sorry.  Yes.

20        Judge Cantu asked --

21        THE COURT:  Okay, wait.  Is that a --

22        MS. DIAZ:  I'm sorry.  Go ahead.

23        THE COURT:  This is not a statement, it's a question.

24  My understanding the question to be, when you conferred as to

25  the contempt citation, was there also a discussion about fraud.

1                    Is that the question?

2              MS. DIAZ:  That is correct.

3              THE COURT:  Okay.  Go ahead, Mr. Iracheta.

4              THE WITNESS:  No, we were not discussing fraud

5     regarding your contempt matter.

6              THE COURT:  Or how about the petitions?

7     Q    (By MS. DIAZ) Were you discussing the petition --

8              THE COURT:  Were you discussing also the petitions at

9     that conference and any fraud in them?

10             THE WITNESS:  No, Your Honor.  At -- at that time,

11    the --

12             THE COURT:  No.

13             MR. WADE:  -- the meeting was over and we were

14    discussing the contempt procedure.

15             THE COURT:  Okay.  Just that.  Okay.

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  All right.  He's answered.

18    Q    (By MS. DIAZ) This flash -- whatever you call this little

19    thing -- depicts the entire meeting, and it also depicts you

20    telling the court that because fraud had been committed -- those

21    were your -- precise words --

22             THE COURT:  Okay, is there a question or are you

23    making a statement?

24    Q    (By MS. DIAZ) Is that what you said?

25    A    Now you're speaking during the meeting, correct?

1   Q     During the meeting.

2   A     Yes.  I was asked by a commissioner on what the next steps

3   were, and I -- and I indicated that there was instances of fraud

4   and that there were multiple questions with the petition, and I

5   advised the Commissioners Court on what steps they could take at

6   that time.

7   Q     Okay.  So when you indicated that there was fraud was

8   during that meeting.

9   A     Okay.

10  Q     During that meeting when that incident broke out.

11        THE COURT:  That's the October 30th meeting?

12        MS. DIAZ:  Yes, ma'am.

13        THE COURT:  Okay.  So what's the question?

14  Q     (By MS. DIAZ) On this flash, this -- whatever you call

15  this, I forgot the name of it -- you approached --

16        MS. DIAZ:  And I'm -- I guess I would need to testify

17  on that.

18        THE COURT:  Yes.  This is the time for you to ask him

19  questions.

20        MS. DIAZ:  Okay.

21  Q     (By MS. DIAZ) Did you not -- you did admit, reaffirming,

22  that fraud had been committed and yet you just testified that

23  you never got involved until after the petition was signed,

24  was -- was turned in?

25        MR. STERN:  Objection.  First, it's leading; but

1  second, it's argumentative.

2          Just ask him one question at a time.

3          THE COURT:  Well, I'm -- I'm not sure that I

4  understand the question at this point.

5          THE WITNESS:  Me -- me, neither, Your Honor.

6          THE COURT:  So reask the question.  Reword it.

7  Q   (By MS. DIAZ) You -- I'm asking you when -- in which

8  meeting did you inform the court that there was fraud; the

9  Commissioners Court?

10 A   On October 30th, if my memory serves me correctly, there

11 was a mention there when Commissioner Morales asked me about

12 procedure, and I indicated what was going on in regards to the

13 fraud.  There was already a fraud investigation -- a criminal

14 investigation ongoing after the petition --

15         THE COURT:  Wait, wait, wait.

16         THE WITNESS:  -- had been submitted.

17         THE COURT:  Wait, wait, wait, wait.  There was a

18 criminal investigation going on?

19         THE WITNESS:  That is correct, Your Honor.

20         THE COURT:  Who were the defendants?

21          Who were the targets?

22         THE WITNESS:  That is still being evaluated.

23         THE COURT:  No, counsel.  I need to know in case they

24 testify.  I have to advise them of their constitutional rights,

25 so I need to know the list of targets.

1            THE WITNESS:  So at this time the people that are

2    being looked into are the people that submitted the petition,

3    which would be Ms. Diaz and Mayito Obregon.

4            THE COURT:  Okay.  So if they testify I've got to

5    advise them of their right to remain silent.  You do understand

6    that?

7            THE WITNESS:  Yes, Your Honor.

8            THE COURT:  Okay.  And they're under investigation for

9    what?

10           THE WITNESS:  Tampering with government records,

11   Your Honor.

12           THE COURT:  How is it government records if y'all

13   rejected them?

14           THE WITNESS:  They were submitted as a document,

15   Your Honor.

16           THE COURT:  I get it, but they're not government

17   records at that point, though, are they?  How did they tamper

18   after they became government records?

19           THE WITNESS:  Your Honor, at -- at this time it's an

20   ongoing investigation that is not being handled by me.  It is

21   being handled by -- by a law enforcement investigator.

22           THE COURT:  I get that, but under your direction, I'm

23   assuming.  Is it -- is it a misdemeanor?

24           THE WITNESS:  At this time we do not know, Your Honor.

25           THE COURT:  Well, counsel, the -- the prosecute -- the

1    investigators don't work alone without a prosecutor.  So

2    which -- who's the prosecutor on the case, or who would be the

3    prosecutor?

4              THE WITNESS:  It would be -- at the current time, it

5    is -- is being operated out of my office.

6              THE COURT:  Okay, so it would be a misdemeanor

7    offense, because I'm assuming you only have jurisdiction over

8    misdemeanors.

9              THE WITNESS:  I only have misdemeanor jurisdiction;

10   however, my law -- law enforcement investigators have the full

11   authority to investigate any criminal --

12             THE COURT:  I get it, but the --

13             THE WITNESS:  -- case in the state of Texas.

14             THE COURT:  -- question is, once it -- if it becomes a

15   felony, it leaves your office?

16             THE WITNESS:  That is correct.

17             THE COURT:  Okay.  So my question to you is:  Now that

18   you're a witness in this case, are you eligible to be an

19   investigator and to oversee that investigation?

20             THE WITNESS:  I'm not sure, Your Honor.  I -- I was --

21   I just found out I was a witness.

22             THE COURT:  Right now?

23             THE WITNESS:  Right now.

24             THE COURT:  Okay.

25                Okay.  Proceed.

1          MS. DIAZ:  Your Honor, I'm asking that you disqualify

2   him as attorney because he is a witness --

3          THE COURT:  He's not here --

4          MS. DIAZ:  -- to this suit.

5          THE COURT:  -- okay, but he's not here as counsel on

6   anything.

7   Q    (By MS. DIAZ) When the petition was being presented,

8   Mr. Iracheta, did you advise the Court that they could reject

9   the signatures?

10  A    That is correct.

11  Q    Based on what, Mr. Iracheta?

12  A    Based on the fact that the project was determined to be for

13  a public health and hazard declaration, which the Commissioners

14  Court had already ruled on; therefore, petitions were no -- no

15  longer valid in accordance to state law.

16  Q    So you are performing at this time -- involved in the

17  investigation as a prosecutor and also as legal counsel for

18  Commissioners Court?  Which one is it?

19  A    Can you say your question again.  I'm sorry.

20  Q    You are the prosecutor for Maverick County, an elected

21  official --

22  A    Yes.

23  Q    Okay.  But you're also counsel -- Commissioners Court

24  counsel, legal counsel, to advise them on procedures?

25  A    Correct.

1   Q    So you're involved in both at this time?

2   A    Correct.

3        THE COURT:  Well, may I ask you a follow-up question,

4   Mr. Iracheta?  So you're saying that the petitions were rejected

5   because of the public health declaration?

6        THE WITNESS:  That is correct, Your Honor.

7        THE COURT:  It had nothing to do with fraud, then?

8        THE WITNESS:  That is correct.  That -- the -- the

9   fraud allegation was part of the consideration --

10       THE COURT:  No.

11       THE WITNESS:  -- that was raised.

12       THE COURT:  Declaration of the nuisance or rejection

13  of the petition for fraud.  What is it?

14       THE WITNESS:  It's the declaration of the -- of the

15  nuisance and the public health hazard.

16       THE COURT:  Okay.

17       THE WITNESS:  Fraud is -- fraud is -- is an incident

18  to what occurred.

19       THE COURT:  No, counsel, it is not.  So, the petitions

20  were rejected not based on fraud, but on a public health

21  declaration, right?

22       THE WITNESS:  That is correct.

23       THE COURT:  Okay.

24       MS. DIAZ:  Your Honor, I have no more questions for

25  this witness, but I will request again that he be --

1          THE COURT:  He's going to be here --

2          MS. DIAZ:  -- removed at the proper time.

3          THE COURT:  I -- I'm not -- it's not before me to have

4   him removed as -- as a prosecutor.  So that's not before me

5   right now.  But he's here as a witness and a punitive party, not

6   as an attorney.  It's my understanding he's not acting as

7   counsel, so he's allowed to be here.

8          MS. DIAZ:  I have no more questions for him,

9   Your Honor.

10          THE COURT:  I'm sorry?

11          MS. DIAZ:  I have no more questions for him --

12          THE COURT:  Okay, let me let -- have Mr. --

13          MS. DIAZ:  -- but he will be added to it as a party to

14   the suit.

15          THE COURT:  Okay, but let Mr. Stern ask questions.

16   He's subject to --

17          MS. DIAZ:  Oh, I'm sorry.

18          THE COURT:  Mr. Stern, you may go forward.

19                       CROSS-EXAMINATION

20   BY MR. STERN

21   Q    On the instance of irregularities, did you find any

22   irregularities --

23          THE COURT:  I'm having a hard time hearing you,

24   Mr. Stern.

25   Q    (By MR. STERN) On the instance of irregularities, did you

1   find any irregular -- irregularities with respect to Mrs. Diaz's

2   signature --

3   A    Yes, I did.

4   Q    -- on the petition?

5          And what was that irregularity?

6   A    Her signature appeared on the petition multiple times.

7   Q    Is that twice or more than twice?

8   A    To my recollection, twice.

9   Q    Okay.

10          THE COURT:  Mr. Stern, the fraud matter is out the

11   window at this point.

12          MR. STERN:  It goes to her credibility, Judge.

13          THE COURT:  She hasn't testified yet.  You can't

14   impugn her credibility before she testifies.

15          MR. STERN:  She did all morning, Your Honor.

16          THE COURT:  But my -- but the question is this,

17   though -- he just testified that the petitions were rejected

18   based on the nuisance finding, not on any findings of fraud.

19          MR. STERN:  Okay.

20          THE COURT:  So what are we doing here on any -- if

21   they're not fraudulent, aren't they admissible?  Aren't they

22   valid, then, the petition should have been accepted?

23          MR. STERN:  No, because of the exceptions --

24          THE COURT:  No, the exceptions are to the -- to the

25   acceptance of the petitions.  The exceptions are -- are to the

1    issuance or the -- the obligations.  There's a difference.

2             MR. STERN:  If that's the Court's ruling --

3             THE COURT:  No, that's not the Court's ruling.  I'm

4    just saying, from what I've read on the statutes, the exceptions

5    are as to whether there's going to be certificates of

6    obligations, not to, necessarily, the acceptance of the

7    petitions as valid.

8             MR. STERN:  Right.

9             THE COURT:  Right.

10            MR. STERN:  Well, no, it looks like they accepted --

11            THE COURT:  No, he said they rejected the petitions

12   due to the public nuisance.

13            MR. STERN:  Right.  That -- that -- correct.

14            THE COURT:  Right.  Not to the fraud.

15            MR. STERN:  Correct.

16            THE COURT:  So based on the certificate of the

17   administrator, the petitions had valid signatures.

18            MR. STERN:  It had at least 600 valid -- excuse me.

19   It had more than five percent of the registered voters --

20            THE COURT:  Right.  So the -- so the --

21            MR. STERN:  -- valid signatures.

22            THE COURT:  -- petitions were valid based on valid

23   signatures, with -- with all the -- I'm assuming, the

24   duplicative ones, everything taken out.

25            MR. STERN:  Correct.

1          THE COURT:  Okay.  So -- but he's saying that the

2    petitions were rejected based on a public nuisance finding, not

3    on a lack of sufficient signatures.

4          MR. STERN:  Correct.

5          THE COURT:  Okay.  So the petitions are valid.  Why

6    are we talking fraud, then, today?

7          MR. STERN:  I can wait until she testifies, Judge.

8          THE COURT:  Okay.  You can wait until she testifies,

9    but, Mr. Stern, what I'm understanding, though, is the finding

10   of the Commissioners Court had nothing to do with the validity

11   of the petitions.  They weren't even considered as -- as to the

12   validity.

13         MR. STERN:  If the Court will look at the --

14         THE COURT:  I'm talk --

15         MR. STERN:  -- the videotape.

16         THE COURT:  -- I'm talking about what he just

17   testified to.

18         MR. STERN:  Okay.

19         THE COURT:  That they were rejected based on public

20   nuisance findings, not on the lack of sufficient signatures.

21         MR. STERN:  That's correct.

22         THE COURT:  So the petitions are valid.

23         MR. STERN:  Except when there's --

24         THE COURT:  No.  The -- the exception is not to the --

25   to the validity of the petitions; it's to when you can issue

1   certificates of obligations without an election.

2          MS. DIAZ:  Exactly.

3          THE COURT:  It's not to the validity of the petitions.

4   So the petition's valid, from what I'm hearing.

5          MR. STERN:  I'm -- I'll let her --

6          THE COURT:  I've got to tell you, all of these matters

7   of fraud are starting to sound like vindictive prosecution,

8   which is a different provision of the Constitution.

9          We got -- we're going down a very bad road and an

10  ugly hole.

11          Cross, Mr. Stern.

12          MR. STERN:  Okay.

13  Q    (By MR. STERN) How was a nuisance -- excuse me.

14          How was a public health nuisance determined in

15  Commissioners Court?

16  A    So, this project had been worked on by one of the

17  commissioners in Maverick County for, I think, going on two

18  years.  And as part of her duties as commissioner, she

19  investigated her precinct and to see the needs that were -- that

20  are required in her -- in her area of -- that she's elected to.

21          My understanding is that there was a need in the

22  Quemado/Thompson Road/Normandy area regarding lack of

23  waterlines, lack of sewer lines, just some places that just

24  either are outdated or nonexistent.  And this commissioner, as

25  well, is in charge of the water plant in that specific area in

1    which she receives notices from the State.

2    Q     Which commissioner is that?

3    A     This is Commissioner Olga Ramos.  And in her time, she --

4    she went out for grants for her precinct.  One of the grants

5    that she acquired or looked into was a grant with the Texas

6    Water Development Board.  And in order to qualify for any of

7    these grants, you have to -- even to be considered, you have to

8    be in an area that is considered a public health nuisance, an

9    emergency, something that is -- I guess, just a public health

10   nuisance matter.  And therefore, she started the application

11   process and it was granted to continue on with this grant, and

12   that's where we find ourselves here today.

13   Q     Now, what studies did the county undertake in order to show

14   that the water conditions in Quemado and the other properties,

15   the subject of the grant, had deteriorated since that

16   commissioner took office?

17   A     To my understanding, I -- I -- I don't handle the studies,

18   but to my understanding, there -- there were on-site

19   inspections, there were TCEQ -- I believe is the correct

20   acronym -- organizations that came and looked at the area.  The

21   organization that hand -- the Texas Water Development Board as

22   well had individuals that came and -- and investigated the water

23   plant, working with the State, working on water boil notices and

24   contamination issues.  And these studies have been going on for

25   years now.  My understanding is that Maverick County has

1   received notices of non-compliance or lack of adequate

2   facilities in this particular region of the community for years,

3   long before this commissioner entered office.

4           THE COURT:  So it's now all of a sudden an emergency

5   for purposes of this grant; that's been going on for years?

6           THE WITNESS:  My understanding is that there has

7   been -- no one has applied or even tried to work with the Texas

8   Water Development Board for over 38 years.

9           THE COURT:  Okay, but what you're telling me is this

10  emergency has existed for 30 years or more and it's now come to

11  the point where you have to issue these certificates of

12  obligation because it's now an emergency.  Is that your legal

13  opinion?

14          THE WITNESS:  My -- my legal opinion, Your Honor, is

15  that in order to even qualify for this grant, you had to have an

16  emergency situation to even be considered.

17          THE COURT:  But an emergency situation indicates that

18  immediate action will be taken, right?

19          THE WITNESS:  It could be interpreted that way.

20  Correct.

21          THE COURT:  And this emergency has been existing for

22  how many years?

23          THE WITNESS:  Multiple years.  It's very sad that it

24  has been.

25          THE COURT:  Yeah, your opinion on that, though, is

1    irrelevant, Mr. Iracheta.  The question is this:  Why is it such

2    an emergency that you would reject the petition of the will of

3    the voters, that since it's existed for multiple years?

4              THE WITNESS:  Correct.  And I -- I understand your

5    position, Your Honor, but --

6              THE COURT:  No, no, no.  It's not my position.  That

7    is a question to you since you're the legal representative and

8    you are giving them legal advice on this point.  What -- why

9    would -- why did you give that advice?

10             THE WITNESS:  I and -- and bond counsel gave advice.

11             THE COURT:  Okay.  Why did you give that advice?  I'm

12   not asking you to --

13             THE WITNESS:  We gave that advice because according

14   to -- according to state law, the Commissioners Court has the

15   authority to make the determination on whether something is

16   considered a public nuisance or a danger to their community.

17   That is their right --

18             THE COURT:  I -- I get it --

19             THE WITNESS:  -- that is granted to them.

20             THE COURT:  -- Mr. Iracheta.

21             THE WITNESS:  Uh-huh.

22             THE COURT:  But the problem is, you've only decided

23   this to avoid an election.  Right?

24             THE WITNESS:  No, ma'am.

25             THE COURT:  What did you -- why did you decide it now?

1            THE WITNESS:  Because the decision to make that --

2    to -- in order to make that --

3            THE COURT:  I'm not asking why the decision or who has

4    the authority to make that decision.  My asking is on the

5    timing.  Since that emergency, according to you, has existed for

6    years and years, why is it time at this point?

7            THE WITNESS:  Because this commissioner just came into

8    term -- into office.  This -- this -- she's --

9            THE COURT:  But she's been investigating it for two

10   years.  So it's --

11           THE WITNESS:  Yeah.

12           THE COURT:  -- not that big of an emergency if it's

13   investigated for two years.

14           THE WITNESS:  Yes.  Unfortunately, Maverick County

15   doesn't have the most funds to get projects like this done, and

16   a project of this size took multiple years to -- to reach even

17   this stage.

18           THE COURT:  So it's not a critical emergency?

19           THE WITNESS:  I -- I would not know, Your Honor.  I

20   mean, I know that --

21           THE COURT:  So it's not --

22           THE WITNESS:  -- there's individuals that -- that have

23   to bring in their own water from a canal ditch that have been

24   told that you cannot drink this water, you cannot bathe in this

25   water.

1          THE COURT:  I actually -- probably they don't have

2     authorization to get water out of a canal.

3          THE WITNESS:  They do not.  Exactly.

4          THE COURT:  Okay.  So there's --

5          THE WITNESS:  And we -- we were told by the State

6     that --

7          THE COURT:  Okay, so my question --

8          THE WITNESS:  -- that we should not be allowing that

9     to happen, which is why we find ourselves here.

10          THE COURT:  Okay, so my question is, though, that's

11     not what creates the emergency.  There are other options.  They

12     don't have to go to a canal.

13          THE WITNESS:  Sure.

14          THE COURT:  Right?

15          THE WITNESS:  And other options are the community that

16     we are bringing sewer and water lines to these individuals --

17          THE COURT:  I get it --

18          THE WITNESS:  -- that have none.

19          THE COURT:  -- but you can't vote -- you can't step on

20     the will of the people because of it.

21          THE WITNESS:  So there's also other deadlines that

22     occur when you do a grant process.

23          THE COURT:  Uh-huh.

24          THE WITNESS:  And -- and if -- and if certain steps

25     were not taken, they do not qualify for these fundings.

1          THE COURT:  Okay, so this is all about timing and

2     getting the money, no matter what?

3          THE WITNESS:  I would not say "no matter what,"

4     because ultimately there is a timing process when it comes to

5     grant applications and when it comes to deadlines.

6          THE COURT:  So what is the timing on this one?

7          THE WITNESS:  My understanding is that if we do not

8     close by the end of December, that we wouldn't -- we would not

9     be able to qualify for the 7.2 million in funding, which is the

10    30 percent that --

11         THE COURT:  Okay --

12         THE WITNESS:  -- that Maverick County would have to

13    raise themselves.

14         THE COURT:  You're saying of 2023.

15         THE WITNESS:  Of this year, yes, ma'am.

16         THE COURT:  Okay.  So the county has to raise the

17    seven million, or have the obligations of seven million, or

18    committed to them, by the end of this year?

19         THE WITNESS:  That is correct, Your Honor.

20         THE COURT:  Okay.  And then what happens if you don't?

21         THE WITNESS:  Then we lose the grant.

22         THE COURT:  Okay.

23          And so, Mr. Stern, I don't -- I -- I just have

24    another question, but I'm going to let you keep going.

25          And if these certificates go out, Mr. Iracheta,

1  they're being paid for by the service users or by ad valorem

2  taxes?

3             THE WITNESS:  Both.

4             THE COURT:  Okay, so you're going to be using both.

5  Okay.

6             THE WITNESS:  The -- the bond counsel would have

7  better knowledge into the terms of that, but to my recollection,

8  it is both, Your Honor.

9             THE COURT:  Okay.  All right.

10             Go ahead, Mr. Stern.

11             MR. STERN:  Pass the witness.

12             THE COURT:  Did I ask all your questions, Mr. Stern?

13  I didn't mean to.

14             MR. STERN:  You've asked most of them.

15             THE COURT:  Okay.  Any -- any redirect, Ms. --

16                         REDIRECT EXAMINATION

17  BY MS. DIAZ

18  Q    Mr. Iracheta, you just informed the Court that the -- you

19  know, you keep saying 7.2 million.  You have -- that was a

20  figure -- that is the figure that the county would be

21  responsible for.  But the overall amount of money that the

22  county would get would be 24 million.  So, based on what you

23  just said, are you -- are you saying that the deadline for them

24  to pass everything in Commissioners Court, in order for them to

25  qualify for the 24 million, there was a deadline in December,

1    which is next month?

2    A     To my understanding, yes.  The grant -- the grant

3    provisions provided deadlines in order for us to be in

4    compliance.  And my understanding is we needed to finish the

5    process by the end of December, yes.

6    Q     So, you were present when Ms. Villarreal presented the

7    petition where she indicated the amount of signatures approved

8    by her?

9    A     Yes, I was.

10   Q     Okay.  And you also heard how many she rejected?

11   A     Yes, I did.

12   Q     You also -- you also heard her tell the judge or

13   Commissioners Court the reasons why she rejected them?

14   A     Yes.

15   Q     Could you -- could you identify what those reasons were?

16   A     I -- I don't remember off the top of my head, but I know

17   it's in the document that you had earlier, that -- you know,

18   register -- not registered --

19   Q     There's four --

20   A     -- deceased, invalid.

21   Q     -- there's four that are in the document presented to the

22   Court that are duplicates --

23   A     Uh-huh.

24   Q     -- duplicates of people that might have gone to two or

25   three different people that were raising signatures.  There were

1   two bonds that were going on at the same time, the COs and the

2   15-million bond.

3            And, yeah, I can accept the fact that some might

4   have signed it --

5            THE COURT:  Wait, wait, wait.

6   Q    (By MS. DIAZ) -- more than once.

7            THE COURT:  Question.  Question.  Question, Ms. Diaz.

8   Not a statement.

9   Q    (By MS. DIAZ) But my question to you is -- you have told

10  this Court -- you have informed this Court that you were

11  involved as a prosecutor and also as legal counsel, and you

12  rejected -- you recommended -- and I assume at that role -- you

13  were playing the role of legal counsel.  You advised the county

14  to reject the ballot based on public health?

15  A    That is incorrect.

16  Q    Public health issues?

17  A    No, that's not what I indicated in Commissioners Court.

18  Q    Correct me and repeat what -- what I might have heard

19  wrong.

20  A    So when asked what the steps -- what steps can be done, I

21  indicated in regards to the petition it could be accepted, it

22  could be ratified or rejected, or it could be postponed for

23  further investigation, to further inquire into the validity of

24  the petition.

25            In regards to the bond, right, now -- in regards to

```
 1  the certificate --

 2  Q    Were you -- Mr. Iracheta, excuse me.

 3            Were you at any time -- at any time, from the 10th

 4  of October that the petition was presented -- were you at any

 5  time -- before the Commissioners Court rejecting the petition,

 6  were you in contact with Mr. Cantu or Isamari privately in your

 7  office?

 8  A    No.

 9  Q    You never were.

10            Were you ever in her office with Mr. Cantu also?

11  A    No.

12  Q    Were you anywhere else with Mr. Cantu and Ms. Villarreal,

13  or either one?

14  A    Yes.

15  Q    You did meet with them?

16  A    Yes.

17  Q    From the 10th of October until Commissioners Court rejected

18  it?

19  A    Yes.  They came to me to inform me regarding potential

20  fraud and -- and misconduct.

21  Q    And who came to you?

22  A    Isamari and Judge Cantu.

23  Q    And Judge Cantu.

24  A    That is correct.

25  Q    Do you have any reason to explain to the Court why Isamari
```

1  needed to be escorted by the county judge to go to your office?

2  A    I cannot speculate to that.  I'm -- I don't know what

3  you're talking about.

4          MS. DIAZ:  I could go into something else, but it

5  would be my testimony --

6          THE COURT:  Okay, this is --

7          MS. DIAZ:  I'll wait until --

8          THE COURT:  Yeah, this is question --

9          MS. DIAZ:  -- I sit on the bench.

10          THE COURT:  Yeah, this is just questions.

11          MS. DIAZ:  Until I sit as a witness.

12          THE COURT:  Yes.

13          MS. DIAZ:  I have no more questions.

14          THE COURT:  Okay.

15          MS. DIAZ:  You're excused.

16          THE COURT:  Okay, hold -- hold --

17          MS. DIAZ:  Thank you, Your Honor.

18          THE COURT:  Okay, let me ask -- hold on.  Let me ask

19  Mr. Stern if he has recross.

20          Mr. Stern, any recross?  Re-recross?

21          MR. STERN:  No, Judge.

22          THE COURT:  All right.  You may step down.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Next witness?

25          Ms. Diaz, who's your next witness?

1          MS. DIAZ:  I do not have another witness, Your Honor.

2          THE COURT:  Okay.  Are you testifying?

3          MS. DIAZ:  Yes.

4          THE COURT:  Okay.  Then you're the next witness.

5          MS. DIAZ:  Yes, ma'am.

6          THE COURT:  Okay.

7

8                          **ENRIQUETA DIAZ,**

9    having first been duly sworn, testified to the following:

10

11         THE COURT:  All right, Ms. Diaz, let me tell you some

12   procedures when you're questioning yourself in this kind of

13   circumstance.  So that Mr. Stern has an opportunity to know what

14   the answer's going to be, you'll have to ask yourself a question

15   and then answer it.  And speak about yourself in the third

16   party.

17         MS. DIAZ:  I will do that.  Thank you, Your Honor.

18         THE COURT:  All right.

19         MR. STERN:  Judge?

20         THE COURT:  Yes, sir?

21         MR. STERN:  I'm willing to let her testify --

22         THE COURT:  Narrative.

23         MR. STERN:  -- with a narrative, as long as she'll

24   keep it to short sentences.

25         THE COURT:  I -- I don't know -- I don't -- let's --

1  we can start that way, Mr. Stern.  If it doesn't go that way,

2  let me know.

3             MR. STERN:  That's fine.

4             THE COURT:  All right.  Then, Ms. Diaz, you don't have

5  to -- Mr. Stern's saying you can just start telling me, but

6  speak in short sentences.

7             Give me your testimony.

8                         DIRECT EXAMINATION

9             THE COURT:  Give me your name, spell your last name

10  for the record.

11            MS. DIAZ:  My name is Enriqueta Diaz, it's spelled

12  E-N-R-I-Q-U-E-T, as in Tom, -A.  Last name is D, as in David,

13  -I-A-Z, as in Zebra.

14            THE COURT:  Okay.  You may continue with what you're

15  going to -- what your testimony is.

16            MS. DIAZ:  My testimony today, this morning -- or this

17  afternoon is that I have been a victim of unauthorized

18  authority.  Even though I was not handcuffed, even though I was

19  not put in a cell, I was detained three, or four, five times by

20  different deputies.  It was a big commotion in Commissioners

21  Court due to the fact that after the -- the petitions were

22  presented in the morning, and Commissioners Court called for a

23  meeting in the afternoon, I was ordered to leave the courtroom

24  simply because I was sitting there saying absolutely nothing and

25  smiling at the allegations done on me by County Judge Ramsey

1    English Cantu.

2         I was sitting quietly.  I do know that once the

3    meeting begins -- that is why at the beginning of the meeting I

4    signed up to have my limited three minutes, and I spoke to

5    Commissioners Court as a whole, explaining to them that the

6    signatures had been provided in the morning; that I -- I had

7    even gone to the extent of getting the voter registration list

8    from Isamari because that's what she was going to use to verify

9    whether the signatures were legal or not.  It cost me close to

10   $500.  And I didn't care.

11        I knew -- I knew when I started the petition against

12   the 24 million-dollar Texas Water Development Board certificates

13   of obligation -- I knew that Mr. Cantu had been insisting --

14   insistent that he was going to get this through no matter what.

15   And it's on video also.

16        I have had several disputes, even -- with him even

17   before he became county judge.  He has explicitly informed me

18   that my level of principle is not his level.  And I have to --

19   without going verbatim, he got what he needed to be told.

20        MR. STERN:  I'm sorry, Judge.

21        MS. DIAZ:  Since the onset --

22        THE COURT:  Wait, wait, wait.

23        MR. STERN:  I didn't hear the last sentence.

24        THE COURT:  Repeat --

25        MR. STERN:  He got --

1          THE COURT:  He got what, Ms. Diaz?  Without being

2     explicit, he got what?  Your last statement, you said, Without

3     being explicit, he got told what?

4          MS. DIAZ:  He got told what he had coming for his

5     insults on me.

6               Mr. Cantu, on the onset of the applic -- of the --

7     on the onset of him taking office, I discovered that he had been

8     not paying his property taxes on property that he owned for over

9     11 years, to the City of Eagle Pass that he was mayor of and to

10    the school district.

11              I also informed the public that the person that ran

12    his campaign was the father of the collection attorney that he

13    hired, who is also waiting to be approved by Commissioners

14    Court.

15         THE COURT:  Wait, wait, wait.  Go back on that one

16    again.  What was that?  The father of the collections attorney?

17         MS. DIAZ:  Roberto Gonzalez in Eagle Pass is the

18    campaign manager, and basically the leader of many campaigns.

19    He is a very notorious well-known person.

20         THE COURT:  Okay, and the -- stop with the calling

21    of -- "notorious" is a -- is a judgment call.

22              But he was Mr. Cantu's campaign manager?

23         MS. DIAZ:  Yes, ma'am.

24         THE COURT:  And -- and his daughter is what?

25         MS. DIAZ:  His daughter is a collection attorney, tax

1 collection attorney for Linebarger and somebody else.  I don't

2 remember the other names.  She has an office in Eagle Pass.  Her

3 name is Sonia Gonzalez.

4         THE COURT:  Okay.  And what does that have to do with

5 what?

6         MS. DIAZ:  All the -- all the time that Mr. -- when

7 Ramsey became -- when Mr. Cantu became mayor of the City of

8 Eagle Pass, Ms. Sonia Gonzalez became the collection attorney

9 for the City of Eagle Pass.  And for all the period that he was

10 there --

11         MR. STERN:  Your Honor?

12         THE COURT:  Well, hold on.  Hold on.

13         MR. STERN:  I would object.  This is so far outside of

14 the pleadings.

15         THE COURT:  Okay, why are -- why are we going through

16 all of this, Ms. --

17         MR. STERN:  Now, I understand there's a political

18 battle --

19         THE COURT:  I -- I get it.  But I'm just saying -- why

20 are we getting into all of this?

21         MS. DIAZ:  We're getting into all of this, Your Honor,

22 because he's been upset with me forever and ever, and ever, and

23 nothing would please him more --

24         THE COURT:  Okay, but why does --

25         MS. DIAZ:  -- with the assistance of the county

1   attorney and to put me in jail.

2          THE COURT:  Okay, so -- but all of this stuff, it has

3   to do what -- what does it have to do with the -- what's

4   happening now?

5          MS. DIAZ:  What it has to do with it, Your Honor, is

6   that because I've been looking out in all the violations he's

7   done, and this is just another one.  And this -- he has a

8   commitment somewhere along the line with Mr. Ruben -- I said his

9   name a while ago.

10         MR. STERN:  Judge?

11         THE COURT:  Yes, sir.

12         MR. STERN:  To me the problem's relevance.  This is

13  great for the removal petition, but --

14         MS. DIAZ:  Garibay.

15         MR. STERN:  -- none of it has to do with this case.

16         THE COURT:  Yeah, I'm not -- let's get to what's --

17  what's in the petition, what you've brought up.

18         MS. DIAZ:  What I brought out in the petition is that

19  I got illegally arrested and the people of Maverick County were

20  denied the right to petition against the 24-million-dollar bond,

21  7.2 million that would have had to be paid by taxpayers.  And

22  he's gone all the way in every which way to try to stop me from

23  exposing what he's doing.

24         THE COURT:  Okay.  Proceed.  Proceed.

25         MS. DIAZ:  That is all I have to say.

1          THE COURT:  Okay.  That's all your testimony?

2          MS. DIAZ:  That's all I'm going to testify to.

3          THE COURT:  Okay.  Mr. Stern, cross-examination?

4          MR. STERN:  Sure.

5                        CROSS-EXAMINATION

6   BY MR. STERN

7   Q    You have a videotape of the October 30th meeting, correct?

8   A    You need to speak louder, sir.  I can't hear you.

9   Q    Let me try this one.

10  A    I think you need to get closer to the microphone.

11  Q    You have a videotape -- that's too much.

12          You've got a videotape of the October 30th meeting,

13  correct?

14  A    Yes, I do.

15  Q    Okay.  And you're going to introduce that into evidence,

16  correct?

17  A    I am going to turn it in as evidence, that is correct.

18  Q    Okay.

19          THE COURT:  Do y'all want to play it for me now, and

20  that way you can question, Mr. Stern, or do you want to question

21  first?

22          MR. STERN:  No, I want to question first --

23          THE COURT:  All right.  Go ahead.

24          MR. STERN:  -- and then if you want to listen to it in

25  chambers --

1          THE COURT:  No.  No, no.

2          MR. STERN:  -- or here.  Doesn't matter to me.

3          THE COURT:  No, go ahead and -- and question --

4          MR. STERN:  Okay.

5          THE COURT:  -- first, Mr. Stern.

6    Q    (By MR. STERN) Now, did you receive a notification from the

7    county judge threatening you with contempt before he held you in

8    contempt?

9    A    Is your question, did I get a notification --

10   Q    Yes, ma'am.

11   A    -- from the county judge?

12   Q    Yes, ma'am.

13   A    No, sir.  I got it from the sheriff.

14   Q    Okay.  Now, did you tell the county judge on October 30th

15   to arrest you?

16   A    Did I tell him to arrest me?

17   Q    Yes, ma'am.

18   A    After he ordered it, I said, I dare you, because you have

19   no authority.

20   Q    Well, that's part of what you said.

21   A    That is what I said.  It's on tape.

22          THE COURT:  Mr. Stern, you're saying that because she

23   gave her consent that's not contempt?

24          MR. STERN:  No, we're going to get down -- I don't --

25   if I can -- I've got like six or seven questions, Judge.

1          THE COURT:  Okay.  I'm just -- I'm just --

2          MR. STERN:  Okay.

3          THE COURT:  -- you know.

4    Q    (By MR. STERN) Did you tell the judge that you weren't

5    leaving the Commissioners Court hearing on the 30th?

6    A    Sir, I can barely hear you.

7    Q    I apologize, ma'am.  Did you tell the judge that you

8    weren't going to leave, after which you were arrested?

9    A    I told him that I was going to leave when I felt like it

10   because he was -- he had no authority to hold me in contempt.

11   And that's what he was claiming and asking the deputy to arrest

12   me.  And he had no jurisdiction in Commissioners Court.

13   Q    Right.  And how did you make the determination as to his

14   jurisdiction in Commissioners Court?

15   A    Because I was the judge before, Mr. Stern, and I know the

16   law.  I study it every day as best as I can.  I'm not an

17   attorney.

18          There's a case also -- there's a case in law in

19   Amarillo, Texas, where Judge Ward was throwing out a deputy from

20   recording the meeting, and it went after the court system, and

21   the court informed -- the deputy won the case because the judge

22   had no authority in Commissioners Court.  Not judicial.

23   Q    You understand there's a contempt statute that applies to

24   Commissioners Court?

25   A    Yes, for the entire Commissioners Court, not Judge Cantu.

1  Q    Okay.  Now, during the meeting, did you in any way

2  interrupt it?

3  A    I can't hear you.

4  Q    Did you, in any way, interrupt the meeting?

5  A    Could you repeat it, sir, I'm sorry.

6        THE COURT:  Did you, in any way, interrupt the

7  meeting?

8        MS. DIAZ:  Not before he started pointing his finger

9  and telling me that I had committed fraud.

10  Q    (By MR. STERN) Now, did you sign the petition two times?

11  A    I don't know.  I might have signed it five times.

12        THE COURT:  We're at this point now --

13        MS. DIAZ:  I don't know.

14        THE COURT:  Wait, wait, I've got to advise her of her

15  right to remain silent, because this could go to the

16  investigation.  But I've got to tell y'all, any type of fraud

17  investigation at this point is smelling like vindictive

18  prosecution.

19        MR. STERN:  Judge, I understand that.

20        THE COURT:  Okay, so --

21        MR. STERN:  Let me switch my question --

22        THE COURT:  -- so we -- we need to be careful where

23  we're crossing on that.  If you're asking her to make a

24  confession here under oath in court, we got a real problem.

25  I've got to advise her of her rights and her right to counsel,

1    and appoint one if one cannot be afforded.

2              So y'all --

3          MS. DIAZ:  I do not know --

4          THE COURT:  Hold on.  Hold on.

5          MR. STERN:  Judge --

6          THE COURT:  So you need to be careful --

7          MR. STERN:  -- I'm going to ask her about what she

8    did, but --

9          THE COURT:  I get it, but you're asking her about what

10   she did on the petition which you're -- which the previous

11   witness said he's got under investigation for fraud, and that

12   she's one of the potential targets.

13         MR. STERN:  But I'm not getting into fraud.

14         THE COURT:  Huh.

15         MR. STERN:  I'm not talking about fraud at all.

16         THE COURT:  But you're asking her about --

17         MR. STERN:  If did she interrupt the meeting.

18         THE COURT:  But -- okay.  But I'm just saying, you

19   were just asking her if she signed the petition twice.

20         MR. STERN:  Correct.

21         THE COURT:  Isn't that going to the fraud

22   investigation?

23         MR. STERN:  I really couldn't tell you, Judge.  I'm

24   not the prosecutor.

25              THE COURT:  Well, that's what the previous -- that's

1   what the previous witness testified to.

2        MR. STERN:  No, he simply said that she signed it

3   twice.

4        THE COURT:  And he said that she was one of the

5   targets of fraud because of duplicative and improper signatures

6   on the petition.

7        MR. STERN:  Correct.

8        THE COURT:  You're asking her to confess --

9        MR. STERN:  No.

10        THE COURT:  -- under oath.

11         Yeah, you are, Mr. Stern.

12        MR. STERN:  Not about fraud.

13        THE COURT:  Yeah, you are.  Because that's what the

14   previous witness testified to.

15        MR. STERN:  Even though it's --

16        THE COURT:  Because that was one of the bases for the

17   fraud investigation, that she signed it twice.

18        MR. STERN:  Even though it's customary in Maverick

19   County.  As -- as the commissioner stated --

20        THE COURT:  Maverick County's still a political

21   subdivision under the laws of the state and the United States,

22   and she still has a constitutional right to remain silent on any

23   matter that could potentially be used in a fraud investigation.

24        MR. STERN:  Fair enough.  We'll skip fraud for right

25   now.

```
1                THE COURT:  Yeah, let's please do that.
2    Q    (By MR. STERN) During the meeting, did you tell the county
3    judge that you had photos of him having sex with another man?
4                THE COURT:  Mr. Iracheta, you're a witness, not
5    counsel, you shouldn't have a phone in the courtroom.
6                MS. DIAZ:  Thank you.  Yes.
7                MR. STERN:  Okay.
8                MS. DIAZ:  Repeat that again, sir, please.
9    Q    (By MR. STERN) Did you refer to him -- did you tell him
10   that you had pictures of him having sex with another man?
11   A    Yes, I did.
12   Q    Okay.  Did you refer to him as "Mr. Homosexual"?
13   A    Yes, I did.
14   Q    And did you interrupt the board at -- with those comments?
15   A    Only after he pointed his finger at me and started accusing
16   me of fraud, and I told him he had no authority as a judge
17   judicially in Commissioners Court.  Yes, I did.
18   Q    Okay.
19   A    He instigated the whole problem.
20   Q    Let's go back to the petitions.
21                What violations of the law with respect to the
22   issuance of the certificates of obligation --
23   A    Sir, you keep lowering your voice.  I cannot hear you.  You
24   need to speak up.
25                THE COURT:  Okay.  Say -- start that again, Mr. --
```

```
 1              MS. DIAZ:  I'm sorry, I can't hear you.

 2              THE COURT:  Start that again, that question.

 3   Q    (By MR. STERN) What violations of law did the Commissioners

 4   Court or the judge commit in trying to get these obligations

 5   prior to --

 6              THE COURT:  Mr. Stern, she's not a legal expert, and a

 7   legal witness and can give me a legal opinion.

 8              MR. STERN:  Uh-huh.

 9              THE COURT:  I make those determinations.

10              MR. STERN:  Okay.

11              THE COURT:  That's my role as the judge and the legal

12   expert in this court.  That's not her role.

13              MR. STERN:  I'll ask it a different way.

14              THE COURT:  Okay.  So you're asking the same question

15   that I just said you couldn't ask her; is that what you're

16   telling me, Mr. Stern?

17              MR. STERN:  No, ma'am.

18              THE COURT:  Okay.  I would suggest you don't.

19              MR. STERN:  Okay.  Thank you.

20   Q    (By MR. STERN) Did you prepare the petition?

21              COURT REPORTER:  Mr. Stern --

22   Q    (By MR. STERN) Did you prepare the petition?

23              THE COURT:  Mr. -- Mr. Stern, we're having a hard time

24   with the -- with the blowback.

25              MR. STERN:  Can I try a different one?
```

```
 1              THE COURT:  Try -- okay, try that other microphone.
 2   Q    (By MR. STERN) Did you prepare the voters' petition?
 3   A    Did I prepare what?
 4   Q    The voters' petition.
 5   A    Did I prepare the voters' petition?
 6   Q    Yes, ma'am.
 7   A    I got the pile of signatures and presented them, yes, I
 8   did.
 9   Q    Okay.
10              THE COURT:  Okay, wait.  When you -- when you're
11   talking about "prepare the voters' petition," what do you mean,
12   Mr. Stern?  You're getting back to the potential fraud
13   matters --
14              MR. STERN:  No.
15              THE COURT:  -- that I've just said --
16              MR. STERN:  I'm not getting into --
17              THE COURT:  -- would be subject to the right to remain
18   silent.
19              MR. STERN:  No, I'm not getting into that.
20              THE COURT:  Yes, you are, Mr. Stern.  You are.
21   Because the subject and the propriety of the petitions are part
22   of the issue of that investigation that the county attorney just
23   testified to.  So you are getting into that.
24              MR. STERN:  I'll move on, Judge.
25              THE COURT:  The propriety of those petitions is off
```

1   base until I advise her of her constitutional rights and appoint

2   counsel to represent her then.

3            MR. STERN:  That's fine.

4   Q    (By MR. STERN) Let's go this way.  Did your arrest occur in

5   Commissioners Court?

6            Were you held in contempt in Commissioners Court?

7   A    The order was placed to hold me in contempt, yes.

8   Q    Okay.  And were you held in contempt in the presence of the

9   county judge?

10   A    That would be for an attorney or a court of law to decide.

11   I know I was detained.

12            THE COURT:  Okay, the question is, though, factually,

13   were you -- did he hold you in contempt while you were in the

14   meeting?  Did he say you were in contempt while in the meeting?

15   A    Yes.  Yes, he did say that.

16   Q    Did all the events leading up to your arrest occur in the

17   meeting and in the presence of the judge?

18   A    Did the arrest...

19            THE COURT:  Did the event --

20            MS. DIAZ:  The arrest occurred outside.

21            THE COURT:  Okay.  The events leading to the arrest,

22   he said, did they all occur in Commissioners Court?

23            MS. DIAZ:  The -- the arrest occurred outside.  I'm

24   saying -- when I say "arrest," when I use that word, I mean

25   "detained" because they told me I could not leave.  Up until

1   that point, the only thing the deputy asked me was to go outside

2   with him, which I did.

3   Q     (By MR. STERN) Now, are you claiming to represent all of

4   the folks that signed the petition?

5           THE COURT:  Mr. Stern, you're going back to the

6   validity of the petition.

7           MR. STERN:  No, I'm just asking what --

8           THE COURT:  You're going back --

9           MR. STERN:  -- her role is.

10           THE COURT:  -- to the validity of the petition.

11           MR. STERN:  But I thought we'd already established it

12   was valid, according to the -- to the Court.

13           THE COURT:  Well, I'll -- but your -- your -- one of

14   your potential parties said that he's investigating it -- s

15   investigating her for fraud on those petitions.  All I'm saying

16   is, if we start getting into that situation, and she's subject

17   to potential criminal prosecution, then she's got some

18   constitutional rights and she needs to be advised of them now.

19           How many times do I have to repeat myself?  Because

20   I'm not going to do it again, because then I'm going to show

21   y'all what real summary contempt is and what real findings have

22   to be made in court.

23           MR. STERN:  Thank you, ma'am.

24   Q     (By MR. STERN) Did you spend 24 hours in jail?

25   A     I spent detention from the moment I stepped outside the

1    meeting.  I'm going to say approximately six hours.

2    Q    During those six hours, didn't you testify -- didn't you,

3    in your opening statement, say that you went to have coffee?

4    A    I can't hear you.

5    Q    Didn't you state in your opening statement that during

6    those six hours that you -- that you went to some place to have

7    coffee?

8    A    No, sir.

9    Q    Okay.  Did you have coffee --

10   A    What I said, if I may?

11   Q    Yes, ma'am.

12   A    What I said is that they detained me outside.  They told me

13   I could not leave, both by Benavides -- Officer Benavides and

14   another deputy that was there that was being the -- the -- what

15   do you call it -- the Parliamentarian, I guess, at Commissioners

16   Court meeting.

17          THE COURT:  Okay, so let's -- let's break it down.

18   How long --

19          MS. DIAZ:  They --

20          THE COURT:  -- how long were you held under those

21   instructions?

22          THE WITNESS:  Under those instructions, I was held

23   there outside the court -- the courthouse approximately three

24   hours, waiting for either advice from the county judge or advice

25   from the district court to the deputies on what -- what

1    procedures to follow.

2              THE COURT:  And -- and then -- keep answering

3    Mr. Stern's questions.  And then what happened after those three

4    hours?

5              MS. DIAZ:  I went to coffee after they released me,

6    that they couldn't hold me.  I went to coffee at Skillets, and I

7    was there about 10, 15 minutes having coffee when Mr. Benavides

8    called me that the judge had ordered -- had issued a warrant for

9    my arrest.  And I was -- I had to report to the sheriff's

10   office, which I did.  Upon arriving at the sheriff's office --

11   Q    (By MR. STERN) You were booked and you were let go,

12   correct?

13   A    I don't know if you call it "booked" or not.  I was not --

14   Q    They took your prints?

15   A    -- given any *Miranda* rights or anything other than to show

16   me the paper that Judge Cantu had ordered, sentencing me --

17   finding me guilty of contempt and sentencing me to 24 hours in

18   jail.

19             THE COURT:  Okay, hold on just a second.

20               Mr. Stern, let me get one piece of information.

21               So this process, while you were at the -- at the

22   sheriff's office or the jail, how long did this take?

23             MS. DIAZ:  I'm going to say probably about two more

24   hours.

25             THE COURT:  Okay.  And -- and then?

1          MS. DIAZ:  And then after the sheriff spoke with the

2     judge again --

3     Q    (By MR. STERN) And how do you know that?

4     A    Because I was in the room when I -- I was listening to

5     the -- what do you call it -- the phone.  It was on the

6     loudspeaker.

7     Q    Okay.

8     A    Okay.  I was listening to the conversation between the

9     sheriff and myself.  I mean the sheriff and judge.  I'm sorry.

10          THE COURT:  Was this -- which judge?

11          MS. DIAZ:  That was Maribel Flores.

12          THE COURT:  Okay.  She told you --

13          MS. DIAZ:  The district judge for the 293rd --

14          THE COURT:  And then?

15          MS. DIAZ:  -- district.

16          THE COURT:  And then what happened?

17          MS. DIAZ:  Well, after he conferred with her -- while

18     he was waiting for her -- because he told her that he had -- she

19     had to check some laws or something and that she would call

20     right back.  And that's at the time that the sheriff said, Well,

21     instead of wasting time, why don't we go ahead and get

22     fingerprints and all this.  And they took me into the other room

23     and it took a long while.  Probably about an hour, hour and a

24     half.  They had some kind of problem with the fingerprint

25     machine.  And -- and they did that, and then after that they

1    released me back to the sheriff, and by then the sheriff said

2    that the judge had said they couldn't hold me based on -- on

3    that warrant of arrest that had been illegally processed by

4    Judge Cantu.

5    Q    (By MR. STERN) Okay.  So after that, you went and filed a

6    petition in state court, correct?

7    A    Yes, I did.

8    Q    And in state court you invoked their jurisdiction, correct?

9    A    If you could speak a little louder.  So I apologize --

10   Q    You invoked --

11   A    -- but I cannot hear you.

12   Q    No, it's -- I'm sorry, ma'am.  I --

13   A    You can't speak and I can't hear.

14   Q    I know.  It's a problem.

15          THE COURT:  Mr. Stern is a very soft-spoken man.

16   Q    (By MR. STERN) Okay.  In your state petition you basically

17   complained about the same things you're complaining about here;

18   your illegal arrest, and you added in some other things about

19   improper act -- actions of the judge, right?

20   A    I cannot recall exactly what the document is -- says.  I

21   don't have it in my possession right now, so I'm not going to go

22   into what it says or what it doesn't say --

23   Q    Let me ask you this.

24   A    -- because I don't have it in front of me.

25   Q    Did you complain about your improper arrest?

1   A   I don't remember what's in it.

2         MR. STERN:  I need to approach the bench before I ask

3  the next question.

4         THE COURT:  Sure.  Come -- and Ms. Diaz, you're going

5  to have to come up with us.

6     (2:13:08 TO 2:14:05 P.M., BENCH CONFERENCE)

7  Q  (By MR. STERN) Now, you prepared --

8         THE COURT:  Mr. Stern, I've -- I'm adding the answer

9  into my notes.

10         MR. STERN:  Okay.

11         THE COURT:  Okay.  Because it's on the record anyway.

12         MR. STERN:  That's fine.

13  Q  (By MR. STERN) Now, the same day that you filed your state

14  petition, you filed your federal complaint, correct?

15  A  According to my recollection, yes, sir.

16  Q  Okay.  And when you filed it, did you pay a filing fee?

17  A  Did I pay a filing fee?

18  Q  In federal court.

19  A  No, I did not.

20  Q  Okay.

21         THE COURT:  Mr. Stern?

22         MS. DIAZ:  I filed an indigent -- indigent document.

23         THE COURT:  Yeah, I think -- I was going to say, I

24  think she did file an IFP.

25         MR. STERN:  Okay.

```
1              THE COURT:  I have not yet, necessarily, ruled on it,
2    but I think it was filed.
3              MR. STERN:  Okay, because -- I mean, I just didn't see
4    it on PACER.
5    Q    (By MR. STERN) Now, could you tell the Court what you do
6    for a living; like are you retired or...
7    A    I'm retired.  I'm on Social Security.
8    Q    Okay.  And just for my knowledge --
9    A    And I do a lot of work for churches in town.
10   Q    Okay.  So give me an idea of how much money you make.
11   A    How much money I make?
12   Q    Yes, ma'am, in a year.
13   A    $2,177 a month.
14   Q    Okay.
15   A    That's my Social Security.
16   Q    No problem.  And you didn't have $400 for a petition?
17   A    No, I didn't.
18   Q    Okay.  And the petition that you filed in state court --
19             THE COURT:  Mr. Stern, where are we going with all of
20   this?  You've already admitted up here I have jurisdiction.
21   You've conceded jurisdiction.
22             MR. STERN:  I -- I certainly have.
23             THE COURT:  So what's the point?
24             MR. STERN:  I'll move on.
25             THE COURT:  I mean, if you have a point, let me know.
```

1    Q    (By MR. STERN) Are you claiming that in Quemado there's no

2    public nuisance based on --

3    A    All I heard was "claiming."  I'm sorry.

4    Q    Okay.  Are -- is it -- is it your testimony that in Quemado

5    there is no public nuisance arising from a damaged water system

6    or sewage?

7         THE COURT:  Actually, Mr. Stern, that's your burden to

8    prove that it is -- exists.

9         MR. STERN:  Is it?

10         THE COURT:  It's -- it's your burden to prove that it

11    does exist.

12         MR. STERN:  I understand that, but can I ask her if --

13         THE COURT:  So why are you asking her?  It's your

14    burden, not hers.  Y'all are claiming the exception.  She's not.

15    She's claiming this should go to the voters.

16         MR. STERN:  But does -- does she acknowledge the

17    exception?

18         THE COURT:  No, she's never acknowledged the

19    exception.

20         MR. STERN:  But she's never stated it.

21         THE COURT:  Huh?

22         MR. STERN:  She's never stated that she doesn't

23    acknowledge it.

24         THE COURT:  The bottom line is, though, it's your

25    clients that have to prove there is a public nuisance for it to

1  proceed under those provisions.

2          MR. STERN:  I understand.

3          THE COURT:  She doesn't have to prove one does or

4  doesn't exist.

5          MR. STERN:  I understand that as well.  I'm just

6  asking her --

7          THE COURT:  So why -- why do -- why does she have to

8  tell you whether one exists or not?

9          MR. STERN:  I guess -- my question is -- I don't

10 understand what's improper about the question.

11         THE COURT:  What's improper is that I still control

12 this courtroom, Mr. Stern.

13         MR. STERN:  Yes, ma'am.  I understand that.

14         THE COURT:  And my question is this:  Why does she

15 have to acknowledge whether or not there is a public nuisance?

16 She's not the one that did the studies, she's not the one

17 relying on that.  You are, and your clients are.

18         MR. STERN:  But --

19         THE COURT:  So shouldn't they have to establish it

20 first that it does exist?

21         MR. STERN:  Well, they need to establish it, that's

22 for sure.

23         THE COURT:  Okay.  So why does she have to establish

24 it for you since the studies are not within her knowledge?

25         MR. STERN:  She can have an opinion about a nuisance.

```
 1              THE COURT:  I don't need her opinion, I need facts.
 2    The witness can testify to facts.  She's not an expert opinion
 3    as to a public nuisance in Quemado.
 4              MR. STERN:  Fine.  Okay.
 5              THE COURT:  That's -- this is not a 702/703 issue.
 6    Q    (By MR. STERN) Ma'am, are you familiar with the Quemado
 7    area?
 8    A    Yes, sir, I am.
 9    Q    Are you familiar with water issues out there?
10    A    Some.
11    Q    Okay.  What are some of the water issues out there?
12    A    Pardon me?
13    Q    What are some of the water issues out there?
14    A    At the present time, I have no idea --
15    Q    Okay.
16    A    -- what's going on with Quemado.
17    Q    All right.
18    A    I haven't been involved in a long time with Quemado.
19    Q    What about any of the other areas that were the subject of
20    the grant; are you familiar with those areas?
21    A    I can't hear you, sir.
22              THE COURT:  I'll -- I'll follow up, Mr. Stern.
23              He's asking if you're familiar with any other water
24    or sewage in any of the other areas of the grant.
25              MS. DIAZ:  I know that when I was the county judge way
```

1  back in 1990 to '94, I got some money, free grant, from the

2  Texas Water Development Board to improve the water plant at the

3  Radar Base.  I was working on getting the airport opened up.  It

4  didn't cost the taxpayers any money because it was a free grant.

5  That's all I know.  What condition it's in at the present time,

6  I have no idea.

7  Q    (By MR. STERN) Okay.  And are you opposed to the grant or

8  are you opposed to the tax increase resulting from the grant?

9        THE COURT:  Does it matter, Mr. Stern?  Does the

10 matter or the motivation for being opposed [sic]?  People can't

11 be opposed without a valid reason, according to your clients?

12        Is that --

13        MR. STERN:  I'm not --

14        THE COURT:  -- is that what you're asking?

15        MR. STERN:  I mean, I'm not sure I understand the

16 Court's question.

17        THE COURT:  My question is -- you're asking her why

18 she's opposed to the grant.  Does it matter?

19        MR. STERN:  Well, yes, in a way it does.

20        THE COURT:  Why?  Why would it matter to this Court?

21        MR. STERN:  She just testified she sought a grant and

22 didn't have to pay for it.

23        THE COURT:  I get it, Mr. Stern --

24        MR. STERN:  And now she's saying --

25        THE COURT:  -- but how is it -- how is it -- whether

1  or not they should have an election and they were improperly

2  denied that, why does it matter why they're for or against the

3  grant?  She is.  What does it matter?

4          MR. STERN:  Very well.  Apparently there's some sort

5  of problem between her and the judge.

6          THE COURT:  Okay, let's assume for --

7          MR. STERN:  It's political.

8          THE COURT:  -- let's assume for a moment this is a

9  personality conflict.

10         MR. STERN:  Absolutely.

11         THE COURT:  Let's assume.  Okay, let's assume that for

12  a moment.  How does that make the signatures on the petition

13  invalid?  How does it make the community's desire for an

14  election on these bond matters irrelevant or unlawful?  How?

15         MR. STERN:  I didn't say it's irrelevant.

16         THE COURT:  That's what y'all are getting to.  Then

17  what's the point?  What's the -- what's the point, then?

18         MR. STERN:  It's a point of --

19         THE COURT:  I know there's a lot of blad -- bad blood

20  in -- in all of this, Mr. Stern.  I don't -- I don't doubt it

21  for a minute.  I get what you're telling me.  But the bottom

22  line is, the fact that there's bad blood, even if we assume that

23  was the motivation, if they got the required signatures and they

24  did what was required, how does that invalidate the need for an

25  election?

1           MR. STERN:  Well, again, I've already spoken to that

2     at the bench --

3           THE COURT:  I get that.

4           MR. STERN:  -- and I know the Court rejected my

5     explanation.

6           THE COURT:  I -- I get that.  But what I'm saying is

7     you -- in terms of your questions.  Okay?  The question as to

8     why she opposes it, how is that relevant to whether or not they

9     met the requirements of a petition and an election?

10          MR. STERN:  That's not relevant to whether they met

11    the requirements.

12          THE COURT:  Well, that's what's before this Court.  So

13    if it's not relevant, why are we going there?

14              I'll -- I'll assume there's bad blood, Mr. Stern.

15    I -- I don't have a problem making that assumption.  I'm just

16    saying, how does that validate or invalidate anything?

17          MR. STERN:  Well, it doesn't validate or invalidate

18    anything.

19          THE COURT:  Okay.  So then what's the point of asking

20    it?

21          MR. STERN:  How about I just withdraw the question?

22          THE COURT:  Okay.  Proceed and ask the next question

23    that would go to what's before me.

24          MR. STERN:  Pass the witness.

25          THE COURT:  Okay.  Ms. Diaz, any additional testimony

1  based on the cross-examination that you want to get on the

2  record?  This is what we call redirect.

3          MS. DIAZ:  I can speak now?

4          THE COURT:  Uh-huh.

5                      REDIRECT EXAMINATION

6          MS. DIAZ:  Okay.  My -- my interest --

7          THE COURT:  Okay, well, I told him he couldn't ask you

8  why you --

9          MS. DIAZ:  -- my involvement --

10         THE COURT:  -- did this, but if you want to tell him,

11 I'll let -- I'll let you tell Mr. Stern.

12         MS. DIAZ:  My involvement in this petition is simply

13 because the plans that were provided by the county as to where

14 the waterlines are going to go on that much money that's going

15 to be charged to the taxpayers are for properties owned by Ruben

16 Garibay, the one that paid the campaign for the county judge,

17 and also the same man that got the third international bridge

18 authority from the county judge.  And I do not believe that the

19 taxpayers of Maverick County should be improving properties for

20 the investors at the cost of taxpayers' property taxes when

21 there's personal interest involved.

22         THE COURT:  Okay, well -- so, Mr. Stern, she answered

23 your question.  How about that?

24         MR. STERN:  She did.  And so I just asked her --

25         THE COURT:  So do you need to ask a -- I'll let you

1  give recross in just a moment.

2          MR. STERN:  Oh, I'm sorry.  I didn't know she'd

3  finished.

4          THE COURT:  Yeah, I -- I don't know.

5            Are you finished with your statement?

6          MS. DIAZ:  I am through, ma'am.  Yes.

7          THE COURT:  Okay.  Go ahead, Mr. Stern.

8                      RECROSS-EXAMINATION

9  BY MR. STERN

10 Q    Describe for the Court what personal interests are

11 involved?

12          Sorry.  Judge, can I just approach her?  It's

13 easier.

14         THE COURT:  Yes.  Just so long as we can all hear you,

15 Mr. Stern.

16          MS. DIAZ:  Thank you.

17 Q    (By MR. STERN) Describe for the Court what personal

18 interests are involved.

19 A    My goodness.  If somebody pays for my campaign, there would

20 definitely be interests.

21 Q    Okay.  Now, are you claiming that the mayor is somehow

22 financially -- actually, the county judge is somehow financially

23 benefiting from this project?

24 A    That's what the plans depict to my -- my personal opinion.

25 Yes.

1    Q      But based on what?

2    A      Based on the fact that it's public record.  On the

3    financial campaign records that were provided by the county

4    judge to Isamari Villarreal, who also handled that that I have

5    in my possession, where monies were given to those people that

6    the judge has deliberately approved.  And that's not the only

7    one.  There's several others.  They're not in question right

8    now.

9    Q      But is it illegal to -- I'm not going to call it "do

10   favors," but is it illegal that people that contribute to your

11   campaign have property that happens to be the subject of a

12   grant?

13   A      I think if I have one lot and the -- the economic

14   development projects are going to be touching my property, no.

15   But when it's in every property -- Quemado, Hopedale -- Quemado,

16   Hopedale and -- and Thompson Road -- I mean, somebody has to be

17   blind not to see the writing on the wall.

18   Q      Okay.  Well, are you saying that there's something corrupt

19   about this because the mayor --

20   A      That's up to the district attorney --

21   Q      No, wait a second.  I'm asking you.  Are you saying there's

22   something wrong with the fact that the mayor --

23   A      I'm saying there's something very --

24   Q      Let me finish, please.

25              THE COURT:  Let him -- let him ask a -- wait, wait,

1  wait.

2           MS. DIAZ:  I apologize.  I'm sorry.

3           THE COURT:  Let -- let him ask a question.

4  Q    (By MR. STERN) That's no problem.  I get you.

5  A    I'm so sorry.

6  Q    Okay.  You're fine.

7           Are you saying there's something corrupt when a

8  politician runs a project through property that's owned by

9  people that contributed to his campaign?

10 A    I think I already answered your question.

11 Q    Would you --

12 A    I said when it's one lot, perhaps not.  But when it's in

13 every subdivision, in every project through the entire

14 24-million-dollar project, that is not normal.  My opinion,

15 there's something going on.

16 Q    Okay.  But what is it that's going on?  That's what I'm

17 asking you.

18           THE COURT:  I think I've already heard it, Mr. Stern.

19 She's already explained it several times.

20 Q    (By MR. STERN) Okay.  Now --

21           THE COURT:  So -- okay, so let me ask both of you, how

22 many -- how many miles does this project cover?  Do we know how

23 many miles it covers?

24           MS. DIAZ:  I don't know how many miles, Your Honor,

25 but I know that Thompson Road, Mr. Garibay owns property on that

1    road.  That's 1588, I believe, or 1589.  I'm not sure of the

2    number.

3            THE COURT:  Okay, so what I'm trying to figure out is,

4    how many miles does this cover and how many miles is of this one

5    person?

6             Maybe that will help elucidate, I guess, the answer,

7    Mr. Stern.

8            MS. DIAZ:  How many miles is that money going -- going

9    to be invested in is your question?

10           THE COURT:  Uh-huh.

11           MS. DIAZ:  Okay.  Ooh, I'm going to say, Thompson

12   Road -- I'm going to say less than a mile on Thompson Road.

13           THE COURT:  Okay.

14           MS. DIAZ:  Quemado, one block, I believe, if I'm not

15   mistaken.  Hopedale is kind of scattered out, but if I remember

16   the -- the design of the plans, there's -- I'm going to say

17   maybe a mile.

18           THE COURT:  So -- so, Mr. Stern, is -- do you want to

19   ask her a question about the mileage?

20           MR. STERN:  I would like to, Judge.

21           THE COURT:  Okay.  Go ahead.

22   Q    (By MR. STERN) How did you determine how many miles are

23   covered by the project?

24   A    Sir, if you lived in Eagle Pass as long as I have and

25   campaigned, been involved with the needs of the community, you'd

1  know every block in the city and the county.  That's how I know.

2  And because I saw the plans posted over Commissioners Court.

3  Q    Okay.  And how many projects are involved in extension of

4  the sewage lines or the public improvement?

5  A    How many?

6  Q    Yes, ma'am.

7  A    I have no idea.  That would be up to the Commissioners

8  Court because they keep everything secret.  So I don't know.

9  Q    But you --

10  A    Even the other commissioner doesn't know anything about it.

11  Q    Well, did you just say the plans were published?

12  A    The plans were published?  I don't know if they were or

13  not.  I'm not aware.

14  Q    Did you just say you saw them on the bulletin board?

15  A    I didn't say "published."  I said they're plastered.

16  There's pictures in Commissioners Court.

17  Q    Okay.

18         THE COURT:  Okay, so is the difference between the

19  wording versus pictures?  It sounds like that's what I'm

20  getting.  So you saw the -- the maps.

21         MS. DIAZ:  No, not the maps.  Streets.

22         THE COURT:  Oh, you saw pictures --

23         MS. DIAZ:  This street within Arroyo and another

24  street within Arroyo.

25         THE COURT:  Oh, so you saw pictures of the --

```
 1              MS. DIAZ:  I haven't seen the plans themselves.

 2              THE COURT:  Okay.  So they're pictures of the physical

 3    locations --

 4              MS. DIAZ:  Yes.

 5              THE COURT:  -- not of the maps of where the plan is.

 6              MS. DIAZ:  Exactly.

 7              THE COURT:  I got you.  Okay.

 8                Go ahead, Mr. Stern.

 9              MR. STERN:  Okay.

10    Q    (By MR. STERN) Let me show you this document, ma'am.

11                Are you familiar with what you're seeing?

12    A    No, sir, I've never seen it.

13    Q    Okay.  Have you ever seen this document?

14    A    No, sir, I have not.

15    Q    This document?

16    A    No, sir, I have not.

17    Q    This one?

18    A    No, sir, I have not.

19                No, sir.

20    Q    This one?

21    A    No, sir.  No, sir.  No, sir.

22    Q    How about any of these?

23    A    No, sir.  None of those plans that you are providing, and

24    that you also showed the Court, have I ever seen them before.

25    Q    Okay.  No problem.
```

1          Let's take a look at this document over here

2    entitled, "U.S. Geological Map."  I guess it's considered

3    proposed improvements.  Do you see that?

4    A    I see it on the paper, yeah.

5    Q    Who owns the property on either side?

6    A    I have no idea right now.  I'd have to look -- glancing at

7    that, I don't know.

8    Q    Okay.  Here's the proposed waterline that runs along 277.

9    Do you know who owns the property that it goes through?

10   A    What is your question?

11   Q    Who owns the property on either side?

12   A    Who owns the property?

13   Q    Yes, ma'am.

14   A    I'd have to go to the appraisal district to find out.

15   Q    So let me ask it in a global -- globally way -- global way.

16   Excuse me.

17          Who owns the property adjacent to where any of the

18   proposed improvements is subject -- and the certificates of

19   obligation, who owns the property through which the -- the

20   improvements would run?

21   A    Who owns the property?  You're asking the same question.  I

22   don't know, other than Mr. Garibay.

23   Q    Are you guessing or you know he owns it?

24   A    Ruben Garibay's name was brought out by one of the

25   residents from Quemado --

1    Q     That's not --

2    A     -- when the judge called for a meeting.

3    Q     But that's not my question.

4    A     Ask me again, then.

5    Q     Okay.  Ma'am, do you know of your own personal knowledge

6    who owns the property on either side of -- of proposed

7    improvements throughout the land in which the proposed

8    improvements will traverse?

9    A     Other than Mr. Garibay, no, sir.

10   Q     Okay.  And which land does Mr. Garibay own?

11   A     In all three sections.

12   Q     Are you saying that he owns everywhere that is the subject

13   of the certificates of obligation?

14   A     Yes.

15   Q     Okay.  Thank you, ma'am.

16         THE COURT:  Okay, any -- Ms. Diaz, any re-redirect

17   based on the questions of cross by Mr. Stern?

18         Anything else you want to say based on the

19   questions?

20         MS. DIAZ:  No.

21         THE COURT:  All right.  You may step down.

22         Let's take a ten-minute break.

23         MR. STERN:  Sure.

24         THE COURT:  Okay.  And then, Ms. Diaz, if you have

25   other witnesses you're going to call, you may call your next

1    witness.

2            COURTROOM DEPUTY:  Judge, (INAUDIBLE.  OFF THE MIC.)

3            THE COURT:  Ms. Diaz?

4            MS. DIAZ:  Yes, ma'am.

5            THE COURT:  If you have any other witnesses to call at

6    that point in time, then we'll do them when we come back from

7    the break in ten minutes.

8            MS. DIAZ:  I need to know when I can turn this in.

9            THE COURT:  Yeah, you can -- you can show it to us at

10   that point.

11           MS. DIAZ:  Thank you.

12           COURT SECURITY OFFICER:  All rise.

13       (2:34:50 TO 3:15:05 P.M., OFF THE RECORD)

14           THE COURT:  Okay, we're back on the record in

15   DR-23-CV-60.  All parties are present.

16            All right, Ms. Diaz, your next witness?

17           MS. DIAZ:  Yes, ma'am.  Thank you, Your Honor.

18            I would like to call Mr. Ramsey English Cantu,

19   Your Honor.

20           THE COURT:  Okay.  Mr. Cantu -- Judge Cantu.

21

22                    **RAMSEY ENGLISH CANTU,**

23   having first been duly sworn, testified to the following:

24

25           THE COURT:  Mr. Cantu, you've heard the Court.  You'll

1   need to speak into the microphone.  We have bad acoustics in

2   here.

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  Proceed.

5                        DIRECT EXAMINATION

6   BY MS. DIAZ

7   Q    Mr. Cantu, thank you for your appearance.

8              Could you state your name and your position as a --

9   as an elected official for the record.

10  A    Yes, my name is Ramsey English Cantu, and I'm county judge

11  for Maverick County.

12  Q    Mr. Cantu, I understand that sometime your -- well, let me

13  go back.  When did you take office as county judge?

14  A    January 1st of this year.

15  Q    Of 2023?

16  A    That is correct.

17  Q    So you've been in office, what, 11 -- a little over 11

18  months.

19  A    Eleven months, more or less.

20  Q    Okay.  When you took office, there was a time when you

21  needed a bond -- bond counsel.  And do you have a bond counsel

22  at this time?

23  A    That is correct.

24  Q    And who would that person be, please?

25  A    The Maverick County Commissioners Court appointed what is

1    Cantu Harden, which is represented by Mr. Carey Troell, here

2    in -- representing Maverick County.

3    Q    Is that the gentleman here in the courtroom?

4    A    That's correct, ma'am.

5    Q    Okay.  And when did he become an employee as -- under

6    contract with Commissioners Court -- or county --

7    A    He's not an employee, but he does have a contract with

8    Commissioners Court to serve as bond counsel from his firm.

9    Q    What -- when did you hire him?

10   A    Roughly -- approximately around Jan -- in January.

11   Q    January.

12        THE COURT:  Of this year?

13        THE WITNESS:  That is correct.

14        THE COURT:  Okay.

15        THE WITNESS:  Yes, Your Honor.

16        THE COURT:  Okay.  Go ahead.

17   Q    (By MS. DIAZ) And the bond counsel gets paid by the hour or

18   gets paid through commission, percentage, or how is he paid for

19   his services?

20   A    No, the services are -- are dependent upon the bonds that

21   are bond certificates of obligation.  The processes that go

22   through there, that's how it is determined, if I recall

23   correctly.

24   Q    So on this 24 million where the county's going to be paying

25   back 7.2 million, the bond counsel would get paid a percentage

1  of that or is it hourly or --

2  A    I would have to go back to the actual contract and review

3  that, Mrs. Diaz, in order to give you a correct answer on that

4  matter because I do not -- don't -- don't have that information

5  with me at this time.

6  Q    And this gentleman that was hired that is in the courtroom

7  right now, when you hired him, he's been the one advising you on

8  this bond issue of the 24 million COs?

9  A    That is correct.

10  Q    That is correct.  Thank you.

11        And is he the one that advised you that you

12  needed -- after we presented the petition, is he the one that

13  advised you that it was okay to declare an emergency to get it

14  through?  Was that his recommendation?

15  A    The -- the recommendation that was pres --

16        MR. STERN:  First of all, it's attorney/client.

17        THE COURT:  It's -- counsel, y'all are the ones that

18  are relying on the emergency.  She gets to ask how it came

19  about.

20        THE WITNESS:  In regards to the specifics of the

21  actual -- the question that you're asking is specific to, Did he

22  advise us that it was okay to determine if it was an emergency?

23  Is that your question that I'm understanding, ma'am?

24  Q    (By MS. DIAZ) Did you get advice from him, as your bond

25  counsel, that if you would approve an emergency, the money would

1  go through -- through the certificates of obligation for the

2  Texas Water Development Board?

3  A    No, ma'am.  Our -- our options were provided to us with the

4  legal recourse that was given to us in order to make sure that

5  we could present -- or be informed to make a --

6         THE COURT:  Okay, so the question is:  Who provided

7  you with those options?

8         THE WITNESS:  That would be our bond counsel man.

9         THE COURT:  Okay, so that's what she --

10         THE WITNESS:  So there are options, ma'am.

11         THE COURT:  Okay.  That's what she was asking.

12         THE WITNESS:  Okay.

13         THE COURT:  Yeah.

14         THE WITNESS:  Very well.

15         Well, the quest -- if that is the question and that

16  is -- and if that -- if I may proceed with that, Your Honor.

17         THE COURT:  Sure.

18         THE WITNESS:  The -- the overall review of what bond

19  counsel does is they provide us with the options and the

20  recourse -- legal recourses that we can take in order to make

21  sure that we can proceed with everything in a legal manner.

22  Q    (By MS. DIAZ) So, you all -- and I'm saying "you all,"

23  Commissioners Court -- followed through with his recommendation

24  based on the fact that he has experience throughout?

25  A    Based on the --

1   Q      On this phase.

2   A      Based on the experience and based, of course, on -- on the

3   legal information and the law that was provided to the Court at

4   the time, the Court did consider and proceed with the next steps

5   that were taken.

6              THE COURT:  Okay, I have --

7   Q   (By MS. DIAZ) What is the name --

8              THE COURT:  Hold on, Ms. Diaz.  I have a --

9              MS. DIAZ:  I'm sorry.

10             THE COURT:  -- I have a question.

11              What were the options that you were given?

12             THE WITNESS:  The options, specifically, Your Honor,

13   were in regards to the concerns of where we were at as far as

14   regards to --

15             THE COURT:  Okay, so what were the options that were

16   given to you?

17             THE WITNESS:  So, specifically --

18             THE COURT:  Uh-huh.

19             THE WITNESS:  -- we were discussing, of course, the

20   options once the -- the -- and this was -- this was on a course

21   of time.  Okay?

22             THE COURT:  Okay, what were the options that counsel

23   provided to you as to what you could do?  You just said he

24   provided options of legal recourse.  What were those options?

25             THE WITNESS:  So, options in this case were to file in

1  the district court to consider what is a 1205 agreement.  Based

2  on the concerns that anything that is in regards to the local

3  government code is basically very clear where you -- where we --

4  where a governing body may have the opportunity to go before a

5  court and ask for the court's consideration based on the

6  petitions that are submitted -- or the petition that was

7  submitted.

8            THE COURT:  And the court's --

9            THE WITNESS:  If I recall everything correctly, on

10  that there's --

11           THE COURT:  And the court's consideration would be of

12  what?

13           THE WITNESS:  Of the petition that was submitted.

14           THE COURT:  Okay.  To determine whether or not it was

15  valid?

16           THE WITNESS:  It was valid.  Correct.

17           THE COURT:  Okay.  And then what other option?

18           THE WITNESS:  So the Court -- the Court, obviously in

19  that case, the Commissioners Court, decided -- we wanted to make

20  sure on the -- based on the decisions that were taken, the

21  Court -- we wanted to have, of course, our -- this reviewed

22  amongst another court.

23           THE COURT:  Okay, so what are the other options?

24           THE WITNESS:  So, on that, Your Honor, that -- that

25  was -- the -- the concern there -- the other option, of course,

1   was the issue of us taking this to a -- to an election, of

2   course, as it was mentioned, looking at the ways for us to see

3   what it is that we were going to do in order to make sure that

4   the -- the process was followed correctly --

5           THE COURT:  And what --

6           THE WITNESS:  -- legally.

7           THE COURT:  What other options?

8           THE WITNESS:  Those were the options, of course, that

9   were presented --

10          THE COURT:  So it was --

11          THE WITNESS:  -- for me to --

12          THE COURT:  -- so it was to file in district court to

13  determine if the petitions were valid or have an election?

14  Those were the only options that you were given?

15          THE WITNESS:  That I -- if I -- as I can recall, yes.

16          THE COURT:  Okay.  All right.

17              Go ahead.

18  Q    (By MS. DIAZ) When was the deadline for the

19  24-million-dollar bond -- I mean, certificates of obligation?

20  A    Deadline for what, ma'am?

21  Q    When was it?

22  A    Deadline for what?  I'm sorry?

23  Q    What was the deadline for you to submit it with -- for the

24  Texas Water Development Board to ensure the money?

25  A    For closing --

```
1   Q    Yes.
2   A    -- on the certificates of obligation, that was looking
3   roughly around the mid-December mark.  I don't have the exact
4   date.
5   Q    December of '23?
6   A    I -- I can't tell you what the -- I don't really recall
7   what the date is on that, but I know that it was mid- to late
8   December.
9   Q    What is the name of the company that the bond attorney
10  worked for?
11  A    Cantu Harden.
12  Q    I'm sorry?
13  A    Cantu Harden.
14  Q    Cantu.  Do you know a gentleman by the name of David
15  Gonzalez?
16  A    Yes, ma'am.
17  Q    Could you tell the Court who he is.
18  A    Mr. Gonzalez is the financial adviser for Maverick County.
19  Q    For Maverick County?
20  A    That's correct.
21  Q    And when was he hired?
22  A    Mr. Gonzalez was hired in January.
23  Q    In January also?
24  A    That is correct.
25  Q    Does Mr. David Gonzalez and the bond counsel work together
```

1    collectively?

2    A    They do.

3    Q    Yes, they do.  Thank you.

4              Who are the parents of David Gonzalez?

5    A    The parents of David Gonzalez are Roberto and Ana Gonzalez.

6    Q    Roberto and Ana Gonzalez.

7    A    That's correct.

8    Q    And may I ask you who is his sister that's an attorney?

9    A    His sister would be Sonia Gonzalez.

10    Q    Sonia Gonzalez?

11    A    That is correct.

12    Q    And she is the one that was -- or may still be the city tax

13    collection attorney?

14    A    I don't know --

15    Q    When you were there as county judge?

16    A    I don't know what the city has --

17    Q    When you were there as -- I'm sorry.  When you were there

18    as the mayor.

19    A    Mrs. Gonzalez was hired at the City of Eagle Pass during

20    the time that I was serving as a councilman.

21    Q    Thank you.  And is she working for Maverick County at this

22    point?

23    A    No, ma'am.

24    Q    She's not?  Has she submitted a proposal?

25    A    I do not know, ma'am.  I know that there have been

```
1   proposals submitted --

2               MR. STERN:  Judge --

3               THE WITNESS:  -- but I do not know who --

4               MR. STERN:  -- I want to know the relevance --

5               THE COURT:  Okay, wait, wait, wait, wait.  There's an

6   objection.

7                What, Mr. Stern?

8               MR. STERN:  Just the relevance of any of this.

9               THE COURT:  Okay, what is the relevance of all this,

10  Ms. Diaz?

11              MS. DIAZ:  What is relevant?

12              THE COURT:  Why is this relevant?

13              MS. DIAZ:  Relevant in -- in the sense that he -- that

14  Mr. David Gonzalez is the son of the man who ran his campaign.

15              THE COURT:  I understand, but how is that relevant to

16  what is in front of the Court right now?

17              MS. DIAZ:  Okay.  And I'm just trying to stipulate --

18  or bring about the -- the connection of the financial adviser

19  and the bond counsel working together.

20              THE COURT:  Okay, that has --

21              MS. DIAZ:  That's -- that's all I'm trying to do, and

22  he has --

23              THE COURT:  Okay, that -- he's already answered that

24  question.

25              MS. DIAZ:  Okay.
```

1    Q    (By MS. DIAZ) On the day in question that you and I,

2    Enriqueta Diaz, got into a dispute in Commissioners Court, if

3    you can recollect, what -- what authority did you have at that

4    time in Commissioners Court to issue a contempt of court and

5    order that I be arrested?

6    A    State law and local government code gives you -- the

7    authority to a county judge to offer or to place an individual

8    in contempt of court for any reason that may be a disruption to

9    the court.

10   Q    Could you give me that code?

11   A    I don't have it with me, but I can -- I can attest that

12   that has been researched; it has been reviewed in order to make

13   sure that that is actually state law.

14   Q    Mr. Cantu, are you referring to the code that stipulates

15   that Commissioners Court can hold somebody in contempt?  Is that

16   the code you're referring to?

17   A    Commissioners Court may hold an individual, and a

18   commissioner may make a motion to have an individual placed

19   under contempt, but the county judge is the ultimate authority

20   that can make that decision.

21   Q    The ultimate authority -- I need to know the code.  Where

22   does the code come from?  I know there exists a code that gives

23   Commissioners Court authority to hold someone in contempt, but

24   there's nothing in the code that indicates that the county

25   judge --

```
1              THE COURT:  Wait, wait, wait, wait.
2  Q    (By MS. DIAZ) -- has full authority.
3              THE COURT:  There -- I have an objection.
4              MR. STERN:  It's argument, Judge.  If she could ask
5  questions --
6              THE COURT:  Just ask a question of -- of the -- of
7  witness.
8                She's asking for the code section.
9  Q    (By MS. DIAZ) So you do not know --
10             THE WITNESS:  I don't have the code, Your Honor.
11             THE COURT:  Okay.
12             THE WITNESS:  I do apologize for that.
13 Q    (By MS. DIAZ) Is it possible for you to provide it for me
14 in the near future or tomorrow?
15             MR. STERN:  Judge, I can actually provide it for her
16 right now.
17             THE COURT:  Okay.  Why don't y'all provide to the
18 Court the -- the provision, and provide the Court with the
19 findings that must be made.
20             MS. DIAZ:  That's -- that's -- that's --
21             THE COURT:  What findings do you have to make
22 according to the code section, Judge?
23             THE WITNESS:  So, base -- based on -- on regards to
24 the -- the situation -- and I don't know if, Your Honor, you
25 wish for me to --
```

1          THE COURT:  I'm just saying, what findings are you

2     required to make under this provision in the courtroom?

3          THE WITNESS:  In the courtroom specifically?

4          THE COURT:  Uh-huh.

5          THE WITNESS:  If an indiv -- if an individual is

6     disruptive in the courtroom -- this is a courtroom decorum --

7          THE COURT:  Well, there are -- there are different

8     types of contempt of court.

9          THE WITNESS:  Right.

10         THE COURT:  Right.  There's one that's called "summary

11    contempt," which I think is what you're trying to get to.

12         THE WITNESS:  Uh-huh.

13         THE COURT:  But there are findings that need to be

14    made in the presence of the person in court.  What are those

15    findings that you have?

16         THE WITNESS:  So -- and you're asking, obviously, the

17    explanation of what happened.  Is that --

18         THE COURT:  No.  I'm asking generically, what findings

19    do you have to make to get to that summary contempt if it

20    applies in Commissioners Court?

21         THE WITNESS:  So if it does apply in particular in --

22    in Commissioners Court regarding to the actual contempt, the

23    individual actually does disrupt, that is where --

24         THE COURT:  Okay.

25         THE WITNESS:  -- I'm coming from based on --

1          THE COURT:  I -- I get it.  But there are findings

2    that a court has to make; otherwise, it is considered a criminal

3    case that has to go through the criminal process.

4          THE WITNESS:  Uh-huh.

5          THE COURT:  So my question to you is:  When you --

6    when you find something in that type of contempt that you're

7    describing, what kind of findings do you have to make in the

8    presence of the person in open court?  Because there are certain

9    findings that have to be made, I'm assuming.

10          THE WITNESS:  Sure.  And I --

11          THE COURT:  So what --

12          THE WITNESS:  -- and I -- I believe that in regards to

13    that, of course, the process and what has been informed to me

14    through TAC, the Texas Association of Counties --

15          THE COURT:  Uh-huh.

16          THE WITNESS:  -- in regards to all of these particular

17    issue, the concerns that I have had during our trainings were,

18    one, that we had to issue warnings to these individuals.  Those

19    warnings were issued, and of course were not adhered to.

20          THE COURT:  Okay, but what findings do you have to

21    make?  I'm sure there's specific findings that you would have to

22    make about the disruption.  So what findings are those that you

23    would general -- generically -- not in this case, but

24    generically would have to make?  I'm -- I'm aware of some

25    summary contempt --

1          THE WITNESS:  I'm sure -- I'm sure that -- the state

2     code would have those reflected, and I'm pretty sure that we

3     could --

4          THE COURT:  Okay, but wouldn't you have to make those

5     in the presence of the person in open court?

6          THE WITNESS:  In regards to the contempt hearing?

7          THE COURT:  Uh-huh.  So what are those particular

8     findings that you would generically have to make?  Not

9     specifically in this case.

10          THE WITNESS:  Okay.  So --

11          THE COURT:  I'll give you -- I'll give you an example.

12     So we have authority -- different types of contempt, right?  One

13     is called "summary contempt."  For me to find somebody in

14     summary contempt in court, it has to happen in my presence or

15     view, I have to make that finding.  I have to find that they're

16     being disruptive, disrespectful, obstructive, and what they

17     disrupted.  I have to make those findings in court before I

18     could make a finding of contempt.  Those are the kind of

19     findings.

20          For you to do that, what are those findings that you

21     have to make generically?

22          THE WITNESS:  So in this -- in this case, this -- the

23     individual in question, which is Ms. Diaz --

24          THE COURT:  No, I'm talking --

25          THE WITNESS:  Oh, in general.  In general.

1          THE COURT:  -- I'm talking in general.  What kind of

2    findings would you have to make?  Because if the person -- let's

3    just say the person -- let's say they're disruptive or whatever

4    and they leave and I don't make those findings, then it's

5    criminal contempt.  And for that there has to be an indictment

6    or an information filed, they have to have an initial

7    appearance, they have to be given counsel if they can't afford

8    counsel, and then you have a contempt trial like a criminal

9    trial.

10          THE WITNESS:  Right.

11          THE COURT:  Okay.  So that's what differentiates the

12    two.  My question is.  Generally, what findings do you have to

13    make in Commissioners Court to make that differentiation?

14          THE WITNESS:  Well, specifically it is noted there in

15    front of the Court.

16          THE COURT:  I know, but you can't just say "contempt

17    of court."

18          THE WITNESS:  No, no, no.  This was --

19          THE COURT:  I'm saying what --

20          THE WITNESS:  -- this was based upon --

21          THE COURT:  I know, but what findings do you have to

22    make?  You still have to make findings, even if it's conduct

23    that occurs in front of you.  What findings did you make -- or

24    generically do you have to make?

25          THE WITNESS:  I don't think I'm following your

1    questions, Your Honor.  I apologize.

2            THE COURT:  Okay.  No problem.  I'm just talking

3    generically, not in this case.  Okay?

4            THE WITNESS:  Yeah.  Okay.

5            THE COURT:  So let's say for a moment, Mr. Cantu -- I

6    should call you Judge Cantu.

7                Let's say for a moment that Mr. Stern gets up and

8    starts yelling and screaming and doing that kind of stuff in my

9    court.  If I tell him, I'm going to hold you in contempt, and he

10   walks out, I can no longer use summary contempt.  Okay?  I have

11   to go through the whole criminal, legal process, and they have a

12   right to be presumed innocent and all that kind of good stuff.

13   Okay?

14               If I'm going to hold him in contempt -- summary

15   contempt -- which in federal court, it's punishable by up to

16   three days in jail and a thousand-dollar fine.  I have to tell

17   him in court what he did, why he did it, and that it was in my

18   presence before I could find him in contempt and punish him.

19   Okay?  And give him an opportunity to address the Court.

20               So those are the different findings.  So I'm asking

21   you -- I'm assuming you were trying to find summary contempt in

22   this particular case.  So generally, what findings do you have

23   to make for that to be upheld?

24           THE WITNESS:  Well, I believe that when -- in -- in

25   regards to what is the -- the statute, what is on there

1    specifically and what has happened presently in front of me as

2    judge --

3              THE COURT:  Okay, I'm not asking what happened in this

4    case because obviously --

5              THE WITNESS:  Well, I think this case or any others --

6              THE COURT:  Yeah.

7              THE WITNESS:  -- it's -- it's --

8              THE COURT:  So why --

9              THE WITNESS:  -- a generic -- generic.

10             THE COURT:  I'm not saying what conduct qualifies.

11   I'm asking what findings do you have to make?

12             Let me give you another example.  So when I take a

13   plea of guilty, okay, defendant pleads guilty.  At the end of

14   the plea, I have to find that they've entered their plea

15   knowingly and voluntarily, that they understand the charge.  So

16   I have to make findings.

17             That's -- so what I'm saying is, what specifically

18   do you have to find to be able to impose summary contempt

19   punishment?  Not that it happened in front of you, not what the

20   individual person did, I'm asking what kind of findings do you

21   have to make?  Otherwise it's criminal contempt, and that has to

22   go through the legal process.  So what differentiates those two

23   processes for you and what findings do you have to make

24   generically?

25             THE WITNESS:  Well, Judge, and based -- based upon at

1  has been informed to us from our trainings, of course, as -- as

2  mentioned and everything -- this is 11 months.  It is a new

3  process.  I come from the mayoral side --

4          THE COURT:  I realize that.  I realize that.

5          THE WITNESS:  And this has been, ultimately, a -- a

6  new process for us, so we are going through this complete

7  change.

8          THE COURT:  Uh-huh.

9          THE WITNESS:  However, nonetheless, when we go

10  through -- or when I went through this particular situation, or

11  in any situation, the respect of court decorum, one, needs to be

12  upheld --

13          THE COURT:  I get --

14          THE WITNESS:  -- on the concerns --

15          THE COURT:  I get -- okay.  I understand what could

16  lead to a contempt proceeding.  I understand that.  Okay?  I've

17  used summary contempt in my court, so I -- I know what you're

18  talking about.  So I know -- but though it happens in my

19  presence and it's a very horrible situation, I still have to

20  make specific findings as to why I'm finding the person in

21  contempt and give them the opportunity to address it in my

22  court.  Otherwise, it goes through the full legal panoply.

23          My question to you is:  What are those findings that

24  you have to make?  Did anybody ever explain what findings you

25  have to make, as opposed to you having the authority?

1          THE WITNESS:  The authority.  Based -- based on that

2   and based on --

3          THE COURT:  I know you have the -- I know you have the

4   contempt authority.  My question is:  Did they ever tell you

5   what findings you have to make?

6          THE WITNESS:  In specifics?

7          THE COURT:  Uh-huh.

8          THE WITNESS:  For that?

9          THE COURT:  Uh-huh.

10          THE WITNESS:  I would have -- I would have to go back

11   and -- and -- and review --

12          THE COURT:  Okay.  So you -- you're not recalling what

13   those specifics are.

14          THE WITNESS:  That's correct.

15          THE COURT:  Okay.

16          THE WITNESS:  I'm not recalling at the moment.

17          THE COURT:  Okay.  That's what I was trying to find

18   out, what findings you had to make.  Generically.  Not in this

19   case.

20          THE WITNESS:  Okay.

21          THE COURT:  All right.  Go ahead.

22            And I think I do have the code provision.  See if

23   this sounds familiar.  It's 81.023 of the -- of the government

24   code.  Okay?

25          THE WITNESS:  And that's where -- I believe it's

1    Commissioners Court specifically.  Because I do have the county

2    court --

3              THE COURT:  Uh-huh.  It -- it --

4              THE WITNESS:  -- I have the county court jurisdiction

5    plus --

6              THE COURT:  Yeah, this one is Commissioners Court.

7              THE WITNESS:  -- Commissioners Court jurisdiction.

8              THE COURT:  Go ahead, Ms. Diaz.

9              MS. DIAZ:  Thank you, Your Honor.

10   Q    (By MS. DIAZ) Mr. Cantu, you -- at one time there was a

11   time when you visited Ms. Isamari.  I'll ask you in a direct

12   question:  Who is Isamari Villarreal?

13   A    Ms. Isamari Villarreal serves as the elections

14   administrator for Maverick County.

15   Q    Was she there before you got elected?

16   A    Ms. -- in that capacity?  Ms. Villarreal was an employee --

17   Q    Before January the 1st.

18   A    Ms. -- Ms. Villarreal was an employee of Maverick County.

19   Q    Was she the election administrator prior to January the

20   1st, 2023?

21   A    She was an employee for Maverick County.

22             THE COURT:  I'm sorry, I didn't hear that answer.

23             THE WITNESS:  No, she -- she was --

24             THE COURT:  Okay.

25             THE WITNESS:  -- not the elections administrator --

1          THE COURT:  Okay.

2          THE WITNESS:  -- prior to the 1st, but she was an

3   employee for Maverick County.

4          THE COURT:  Okay.

5   Q    (By MS. DIAZ) Was she a continued employee with Maverick

6   County -- was she an employee at the time that you got elected?

7   A    Yes, ma'am.

8   Q    Of Maverick County?

9   A    Of Maverick County.

10  Q    What was her position?

11  A    Mrs. Villarreal was working as a clerk in Sara Montemayor's

12  office under the County Clerk's Division.

13  Q    Okay.  Now, when you got elected, you selected

14  Ms. Villarreal to come work as the election administrator; you

15  appointed her?

16  A    The committee that is set by statute, which is set up by

17  law, for the -- which is the two Democratic and Republican party

18  chairs.  Myself, the tax collector, and the county clerk are the

19  individuals that are charged with hiring an elections

20  administrator.  The election administrator is appointed by the

21  committee.

22  Q    So you didn't have anything to do with giving her a job?

23  A    I'm a member of the committee.

24  Q    You're a member of the committee.

25          Okay, so what are the -- what are the duties of the

1   election administrator according to your knowledge?

2   A    The elections administrator is there to serve as the

3   custodian for the election process; they work closely with the

4   secretary of state in order to make sure that the provisions of

5   the election law are upheld, as well as making sure that all of

6   the processes for the election are held to -- to the correct

7   standards.

8   Q    And it was Isamari Villarreal, as the election

9   administrator, to your knowledge that was presented with the

10  petition to verify the signatures?

11  A    To my knowledge, it -- what was done was that it was

12  presented to Mrs. Montemayor, and Mrs. Montemayor, the county

13  clerk, provided that information to Mrs. Villarreal.

14  Q    So Ms. Villarreal, and I assume her staff, were to verify

15  the signatures from the petition presented?

16  A    That is the responsibility of the elections administrator.

17  Q    Okay.  What brought you to go to her office and request a

18  copy of the list of signatures?

19  A    As the county administrator for Maverick County, I did go

20  to -- since it was on, what I recall, was the 10th of October

21  when that petition was received, the County Commissioners Court

22  was set and scheduled to have a meeting at 5:00 p.m.  I believe

23  that the petition was received in the late afternoon, if I'm not

24  mistaken, or early mid-day.  My concern was that we had had

25  items on the agenda that were pursuant to the continuance of the

1    Texas Water Development Board loan.  And in that process, we

2    wanted to make sure that -- I wanted to make sure, as the

3    administrator for the county, that we were aware that there was

4    a petition submitted to the -- to the county.  It was not

5    submitted to the Court, but it was submitted to the county.  And

6    that's when I did speak with Mrs. Villarreal about that to

7    confirm.

8    Q    So at that meeting that you all were going to have that

9    same day that the petitions were presented to Isamari and Sara

10   Montemayor, you had a meeting scheduled at, what, 5 o'clock,

11   5:30?

12   A    5 o'clock is the regular meeting.

13   Q    And at that time you had two items on the agenda in

14   reference to the certificates of obligation?

15   A    I believe so.  I would have to go back and confer.  I know

16   that there were items that were specific to the certificates of

17   obligation, but I'm not sure if there were just two.

18   Q    And what -- what action did you all take on those items?

19   A    Once we did -- once I did have the information that was --

20   there was a petition that was submitted, I did ask the Court to

21   consider its holding and tabling of the items in order for us to

22   have the -- the process, due process, followed by the elections

23   administrator's office.

24   Q    Was bond counsel there at the time?

25   A    Yes.

1          THE COURT:  Who?  Oh, bond counsel.

2          THE WITNESS:  Bond counsel.

3          MS. DIAZ:  Bond counsel.

4          THE WITNESS:  Yes.

5   Q    (By MS. DIAZ) Was he there at the time?

6   A    Yes.

7   Q    Did you ask him if you could continue on or you needed to

8   stop since the petitions had already been presented in the

9   morning?

10  A    I had spoken with bond counsel prior to the meeting

11  regarding several topics, of which one of those was to discuss

12  the -- the petition that was submitted.  And it was recommended

13  at that time that we would go ahead and hold off until the

14  petition was reviewed.

15  Q    Do you recall me being there at that meeting?

16  A    I know that you've attended a couple of meetings.  I don't

17  know if you were there at that one.

18  Q    Now, it's already been testified to by Mr. Iracheta -- and

19  it may be wrong if he's not the county judge -- that it was

20  sometime in December -- and you also said the same thing -- for

21  the deadline to submit the -- the approval so they could go

22  ahead and release the money.

23          The deadline for the COs by the Texas Water

24  Development Board, it was in the month of December where you had

25  to get it through or it would be canceled.  Am I correct?

1   A     December the -- the date that is -- that is set for

2   December is the closing for the Texas Water Development Board.

3   Q     Exactly.  So, again, December was the deadline.  If -- if

4   you did not submit all the documents approving that bond, or

5   those COs, that would be dead on its feet, you would not get a

6   cent out of that 24 million you needed?

7   A     The -- the certificates of obligation would not meet the

8   requirements at that point.

9   Q     Would not meet the requirements.

10         So, later on, after I was taken out of Commissioners

11  Court, you provided a document -- I believe you said -- and

12  we're going to look at it on video.  I believe you indicated it

13  was from the Texas Water Development Board where it depicted in

14  the letter that there was a public nuisance, health hazard,

15  whatever.  Whatever wording, but it was a public health issue.

16  And they were advising you that it was the water plant at the

17  Radar Base.  And I believe, if I'm not mistaken, it was June,

18  May.  I saw that on the video.  And again, it'll come out on the

19  video in a few minutes.

20         That document that you presented there, when you

21  were -- you were talking about that it was an emergency, the

22  same way as our petition was, that it was for emergency

23  purposes, so therefore let's approve it.

24         THE COURT:  What is the question?

25         MS. DIAZ:  The question is:  On that document that he

1    was providing, when did he get that, and what was the specifics

2    of that letter from the Texas Water Development Board or TCEQ?

3    Q    (By MS. DIAZ) What were the specifics of the public

4    nuisance or public health problem?

5    A    So, in regards to your question, which I hope I'm

6    understanding correctly, when the Texas Water Development Board

7    reviews any case, they are reviewed specifically with the --

8    because of the fact that they will assist an economically

9    distressed area.  Which Maverick County, in this case, does have

10   an economic distress concern at the moment.

11           On the -- and I -- if I recall the date correctly,

12   of June 6th, it is on the Texas Water Development Board letter

13   that has a resolution that has been signed and approved by the

14   Texas Water Development Board, and it's been signed by the

15   chairman, or chairwoman, specifically listing every aspect of

16   the project, including the concerns of public threat for health,

17   and even danger.

18           THE COURT:  And even what?

19           THE WITNESS:  Danger, in regards --

20           THE COURT:  In the -- is that in the proposal that I

21   saw?

22           THE WITNESS:  That's -- that's on the resolution,

23   Your Honor.

24           THE COURT:  Is that a part of the proposal that

25   Mr. Stern showed me?

1          THE WITNESS:  I'm not sure what he showed you.  If

2     it's the Texas Water Development Board, the resolution, the --

3     the letter --

4          THE COURT:  Yeah, it was the resolution.

5          THE WITNESS:  So it's not the letter.  There's a

6     resolution.  The resolution on there is --

7          THE COURT:  I thought it was -- the one that says

8     "whereas"?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay, I saw the resolution.

11          THE WITNESS:  So on the resolution specifically --

12     it's a number of pages, and there's a number of -- of outlines

13     specifically on that document.  Within that document, the Texas

14     Water Development Board, since June, declared that, based on the

15     economic relief distress concern, as well as the situation of

16     what we're facing with the water plant.

17          Now, might I remind you --

18          THE COURT:  That's not in the proposal I -- that I

19     saw.

20          THE WITNESS:  It -- I --

21          THE COURT:  It just says it's a public nuisance based

22     on the projects that were submitted.

23          MR. STERN:  If can approach, Judge?

24          MS. DIAZ:  Precisely what I --

25          THE COURT:  Okay, hold -- hold -- hold on --

```
 1            MS. DIAZ:  -- was getting to.

 2            THE COURT:   -- hold on.

 3            MS. DIAZ:  Yes, ma'am.

 4            THE COURT:  Let me see, Mr. Stern.

 5            Okay, he just may just need to refresh his memory is

 6  all, Mr. Stern.  That may be all that needs to be done.

 7            MR. STERN:  I'm -- I'm just going give this to the

 8  clerk and...

 9            THE WITNESS:  Your Honor, may I have some water?

10            THE COURT:  Sure.  Let me see where we can get you

11  some.

12            Can he have some water, Ms. Green.

13            You can come up, Mr. Stern.

14     (3:46:52 TO 3:47:48 P.M., BENCH CONFERENCE)

15            THE COURT:  Judge?

16            THE WITNESS:  Yes?

17            THE COURT:  Refresh your memory and --

18            THE WITNESS:  Sure.

19            THE COURT:  -- because you were saying that there's

20  specifics of the problems, the health problems.

21            And, Mr. Stern, that would be what?  Defense Exhibit

22  what?  Three?

23            MR. STERN:  That'd be fine.

24            THE COURT:  Will it -- will it be Three?  Okay.

25            MR. STERN:  It's not marked, Judge.  I apologize.
```

1           THE COURT:  That's okay.  We'll -- we'll get them

2   marked.  I know that you already had One and Two, but I don't

3   remember what those are, Mr. Stern.

4           MR. STERN:  Those were the voter lists.

5           THE COURT:  Okay.  That's right.

6           THE WITNESS:  So, on there specifically --

7           THE COURT:  Go ahead.  Go ahead.  Uh-huh.

8           THE WITNESS:  So on there specifically, Your Honor,

9   it -- it does state there on the -- based on the resolution on

10  Item One.

11           Based on the findings stated above, the Texas Water

12  Development Board determines that a nuisance dangerous to the

13  public health finds safety exists in the area to be served by

14  the proposed project pursuant to --

15           THE COURT:  Okay, so what are --

16           THE WITNESS:  -- Texas Water Code 17.

17           THE COURT:  -- are specific findings, though?

18           THE WITNESS:  So, based on the findings -- and I know

19  that there -- there's a lot more information that can be

20  specifically provided by the water commissioner --

21           THE COURT:  Okay, but you -

22           THE WITNESS:  -- but I can give you some additional

23  specifics such as --

24           THE COURT:  Okay.  Stop for just a second.

25           THE WITNESS:  Yes.

1          THE COURT:  Because you were testifying that in that

2    proposal it has specific health problems.  What are those

3    specific health problems that are in that document?

4          THE WITNESS:  Well, the document goes on -- and I can,

5    of course, go in and look at those completely again.  It's been

6    a while since I've seen the entire document again.

7          THE COURT:  I'm just making sure --

8          THE WITNESS:  But based on the -- on the water code --

9          THE COURT:  I'm just making sure that I didn't miss

10   something.  No, I looked at those provisions for the water code.

11   They don't specifically set out what the health problems are.

12         THE WITNESS:  Okay.  So on there, though, on the

13   designation and of course on the nuisance dangerous to the

14   public health and safety exists in the area --

15         THE COURT:  Okay, so what are those specific --

16         THE WITNESS:  -- to be served by the proposed

17   project --

18         THE COURT:  What are those specific --

19         THE WITNESS:  So --

20         THE COURT:  -- problems?  Not what the statute says,

21   not what you're supposed to say to cover.  The question is:

22   What are those specific problems y'all are relying on?

23         THE WITNESS:  So, I can give you example, of course,

24   of what we are living through as living testimony of the

25   situations that we have heard from the citizens --

1          THE COURT:  Mr. Cantu, you're not providing these --

2     this project for the entirety of all the people that have

3     problems.  You have a lot of colonias, you have a lot of areas

4     that are not.  So, the bottom line is, you're really not taking

5     care of the public health or the nuisance of everybody, it's

6     just some people.  And 24 million plus 7 million is going to

7     cover a really small area because that's -- it's going to be a

8     very expensive project, isn't it?

9          THE WITNESS:  It is a very expensive project,

10    Your Honor.

11         THE COURT:  So if it's such a horrible nuisance, why

12    isn't it covering all of the places in Maverick County that need

13    that?

14         THE WITNESS:  So Maverick County has what is a utility

15    review of what is responsible to Maverick County.  All areas

16    outside of the northern portion of Maverick County, from

17    Thompson Road forward, are supplied water and sewer services

18    through the Maverick County Water Plant.

19         THE COURT:  Not all of them.

20         THE WITNESS:  Every -- exactly.

21         THE COURT:  Not all of them.

22         THE WITNESS:  And that's -- that is the intention --

23         THE COURT:  Not all of them, Mr. Cantu.

24         THE WITNESS:  No, no, and I understand that.

25         THE COURT:  Okay, but the problem is, when I look at

1  these maps that Mr. Stern showed me, you're servicing the same

2  areas that already have that --

3          THE WITNESS:  So --

4          THE COURT:  -- with this project.  So my question is:

5  What other areas are being served that don't already have that?

6          THE WITNESS:  So if I can give you an understanding,

7  Your Honor --

8          THE COURT:  I have an understanding.

9          THE WITNESS:  No, no.  But an understanding based

10  on --

11          THE COURT:  Judge Cantu, I have a real good

12  understanding.

13          THE WITNESS:  No, no.  I understand.  I understand

14  that.

15          THE COURT:  Okay.  So the bottom line is, when I look

16  at those maps, what's in red and what's highlighted, aren't

17  those areas that already have water lines all the way to the

18  northern part of --

19          THE WITNESS:  I would have to see the maps --

20          THE COURT:  Sure.

21          THE WITNESS:  -- that you saw, ma'am.  Is that fine?

22          THE COURT:  Mr. Stern, bring those maps up.

23          Just give him the ones you brought to me, Mr. Stern.

24  That's fine.  That's enough.

25          MR. STERN:  I wish I could remember which ones they

1  were.

2          THE COURT:  It -- it was the three phases of the

3  project.  It was -- it was the maps that had -- were

4  color-coded.

5          MR. STERN:  Right.  Here's one.

6      (BRIEF PAUSE)

7          THE WITNESS:  So, Your Honor, in regards --

8          THE COURT:  Uh-huh.

9          THE WITNESS:  -- to these particular projects as -- as

10  they -- they are defined --

11          THE COURT:  Uh-huh.

12          THE WITNESS:  -- where I see the concern is obviously

13  if there are areas that are being serviced -- and I think that

14  photos have also been provided to the Court, respectfully.  As

15  far as on the actual infrastructure itself --

16          THE COURT:  Okay.

17          THE WITNESS:  -- when we're dealing with cast iron

18  pipes --

19          THE COURT:  Yes, you were talk --

20          THE WITNESS:  -- when we're dealing with those --

21          THE COURT:  It's two -- it's two on Columbine Circle,

22  I think is the pictures that Mr. Stern showed me.

23          THE WITNESS:  I would -- yeah.  So -- so those are --

24          THE COURT:  Hold on.  Columbine Circle is located

25  where?

1            THE WITNESS:  So, Columbine Circle would be roughly

2       around...

3            THE COURT:  Those were the two pictures Mr. Stern

4       showed me.

5            THE WITNESS:  Is that it (INDICATING)?

6            THE COURT:  It was two --

7            THE WITNESS:  This is --

8            THE COURT:  -- it's two that said -- no.  It wasn't

9       those.  It was two that had an address on Columbine Circle,

10      because I think I asked Mr. Stern, Where is Columbine Circle?

11           MR. STERN:  Judge, can we stipulate it's the Radar

12      Base?

13           THE COURT:  So Columbine Circle's at the Radar Base?

14      Okay.

15           MR. STERN:  Yes, ma'am.

16           THE COURT:  So those are the ones that he showed me.

17           THE WITNESS:  Okay.  And the questions, obviously,

18      that from -- specifically on the projects are Thompson Road,

19      Radar Base heading towards Normandy, and Quemado.

20           THE COURT:  Okay.  So my question is:  When you look

21      at those maps that show what's going to be affected --

22           THE WITNESS:  Correct.

23           THE COURT:  -- okay -- and you're talking about water

24      lines.  Aren't there already water lines in all of that area,

25      going all the way down to Quemado with the county?

1          THE WITNESS:  Specifically -- and that -- that

2    question I wouldn't be able to tell you if there is a complete

3    extension of that on there.

4          THE COURT:  Okay.  So --

5          THE WITNESS:  On the review.

6          THE COURT:  So wouldn't it be important to know, if

7    you're covering that area, whether or not they already have some

8    of those services before you obligate the taxpayers?

9          THE WITNESS:  Correct.  But the -- what is --

10         THE COURT:  So do you know that or not?

11         THE WITNESS:  In regards to if the water line is

12   extended completely all the way to -- to Quemado?

13         THE COURT:  Uh-huh.

14         THE WITNESS:  That would be, I think, a quest --

15   it's -- I don't believe that it is, but I do know that that is a

16   question that would be served by the commissioner of that

17   precinct.

18         THE COURT:  Okay.  So -- but, so the question is --

19   let's assume for a moment that it is.

20         THE WITNESS:  Uh-huh.

21         THE COURT:  Wouldn't that be duplicative services,

22   then, with this bond issuance if you're putting down water lines

23   again all the way down to Quemado if they already exist?

24         THE WITNESS:  Okay, if we're looking at water lines,

25   I -- I would respectfully disagree if it's based on the

1  infrastructure and the outdatedness.  As this Court has

2  indicated, the years that -- that have been serving that area,

3  specifically in Quemado --

4          THE COURT:  But you understand water from the county

5  hasn't always been in that part of the county, right?  So it

6  isn't that old, right?  You don't know, though?

7          THE WITNESS:  Well, specifically on the actual date of

8  the water plant and its inception --

9          THE COURT:  No, the water plant's not in Quemado.  The

10 water plant's at the Radar Base, right?

11         THE WITNESS:  But the water plant services what is the

12 areas out there, the northern portion of Maverick County.

13         THE COURT:  Okay.  So -- so let me ask you a question.

14 The Radar Base water plant, do you know when it was built?

15         THE WITNESS:  I do not have that date with me, no.

16         THE COURT:  Do you know when it was updated?

17         THE WITNESS:  The last -- there were some upgrades

18 that were done within these last years --

19         THE COURT:  Okay.

20         THE WITNESS:  -- which were minimal.

21         THE COURT:  Okay.  So at that point in time, were any

22 studies done about any health or issues with the lines out of

23 the -- the water -- out of the Radar Base?

24         THE WITNESS:  I cannot tell you what the past

25 administration did or did not do.

```
1              THE COURT:  No, that's not my question.  I'm asking if
2    you are aware of any issues that were discovered and/or
3    ameliorated or not ameliorated based on those -- those -- that
4    work?
5              THE WITNESS:  I can tell this Court that based upon
6    the knowledge that I have and the numerous boiling notices that
7    have been asked to be sent out to residents that are serviced by
8    this particular plant --
9              THE COURT:  Uh-huh.
10             THE WITNESS:  -- is a concern to this -- to this
11   Court.
12             THE COURT:  Okay.  So do you have any idea how old the
13   lines are from the Radar Base all the way to Quemado?  Do you
14   know how long they've been there?
15             THE WITNESS:  I cannot tell you, ma'am.
16             THE COURT:  So how do you know that they're a public
17   nuisance or health issues?
18             THE WITNESS:  I think that the photos depict the
19   concerns --
20             THE COURT:  The photos are of the Radar Base.  That's
21   not Quemado.  That's four miles away.
22             THE WITNESS:  Well, that specifically -- but that is
23   what we are seeing specifically in all areas.
24             THE COURT:  I get it, but you're going -- you're
25   asking for money to go all the way to Quemado.
```

1          THE WITNESS:  That's correct.

2          THE COURT:  And so what are the needs of Quemado as

3  far as you know?

4          THE WITNESS:  Well, in regards to the specific needs

5  of Quemado and the residents I have spoken to, whether it be

6  during these past months or prior to --

7          THE COURT:  Uh-huh.

8          THE WITNESS:  -- coming into office --

9          THE COURT:  Uh-huh.

10          THE WITNESS:  -- their concerns have always been the

11  issue of sewer and water.

12          THE COURT:  Okay.  So the question --

13          THE WITNESS:  And now, I think more so, with the

14  situation that is ongoing with the water district and the

15  concerns for irrigation --

16          THE COURT:  The water district has --

17          THE WITNESS:  -- which has nothing to do --

18          THE COURT:  -- has nothing to do --

19          THE WITNESS:  -- but nonetheless it's --

20          THE COURT:  -- so why are you bringing it up?

21          THE WITNESS:  No, no.  But these are the concerns --

22          THE COURT:  Stop.

23          THE WITNESS:  -- that are still coming in.

24          THE COURT:  The water district has nothing to do --

25  that is totally agricultural water.  It has nothing to do with

1  drinking water.  I have no idea why y'all are using that as an

2  excuse at this point.  That will not be tolerated.

3            Now, let me ask you a question.  How many people are

4  going to be serviced by this new service in Quemado?

5            THE WITNESS:  So in regards to the overall meters,

6  we're looking approximately -- there's over 500 meters, I

7  believe, that we're looking at out of there.

8            THE COURT:  You're -- you're going to put 500 meters

9  in Quemado?

10            THE WITNESS:  Well, the -- that is with service in

11  total, more or less, in the numbers that I recall from what was

12  informed to me.

13            THE COURT:  Well, according to that proposal, there

14  are only 300 homes.

15            THE WITNESS:  No, no.  But the overall process of --

16  of the meter process --

17            THE COURT:  Uh-huh.

18            THE WITNESS:  -- whether -- and this, like I said, can

19  be reviewed specifically out there, whether it's the homes that

20  are here specifically or the others.

21            THE COURT:  Okay, so what --

22            THE WITNESS:  This -- this plan --

23            THE COURT:  So what are the other 200 meters that are

24  going to be out there that are not on a home?

25            THE WITNESS:  So that is what -- that, we can

1   obvious -- I can have the commissioner give a better explanation

2   on.  As I -- as I informed, of course, of this Court, this is

3   still something that we are getting all of the information based

4   on this.

5          THE COURT:  Well, wait.

6          THE WITNESS:  But based upon what --

7          THE COURT:  Wait a minute.  Y'all are about to

8   obligate the taxpayers to the tune of $7 million for a problem

9   that's still ongoing, under investigation.

10         THE WITNESS:  No, ma'am.

11         THE COURT:  That's what you're saying, Judge.  Or

12   problem that you're not completely aware of.

13          Now, from what I'm hearing is, you're saying because

14   it's a public health nuisance but the -- a hundred percent of

15   the residents in all of these areas aren't going to have the

16   service.  Now, you're going to add meters to 500 locations, but

17   only 300 houses in Quemado, according to what you're testifying

18   to.  So what are those other 200 people going to get in terms of

19   sewage and city water --

20         THE WITNESS:  There is -- there is no city --

21         THE COURT:  -- on the places that don't have houses?

22         THE WITNESS:  -- there is no city water that is

23   provided out there.

24         THE COURT:  That's actually not true.

25         THE WITNESS:  Specifically in Quemado?

1          THE COURT:  There's -- there's water that's provided

2    to Quemado that's not -- that's not water well water.

3          THE WITNESS:  Well --

4          THE COURT:  Aren't you aware of that?

5          THE WITNESS:  But specifically on what is water well

6    water is -- is an issue.  There are meters that are being --

7          THE COURT:  No, this -- I know you're not talking

8    about water well.

9          THE WITNESS:  Yeah.

10          THE COURT:  I'm just saying, are you aware that there

11    is water service in Quemado, to certain parts of Quemado,

12    already?  Did you -- were you aware of that?

13          THE WITNESS:  That are being serviced by the City of

14    Eagle Pass Waterworks?

15          THE COURT:  By -- by the city -- well, I'm assuming

16    it's by the county.

17          THE WITNESS:  It's the county.  That's -- that's our

18    entity --

19          THE COURT:  Right.  So -- I get it.

20          THE WITNESS:  -- which is applying for this.

21          THE COURT:  I get it.  But are you aware that they

22    already receive that?

23          THE WITNESS:  That is correct.

24          THE COURT:  Okay.  So the question is:  How many

25    people above and beyond those --

1              THE WITNESS:  Uh-huh.

2              THE COURT:  -- are going to be serviced by this

3      proposal?

4              THE WITNESS:  So, based on what is on there, I -- I

5      cannot tell you the exact amount of people that are there.

6      Based on what I'm seeing -- and I would have to just refresh

7      myself on this.

8              THE COURT:  Sure.  Go right ahead.

9              MR. IRACHETA:  Excuse me, Your Honor.  May I approach?

10     I need to --

11             THE COURT:  You need to give that to Ms. Green?  Okay.

12     Go ahead.

13        (BRIEF PAUSE)

14             THE WITNESS:  Your Honor, I would have to -- I would

15     have to go back and actually see what is the total amount of --

16     of accounts that the county waterworks has have.

17             THE COURT:  Let me ask you a question.  Is that -- are

18     those documents that you have here that could be gotten for you

19     to refresh your memory?

20             THE WITNESS:  I'm not sure within the documents that

21     we have from the county, if they are actually there specifically

22     for that.

23             THE COURT:  Okay.  Well, let her --

24             THE WITNESS:  I don't --

25             THE COURT:  -- keep asking you questions --

1              THE WITNESS:  Sure.

2              THE COURT:  -- while they look for that and refresh

3    your memory.

4              THE WITNESS:  Sure.  I appreciate that, Your Honor.

5              THE COURT:  Ms. Diaz, your next question?

6              MS. DIAZ:  Excuse me.  Yes.  Thank you, Your Honor.

7    Q    (By MS. DIAZ) Mr. Cantu --

8              THE COURT:  Let -- let's call him Judge Cantu.  That's

9    fine.

10   Q    (By MS. DIAZ) On -- are you familiar or are you aware that

11   there was a state lawsuit for declaratory judgment filed on

12   11/6/23?

13   A    The 1205; that is correct.

14   Q    Eleven -- on 11/6/23?

15   A    The declaratory judgment --

16   Q    Yes.

17   A    -- filing.  That's correct.

18   Q    However, the date on it is 11/27/23.

19   A    If you have a document, ma'am, for me to see, I'd -- I'd be

20   more than happy to look at that.

21   Q    This was to validate the issuance of the 7.2 million bond

22   issue.

23             THE COURT:  Do you -- hold on.

24   Q    (By MS. DIAZ) -- as an emergency.

25             THE COURT:  Do you have a copy of the document,

1   Ms. Diaz?

2          MS. DIAZ:  I do not have it before me, Your Honor.  At

3   this point I don't.

4          THE COURT:  Okay, do you know anybody that may have it

5   here, that may have the document?  Any -- do you know if any --

6          MS. DIAZ:  I don't know if anybody would have that.

7          THE COURT:  Do you have the document?

8          MR. STERN:  I think I do.

9          MR. IRACHETA:  I do, Your Honor, if I may.

10          THE COURT:  Yes, you may.

11          MS. DIAZ:  Thank you.

12          MR. IRACHETA:  One second.

13          MS. DIAZ:  May I --

14          THE COURT:  Yes, you may.

15          MS. DIAZ:  Thank you.

16          THE COURT:  But he -- just to refresh his memory.

17            That's -- that's fine, Mr. Stern.

18          MR. STERN:  May I approach to give it to him?

19          THE COURT:  Sure.  I have a feeling that I'm at the

20   point of hire -- of hiring counsel for the plaintiff and paying

21   for counsel.

22          MR. STERN:  We're not proceeding against her

23   criminally.

24          THE COURT:  No, no.  This is for the civil case.  I

25   can -- I can authorize payment of counsel for a civil case.

1              And, Mr. Stern, look at ECF Number Three.

2              Go ahead.  Give him -- give him what documents you

3      have.

4              THE WITNESS:  Yes, this is the document.

5              THE COURT:  Is it the same one that --

6              THE WITNESS:  Is it --

7              THE COURT:  Okay.  Or did -- no, you're -- you would

8      give it to Mr. -- to the judge.

9              That's the same one, Judge?

10             THE WITNESS:  That is correct, ma'am.

11             THE COURT:  Okay.  Go ahead and refresh your memory.

12             THE WITNESS:  Yes, this is -- this is the 1205

13     declaratory judgment that was submitted by --

14             THE COURT:  Okay.

15             THE WITNESS:  -- legal counsel for Maverick County.

16             THE COURT:  Okay.  So what was your question about

17     11/27?

18             MS. DIAZ:  That they filed it on 11/6/23, and that the

19     hearing is scheduled for 11/27/23, in order to validate the

20     issuance of the 7.2 million, the declaratory judgment that they

21     filed in district court in Eagle Pass.

22             THE COURT:  So right now that hearing is set for

23     November 27th?

24             MS. DIAZ:  That is correct.

25             THE COURT:  Okay, is that correct, Judge?

```
1              THE WITNESS:  That is correct, ma'am.

2              THE COURT:  Okay.

3              MS. DIAZ:  And I'm saying -- I'm bringing this out,

4    Your Honor --

5              THE COURT:  Okay, ask him questions.  Ask him

6    questions.

7              MS. DIAZ:  Okay.

8              THE COURT:  He's the witness right now.

9    Q    (By MS. DIAZ) When you issued the warrant of arrest for

10   your -- for Enriqueta Diaz, me, you additionally requested that

11   I be handcuffed because I was arguing with you that you had no

12   authority.  At the time Mr. Iracheta approached you and told you

13   something -- I don't know what he said -- but you immediately

14   added, Put the handcuffs on her now.

15             MR. STERN:  Objection.  Testimony --

16   Q    (By MS. DIAZ) Could you tell me what it is that

17   Mr. Iracheta told you.  It's on the video.

18   A    Ma'am, I do not recall what Mr. Iracheta didn't -- tell me

19   at that moment.  I know that that was a discussion that was

20   going -- ongoing, or at least a discussion between you and I.

21   Q    Let me ask you -- let me ask you this, Mr. Cantu.  What was

22   it that I did before your Court that you started pointing

23   fingers at me and warning me that I better not speak or say a

24   word or you would hold me in contempt?  What was it that you saw

25   me doing?
```

1  A    Upon -- during the time that I was recapping and going

2  through the entire situation of that agenda item --

3  Q    Yes.

4  A    You, ma'am, at one point in that -- in that discussion, or

5  the -- the comments that I was relating publicly, you mumbled

6  *"Me Vale."*

7  Q    No, I didn't.

8  A    And then you turned around --

9           THE COURT:  Okay, wait, wait, wait.

10          THE WITNESS:  -- and when I looked at you again --

11          MS. DIAZ:  Your Honor?

12          THE WITNESS:  -- you said *"Me vale."*

13          MR. STERN:  Objection.

14          THE WITNESS:  You said it twice.

15          THE COURT:  Wait, wait, wait, wait.  Wait, wait.  Let

16  him finish his answer.

17          MS. DIAZ:  Okay.

18          THE COURT:  He's answering.

19          THE WITNESS:  So with that situation resulted in me

20  warning you the first time after your first *"Me vale,"* and the

21  second one is where you got up and objected, of course, and said

22  basic -- when I informed you of the contempt of court matter, is

23  where you were taken to the next step -- it was taken to a next

24  level.

25  Q    (By MS. DIAZ) Did you hear me say that?

1   A   Yes, ma'am.  I saw it in --

2   Q   Are you alleging you heard me?

3   A   I saw this -- I saw this -- you -- I saw you.

4   Q   Well, if you saw me, then it should be on the video, right?

5   It should be.

6   A   It should be.

7   Q   Because it's live and the judge is going to look at it in a

8   minute.

9           THE COURT:  Okay, wait, wait, wait, wait.  Ask a

10  question.  This is not a time for an argument, this is time for

11  a question.

12  Q   (By MS. DIAZ) Mr. Cantu, you have violated my rights under

13  the Fourth Amendment and had me detained illegally --

14          THE COURT:  Okay, Ms. Diaz, you've got to ask a

15  question --

16  Q   (By MS. DIAZ) -- and that'll be a judgment --

17          THE COURT:  Ms. Diaz --

18  Q   (By MS. DIAZ) -- for the Court --

19          THE COURT:  Ms. Diaz, you've got to ask a question.

20  This is not the time for a speech.  Ask a question.

21  Q   (By MS. DIAZ) Where did you go -- where did you take the

22  signatures after you picked them up from Isamari's office?

23  A   Those signatures that were picked up, specifically, to

24  count how many, one, you all had received -- or how many were

25  received, were taken -- I brought -- I brought them over to my

1  office.

2  Q    To your office?

3  A    Where they remained.

4  Q    And what did you do with them?

5  A    They remain in my office.

6  Q    So you've had them there as a souvenir or what?  What was

7  the purpose of you having them in your office?  What were you

8  going to do with them?

9          MR. STERN:  Objection.  It's argumentative.

10         THE COURT:  Overruled.  I want to know what -- what --

11  what's going to happen to them.

12         THE WITNESS:  So, these signatures were -- were there

13  in my office as I reviewed the petition that was submitted.

14  Obviously, I needed to make sure that the petition also was

15  going to have the necessary numbers.  My concern was that maybe

16  it didn't meet that requirement.  Maybe it did, maybe it didn't.

17  I wanted to inform the Court and to be informed of such at the

18  time of us proceeding with the next steps, for us to proceed or

19  not, which of course, the Court respected and decided at that

20  time that we would make sure that we would hold off until there

21  was a complete, full review amongst the elections

22  administrator's office.

23  Q    Okay.  So when Isamari Villarreal took office, you approved

24  her taking that position, but yet you didn't trust her to be

25  responsible to do the job you appointed her for?

1          MR. STERN:  Objection.  Relevance.

2          THE COURT:  Okay.  Is that --

3  Q    (By MS. DIAZ) Am I correct?

4          THE COURT:  Is it true or not?

5          THE WITNESS:  I'm sorry, ma'am?

6          THE COURT:  Did you trust her to do the job or not?

7          THE WITNESS:  Oh, I -- I trust Mrs. Villarreal.  She

8  has -- she comes with a great reputation during her times as a

9  public servant, as a former tax collector.

10  Q    (By MS. DIAZ) My question to you is:  If you trusted her

11  that much and you appointed her, why did you need to review her

12  work on what was her responsibility to do?

13  A    I was not reviewing any of her work, ma'am.  That was her

14  responsibility in which she upheld, and she did.  I simply asked

15  for a copy of the petitions.

16  Q    And were you alone when you talked to her?

17  A    I was in the office with Mrs. Villarreal.  I went to her

18  office specifically because it was approximately about an hour

19  or so before the Court -- Commissioners Court meeting.

20  Q    So overall, you wanted to make sure --

21  A    And I did not --

22  Q    -- that she was doing --

23  A    And there were members --

24  Q    -- the right job?

25  A    -- and there were members of her staff that were also

1  present when I did go in and ask for that -- that document --

2  Q     Have they --

3  A     -- which is within our right.

4  Q     I -- I know that.  They -- they told me that.  They are the

5  ones that told me.

6              You have --

7              THE COURT:  Okay, so let me ask a quick question.  So

8  do you have copies, Judge, or do you have the originals?

9              THE WITNESS:  Of the petition, no, I have copies.

10             THE COURT:  You have copies.  What --

11             THE WITNESS:  The originals -- everything was left

12 specifically there with --

13             THE COURT:  With her?

14             THE WITNESS:  -- with her.

15             THE COURT:  Okay.  So the originals are still with the

16 administrator?

17             THE WITNESS:  That's correct.

18             THE COURT:  Okay.

19             THE WITNESS:  They -- that -- that cannot be taken out

20 of the office.

21             THE COURT:  Okay.

22 Q     (By MS. DIAZ) Okay.  So, you just testified that you wanted

23 to make sure that there were enough, and you were reviewing all

24 kinds of things to make sure everything was all right.  Is that

25 correct?

```
 1  A    I was not reviewing her work, ma'am.  I was --
 2  Q    I'm sorry?
 3  A    -- what I did was I simply asked for a copy of the
 4  petition.
 5  Q    What were -- what did you need them for?
 6  A    Ma'am, as the administrator for Maverick County, and as --
 7  in any document or so, I simply asked for a copy, which is my
 8  right as the administrator and county judge.
 9  Q    So do you know -- since you were involved in getting those
10  signatures from her, do you know who found fraud in the
11  signatures?  Was it you?
12  A    I cannot tell you, ma'am.
13  Q    The county attorney?  Isamari, who --
14           THE COURT:  Well, that's -- that's already been before
15  this Court.  So if we get into that, I'm going to have to advise
16  anybody that's a potential target of any investigation --
17           MS. DIAZ:  Okay.
18           THE COURT:  -- of their rights.
19           MS. DIAZ:  I'm having a little trouble, Your Honor.  I
20  know that some areas that I'm covering I shouldn't be.
21           THE COURT:  Uh-huh.
22           MS. DIAZ:  And I apologize.  Like I said --
23           THE COURT:  Well --
24           MS. DIAZ:  -- I'm not an attorney.
25           THE COURT:  Well, that's --
```

1          MS. DIAZ:  And because of that, I'm going to excuse

2     him.  I have no more questions for him.

3          THE COURT:  Okay, hold -- hold on.  I'm going to let

4     Mr. Stern ask questions.  But, Ms. Diaz, the Court has the

5     ability and the options to appoint counsel in a civil case to

6     represent the parties.  I think that this case is going to merit

7     such a step and such actions as to appoint counsel for the

8     plaintiff, paid for by the Court.

9          MS. DIAZ:  Thank you so much.

10         THE COURT:  Mr. Stern?

11         MS. DIAZ:  I --

12         THE COURT:  Okay, hold on.  Mr. Stern gets to ask him

13    questions now.

14                         CROSS-EXAMINATION

15    BY MR. STERN

16    Q    For the record, what's the Spanish trans -- or the English

17    translation of the Spanish phrase that you uttered in court

18    during your direct testimony?

19         THE COURT:  I think it's "*Me vale*" -- I think it's --

20    he's looking for "*Me vale*."

21         THE WITNESS:  "*Me Vale*"?

22         THE COURT:  I think that's what he's --

23         THE WITNESS:  That's the translation?

24         THE COURT:  I think that's --

25         THE WITNESS:  Are you asking me to translate?

1          MR. STERN:  Yes, sir, I am.

2          THE COURT:  Yeah.

3          MR. RAMON:  Your Honor, I've been asked to --

4          THE COURT:  Okay.

5          MR. RAMON:  -- give you this.

6          THE COURT:  Go ahead.  Go ahead, Mr. Stern.

7          THE WITNESS:  So I would have to say that "*Me vale*" --

8    and it -- I don't want to be vulgar, either, but nonetheless --

9          THE COURT:  Go -- go -- go ahead and say what you

10   translate it as.

11         THE WITNESS:  Okay.  "*Me vale*", I -- you know, I'll --

12   I'm going to keep this as professional as possible.  But

13   "*Me vale*" on this -- in this instance would pretty much be

14   either --

15   Q    (By MR. STERN) Why don't you just say it.

16   A    -- "I don't care," or, "I don't give a crap."

17   Q    (By MR. STERN) Okay.  There's another way to say it that's

18   more vulgar, isn't there?

19   A    There is another way, but out of respect for the Court, I'm

20   not going to go that way.

21         THE COURT:  Well, you can -- you can say what -- how

22   you take it.

23         MR. STERN:  It's not like we're --

24         THE COURT:  That's fine.  It doesn't --

25         MR. STERN:  -- we're children here.

1          THE COURT:  Mr. -- I've heard worse, Judge Cantu --

2          THE WITNESS:  I understand.

3          THE COURT:  -- so it doesn't -- it doesn't offend me.

4    Q     (By MR. STERN) So say what it means to you.

5    A     So in my -- in my opinion, when I saw those words mumbled

6    out of her mouth, obviously, it's, "I don't give a shit."

7    Q     Okay.  Now -- and is -- when she mumbled those words, is

8    that when you warned her or when did you warn her?

9    A     The first -- the first "*Me vale,*" shortly after that, I --

10   I placed my hand out, which you will see, and I basically said,

11   Ma'am, I'm going to warn you, and I don't want to hold you in

12   contempt of court for such.

13          And "*Me vale*" yet again.  And she mumb -- she --

14   this was just mumbling, and that's when I said, ma'am -- and you

15   will see that there on any video, either hers or yours,

16   depending on which is presented and which is accepted by the

17   Court.  But those are specifics of what had happened and what

18   preempted the decisions for me to take the steps.

19   Q     Okay.

20   A     My Commissioners Court and Commissioners Court will not be

21   disrespected in that manner.

22   Q     Okay.  How did the plaintiff disrupt your Commissioners

23   Court, if she did, on that date?

24   A     Shortly after that, after that timeframe when I -- when

25   she -- when I basically explain -- I warned her of the contempt

1  of court, she raised her arms up and said, Well, then hold me in

2  contempt of court.

3              And went into, you know, discussions basically that

4  I didn't have that authority, that there were -- you know, that

5  I -- I did not have that right to do that, that she was not

6  going to leave.  I asked -- at that point I was -- you know, I

7  asked the bailiff to please remove Mrs. Diaz from the courtroom.

8  And there was -- it was a very intense, I think, discussion that

9  was -- and I'll call it a discussion, but it was, I think, you

10 know, a very intense moment in the Court.  And for the Court to

11 see that type of out -- outburst was unacceptable.

12 Q    So, did this former judge call you a homosexual?

13 A    Yes, she did.

14 Q    Did she call you Mr. Homosexual?

15 A    Yes, she did.

16 Q    Okay.

17            THE COURT:  Was that before or after you said she was

18 in contempt of court?

19            THE WITNESS:  This was after, ma'am.

20            THE COURT:  Okay.  After.

21 Q    (By MR. STERN) Okay.  Did she purport to have pictures of

22 you?

23 A    She stated it.

24 Q    Okay.  Could have you filed other charges against her?  I'm

25 not suggesting that you should, but at that time, could you have

1  filed a different charge against her as opposed to contempt?

2  A    In my official capacity or personal capacity?

3  Q    Official.

4         THE COURT:  You could not have in your personal

5  capacity, right?

6         THE WITNESS:  No, no.  No, but that's --

7         THE COURT:  So it's assuming it's for --

8         THE WITNESS:  -- that's why I'm asking the question.

9         THE COURT:  Yeah, I'm -- I'm assuming it's

10  professional.

11         THE WITNESS:  Yeah.  In charges of -- of that manner,

12  I -- you know, the -- from the moment of when everything

13  occurred at that time, I wanted to make sure that we had

14  followed every process correctly in that standard way of --

15  Q    (By MR. STERN) Okay.

16  A    -- of doing that.  So at this point --

17  Q    How did you go about -- how did you go about determining

18  what process you should follow?

19  A    Well, based on the training that we had received from

20  our -- our legislative trainings, specifically on for all of

21  this, there were -- it was very clear as to what we needed to

22  do.  Based on the situation for the initial warning, if the

23  individual continues, what you need to do after that, which

24  would be, you know, to make the determination whether -- as --

25  as -- it is left to the judge's discretion.

1   Q   Okay.  After the act of holding her in contempt, after her

2   comments, could you have filed a different charge against her,

3   say, for example, interrupting a meeting?  I'm not suggesting

4   you should do it, but could you have?

5   A   Yes.

6   Q   Okay.

7         THE COURT:  Under what provision, Mr. Stern?

8         MR. STERN:  Class B, Judge.

9         THE COURT:  Okay, but under what provision?  Penal

10   Code what?

11         MR. STERN:  Hold on a second.

12          I'll have to look it up, ma'am.

13         THE COURT:  Okay.  You can give it to me later,

14   Mr. Stern.

15         MR. STERN:  Okay.  Thank you, Your Honor.

16   Q   (By MR. STERN) Now, you didn't do that, correct?

17   A   No, sir.

18         THE COURT:  Yet.

19         MR. STERN:  He hasn't threatened it.

20         THE COURT:  Wouldn't it be "yet"?

21         MR. STERN:  No.

22         THE COURT:  Well, aren't they under investigation for

23   fraud?

24         MR. STERN:  That has nothing to do with interrupting a

25   meeting.

1          THE COURT:  Well, but the problem is --

2          MR. STERN:  It's a separate offense.

3          THE COURT:  -- the statute of limitations hasn't run

4    on any of it, Mr. Stern.

5          MR. STERN:  Well, that's true.

6          THE COURT:  Okay.  So "yet" is really the appropriate

7    word here at this point, right?  It's not a past opportunity.

8          MR. STERN:  I mean, I thought my question was:  You

9    didn't file the charges.

10         THE COURT:  I know, but that doesn't mean he couldn't

11   still since the statute of limitation hasn't run.

12         MR. STERN:  He could, but it would be against my

13   advice.

14         THE COURT:  Well, that's different, Mr. Stern.

15   Frankly, any -- any charges filed at this point would appear

16   very vindictive.

17         MR. STERN:  Of course.

18         THE COURT:  It would appear to be vindictive

19   prosecution, really.

20         MR. STERN:  Well, I think, basically, he's got two

21   years to file if he chose to do so.

22         THE COURT:  I know, but it would still appear to be

23   vindictive prosecution.

24         MR. STERN:  Well, I understand, and that's why --

25         THE COURT:  But -- but the -- but the point is --

1          MR. STERN:  The -- the Court has heard my --

2          THE COURT:  -- he could have at that time.  He didn't.

3          MR. STERN:  Right.

4          THE COURT:  Okay.  What else?

5    Q    (By MR. STERN) Now, did you check with anybody to see if

6    you had the authority to hold her in contempt?

7    A    Prior to that?

8    Q    Yes, sir.

9    A    No.

10   Q    Okay.  And while it was going on and she was being

11   detained, did you check with anybody to see whether or not you

12   had that authority?

13   A    To proceed?  I knew that I had the authority as the county

14   judge, and the Commissioners Court had the authority for

15   contempt orders.  That is what I knew already.

16   Q    Okay.

17   A    Now, the process --

18   Q    Let me ask you this before you go.  Did you have any

19   discussions with the district judge?

20   A    With the district judge?

21   Q    Yes, sir.

22   A    No, sir.

23   Q    With any other county official regarding your authority to

24   hold her in contempt?

25   A    Prior to it happening?

1    Q    No.  Afterwards.

2    A    Afterwards.  After the Court -- after the Court finished,

3 Commissioners Court finished that day, which Mrs. Diaz, I

4 believe, had been either -- either released or had been led off

5 by the -- the bailiff, based on the sheriff's orders in that

6 case.  What I saw was that there was a -- a concern there that

7 there was not an order that was followed by the bailiff to

8 proceed.  I did ask to make sure that I could process what is

9 the necessary order to the bailiff, and the bailiff asked me

10 that they needed to have an order in writing in order to take

11 the next steps to have her arrested.

12    Q    Okay.  Hold on.

13    A    Which the only time that I --

14    Q    Stop, stop, stop.

15    A    Yeah.

16    Q    As soon as you held her in contempt, how much time went by

17 before you got an order holding her in contempt?

18    A    An order of contempt, I'd say within about -- I can't -- I

19 can't recall exactly.  I mean, I would think that that -- that

20 was not a very long meeting, if I reflect correctly or reflect

21 on the -- of my memory.

22    Q    Just if you know.

23    A    But I'd say that from the point of that happening to

24 finishing the meeting, probably about 45 minutes.

25    Q    Okay.  And who requested the order of contempt?

```
1   A      Who requested it?

2   Q      Right.

3   A      That would have been -- according to Mr. -- Bailiff

4   Benavides, he had requested that Sheriff Schmerber had requested

5   that it be done in -- well, that the sheriff's --

6   Q      Okay.  Okay, let me see if I can --

7   A      -- deputies had requested it.

8   Q      -- cut it short.  Did the sheriff request the order of

9   contempt?

10  A      The sheriff's deputies requested such.

11  Q      Okay.

12  A      Because they needed it in writing.

13  Q      And you complied with their request?

14  A      And I complied with their request.

15  Q      Okay.  And they subsequently cut her loose, correct?

16  A      That's correct.

17  Q      Okay.

18  A      Upon verbal orders that were given to them after the

19  situation happened in front, the individual was released, which

20  defied the court order, and then had to come back and reissue

21  when there was a question as far as why was there not a due

22  process on that.

23  Q      Okay.  Now, was your order of contempt -- and I can't

24  remember -- did it include a 25-dollar fine, or was it just

25  incarceration for 24 hours?
```

```
1              THE COURT:  Do you need that --

2              THE WITNESS:  It was -- I --

3              MR. STERN:  If -- if he knows.

4              THE COURT:  Okay.

5              THE WITNESS:  I'm sorry?

6              THE COURT:  I was going to say, if he has a -- if he

7    needs a copy, I have it here in front of me.

8                 Mr. Stern, if you need it for your questions.

9              MR. STERN:  Sure, Judge.

10             THE COURT:  Okay.  Here.  Oops.

11       (BRIEF PAUSE)

12             THE COURT:  Okay, go ahead, Mr. Stern.

13   Q    (By MR. STERN) So the order only included a request for

14   confinement for 24 hours, correct?

15             THE COURT:  Do you need to refresh your memory, Judge?

16             THE WITNESS:  On the -- on the order that I gave?

17             THE COURT:  Uh-huh.

18             THE WITNESS:  It was specifically for a 24-hour time.

19   Q    (By MR. STERN) Okay.  No fine?

20   A    No fine was assessed.

21   Q    You could have fined her if you wanted to be vindictive,

22   right?

23   A    I -- I mean, I --

24             THE COURT:  Mr. Stern --

25             THE WITNESS:  -- at no time am I -- am I --
```

1        THE COURT:  -- I get to decide the --

2        THE WITNESS:  -- am I being vindictive.

3        THE COURT:  -- vindictiveness issue, but I'm not --

4   we're not talking about the contempt matter here.

5        MR. STERN:  Okay.

6        THE COURT:  He could have fined her.  I know that.

7          Did -- but he -- you did not fine her, correct?

8        THE WITNESS:  That's correct.

9        THE COURT:  Okay.

10  Q    (By MR. STERN) Now, the discussion you previously had with

11  Judge Moses concerning the number of customers that would be

12  served by the water lines -- do you remember that?

13  A    Yes.

14  Q    Okay.  Aren't those customers also going to be served by

15  sewer lines?

16  A    That's correct.

17  Q    And do you know how many customers are supposed to be

18  served by sewer lines?

19  A    No, but based on -- based on that, I'm -- and on the

20  project purpose, the colonial community of Quemado, Texas, with

21  a population of approximately 300 homes and an estimated median

22  net income, I mean, that's the -- the 300 that are specific

23  there.  But on the actual accounts that the Waterworks -- I

24  apologize that I go back -- but I would need to confer and see

25  what that final number is.  I -- I would hate to misrepresent to

1    the Court.

2    Q    Okay.  I guess the real question -- the 64,000-dollar

3    question is:  Are those extra meters reserved for your political

4    contributors for anybody who supported your election?

5    A    I -- no.  And I would -- I would like to -- to make that,

6    you know, very clear that I -- I would need to go back and

7    confer whether those were -- whether it was 500 or not.

8    Q    Okay.

9    A    And I'd like to -- to make that clear on the record; that

10   in regards to that, I would have to go back and just

11   double-check the numbers.

12   Q    Okay.

13   A    I mean, no, that is not the way that I work in those

14   particular issues.

15            MR. STERN:  Pass the witness, Judge.

16            THE COURT:  Okay, before y'all proceed to it -- to the

17   redirect, if you have any direct questions, would it be possible

18   to go ahead and show the video before my computer person has to

19   leave?

20            MR. STERN:  Fine with me.

21            THE COURT:  And that way if you still have any --

22   Judge, stay where you are.  You'll be able to watch the video on

23   the monitor in front of you.  You -- they will -- you won't be

24   able to move that chair.

25                Because that way if she has to leave, we at least

```
 1   had that situation taken care of.
 2           MS. DIAZ:  That's fine.
 3           THE COURT:  So she's going to show it.  I -- I want to
 4   make sure everybody can see it on their monitors once we get to
 5   that.
 6               And this is Plaintiff's Exhibit Number what?
 7               Ms. Green, do we have a number on that?
 8           COURTROOM DEPUTY:  Number Two, Judge.
 9           THE COURT:  It's Number Two.
10           MS. DIAZ:  Number Two, yeah.
11      (PARTIAL PLAYING OF PLAINTIFF'S EXHIBIT NUMBER TWO)
12           THE COURT:  Okay, was this a video or audio?
13               Is -- is it both --
14           MR. STERN:  It should be both, Judge.
15           THE COURT:  -- because I'm not seeing video.
16      (PARTIAL PLAYING OF PLAINTIFF'S EXHIBIT NUMBER TWO)
17           THE COURT:  Can you see it, Judge?
18           THE WITNESS:  Yes, ma'am.  Yes, Your Honor.
19           THE COURT:  Mr. Stern, can you see it, your counsel
20   table?
21           MR. STERN:  I can, Judge.
22      (PARTIAL PLAYING OF PLAINTIFF'S EXHIBIT NUMBER TWO)
23           MR. STERN:  Judge, can we just skip to the part --
24   this is where she was at her three minutes of citizen speech.
25   If we could skip to the part that's relevant to the contempt.
```

1          THE COURT:  Let me -- stop it for just a second.

2               So, what part -- what part of the -- of the meeting

3    are y'all wanting me to see?  Are there going to be any

4    questions about any other part of the meeting that was recorded,

5    than the contempt process?

6          MR. STERN:  I don't have any questions about it.

7          THE COURT:  Okay.

8          MR. STERN:  In other words -- there should be two

9    separate video files, if -- if you've got it all, basically.

10         MS. DIAZ:  There's three.

11         MR. STERN:  Three.  Okay.  One of them is where she

12   speaks as a citizen during citizens' comments.

13         THE COURT:  Okay.  That's this part right now?

14         MR. STERN:  Right.

15         THE COURT:  Okay.

16         MR. STERN:  That's really not the relevant part that I

17   think the Court is interested in.

18         THE COURT:  I don't know.  I don't know what's

19   relevant at this point.  Because I got to tell you, Mr. Stern,

20   this case has turned out to be surprisingly strong to the point

21   where I'm thinking of appointing counsel for plaintiff.

22              I don't know what's relevant now, given all of the

23   testimony that I've heard.

24         MR. STERN:  That -- that I understand.

25         THE COURT:  So I can watch the parts that y'all don't

```
1   need for me to watch today later, since it's Exhibit Number Two,
2   if you want to just key in on the parts that --
3           MR. STERN:  Well, it's -- it's up to her.  It's her --
4   her document.
5           MS. DIAZ:  Your Honor --
6           THE COURT:  Uh-huh.
7           MS. DIAZ:  The only reason we're start -- I'm starting
8   the -- the video from the beginning --
9           THE COURT:  Uh-huh.
10          MS. DIAZ:  -- is that you can see that if he was
11  conducting the meeting after I spoke, I was conducting myself,
12  not saying a single word.
13          THE COURT:  You're saying after you did your three
14  minutes?
15          MS. DIAZ:  I'm sorry?
16          THE COURT:  You're saying after your three minutes?
17          MS. DIAZ:  Yeah.
18          THE COURT:  Okay.  So do you --
19          MS. DIAZ:  After that time, I sat without saying a
20  single word --
21          THE COURT:  Okay.  So then --
22          MS. DIAZ:  -- until he started accusing me of
23  threat --
24          THE COURT:  Okay, so --
25          MS. DIAZ:  -- of fraud.
```

1          THE COURT:  -- so let's go to --

2          MS. DIAZ:  Fraud.

3          THE COURT:  -- to that point where it begins that

4     she's finished her three points [sic] just for this -- for

5     purposes of right now --

6          MR. STERN:  Okay.

7          THE COURT:  -- since it's all in evidence.

8          MS. DIAZ:  So, the -- what you're viewing right now --

9          THE COURT:  Is where you --

10         MS. DIAZ:  -- was where I made my comments and I

11    talked to Villarreal --

12         THE COURT:  Okay.

13         MS. DIAZ:  -- to the commissioners about what had been

14    presented.

15         THE COURT:  Okay.  So, let's go to the -- the other

16    part --

17         MS. DIAZ:  All right, let's go to Two.

18         THE COURT:  -- after you sit down after your three

19    minutes then.

20       (PARTIAL PLAYING OF PLAINTIFF'S EXHIBIT NUMBER TWO)

21         MS. DIAZ:  I would like to bring to your attention,

22    Your Honor, that as the video's going on, the camera is not on

23    me at all.

24         THE COURT:  Okay.  That's what I'm trying to -- okay.

25         MS. DIAZ:  Until he starts pointing the finger, they

1  switch it to me.

2           THE COURT:  Okay, so now --

3           MS. DIAZ:  That his staff.

4           THE COURT:  Okay, hold on.  The count -- the -- the

5  camera's now on everybody.

6      (4:29:14 TO 4:38:14 P.M., PLAYING OF PLAINTIFF'S EXHIBIT

7  NUMBER TWO)

8           THE COURT:  Okay.  Any other videos before I release

9  our IT person?  No?  Okay.

10           Go ahead -- Ms. Zamora, go ahead and also take --

11  leave the exhibit here, but you -- you have to take the

12  computer, right?

13           MS. ZAMORA:  Yes.

14           THE COURT:  Okay.  All right.

15           Any questions for Judge Cantu on redirect, Ms. Diaz?

16           MS. DIAZ:  I just have a couple of questions,

17  Your Honor, if I may.

18           THE COURT:  Proceed.

19                     REDIRECT EXAMINATION

20  BY MS. DIAZ

21  Q    Mr. Cantu, when I got taken out of the office of

22  Commissioners Court, I wasn't aware of what was going on in your

23  court after that, but sometime later Mr. Benavides came forth

24  and informed me that you had ordered a citation.  Did you order

25  a citation for me?

1    A    No, ma'am.

2    Q    You did not order a citation?

3    A    No, ma'am.  The order that was --

4    Q    Let me show you this as --

5    A    -- the order -- the order that given was -- was the order

6    that was written.

7              MS. DIAZ:  May I approach the witness?

8              THE COURT:  You may.

9    Q    (By MS. DIAZ) This is the citation that I got.  According

10   to Mr. Benavides, you ordered it.

11   A    No, ma'am.  It was my understanding, based upon the

12   information that was provided to me by Mr. Benavides when he

13   came into this court asking for a written warrant for you,

14   specifically that the sheriff had issued, that there be a

15   citation issued for conduct.  If I'm not correct -- if I -- if I

16   don't -- I couldn't tell what it is that's read on there.  I

17   couldn't -- I could barely see what it is.  It's not very --

18   written very well on that item.

19   Q    It says, Maverick County Commissioners Court, is what it

20   says.

21   A    Uh-huh.

22   Q    Contempt.

23   A    So --

24   Q    Is what it says.

25   A    -- that is what Mr. Benavides informed me in my office

1  after the meeting.  Deputy Benavides.

2  Q    So how much longer after the meeting finished -- I -- I'm

3  assuming it finish -- it ended before you prepared the document

4  to issue the warrant.

5  A    The document was issued immediately after the meeting.

6  Q    The order --

7  A    The order, that's correct.

8  Q    -- of arrest.

9  A    That's correct.

10 Q    How -- how much longer after -- or did you stop the meeting

11 and then do it, or did you do it after the meeting?

12 A    For that item, I don't believe that that -- if I recall

13 correctly, the -- the Commissioners Court meeting did not have a

14 lot of items on the -- that agenda, if I recall.  We ran through

15 the agenda.  And I believe that from the point of the contempt

16 order to the point of issuing a written warrant was

17 approximately about 45 minutes.  If I recall correctly.

18 Q    So who assisted you in preparing it?

19 A    My court coordinator.

20 Q    And that is?

21 A    Rudy Garcia.

22 Q    Mr. Iracheta was not involved at all?

23 A    Mr. Iracheta -- I did ask Mr. Iracheta just to review the

24 document for legality purposes and to make sure that everything

25 was within compliance with the law.

1    Q    And he said that was the proper thing to do?

2    A    Based upon the --

3    Q    He advised legal counsel --

4    A    -- based upon the statute -- based upon statute, that was

5    the correct thing.

6              MS. DIAZ:  I have no more questions for you --

7              THE COURT:  Okay, Mr. --

8              MS. DIAZ:  -- for the witness.

9              THE COURT:  -- Mr. Stern, any recross?

10              Any recross?

11         MR. STERN:  No, ma'am.

12         THE COURT:  Okay.  I do have a question.

13         THE WITNESS:  Yes, Judge.

14         THE COURT:  So, after Ms. Diaz is out of the

15    Commissioners Court, did the commissioners vote on a contempt

16    citation or not?

17         THE WITNESS:  No, ma'am.

18         THE COURT:  Okay.  So there was no Commissioners Court

19    vote on that?

20         THE WITNESS:  No, ma'am.

21         THE COURT:  Okay.  Any questions by either side based

22    on the Court's questions?

23         MR. STERN:  No, Judge.

24         THE COURT:  No?  Okay.  You may step down.

25         THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  Next witness, Ms. Diaz?

 2              MS. DIAZ:  Mr. Richard Flores, please.

 3              THE COURT:  Okay, what -- why is one of the parties

 4   leaving?  One of the parties is leaving.

 5                Mr. Stern, are you okay with one of your parties

 6   leaving the courtroom without the Court's permission?

 7              MR. STERN:  No, I didn't see, Judge.  I'm sorry.

 8              THE COURT:  He just walked out.  I think he needed a

 9   break.

10              MR. STERN:  I imagine he went to the restroom.

11              THE COURT:  Do -- do I need to wait for him to get

12   back to start the questioning?

13              MR. STERN:  No, Judge, I think we can proceed.

14              THE COURT:  All right.  Mr. Flores, come on up here.

15

16                        RICARDO FLORES,

17   having first been duly sworn, testified to the following:

18

19              THE COURT:  Okay, speak into the microphone.  We have

20   bad acoustics here.

21                Okay.  Proceed.

22              MS. DIAZ:  Thank you.

23                        DIRECT EXAMINATION

24   BY MS. DIAZ

25   Q    Mr. Flores, could you state your name, please.
```

1  A    Yes.  Ricardo Flores.

2        THE COURT:  Okay, you're -- you are going to have to

3  speak a little bit closer to the microphone.

4        THE WITNESS:  Yes.  Ricardo Flores.

5  Q   (By MS. DIAZ) Ricardo Flores.

6        Mr. Flores, are you -- are you holding any political

7  position of any kind?

8  A    No, ma'am.

9  Q    What do you do for a living?

10 A    Right now I'm on unemployment from working with the county.

11 Q    Working for the county?

12 A    Or used to work for the county.

13 Q    Okay.  How long did you work for the county?

14 A    Two years.

15 Q    Three years?

16 A    Two.

17 Q    Three years.

18 A    Two.

19 Q    And -- two years.  Okay.  And what was your position with

20 the county?

21 A    I was assistant to Commissioner Olga Ramos.

22 Q    You were assistant to Olga Ramos, the Commissioner of

23 Precinct Three --

24 A    Yes.

25 Q    -- am I right?  Thank you.

1          What -- why did you voluntarily quit or what

2   happened to you?

3   A     No, I was let go.  I was -- got a letter that my services

4   were no long -- longer needed, so I was let go.

5   Q     You were terminated?

6   A     Yes.

7   Q     How long ago were you terminated?

8   A     Six months ago.

9   Q     Six months ago.  Did they explain why?

10  A     No, ma'am.

11  Q     Did they give you anything in writing that --

12  A     Just --

13  Q     -- tomorrow is the last day or whatever?

14  A     Just a letter that I was no longer -- my services were no

15  longer needed.

16  Q     No reason whatsoever?

17  A     No, ma'am.

18  Q     And you were two years as assistant to Olga Ramos?

19  A     Yes.

20  Q     Commissioner of Precinct Three?

21  A     Yes.

22  Q     And you were never given a reason why, you just go by --

23  good-bye?

24  A     Yes, ma'am.

25  Q     Okay.  In reference to the day in question on this video

1  that we just saw, were you present at that meeting?

2  A     I was.

3  Q     Where were you sitting in Commissioners Court?

4  A     Directly -- I believe, one row behind you.  I was sitting

5  directly behind you.

6  Q     You were sitting behind me?

7  A     Yes, ma'am.

8  Q     Okay.  And what did you observe during all this incident?

9  A     Just that -- what was going on and basically saw Judge

10  Cantu directing to you the fact that there was something going

11  on with the signatures, and that -- they started paint --

12  pointing to you, but I did not hear you say anything indirectly

13  to -- to him until he actually said that you were going to be

14  arrested.  And you -- your answer -- or your question was, For

15  what reasons, or for why were you going to arrest me; I

16  didn't -- I have not done anything.

17            That's what I heard.

18  Q    You heard that sitting in the area that you were -- you --

19  you say you were sitting behind me?

20  A     Yes.

21  Q     You heard clearly -- you could hear my voice clearly where

22  you were sitting?

23            MR. STERN:  Leading.

24            THE WITNESS:  Not clearly, but I did -- I -- I didn't

25  hear you say nothing.

1            THE COURT:  What's the objection?

2            MR. STERN:  Leading.

3            THE COURT:  What?

4            MR. STERN:  Leading.

5            THE COURT:  He's answering, and he's not answering not

6    as a yes or a no, so I'm going to let it go.

7                You can go ahead and answer.  You were saying, "Not

8    clearly," but you heard what now?

9            THE WITNESS:  I did not hear her say anything to the

10   judge, Judge Cantu, until I did hear her say, For -- for what

11   reasons; or what -- why were you going to arrest me if I have

12   not done anything?

13               That's the only words that I heard her say after she

14   was --

15   Q    (By MS. DIAZ) So at any time before Judge Cantu started

16   pointing fingers at me and claiming fraud and dead people

17   voting, did you at any time hear me -- prior to him pointing

18   fingers, did you hear me say a single word to interrupt the

19   meeting?

20   A    I did not.

21           MS. DIAZ:  Your witness.

22           THE COURT:  Go ahead, Mr. Stern.

23                       CROSS-EXAMINATION

24   BY MR. STERN

25   Q    So your only testimony is that you only -- didn't hear

1    anything from Ms. Diaz, correct?

2    A    Correct.

3    Q    Okay.  You don't know if she mouthed anything, do you?

4    A    I did not hear nothing.  No, sir.

5    Q    Did hear -- did you hear her talk -- hear anything else she

6    said in court?

7    A    No, I did not hear.  Just except for when he was directly

8    addressing to her and she said -- or Judge said that he was --

9    she was going to be arrested.  And her, For what reasons, I

10   haven't done nothing.

11                So, that's the only thing I heard coming out of --

12   out of her.

13   Q    Now, are you collecting signatures to run for office?

14   A    Sir?

15   Q    Are you collecting signatures to run for office?

16   A    No, sir.

17   Q    Okay.  Now, you didn't hear anything after the judge held

18   her in contempt?  You didn't hear her say anything, correct?

19   A    After?

20   Q    Yes, sir.  You don't have to look at her.

21   A    I just -- just what we saw on the video a while ago, just

22   that --

23   Q    Okay.

24   A    -- what went on after.

25   Q    Okay.  And you heard all that, right?

1    A    Yes.

2    Q    Was she being disruptive?

3         THE COURT:  Mr. Stern, I'll be honest.  She was

4    already found in contempt.  You can't bootstrap a contempt order

5    on after-the-fact conduct.

6         MR. STERN:  I'm not trying to.

7         THE COURT:  Yeah, y'all are.  At that point, she had

8    already been ordered held in contempt and ordered arrested.  So

9    you can't bootstrap.  And the best -- the best evidence is the

10   video and I saw it.

11        MR. STERN:  We can agree the best evidence is the

12   video.

13        THE COURT:  I -- I saw it.  I watched it.

14   Q    (By MR. STERN) Now, had you seen the video before, sir?

15   A    Not before today.

16   Q    Okay.  And was there anything illegal about you being let

17   go from your employment?

18   A    No, sir.

19   Q    You didn't file a discrimination case?

20   A    No.

21   Q    Haven't sued the county?

22   A    No.

23        THE COURT:  Well, let me ask a question, Mr. Stern.

24         How would we know if the reasons weren't given?

25        MR. STERN:  He may know the reasons.

```
 1              THE COURT:  Well, he just -- she asked him.

 2                 Ask him again.

 3              MR. STERN:  Okay.

 4  Q    (By MR. STERN) Do you know the reasons why you were let go?

 5  A    No, sir.

 6  Q    What did the letter state?

 7  A    Your services were no longer needed, and was let go.

 8  Terminated.

 9  Q    Well, do you have some sort of feeling as to why you were

10  let go, if the real reasons weren't stated?

11  A    No, sir.

12  Q    Is there -- you have any hard feelings about being let go?

13  A    No, sir.

14  Q    Okay.

15              MR. STERN:  That's all I have, Judge.

16              THE COURT:  Okay.  Any other redirect of this witness?

17              MS. DIAZ:  No, Your Honor.

18              THE COURT:  All right.  You may step down.

19              MS. DIAZ:  You may excuse the witness.

20              THE COURT:  Let me -- this is only for scheduling

21  purposes.  Mr. Stern, Ms. Diaz, come on up for just a moment so

22  we can talk about scheduling for just a second.

23      (4:50:49 TO 5:02:42 P.M., BENCH CONFERENCE)

24              THE COURT:  All right.  This hearing's going to be

25  continued.  In the meantime, the Court -- the Court finds it
```

1    necessary to enjoin the parties from doing anything further

2    until I can re -- recall this particular case to finish hearing

3    from the witnesses and to finish gathering evidence.

4              I'm also going to appoint counsel to represent the

5    plaintiff.  It has gotten to that point.  Plaintiff counsel is

6    necessary.  So I'm going to appoint counsel.  I'm going to find

7    counsel that may have some knowledge and maybe it will move the

8    matters clear -- faster.

9              But at this point, given that I am still hearing

10   evidence, nothing else is going to happen, nothing else is going

11   to move forward until I hear the rest of the testimony.

12             Any questions by any of the parties?

13             You are hereby enjoined, Mr. Iracheta.  You are

14   hereby enjoined at this point.  That's the order of the Court,

15   and those are the findings of the Court at this point.

16             I want to finish hearing the evidence before any

17   final rulings.

18             Yes, sir, Mr. Stern?

19         MR. STERN:  Judge, could they get an order -- couldn't

20   the Court -- can the Court -- can my clients have your Court's

21   written order so they can stay the proceedings?

22         THE COURT:  No, counsel.  Order in federal court is

23   what's pronounced from the bench.  The written order has to

24   comply with the -- with the oral order, and I just pronounced

25   it.

1          MR. STERN:  No, I understand that.

2          THE COURT:  There is no written order that's going to

3    follow.  This is the order and this is what's binding.  It's the

4    oral orders of the Court on the record that are the binding

5    records.  It's not what's written thereafter.

6          MR. STERN:  Well, the only concern was needing

7    something to stay the action in state court.  We can't even file

8    an answer in state court, the way I understand it.

9          THE COURT:  Well, why would -- why would they be

10   filing an answer -- you're saying to her -- her matter?

11         MR. STERN:  Her petition.

12         THE COURT:  I -- I think we're going to finish this

13   before the expiration of the 20 days.  When -- when is that

14   answer going to be due?

15         MR. STERN:  I'd have to look, but --

16         THE COURT:  Wouldn't it be the first Monday after the

17   expiration of 20 days of -- would be November the 6th.

18         MR. STERN:  November 6 is 20 days.

19         THE COURT:  Okay, hold on and let me see if I can do

20   that.  It's -- it would be the 27th of November.  I'm hoping to

21   have the hearing before then, Mr. Stern; to finish up on the

22   hearing before then.  That's my -- my plan.

23              If for some reason I don't -- we don't get to have

24   the hearing before the 27th, then -- the parties are asking me

25   to issue an order staying everything so the state court will

1    know that they don't have to file an answer.

2              MR. STERN:  Right.

3              THE COURT:  Now, here's my question to everybody.

4                Mr. Stern, you want -- do you need to file an answer

5    to what I have -- since this is just a preliminary injunction

6    hearing, it's not yet a --

7              MR. STERN:  No, I understand.

8              THE COURT:  Because your answer to this case would

9    also be due the 27th.

10             MR. STERN:  Right.  And of course they're going to get

11   a 12(b) with it as well, so -- in the --

12             THE COURT:  But you -- you agreed here at the bench

13   that I have jurisdiction.

14             MR. STERN:  That's fine.

15             THE COURT:  So how are you filing a 12(b)?  For what?

16             MR. STERN:  Well, you have to have jurisdiction on

17   her -- well, if her complaint is taken at face value.

18             THE COURT:  I -- it's the -- you're -- you're saying

19   *Twombly and Iqbal*?

20             MR. STERN:  Right.

21             THE COURT:  Okay.  But I have to give her an

22   opportunity to amend.  And once I appoint counsel, they can

23   amend.

24             MR. STERN:  That's fine.

25             THE COURT:  So she would still have that opportunity.

1          MR. STERN:  Correct.

2          THE COURT:  Okay.  So -- but you need -- are you going

3   to file your answer before the 27th, or are you going to file

4   your 12(b) motion?

5          MR. STERN:  If I file -- I'll probably file them both

6   concurrently, Judge.

7          THE COURT:  Okay.

8          MR. STERN:  I just don't know which date.

9          THE COURT:  Okay.  Which at that point, once she has

10  counsel, I've got to give her an opportunity to correct and

11  amend and --

12         MR. STERN:  Sure.

13         THE COURT:  -- correct any deficiencies.  But until

14  that point, nothing goes forward.  My plan is to hopefully have

15  the continuation of this hearing before the 27th, though.  So

16  that you can have a final ruling at that point.

17         MR. STERN:  That's fine.  Thank you, ma'am.

18         THE COURT:  Okay.  But nothing else will happen until

19  I can finish this hearing.

20              All right, you may -- any other findings you need to

21  make?

22         MS. DIAZ:  Just as a last thing, if I may, Your Honor.

23  The declaratory judgment document that I provided that was

24  accepted as Item Number Four --

25         THE COURT:  Uh-huh.

1          MS. DIAZ:  -- or Exhibit Four, clearly it meets --

2    there was sufficient verified signatures to the petition, but

3    they denied the petition based on public nuisance/emergency.

4          THE COURT:  Okay, but --

5          MS. DIAZ:  They placed the citizens' public and safety

6    in danger.

7          THE COURT:  Okay, but this is -- this is the -- the --

8    okay, this was also filed the -- the 6th of November, so who

9    is -- who is responding, if anybody, to this petition?

10         MR. STERN:  Okay.  The expedited declaratory

11   judgment --

12         THE COURT:  Uh-huh.

13         MR. STERN:  -- was filed by our side.

14         THE COURT:  Right.  November the 6th.

15         MR. STERN:  She -- she would have to -- somebody's

16   going to have to respond --

17         THE COURT:  That's why she needs counsel, Mr. Stern.

18         MR. STERN:  Well, I think probably the AG may have to

19   respond as well in -- in a separate --

20         THE COURT:  He can't -- he can't respond to his own

21   petition.

22         MS. DIAZ:  He's a party to this.

23         THE COURT:  How is -- how does he -- how does he

24   respond to his own petition for both sides?  That would be a

25   conflict of interest.

1          MR. STERN:  I'm sorry?

2          MR. IRACHETA:  The attorney general.

3          MR. STERN:  The attorney general.

4          THE COURT:  Yeah, it would have to be the attorney

5     general.  I was going to say, I don't -- I can't see

6     Mr. Iracheta being able to represent both sides.

7          MR. STERN:  No, I -- I get you on that.  I apologize

8     for misspeaking.

9          THE COURT:  So who from the attorney general's office

10    will be involved?  Has this already been forwarded to the

11    attorney general?

12              Have you received an answer, Mr. Iracheta, as to

13    that attorney that may be -- that's assigned?

14          MR. IRACHETA:  I -- I don't remember the name, Your

15    Honor, but --

16          THE COURT:  But you have a name?

17          MR. IRACHETA:  I do have a name.

18          THE COURT:  Okay.  All right.

19              So he needs to know that the Court has stayed

20    everything as well, for purposes of this as -- as well,

21    potentially.  But like I said, I want to have my -- the rest of

22    my hearing before the 27th as well.

23          MR. STERN:  Yes, Your Honor.

24          THE COURT:  So, Mr. Stern, what other findings or

25    information do you need?

1                And Ms. Diaz --

2                MR. STERN:  I believe that was it.

3                THE COURT:  -- what other findings do you need for

4    right now?

5                The parties are enjoined from moving forward.

6                MS. DIAZ:  Yes.

7                THE COURT:  And maybe I should be -- I should clarify.

8    The parties are enjoined from moving forward on the issuance of

9    the certificates of obligation.  Maybe that would be clearer,

10   Mr. Stern.

11               MR. STERN:  No, I understand the Court.

12               THE COURT:  That way if there's anything in terms of

13   having to file court documents, they could file court documents

14   in -- pending in the meantime.

15               MR. STERN:  All right.

16               THE COURT:  Just in case we're beyond the 27th date.

17               What else do I need to clarify?

18               MR. STERN:  That's it.

19               THE COURT:  Okay.  All right.  I'll see you again at

20   the second part of this hearing.  I have not concluded this

21   hearing.  It is just going to be held in abeyance until we can

22   finish the hearing.

23               Ms. Diaz, the Court is going to name and appoint an

24   attorney to represent you in this matter and -- and proceed on

25   with this case.

1          MS. DIAZ:  Thank you, Your Honor.

2          THE COURT:  All right.  You may be excused.

3      (5:10:08 P.M., OFF THE RECORD)

4

5                      -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4  U.S. DISTRICT COURT          )

5  WESTERN DISTRICT OF TEXAS )

6  DEL RIO DIVISION             )

7

8            I, Vickie-Lee Garza, Certified Shorthand Reporter, do

9  hereby certify that the above-styled proceedings were reported

10  by me, later reduced to typewritten form, and that the foregoing

11  pages are a true and correct transcript of the original notes to

12  the best of my ability.

13

14            In addition, it is hereby noted that bench conferences

15  held within this hearing are deemed confidential and are

16  therefore contained in a separate **SEALED** transcript, per order

17  of the Court.

18

19            Certified to by me this 22nd day of January, 2024.

20

21

22

23                    /s/  VICKIE-LEE GARZA
                      TX CSR #9062, Expires 10/31/25
24                    P.O. Box 2276
                      Del Rio, Texas  78841
25