```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                      DEL RIO DIVISION

3

4  ENRIQUETA DIAZ,                      *  No. DR-23-CV-60
                                        *
5         Plaintiff,                    *
                                        *
6  v.                                   *  NOVEMBER 20, 2023
                                        *
7  RAMSEY ENGLISH CANTU, ROXANNA RIOS,  *
                                        *
8  OLGA RAMOS and ROBERTO RUIZ,         *
                                        *
9         Defendants.                   *  DEL RIO, TEXAS
10 ---------------------------------------------------------

11       TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

12          BEFORE THE HONORABLE ALIA MOSES

13          CHIEF UNITED STATES DISTRICT JUDGE

14 ---------------------------------------------------------

15                    A P P E A R A N C E S

16

17   For the Plaintiff:       WEBB, CASON & MANNING, P.C.
                              BY:  MR. MATTHEW STEVEN MANNING
18                            710 Mesquite Street
                              Corpus Christi, Texas  78401
19

20
     For the Defendants:      LAW OFFICES OF JACK R. STERN
21                            BY:  MR. JACK STERN
                              P.O. Box 4359
22                            Del Rio, Texas  78841

23

24
   Proceedings recorded by mechanical stenography.  Transcript
25 produced by Computer-Aided transcription.
```

1                        **I N D E X**

2                                        DIR  CROSS  REDIR  RECROSS

3  BY THE DEFENDANTS:

4     MR. CAREY TROELL               11    36    43     46

5     MS. OLGA RAMOS                 52    91   117    118

6        (VOIR DIRE EXAMINATION BY MR. MANNING, Page 81)

7

8  BY THE PLAINTIFF:

9     NONE

10

11

12                      **E X H I B I T S**

13                                              OFFER / ADMIT

14  FOR THE DEFENDANTS:

15     4.  Proposed Declaratory of Emergency          31 / 32

16     4-A. Proposed Declaratory of Emergency, Pt. 2   61 / 62

17     5.  Letter, State of TX to TX Water Develop. Board  61 / 61

18     7.  Photos (3), residences of Quemado           71 / 71

19     8.  Water boil notice and rescinded boil notice   -- / 83

20     9.  Maverick County Budget                     140 / 140

21

22  FOR THE PLAINTIFF:

23     NONE

24

25                      * * * * * *

1                          *** NOTE ***

2   THIS HEARING CONTAINS SEVERAL BENCH CONFERENCES.  BENCH

3   CONFERENCES ARE DEEMED CONFIDENTIAL AND ARE NOT A PART OF THE

4   OPEN COURT RECORD.  THESE BENCH CONFERENCES HAVE BEEN PLACED IN

5   A SEPARATE **SEALED** TRANSCRIPT, AVAILABLE ONLY TO THE

6   REPRESENTATIVE PARTIES.

7

8        (10:30:33 A.M., START TIME)

9             THE COURT:  Mr. Iracheta, are you here today as an

10  attorney or just a party?  Or not really a party, a witness,

11  right?

12            MR. IRACHETA:  Yes, Your Honor.

13            THE COURT:  Okay.  Let me call the case now.

14             This is DR-23-CV-60, Enriqueta Diaz versus Ramsey

15  English Cantu, Roxanna Rios, Olga Ramos, Roberto Ruiz.  And I'm

16  going to presumptively say, In their official capacities.

17            Mr. Stern -- Mr. Stern, you need to close your --

18            MR. STERN:  I apologize.

19            THE COURT:  Uh-huh.  Now, at the -- at the ending of

20  the last hearing, the plaintiff had called witnesses.  I'm not

21  sure if there are any more witnesses from the plaintiff.  And

22  then I know the defense had some witnesses that we needed to

23  call.  Any --

24            MR. STERN:  Judge, if -- if I could just ask the Court

25  a few questions.

1            THE COURT:  Uh-huh.

2            MR. STERN:  Is plaintiff's counsel going to be able to

3    go over what the Court's already considered and recall the

4    witnesses, or is he just going to present new witnesses --

5            THE COURT:  They haven't yet rested, Mr. Stern.

6            MR. STERN:  That's my question.

7            THE COURT:  Yeah, they have not rested yet.  Uh-huh.

8            MR. STERN:  Okay.  Thank you.

9            THE COURT:  Okay, does that -- you said you had

10   several questions.  That was one of them.

11           MR. STERN:  No, that --

12           THE COURT:  Any other questions?

13           MR. STERN:  No, that was it.

14           THE COURT:  Okay.  All right.

15            And go ahead and make announcements.

16           MR. MANNING:  Good morning, Your Honor.  Matt Manning

17   for Plaintiff Enriqueta Diaz.

18           THE COURT:  Okay.

19           MR. STERN:  Morning, Judge.  Jack Stern for all

20   defendants.

21           THE COURT:  Okay.  And all parties are present.

22            Mr. Manning, I know that you just came on board on

23   the case, and have you had some time to speak to your client in

24   this matter?

25           MR. MANNING:  Yes, Your Honor.  Good morning.  I have

1   had an opportunity to speak to Ms. Diaz.  I met with her for

2   quite a while yesterday in Eagle Pass.  I've also had the

3   opportunity to review the entirety of the audio from the Court's

4   last hearing.  I would like to put a couple things on the record

5   if the Court would oblige me before we continue.

6           THE COURT:  Okay.  Well, the plaintiff hasn't rested,

7   so you may proceed.

8           MR. MANNING:  Thank you, Your Honor.

9            First, I'd like the Court to know that this morning

10  I filed a supplement to the original complaint and request for

11  injunction.  Mr. Stern did in fact receive it, and I wanted to

12  just apprise the Court that obviously the truncated time table

13  between when I was put on and -- and today did not allow for

14  full briefing, but we would ask that the Court consider that

15  supplement.  And I wanted to point a few things out to the Court

16  there.

17           As the Court has already identified, it's our

18  intention to -- hopefully, with the Court's permission -- reform

19  the pleadings to make the suit both in their official and

20  individual capacities.  The reason for that, Your Honor, as the

21  Court well knows, is suing in an individual capacity is about

22  monetary damages, and that deals with immunity in a certain way.

23  Whereas suits in an official capacity for the purpose of federal

24  injunctive relief can be -- you know, can go forward.

25           So we're asking that the Court recognize that we are

1  seeking to reform the pleadings at this juncture in both

2  respects, so that if the Court does make ultimate findings, that

3  we ask it would be appropriate under the -- the case law as it

4  relates to federal injunctive relief in their official capacity.

5          THE COURT:  Okay.  Mr. Stern, you have received this

6  document?  I've -- I'm looking at it right now.  Any problems at

7  this point, Mr. -- Mr. Stern?

8          MR. STERN:  Just the understanding that I have was

9  based on the district pleadings.  This was a case calling for a

10  preliminary injunction.

11          THE COURT:  Right.

12          MR. STERN:  And I just want to make sure that that's

13  the stage we're at, as opposed to --

14          THE COURT:  We're -- we're still at the same two.

15  It's the -- it's the 1983, and then by supplemental

16  jurisdiction, the -- the injunctive relief.

17              And I'm -- I'm looking at Roman Numeral Number Two.

18              And then Number Three is still the same.  It's just

19  the injunctive relief.

20          MR. MANNING:  That's correct, Your Honor.  And may I

21  speak to that, if the Court would allow?

22          THE COURT:  Sure.

23          MR. MANNING:  Thank you, Your Honor.  We don't mean in

24  any way to try to change substantially the -- the pleadings, but

25  we do want to present to the Court that the nature of the

1    alleged injury here is one such that we would be asking the

2    Court to make, if it deems it appropriate, a finding for a

3    permanent injunction because it's not one where we're alleging

4    that relief can be ameliorated by a preliminary injunction.

5    That's why I provided to the Court the standard for both the

6    preliminary and permanent injunction.

7              In listening to the audio, I heard the Court apprise

8    Mr. Stern that the -- the Court might afford my client an

9    opportunity to amend her pleadings.  So, just trying to, you

10   know, be -- recognizing judicial economy, I wanted to provide

11   that to the Court that that's where we intend to go and that's

12   what we intend to ask for.

13             THE COURT:  Okay.  Mr. Stern, this is kind of, I

14   think, based on your -- our last decision about potentially a

15   12(b)-type motion.

16             MR. STERN:  That's correct.

17             THE COURT:  Right.  Okay.  All right.

18             Go ahead, Mr. Manning.  What else -- what other

19   evidence would you like to present to the Court?

20             MR. MANNING:  May I confer with my client for just a

21   split second, Judge?

22             THE COURT:  You may.

23             MR. MANNING:  Thank you.

24        (BRIEF PAUSE)

25             MR. MANNING:  Your Honor, at this time plaintiff

1    rests.  However, we would ask the Court for the opportunity to

2    reopen for rebuttal if we deem it appropriate and if the Court

3    would allow.

4           THE COURT:  Uh-huh.  It would be proper.

5              Let me -- and let me make sure -- Mr. Manning, I

6    know -- since everybody wasn't here, let me make sure that I

7    have all of the exhibits that I should have from the last

8    hearing.

9              I have Exhibit Number One, which is actually the

10   screen shots from the telephone.

11             Exhibit Number Four, which is the -- is it the

12   declaratory -- I think that's what that is.

13          MR. STERN:  It was the expedited declaratory action --

14          THE COURT:  Right.

15          MR. STERN:  -- in state court, Judge.

16          THE COURT:  Right.  Was that -- Mr. Stern, that was

17   the one that was also filed November the 6th in state court?

18          MR. STERN:  Yes, ma'am.  That's correct.

19          THE COURT:  Okay.  And then I have the -- Exhibit

20   Number Two was the flash drive video that we watched.

21             Three was not -- I don't remember what Three was,

22   but Three did not yet get admitted.

23             And then I have Defendant's Exhibit Number One,

24   which is a copy of the page of a petition.

25             Exhibit Number Two, which is another page of a -- of

1    a petition, but a different -- it looks like a different format.

2              And then Defendant's Exhibit Number Three, which is

3    the fine -- the resolution, I think, of the Texas Water

4    Development Board.

5              I'll tell you what I would like that I know we

6    talked about and I did, apparently, get a chance to see it at

7    the last hearing, was the actual proposal made by the county.

8              MR. STERN:  Yes, Judge, we'll -- we'll be introducing

9    that.

10             THE COURT:  You will?  Okay.  And Mr. Stern, I don't

11   know -- as I've seen in the past, some of these proposals have,

12   like, previous iterations.  I'd like to see the iteration that

13   was submitted to the Texas Water Development Board, and then the

14   iteration that was then the final in County Commissioners Court.

15             MR. STERN:  That's correct, Judge.

16             THE COURT:  I'm assuming it's one and the same, but

17   let me see both of them.

18             MR. STERN:  Certainly.

19             THE COURT:  Okay.

20             MR. STERN:  But the Court is correct, that there was a

21   preliminary iteration on one date and a final --

22             THE COURT:  There usually is.  There -- it's not an

23   unusual situation, Mr. Stern.

24             The other question I have for the parties is, when I

25   started looking at the Texas Water Development Board, the

1   program -- and this is more of a clarification, potentially,

2   from the parties.  When I started looking towards the source of

3   the monies that the State is granting, are they federal monies

4   originally?  Do we know?

5          MR. MANNING:  I cannot speak to that, Your Honor.  I'm

6   not sure.

7          THE COURT:  Okay.  Were there -- were they federal

8   monies that were awarded to the State and then the State gets to

9   determine where they go?  Anybody?  Any --

10         MR. TROELL:  I can answer that, Your Honor.

11         MR. STERN:  Somebody -- bond counsel can answer that.

12         THE COURT:  Well, I -- bond counsel can answer it if

13  and when he testifies, Mr. Stern.

14         MR. TROELL:  Correct.

15         THE COURT:  He's not the Court's counselor.

16         MR. STERN:  No, I understand.

17         THE COURT:  And I'm -- he's not here to counsel the

18  Court on the law.

19         MR. STERN:  Okay.

20         THE COURT:  As what the -- what I understand from the

21  testimony before, bond counsel has an interest in this going

22  through because he gets paid that way, is I -- what I remember

23  from the testimony.

24         MR. STERN:  And that -- and that's obviously correct,

25  Judge.

1          THE COURT:  Okay.  So that's why I want to keep him as

2    just a witness, Mr. Stern.

3              Okay, Mr. Stern, then call your first witness.

4          MR. STERN:  Call bond counsel.

5          THE COURT:  Okay.  Now, Mr. Stern, I don't need legal

6    advice.  Let's be very clear about that.

7

8                         **CAREY TROELL,**

9    having first been duly sworn, testified to the following:

10

11         MR. MANNING:  Your Honor, I apologize, but would the

12   Court like me to do cross-examination here or at some other

13   place?

14         THE COURT:  You'll end up doing that at the podium

15   where Mr. Stern is when it's time.

16         MR. MANNING:  Thank you, Judge.

17         MR. STERN:  May I proceed, Judge?

18         THE COURT:  Sure.

19                      DIRECT EXAMINATION

20   BY MR. STERN

21   Q    State your name.

22   A    My name is Carey Troell.

23   Q    How are you employed?

24   A    I'm an attorney for a law firm out of San Antonio, Texas.

25   Q    What type of legal work do you do?

A      I'm a partner with Cantu Harden Montoya and we specialize in public finance, which is issuance of debt by political subdivisions of the State of Texas.

Q      And are you familiar with certificates of obligation?

A      Yes, I am.

Q      And have you issued certificates of obligation for more than one county?

A      Yes, I have.

Q      How many?

A      Too numerous to -- to be able to count that over 25 years. But to say that, you know, I've been issuing certificate -- certificates of obligation for the past 25 years for a variety of political subdivisions, including counties.

Q      Have you been qualified as an expert witness to testify in federal court?

A      Yes, I have.

             THE COURT:  Mr. Stern, I don't need somebody to tell me who the -- what the law is.  I will make those findings.  I don't need that.  I don't know how many times I have to tell you that on the record, and y'all keep insisting that this gentleman's going to tell me what the law is and what I should find.  I don't need that.  I don't need that.  Just to be -- be clear.

             MR. STERN:  Okay.  May I proceed?

             THE COURT:  You may.

1   Q    (By MR. STERN) Which federal court were you qualified in?

2   A    In this -- in this court here.

3         THE COURT:  I don't find people to be expert witnesses

4   in trials or hearings anymore.  That's not allowed by federal

5   rules.

6   Q    (By MR. STERN) Now --

7         THE COURT:  Now, he may testify to such, Mr. Stern.

8          Probably out of Crystal City?

9         THE WITNESS:  That's correct, Your Honor.

10        THE COURT:  Uh-huh.

11  Q    (By MR. STERN) Now, what's the difference between -- the

12  practical difference between a bond and a certificate of

13  obligation?

14  A    Well, there -- there are -- first of all, there's very

15  numerous types of, quote/unquote, bonds.  "Bonds" is -- is a

16  general term.  It is used within numerous statutes.  I think

17  most people would consider in -- in my practice, is -- is a bond

18  is -- is a general obligation of the issuer, payable solely from

19  ad valorem taxation.  And in most cases, an election is required

20  for -- for a bond, but not in all cases.

21  Q    Now --

22  A    Then certificates of obligation is a specialized statute,

23  and that got by the legislature in 1971 to provide alternative

24  means to uplift subdivisions, and those being in a county or a

25  city, to issue a -- a -- another form of debt, which is --

1          MR. MANNING:  Objection.  Narrative.

2          THE COURT:  Ask a question.  Mr. Stern, you're just

3 getting him to recite the law, which is what I don't need.

4             Now, in this particular case, I've heard them called

5 as "bonds" and I've heard them called "certificates of

6 obligations."  How do they start off?

7          THE WITNESS:  They're certificates of obligation, Your

8 Honor.

9          THE COURT:  They started off as certificates of

10 obligations?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  Okay.  And so that's how they were

13 proposed to begin with?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  Okay.  And those are in all of the

16 proposals, as certificates of obligation?

17          THE WITNESS:  Yes, Your Honor.  It...

18          THE COURT:  Mr. Stern, keep going.

19 Q    (By MR. STERN) What do bond counsel in other cases

20 typically rely upon to guide them in the issuance of

21 certificates of --

22          THE COURT:  No, Mr. Stern.  Ask him about his work on

23 this.  You keep trying to have him testify as an expert in this

24 area.  I need to know what he did and what he advised in this

25 case.

1          MR. STERN:  Thank you, Judge.

2    Q    (By MR. STERN) What did you do in this case?

3    A    I was contacted about a specialized program of Texas Water

4    Development financing.  With --

5          THE COURT:  By whom?

6          THE WITNESS:  By the -- by the county.  It starts with

7    the county.

8          THE COURT:  Okay.  By whom?

9          THE WITNESS:  I would say, probably, by the county

10   judge, if -- by recollection.

11         THE COURT:  Okay.

12         THE WITNESS:  That they were -- they had received

13   approval from the Texas Water Development Board for financing.

14   And in -- from there I inquired of the Texas Water Development

15   Board what kind of debt instrument they were looking for.

16   Q    (By MR. STERN) And what did they tell you?

17   A    They typically -- well, they required certificates of

18   obligation with a subordinate revenue plan.

19   Q    Now, did you have to issue notice to the public?

20   A    If -- the county elected to issue notice to the public

21   pursuant to 271.049 of the Texas Local Government Code.

22   Q    Did the county have to have a resolution in order to go

23   forward --

24   A    Yes.

25   Q    -- with the certificates of --

1  A      The -- the --

2  Q      -- certificates?

3  A      The county -- process is the county adopts a resolution

4  authorizing a notice of intention, which that was done on

5  August 16th of 2023.

6              THE COURT:  Wait.  That was when?

7              THE WITNESS:  August 16th, 2023, Your Honor.

8  Q   (By MR. STERN) Now, in this particular case, was a bond

9  election --

10              THE COURT:  No, Mr. Stern.

11  Q   (By MR. STERN) -- requested --

12              THE COURT:  Oh, I'm sorry.  I thought you were going

13  to say "necessary."  I was going to stop you there.

14              THE WITNESS:  Okay --

15              THE COURT:  Requested by whom, Mr. Stern?

16  Q   (By MR. STERN) -- by the county?

17  A      The count -- the county was following under the statute

18  for -- for Subchapter (c), Chapter 271.  So the county did not

19  request an election.

20  Q      Did the voters request an election?

21  A      Repeat that, I did not hear.

22  Q      Did five percent of the voters request the county hold --

23  A      We received --

24  Q      -- an election?

25  A      -- a petition at a meeting on October 10th that had the

1  sufficient number of -- of people's signatures --

2  Q    And what's the percentage required?

3  A    Five percent.  Correct.

4  Q    Okay.

5  A    And because there was not enough time to confirm the

6  signatures, I recommended to the court to postpone action on the

7  order so that we could review the petition and -- and determine

8  its application to the county.

9  Q    When -- what date was the petition -- the voters' petition

10  received on?

11  A    It was on -- it was on the 10th.  I believe I was told it

12  was 11:00 a.m. that it was received, and Commissioners Court was

13  at 5:00, I believe, that day.

14  Q    Are there any exceptions to the election requirement if

15  five percent of the voters --

16          THE COURT:  You're asking him the law, Mr. Stern.

17  Q    (By MR. STERN) Did you rely on any exceptions to the

18  requirement of an election in deciding to -- or did the

19  Commissioners Court rely on any exceptions to the requirement of

20  an election where five percent of the voters so request?

21  A    Yes.  We met with the Commissioners Court to discuss the --

22  the possible actions the Commissioners Court could take after

23  receiving the petition.  And --

24  Q    What were those possible actions?

25  A    They could accept the petition and -- and request an

1    election, or there is a specific provision in the same section

2    of that 271.049 that allows an exception from petition if -- if

3    one of four elements exists in -- in the purpose of the

4    certificates of obligation.

5    Q    Okay.

6    A    I discussed with them one of them was the specific law,

7    maybe not verbatim.  Best of my recollection is, if it's to

8    protect and preserve the public health and safety of residents,

9    the issuer is exempt from the requirements of 271.049 of the

10   Texas Local Government Code, including specific -- including the

11   right of the public to petition.

12   Q    Now, the judge has asked --

13            THE COURT:  Mr. -- hold on, Mr. Stern.

14            The judge testified that you advised him of three

15   options.  What are the three options you advised him of?  He

16   only told me two.  What would be three?

17            THE WITNESS:  Um, the -- give me a moment.

18            THE COURT:  Uh-huh.

19            THE WITNESS:  Let me think.

20            It's -- it was -- and I'll -- it's going to take a

21   little explanation.  All right, so it was to --

22            THE COURT:  Give me the three options you told him.

23            THE WITNESS:  Correct.  It was to accept the petitions

24   and -- and hold an election.

25            THE COURT:  Uh-huh.

1          THE WITNESS:  It was to discontinue pursuing

2     certificates of obligation all -- altogether and -- and doing no

3     further action.  Or it was to rely on the exemption under the

4     certificates of obligation Act for the issue of public health

5     and safety, Your Honor.

6          THE COURT:  Okay.  He mentioned you advised him of the

7     declaratory act -- the Declaratory Judgment Action.  Did you do

8     that one?

9          THE WITNESS:  I did, but that was -- that was in

10    support of the declaration of exemption based upon public health

11    and safety, Your Honor.

12         THE COURT:  Well, why do you need a declaratory action

13    if you can declare an emergency yourself?

14         THE WITNESS:  Correct.

15         THE COURT:  You don't need it, do you?

16         THE WITNESS:  No, I do not.

17         THE COURT:  Okay.  All right.

18            Keep going, Mr. Stern.

19    Q    (By MR. STERN) Now, are you familiar with the county's

20    grant application in this case?

21    A    I am.  I do not -- I did not prepare the -- the

22    application.  But based upon the application's filing with the

23    Texas Water Development Board, I -- I do review the contents of

24    the application in preparing for the issuance of debt.

25         THE COURT:  Do you know who prepared it?

1          THE WITNESS:  Melba Romero, an engineer employed as a

2    professional by the county.  And there was a second individual,

3    Ida, but I don't offhand remember Ida's last name.

4          THE COURT:  Okay.

5          THE WITNESS:  Sure.

6    Q    (By MR. STERN) Now, the judge -- this judge in this court,

7    asked before you took the stand if you knew -- or if I knew what

8    the source of funds were for the certificates of obligation.  Do

9    you know what the source of those funds is?

10   A    According to my conversation with the Texas Water

11   Development Board, the funding will come -- if this -- if this

12   grant and loan -- and the loan is funded by the certificates of

13   obligation -- the grant is a separate portion that's --

14         THE COURT:  Just tell me where it comes from.

15         THE WITNESS:  Okay.  They -- I was told it was coming

16   from the issuance of bonds by the Texas Water Development Board

17   to be issued in February of 2024.

18   Q    (By MR. STERN) So is that state money or federal money?

19   A    That would be a state bond by -- backed by --

20         THE COURT:  Wait a minute.  So the state is going to

21   raise taxes to give bonds to people, who are then going to also

22   have to raise taxes to pay everything off?  Is that what I'm

23   understanding?

24         THE WITNESS:  The -- I -- I don't know the --

25         THE COURT:  Are you --

1          THE WITNESS:  I don't know that process.  That's --

2   that's --

3          THE COURT:  What do you mean you don't know that

4   process, you've been doing it for 25 years --

5          THE WITNESS:  I understand.

6          THE COURT:  -- according to you.

7          THE WITNESS:  I don't represent the Texas Water

8   Development Board.

9          THE COURT:  Well, you obviously have a lot of contact

10  with them.

11         THE WITNESS:  We're -- yes, I've been speaking with

12  their legal counsel since the inception of this transaction, and

13  he's the one that informed me, Your Honor.

14         THE COURT:  Are you sure it's not coming from the

15  federal government?

16         THE WITNESS:  I don't -- this is, again, only what I

17  was told by Michael Perez, the legal counsel for the Texas Water

18  Development Board.

19         THE COURT:  And so we don't -- well, and those --

20         THE WITNESS:  That's true.  I'm not --

21         THE COURT:  -- have been approved?

22         THE WITNESS:  -- a hundred percent sure.

23         THE COURT:  And those bonds have been approved in the

24  state area?

25         THE WITNESS:  No.  So what happened --

```
1              THE COURT:  So they're not approved yet by the state?

2              THE WITNESS:  Not -- not to my understanding, Judge.

3              THE COURT:  Okay.

4              THE WITNESS:  Yeah.

5   Q    (By MR. STERN) Now, have you had discussions with anybody

6   regarding whether the issuance of certificates of obligations to

7   support this grant would raise the taxes of people in Maverick

8   County?

9   A    So, in preparation for the issuance of these certificate --

10  certificates of obligation, I work in concert with the county's

11  financial adviser, David Gonzalez of Public Finance Management.

12  And according to his calculations, there would not be a tax

13  increase for Maverick County --

14             THE COURT:  Okay, wait a minute.  Back up just a

15  second.  Is the county solvent right now?  Is it in the black

16  right now?

17             THE WITNESS:  I don't know, Your Honor.  I'm not the

18  financial --

19             THE COURT:  Well, you're testifying as to what he told

20  you.  Is the county solvent right now?

21             THE WITNESS:  I don't know the answer, Your Honor.

22             THE COURT:  So, do you know whether or not the county

23  has the money to pay this back without raising valuations and/or

24  tax rates?

25             THE WITNESS:  The explanation to me from -- from David
```

1   was that the valuations had increased between 2022 and 2023, and

2   that the county had reduced its budget by over $200,000, that --

3           THE COURT:  Y'all -- the -- these -- these

4   certificates of obligations are for seven million.  More than

5   seven million.

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  And 200,000 is not going to get there.

8           THE WITNESS:  Yes.

9           THE COURT:  So, is the county solvent?

10          Now, you're talking valuations of properties, right?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  So if those keep going up, it's not just

13  their county taxes that are actually going to go up.  It's the

14  school, it's the city, it's all the other taxes will go up

15  because that's all based on the same valuation.  Do -- are they

16  not?

17          THE WITNESS:  There's two components.

18          THE COURT:  Are they not?

19          THE WITNESS:  No, Your Honor.

20          THE COURT:  So there -- the schools -- the -- a school

21  ad valorem with valuation of -- of the property going up?

22          THE WITNESS:  Their -- their -- their tax rate would

23  have to come down to -- to --

24          THE COURT:  Well, what if it doesn't come down?  You

25  don't -- there is no guarantee that any of the other tax rates

1  are going to come down.

2          THE WITNESS:  The state law requires every -- annually

3  the -- each -- each political subdivision to set a tax rate

4  based on their --

5          THE COURT:  Mr. Troell, y'all are playing sleight of

6  hand with all that.  There's no way the taxes aren't going to go

7  up on people when you raise their debt limits.  There's just no

8  way.  Y'all are playing sleight of hand.

9          THE WITNESS:  Your Honor --

10          THE COURT:  And y'all are trying to throw anything at

11  it to see what sticks.

12          Mr. Stern, this is -- it's difficult to believe that

13  you're going to -- you're going to raise the -- the level of --

14  of debt of a county and neither the tax rates or the valuations

15  or the taxes are going to go up.  It makes no sense.

16          MR. STERN:  All -- all I know, Judge --

17          THE COURT:  It's sleight of hand, is what it is.  I'm

18  starting to get that with this whole emergency thing and with

19  this, No, taxes are not going to raise, and people are not going

20  to pay more taxes.

21          That's all sleight of hand, and that's what I'm

22  starting to see with all of this.

23          MR. STERN:  Well --

24          THE COURT:  It doesn't make any sense, not -- not one

25  bit.

1          MR. STERN:  Well, as long -- my understanding is, as

2     long as the county stays within the confines of the state

3     constitution and doesn't raise --

4          THE COURT:  I get that everybody wants to stay within

5     the confines of the constitution, but the state constitution

6     allows valuations to go up, they allow counties and cities and

7     hospital districts and college districts and everybody to raise

8     a valuation, and that's one way for them to raise more taxes

9     without raising the rate.

10          MR. STERN:  All I know is there's a constitutional

11     limitation --

12          THE COURT:  I'm sure there's a --

13          MR. STERN:  -- in the Texas Constitution.

14          THE COURT:  -- constitutional limitation.  So the

15     bottom line is, it's still sleight of hand because you're -- if

16     you're paying with ad valorem taxes, I'm going to need to know

17     how much money in surplus is in the county that you don't have

18     to do any of that.

19          MR. STERN:  Well, I think -- I think part --

20          THE COURT:  Because if there's a surplus in the

21     budget, you're going to have to raise the money or the fees for

22     the service are going to be super high for the people that get

23     this service because somebody's got to pay it off.

24          MR. STERN:  Well, the county can use its credit as

25     opposed --

1          THE COURT:  I understand, but somebody's got to pay

2     that credit card, Mr. -- Mr. Stern, and usually it's the

3     taxpayers.  Right?  Isn't that -- isn't that a fair statement?

4          MR. STERN:  Pretty fair.

5          THE COURT:  Okay.  So if -- if they're having to pay

6     the credit card that doesn't have an unlimited maximum, how are

7     you going to raise the money to pay it off?  It's either taxes,

8     or the fees are going to be sky high for the service or a

9     combination.

10          Now, you -- this is all sleight of hand.  This is

11     starting to sound not very pretty.

12          So how can you tell me that you're not going to

13     raise taxes, you're not going to raise valuations, they're going

14     to be able to pay this off by cutting the budget with $200,000

15     so far?  That doesn't make any sense.

16          This is all sleight of hand.

17          And if you raise valuations, you're raising all the

18     taxes for the people, not just the county.  Right?  Ad valorem

19     tax -- taxes apply to city, school, hospital, everything else.

20     So how does it not affect the people?

21          How would it not affect the people, Mr. Troell?

22          THE WITNESS:  So, Your Honor, because the tax assessed

23     valuation has increased, the same tax rate that is set for the

24     current year, when they set it back in September in 2022, it

25     will remain the same when they set it for -- when they set it

1   for 2024.  Because the increased assessed valuation produces

2   more money on the same tax rate, which would pay back that --

3   and -- and the --

4          THE COURT:  That's the point.  You are paying more

5   taxes because they increased the valuation of the properties,

6   and that's only good until 2024.  And then what happens in 2024?

7   They can raise the valuation again.

8          THE WITNESS:  No.

9          THE COURT:  Right?

10         THE WITNESS:  You're correct -- in the future, if the

11  tax -- if the assessed valuation changed to the negative, it

12  could -- would effect a tax increase.

13         THE COURT:  So the bottom line is, the taxes will

14  continue to go up so long as the county keeps spending money and

15  they need it.

16         THE WITNESS:  Just like every political subdivision.

17         THE COURT:  Exactly.  Right?

18         THE WITNESS:  Correct.

19         THE COURT:  So these bonds are going to add to that.

20         THE WITNESS:  They are a debt of the county, annually

21  payable by ad valorem taxes and a surplus revenue [fund],

22  correct.

23         THE COURT:  Okay.

24         THE WITNESS:  I can't argue with that.

25  Q    (By MR. STERN) Now, what are the certificates of obligation

1  in this case being used for?

2  A    They're being used for water and wastewater improvements to

3  specified areas of Maverick County in the areas -- and I don't

4  know Maverick County, but in the areas of Thompson Road and

5  Quemado.

6  Q    Okay.  Are water supply projects public works?

7  A    Yes, they are.

8  Q    Did the Texas Water Development Board determine that a

9  nuisance existed that was dangerous to public health in areas to

10  be served by the grant project?

11  A    Yes.  I received a resolution of the Texas Water

12  Development Board.  I reviewed its findings, and they did have a

13  specific finding in their resolution that there was a nuisance

14  dangerous to the public health and safety of the residents of --

15  of the areas to be completed with the project.

16          THE COURT:  Okay, so what are the specific nuisances

17  that they found?

18          THE WITNESS:  They found that there was --

19          THE COURT:  And what paragraph, by the way?

20          THE WITNESS:  Not -- not within the resolution.  It

21  was based upon the application of the county --

22          THE COURT:  Okay.  So --

23          THE WITNESS:  -- and -- and the evidence therein.

24          THE COURT:  Okay.  So who made -- who made the

25  findings -- what -- who made the specific findings of the

1    nuisances?

2           THE WITNESS:  So, in the application process, which,

3    once again, Melba Romero and -- and Ida -- I don't remember.  I

4    apologize.

5           THE COURT:  Okay.  So why did the Texas Water

6    Development Board not adopt those findings into the resolution?

7           THE WITNESS:  I can't answer for the Texas Water

8    Development Board.

9           THE COURT:  Well, you seem to be doing a lot of that

10   today for -- for everybody; for David Gonzalez, for the Texas

11   Water Development Board, for a lot of folks.

12             So what are those specific nuisance emergencies?

13          THE WITNESS:  Again, they relied on the findings of

14   the county's application of the areas of Quemado, which there

15   they had deteriorating septic systems --

16          THE COURT:  Okay, but this water's not just for -- the

17   money is not just for Quemado.  It's for other areas that don't

18   have these --

19          THE WITNESS:  There's --

20          THE COURT:  -- problems, right?

21          THE WITNESS:  Yes, there's three separate projects.

22   Basically --

23          THE COURT:  Okay.  And so -- oh, three separate

24   projects and one proposal?

25          THE WITNESS:  Correct.

1          THE COURT:  Only one emergency, the one in Quemado?

2          THE WITNESS:  Not an emergency; public health and

3    safety, but -- but the --

4          THE COURT:  Well, that's what -- y'all keep calling it

5    an emergency.  I'm just -- I'm just using the nomenclature

6    that's been going on.

7          THE WITNESS:  Right.  Not me, Your Honor.  I -- just

8    public health and safety for me.

9          THE COURT:  So you don't think it's an emergency?

10          THE WITNESS:  Not -- not -- I'm not required to make

11    that finding under Texas -- the Chapter 271.

12          THE COURT:  But that's what you're telling the county

13    they need to do, is declare an emergency.

14          THE WITNESS:  No, Your Honor, they do not have to.

15          THE COURT:  That's what they put in their petition,

16    didn't they, that it was an emergency?

17          THE WITNESS:  That was a finding they made.

18          THE COURT:  Of an emergency?

19          THE WITNESS:  That's the finding in an order they may

20    have passed.

21          THE COURT:  Okay.  But you're telling me that's not

22    what you said existed.

23          THE WITNESS:  That's not what's required under Chapter

24    271.049, as the exemptions.

25          THE COURT:  Okay.  So let's just -- for purposes of

1   clarity or just what we're --

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  -- talking about here.  The only, quote/

4   unquote, public nuisance was Quemado, but this bond is not just

5   for Quemado?

6           THE WITNESS:  No, there was also --

7           THE COURT:  Or the certificates of obligations.

8           THE WITNESS:  The public health and safety issue found

9   by the Texas Water Development Board was for all three projects.

10  That information is going to be better served and presented by

11  Commissioner Ramos about the specific findings.

12          THE COURT:  Well, let me -- Mr. Stern, maybe you need

13  to have this witness sponsor the proposal, because apparently

14  that's where it's in.

15          MR. MANNING:  Respectfully, Your Honor, I'm going to

16  object to hearsay and authentication.  This witness has already

17  testified it's not a part --

18          THE COURT:  I'm asking for it, though, Mr. Manning.

19  That's fine.

20          MR. MANNING:  Yes, Your Honor.

21      (BRIEF PAUSE)

22          MR. STERN:  Judge, I don't know if you want them to

23  introduce the exhibit or simply tender it to the Court or...

24          THE COURT:  You can ask him if that's what he's

25  relying on, Mr. Stern.  Maybe that would be best since he's

1  talking about the proposal that was submitted to the Texas Water

2  Development Board.

3  Q    (By MR. STERN) I'm showing you what's been marked as

4  Defendant's Exhibit Four.  Can you identify it?

5            MR. STERN:  If I can approach him, please.

6            THE COURT:  Yes.

7            THE WITNESS:  It -- it contains additional pages that

8  are not exactly in the -- in -- in the application.  There's

9  some additional documents that are attached thereto from the

10 folder.

11 Q    (By MR. STERN) Could you remove those additional documents,

12 please.

13           THE COURT:  Those can be Four-A, Mr. Stern.

14           MR. STERN:  Okay.  So be it.

15           THE WITNESS:  So it's going to take me a second to

16 sort where it stops, so...

17           THE COURT:  Sort them out.

18     (BRIEF PAUSE)

19           THE WITNESS:  These are the extraneous pages.

20           THE COURT:  Okay, those would be -- Mr. Stern, hold on

21 to those.  Those would be Four-A.

22           MR. STERN:  If I could just mark them, Judge.

23           THE COURT:  Sure.  That's fine.

24           THE WITNESS:  So, at -- this document, at the request

25 of Melba Romero, she sent me this document that she had put

1   together for the application to the Texas Water Development

2   Board.

3            THE COURT:  So you two put that one together.  Okay.

4            THE WITNESS:  She put it together, but I reviewed it

5   when we received the grant.

6            THE COURT:  You -- from what I'm hearing, though,

7   nobody has received a grant because it hasn't yet been approved.

8            THE WITNESS:  Well, we received approval for the

9   grant, Your Honor.  You're right, we have not received the --

10   the grant has not been assigned.

11            THE COURT:  So, is that the proposal that was

12   submitted to the Texas Water Development Board for their

13   consideration?

14            THE WITNESS:  Yes, that's the application, Your Honor.

15            THE COURT:  Okay.  And it was submitted when?

16            THE WITNESS:  Best of my recollection --

17            THE COURT:  Well, is it dated?

18            THE WITNESS:  It -- this is not dated.  It's in

19   electronic form, so there was no date on it, Your Honor.  I'm

20   reviewing it, but I -- I don't see a date on it, Your Honor.

21            THE COURT:  Okay.  So give me an approximation of when

22   it was submitted.

23            THE WITNESS:  I believe it was submitted in May -- or

24   completed in May.  I -- it's a process.  They start the

25   application -- and I think they completed all the requirements,

1   I believe, in May of 2023, Your Honor.

2           THE COURT:  And so when was it submitted, more or

3   less?

4           THE WITNESS:  May -- May 2023.

5           THE COURT:  Okay, Mr. Stern, let me see that proposal

6   while you continue to question him.

7           MR. STERN:  If -- if I might ask him --

8           THE COURT:  Sure.

9           MR. STERN:  -- before I come up and tender it.

10          THE COURT:  Uh-huh.  Go ahead.

11  Q    (By MR. STERN) Is it the final propose -- final grant

12  request that was submitted on that date, or the preliminary

13  grant request that was submitted in 2023?

14  A    This was sent to me by the person, Melba Romero, who said

15  this was the application.  I do not actually know that this was

16  the final one.  This is what I was told by Melba that was the

17  evidence they provided to the Texas Water Development Board.

18          THE COURT:  So this could be the first -- first

19  iteration, not what was submitted?

20          MR. STERN:  I suspect it's the last one, but it could

21  be the first one.

22          THE WITNESS:  Yeah, I can't testify either way,

23  Your Honor.

24  Q    (By MR. STERN) Now, do counties have authority to enforce

25  health regulations?

```
 1   A    Beyond my scope as bond counsel.  I just know what's
 2   presented before me and then what's in the findings through the
 3   statutes.
 4              MR. STERN:  Pass the witness, Judge.
 5              THE COURT:  Okay.  I have a question here.
 6              THE WITNESS:  Yes, Your Honor.
 7              THE COURT:  Counsel, one of the nuisance
 8   determinations in this proposal was that Quemado doesn't have
 9   water from another source other than water wells.  Do you know
10   that to be true or not?
11              THE WITNESS:  Oh, no, Your Honor.  I do not know
12   factually if that's true.
13              THE COURT:  Would it surprise you to know that they do
14   have another water source other than water wells?
15              THE WITNESS:  Again, I -- since I haven't -- do not
16   know --
17              THE COURT:  But y'all are -- y'all are reviewing this
18   and you're agreeing with it.  You don't even know the facts that
19   are being stated in here is what you're telling me.
20              THE WITNESS:  I do not know the residents of Quemado.
21   Yes, Your Honor.
22              THE COURT:  You don't know that they already have
23   county water?  Some of them do.
24              THE WITNESS:  Yes, Your Honor, I would not know that.
25              THE COURT:  So if that was in this proposal, you
```

1    wouldn't know that that would be incorrect?

2              THE WITNESS:  Your Honor, I would not.

3              THE COURT:  Okay.

4              THE WITNESS:  I did not put it --

5              THE COURT:  Go ahead, Mr. Manning.

6              MR. MANNING:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. MANNING

9    Q    Can you hear me, Mr. Troell?

10   A    Yes.

11   Q    Is that how to pronounce your last name, Troell?

12   A    Troell.

13   Q    Troell.  Pardon me.

14   A    That's fine.

15   Q    You'd agree with me that Section 271.049(d), the section

16   that you're speaking of, allows the county to issue the

17   certificates of obligation without bond or without an election

18   only refers, really, to the advertisement of those bonds; isn't

19   that correct?

20   A    That is not correct.

21   Q    Doesn't the title of that statute say that it doesn't apply

22   in certain circumstances, the first of which is public calamity;

23   is that correct?

24   A    That is one of the exemptions from petitioning, yes.

25   Q    Okay.  You would agree with me that when the application

1  was submitted in January -- or in May, excuse me, of 2022, there

2  was no allegation of a public calamity from the county, correct?

3  A     The petition -- I would argue that the application for the

4  specified funds of the Economically Distressed Areas Program

5  required the county show evidence of a health and public safety

6  issue.

7        THE COURT:  Okay, that wasn't the question.  He's

8  asking you --

9        MR. MANNING:  Right.

10       THE COURT:  -- about the first exception.

11       THE WITNESS:  Public -- no.  There's no public

12  calamity that I'm aware of.

13 Q     (By MR. MANNING) Okay.  And you would agree with me that

14 the only time this was ever termed as a nuisance was when the

15 Texas Water Development Board made that determination in June of

16 2023, correct?

17 A     As it's not required in the statute, sure.

18 Q     Okay.  And you would agree with me that the statute does

19 not speak to, in 271.049, a nuisance being a circumstance under

20 which a county can issue a certificate of bond without an

21 election?

22 A     Correct.  The exemptions talk nothing about a nuisance.

23 Q     Precisely.  So you would agree with me that a nuisance is

24 not tantamount to a public calamity, correct?

25 A     That's correct.

1  Q    Nor is a nuisance necessarily tantamount to a public

2  emergency or danger to health, correct?

3  A    Well, it did say nuisance to -- dangerous to public health

4  and safety, but --

5  Q    Okay.

6  A    -- nuisance in itself, no.

7  Q    But you'd agree with me that the terminology "nuisance,

8  danger to public health and safety," is the determination that

9  the county made, right?

10  A    No.  That is not correct.

11  Q    Okay.  Is that what the statute reads?

12  A    The statute reads, To protect and preserve the public

13  health and safety of the residents of the issuer.

14  Q    Okay.  And you would agree with me that protecting and

15  preserving is not the same as saying, Abating a nuisance by

16  virtue of issuing debt without an election?

17  A    Yes, that's nowhere in the statute.

18  Q    Okay.

19       THE COURT:  Wait, wait, wait.  And the -- he -- you

20  said the findings had to be made -- say -- say -- the previous

21  answer to the previous question was:  It was a finding that was

22  made of a public nuisance by...

23       THE WITNESS:  The Texas Water Development Board, in

24  their resolution.

25       THE COURT:  Well, you said by their issuer.

1          THE WITNESS:  No, by the Texas -- in their resolution.
2    It -- it --
3          THE COURT:  Well, you didn't say "resolution."
4          THE WITNESS:  Then I misspoke, Your Honor.
5          THE COURT:  Because the question was:  Doesn't the
6    county have to make the finding?
7          THE WITNESS:  And I said they don't have to make a
8    finding of nuisance.
9          THE COURT:  The counties don't have to make a finding
10   of nuisance to issue certificates of obligations without an
11   election?
12         THE WITNESS:  That's correct.  They do not.
13         THE COURT:  I don't -- I, frankly, don't buy into
14   that.
15         THE WITNESS:  I'm just quoting the statute.
16         THE COURT:  I don't buy into that.
17           Ask the next question.
18         THE WITNESS:  I'm quoting the statute.
19         MR. MANNING:  Thank you, Your Honor.
20   Q    (By MR. MANNING) If -- if I may, the remainder of that
21   statute in Subsection (c), 271.049, says that if five percent of
22   the qualified voters of the county issue a petition protesting
23   it, then it has to go to an election, correct?
24   A    (c) does say that.
25   Q    Right.  And (c) says that with the exception of the

1    circumstances where you can show a public calamity, correct?

2    A    Or a public nuis -- or public health and safety, yes, sir.

3    Q    Okay.  And you would agree with me, as it goes to the

4    timeline, that there was no finding by the county of a nuisance

5    regarding public safety until after the time the petition with

6    the requisite signatures was submitted?

7    A    Nuisance is not required under the statute.

8    Q    Okay.  But you would agree with me that the county did not

9    find that until the citizens submitted a petition pursuant to

10   271.049(c), correct?

11   A    I -- I don't know if the county's ever found specific

12   nuisance -- nuisances.  It's not required.

13   Q    Well, you -- you would --

14   A    I'm not aware.

15   Q    You would agree with me, Mr. Troell, in order to issue the

16   certificates of obligation, the county has to meet one of the

17   requisite exemptions, correct?

18   A    And they do, yes.

19   Q    Okay.  And the county did not believe it met those

20   requisite exemptions until after the citizens submitted a

21   petition pursuant to 271.049(c), correct?

22   A    I disagree.

23   Q    Okay.  Well, are you familiar --

24        MR. MANNING:  May I approach the witness, Your Honor?

25   Q    (By MR. MANNING) I don't have a copy for --

1    A     Sure.

2    Q     -- evidence, but there may be one in evidence.

3              Are you familiar with the petition for the --

4    A     I am.

5    Q     Okay.  I'll represent to you, Mr. Troell, that in this

6    petition there is a distillation of the timeline, relatively

7    speaking, correct?

8    A     Yes, there is.

9    Q     Okay.  And you would agree with me that in that

10   Commissioner Ramos just essentially made the application, the

11   Texas Water Development Board issued its resolution, and the

12   county never made any finding of nuisance, emergency, public

13   calamity, anything else subsumed by the statute, correct?

14   A     They were required to have that finding in the application

15   in order to apply for the Economically Distressed Areas Program.

16   So, yes, they'd already made that finding.

17   Q     Okay.  And you would agree with me that the Commissioners

18   Court made a supplemental finding -- let's call it that -- on

19   October 30th in the meeting after the petition had been

20   submitted, correct?

21   A     They -- they reconfirmed the findings -- the past findings

22   of the Commissioners Court.

23   Q     Okay.  And you would agree with me that Section 271.049(c)

24   does not require that the petition be submitted in any

25   particular form; isn't that correct?

1   A    That's correct.

2   Q    Okay.  In fact, it just requires that five percent of the

3   qualified voters submitting that petition then pushes the issue

4   to an election, correct?

5   A    That's correct.

6   Q    And it's your understanding -- correct me if I'm wrong --

7   that the elections administrator for Maverick County did in fact

8   certify that five percent of the qualified voters to push it to

9   a bond election, correct?

10  A    I was -- I was present at the meeting when she presented

11  her evidence.  And -- and I don't know factually, but she made

12  the statement then there was more than five percent.  That's --

13  from her testimony.

14  Q    Okay.  And under your understanding of what that statute

15  allows, it would then require a bond election if in fact --

16  okay, if in fact one of the exemptions to the statute was not

17  met, correct?

18  A    If the county did not have an exemption under

19  27.049(d) [sic], their options would be to abandon the

20  certificates of obligation or have an election.

21  Q    Okay.  And you would also agree with me, right, that the

22  petition need be submitted any time before the deadline for the

23  issuance of certificates of obligation?

24  A    That's just a little wonky, but it says that either the day

25  of the meeting or before the action item.  So literally it's

1    anytime before the action item is held by the Commissioners

2    Court.

3    Q    So your prior testimony that the petition was received

4    sometime the same day before the Commissioners Court meeting

5    would comport with the statute that requires that the citizens

6    provide a petition before the deadline, correct?

7    A    Yes.  That's correct.

8    Q    All right.  So absent an express finding of public calamity

9    and absent an express finding of some determination to protect

10   the health and safety, the citizens of Maverick County are

11   entitled to a bond election per 271.049(c)?

12   A    That would be correct.

13          MR. MANNING:  Pass the witness, Your Honor.

14          THE COURT:  Mr. Stern?

15                      REDIRECT EXAMINATION

16   BY MR. STERN

17   Q    Now, is it your testimony that you were not familiar with

18   any findings of a situation dangerous to human health prior

19   to -- what -- what year was it?

20          THE COURT:  Mr. Stern, hold on.  I -- I'm having a

21   hard time hearing you.  Say --

22          MR. STERN:  I'm sorry, Judge.  It's the mic.

23          THE COURT:  Repeat that again.  Speak a little bit

24   louder.

25          MR. STERN:  I'm sorry.  Can you hear me all right now?

1              THE COURT:  Not really.

2              MR. STERN:  Let me try the other one, Judge.

3              THE COURT:  Okay.

4              MR. STERN:  Can you hear me okay now?

5              THE COURT:  That's better.

6              MR. STERN:  I apologize.

7    Q    (By MR. STERN) Now, when was the first time that you became

8    aware that there was a nuisance at -- in the Quemado -- not a

9    nuisance, but a situation dangerous to human health and safety

10   in the Quemado area?

11   A    The -- my understanding of the issue of public health and

12   safety was when I was contacted by the county that they were

13   going forward with the Texas Water Development Board loan under

14   the Economically Distressed Areas Program, which required

15   specifically -- well, the -- the program is -- is for issues of

16   public health and safety.

17             THE COURT:  And that would have been in January of

18   2023?

19             THE WITNESS:  No, Your Honor.  I think it -- it was

20   after -- I think it was more along May when the application was

21   finally granted.  I'm not brought -- bond counsel's not brought

22   in until the debt's ready to issue, so --

23             THE COURT:  Well, I understood the county judge saying

24   you were hired in January of 2023.

25             THE WITNESS:  Oh, that's correct.  Yes, I was.

```
1              THE COURT:  Okay.  So would it have been in January of
2     2023?
3              THE WITNESS:  No, Your Honor.  We were dealing with
4     the Series 2022 petition on the certificates of obligation back
5     then.  So that -- when I was first employed, we were dealing
6     with a different series of certificates of obligation.
7              THE COURT:  Mr. Stern, go ahead.
8     Q    (By MR. STERN) Now, are you aware that back in 2010, the
9     Texas Department of State Health Services found there to be a
10    situation or a nuisance dangerous to public health and safety in
11    the Quemado area?
12    A    I have been made aware of that, and I have seen that letter
13    you're talking to -- talking about, but I -- I was not made
14    aware of it until recently -- well, within the last few days.
15             THE COURT:  Since after the last hearing, right?
16             THE WITNESS:  Yes, Your Honor.  I believe that's
17    correct.  Yes.
18             THE COURT:  Okay.
19    Q    (By MR. STERN) And you're aware that the letter from the
20    Department of Texas Health -- Texas Department of State Health
21    Services, dated November 19th, 2010, finds --
22             THE COURT:  Mr. Stern, that's not going to get y'all
23    into the public health and nuisance disaster situation.  It is
24    not.  That's at least 13 years ago.  It's just not.
25             MR. STERN:  Okay.  But --
```

1          THE COURT:  I mean, the fact that this proposal says

2   Quemado doesn't have county water is incorrect right off the

3   bat.

4          MR. STERN:  Could be, Judge, but I didn't prepare it.

5          THE COURT:  No, it's not "could be."  It is.  There

6   are people that have county water in Quemado.  The fact that

7   y'all don't know that and don't have that in here tells me

8   nobody cared to find out.

9          MR. STERN:  If I could continue on, Judge.

10          THE COURT:  I suppose.

11  Q    (By MR. STERN) Are you aware of any improvements that have

12  been made in the Quemado area since 2010 to ameliorate the

13  finding of a nuisance dangerous to public health and safety that

14  existed in 2010?

15  A    I'm not aware --

16          MR. MANNING:  Objection.  Relevance.

17          THE COURT:  He's not aware.  I'll allow it.

18          MR. STERN:  Pass the witness.

19          THE COURT:  Any re -- recross?

20          MR. MANNING:  Yes, Your Honor.  May I approach for a

21  very quick recross?

22          THE COURT:  Uh-huh.

23                     RECROSS-EXAMINATION

24  BY MR. MANNING

25  Q    All right, Mr. Troell, just a couple other questions.

1   Okay?

2   A    Sure.

3   Q    You would agree with me that, at best, if this were to go

4   forward, the percentage of people in Maverick County who would

5   be affected is extremely small; isn't that correct?

6   A    What do you mean by "affected"?

7   Q    Meaning that this application intends to change the

8   wastewater system for 300-some-odd people or properties; is that

9   correct?

10  A    I'm aware of an incident of one ambulance purchased and

11  found it to be a public health and safety by a county, but -- so

12  the numbers don't -- doesn't matter under state statute.

13  Q    Okay.  And you would agree with me that a nuisance is -- is

14  customarily something that's abated, right?

15  A    Again, a nuisance doesn't have relevance to my exemption.

16  Q    Okay.  Very quickly --

17          MR. MANNING:  I'm sorry, Your Honor, were you going --

18          THE COURT:  I was going to say, it's -- it's a

19  nuisance when they want to sustain it, it's not a nuisance when

20  they need to answer a question.

21              Is it a nuisance or not?

22          THE WITNESS:  It -- it's irrelevant under state

23  statute.

24          THE COURT:  That's not what I'm asking you.  Is it a

25  nuisance or not in fact?

1          THE WITNESS:  According to the Texas Water Development

2    Board --

3          THE COURT:  No, I'm asking you in fact.  Is it a

4    nuisance or not?

5          THE WITNESS:  I have no factual knowledge --

6          THE COURT:  Well, you're the one that's testifying --

7          THE WITNESS:  -- other than what I've reviewed.

8          THE COURT:  -- that it's a nuisance and the nuisance

9    finding is sufficient.  You're the one that is advising the

10   county based on that finding.  How do you not know the basis of

11   it?

12         THE WITNESS:  I am not asserting nuisance as any kind

13   of requirement under the 271 exemption.  Only that it's to

14   protect and preserve the public health and safety.

15         THE COURT:  But you don't even know if there's a

16   nuisance or not.  You're just throwing that out there as, That's

17   state law so therefore there must exist a nuisance if somebody

18   says it.

19         THE WITNESS:  I have not -- I have not said

20   "nuisance."

21         THE COURT:  Yeah, you've used them all.

22         MR. MANNING:  May I proceed, Your Honor?  Just very

23   short.

24   Q    (By MR. MANNING) You'd agree with me that Defendant's

25   Exhibit Five shows that the county basically didn't do anything

1  for 13 years; is that right?

2  A    I mean, I wouldn't know those factual situations.  I was

3  employed by the county in 2023, so -- and I'm not a resident of

4  the county, and I'm not a resident of Quemado, and not a

5  resident of Thompson Road.

6  Q    Okay.  And you would also agree with me that per state law,

7  in the event that these certificates of obligation are defeated

8  at an election, the Commissioners Court would have to wait

9  36 months to seek to issue them again; is that right?

10 A    There -- there -- the -- a -- the law reads that if there

11 is a failed election, you cannot issue certificates of

12 obligation for those specific projects for a period of time.

13 That's correct.

14 Q    And you would also agree with me that this year, in

15 October, there was a failed election on certificates of

16 obligation, right?

17 A    There's a little history behind that.  We -- we did not do

18 the certificates --

19          THE COURT:  Okay, yes or no.  So I'll --

20          THE WITNESS:  No.

21          THE COURT:  -- I'll let you explain.

22          THE WITNESS:  Yes.  No.

23 Q    (By MR. MANNING) Let me ask it a better way.  Was there a

24 recent election wherein certificates of obligation were

25 defeated?

1   A    There was a petition received in 2022.  In review of the --

2   of the certificates of obligation and discussions with the

3   county, we did want to have an election for the items of that

4   certificate of obligation, but because it was kind of broad and

5   vague, we went to an election for the items the county was

6   trying to get approved, and those were streets and park

7   improvements.  So that's why I said --

8          THE COURT:  Okay.  And did they get defeated or not,

9   was the question.

10         THE WITNESS:  Oh, they did lose at the election.

11         THE COURT:  Okay.

12         THE WITNESS:  Correct, Your Honor.

13  Q    (By MR. MANNING) So you would agree with me, then, that

14  that would make sense as to why County Judge English Cantu would

15  say in a Commissioners Court meeting that, This is going

16  forward, no matter what?

17  A    I do not know why he would make -- why he made that

18  statement.

19  Q    And you would agree with me factually that it would then be

20  incumbent on the county to make sure that this debt got through

21  by "hook and by crook" to ensure that the debt was issued,

22  because they already had a barometer on the citizens, where the

23  citizens said, We don't want to issue more debt?

24  A    Can you explain to me what "hook and crook" means?

25  Q    Sorry.  Let me -- let me -- let me use more formal

1  language.

2         You would agree with me that you -- or the county

3  might engage in subterfuge -- for instance, finding a, quote,

4  emergency -- that is the exact same circumstance something has

5  been in more than ten years for the purpose of trying to get

6  around having an election where the people get to decide if debt

7  is issued?

8  A   I have never done anything fraudulent in my career as a

9  public finance lawyer.

10 Q   Yes, sir, and I'm not -- I'm not insinuating you're being

11 fraudulent.  What I'm saying is, in order for the county to

12 issue this debt, right, the county would have to either issue an

13 election or it would have to be shown that it met one of the

14 exemptions under the code in order to issue the COs without the

15 requisite election pursuant to a petition?

16 A   It's the same answer and I've been answering.  Yes.

17 Correct.

18 Q   Okay.

19         MR. MANNING:  Pass the witness.

20         THE COURT:  Mr. Stern, any redirect?

21         MR. STERN:  No, Judge.

22         THE COURT:  All right.  You may step down.

23          Call your next witness.

24         THE WITNESS:  Thank you, Your Honor.

25         MR. STERN:  Call Olga Ramos.

1                          **OLGA RAMOS,**

2      having first been duly sworn, testified to the following:

3

4              MR. STERN:  Could I proceed, Judge?

5

6                        DIRECT EXAMINATION

7      BY MR. STERN

8      Q      Tell us your name and what your position is.

9      A      Olga Ramos.

10     Q      What's your position?

11     A      Maverick County Commissioner, Precinct Three.

12     Q      When were you elected?

13     A      Elected, yes.

14     Q      When?

15     A      Three -- going on three years ago, 2021.

16     Q      Does your precinct cover the county area that's the subject

17     of the grant application before the Court?

18     A      Yes, sir.

19     Q      Okay.  And would that area be Thompson Road and Quemado?

20     A      Correct.

21     Q      Did you receive -- once elected, did you receive any

22     complaints from resident -- residents in those areas?

23     A      Yes, sir, I did.

24     Q      What were the -- what were the citizens' concerns?

25     A      In reference to the grant application, yes --

```
 1   Q     Well --
 2   A     -- water issues.  The majority were a lot of people that
 3   don't have water in Quemado, and the people from Thompson
 4   Road -- the 15 residents on Thompson Road that don't have
 5   potable water, and all of the town of Quemado does not have
 6   sewer.
 7   Q     And are -- and did you have any concerns for the health and
 8   safety of the residents of the area based upon the complaints
 9   that you received?
10   A     Yes.  Yes, I did.
11   Q     Did you visit the area to observe your constituents'
12   complaints?
13   A     Yes, sir, I did.
14   Q     What did you observe?
15   A     I observed that the majority of the citizens in downtown --
16   the Quemado area, the -- they don't have -- the majority of them
17   have cesspools, that they don't have septic tanks.  And I
18   realized we had a big concern with the sewer problems, looking
19   at -- at those cesspools in the area.
20   Q     Is there any concern with potable water in the Quemado
21   area?
22   A     Yes.  The majority of the town in Quemado does have water
23   from our water plant, but there's a lot of people outside in --
24   in Quemado.  There's an area that we're looking at for -- to
25   provide water to them --
```

1   Q      Okay.

2   A      -- in the grant application.

3   Q      How long have the residents of the Quemado community

4   suffered from conditions that you believe to be dangerous to

5   public health and safety?

6   A      I took -- I found out when I took office, sir, in -- in --

7   I didn't know the conditions before that, but I do -- and when I

8   took office, I did see some documents there at the office

9   that -- that they had established -- that they tried to get a

10  grant or they -- a grant was awarded, or in the process, from

11  the Texas Water Development Board for sewer in Quemado.

12  Q      When was that?

13  A      In 2010.  And the Department of State issued a letter to

14  the county, telling them that there was a nuisance.  And so

15  we -- I started looking at funding options to see how we could

16  help these residents out.

17          THE COURT:  Okay, wait.  I want the timeline on all of

18  those findings.  On all of that, Mr. Stern.

19          MR. STERN:  Sure.  Just one second, Judge.

20      (BRIEF PAUSE)

21          MR. STERN:  If I could approach the witness, please,

22  Judge.

23          THE COURT:  Uh-huh.

24  Q      (By MR. STERN) Let me show you what's been marked as

25  Defendant's Exhibit Number Five.  Can you identify it?

1  A    Yes, sir.  This is a letter from the Texas Department, the

2  State of Health Services back on November 19, 2010.  It was a

3  letter sent to the Texas Water Development Board where they

4  identified that the conditions with the -- within the defined

5  Quemado subdivision survey area with a total of 98 residential

6  lots containing dwellings do support a finding of the Department

7  of Health Services that a nuisance dangerous to the public

8  health and safety does exist, as defined in Chapter 341.  And it

9  goes on and on.

10        THE COURT:  Okay, wait.  Stop for just a second.

11  Ninety-eight dwellings?

12        THE WITNESS:  It says -- well, actually on the

13  environmental health survey --

14        THE COURT:  What you just read said 98 dwellings,

15  correct?

16        THE WITNESS:  Correct.

17        THE COURT:  So 98 dwellings were affected in the

18  Quemado area?

19        THE WITNESS:  They -- they did a survey --

20        THE COURT:  Yes or no?

21        THE WITNESS:  Yes, ma'am.

22        THE COURT:  Okay.  And so this proposal was for 300

23  homes in Quemado, or 300 homes total?

24        THE WITNESS:  300 --

25        THE COURT:  Or 500?

1          THE WITNESS:  -- 300 homes, Your Honor.

2          THE COURT:  Where?

3          THE WITNESS:  In -- in Quemado for sewer only.  For

4    sewer.

5          THE COURT:  And then -- and how many for water?

6          THE WITNESS:  For water -- for water, it's only for

7    the dates -- Days Road, Edwards Road and along 277.

8          THE COURT:  So why does the proposal you submitted say

9    Quemado didn't have any county water?

10          THE WITNESS:  Your Honor, they don't have water in

11    that proposed --

12          THE COURT:  No, that's not what this says.

13          THE WITNESS:  In the proposed area.

14          THE COURT:  It says, The community of Quemado does not

15    have county water.

16          THE WITNESS:  In the proposed area of the --

17          THE COURT:  No, it doesn't say "in the proposed area."

18    It says, The community of Quemado does not have county water.

19          THE WITNESS:  No, they -- they do.  Down to -- some

20    of --

21          THE COURT:  Okay.  So this proposal is incorrect?

22          THE WITNESS:  It's --

23          THE COURT:  Incorrect, is what I'm saying.

24          THE WITNESS:  Well, it's only the -- they don't have

25    water in the proposed area.

1           THE COURT:  That's not what this says.  Would you like

2      to see this so that you can see what you submitted?

3               It says, Site Two, Quemado, Texas waterline.  The

4      community in Quemado does not have -- does not have county water

5      and would be seeking to obtain first-time water service.

6           THE WITNESS:  Yeah.  It's for --

7           THE COURT:  That's not --

8           THE WITNESS:  -- some water service --

9           THE COURT:  It's not if it has --

10          THE WITNESS:  -- to the one --

11          THE COURT:  It doesn't say, "limited to Day Road and

12     Edwards," like you just testified to it.

13          THE WITNESS:  It -- on the -- on the proposed project

14     it shows the streets.

15          THE COURT:  It doesn't say that in your proposal.

16          THE WITNESS:  But on the -- on the engineer design,

17     the -- it's on there.

18          THE COURT:  But you -- you don't limit it in your

19     proposal.  Okay, so you're now saying 300 homes for what; for

20     water --

21          THE WITNESS:  For sewer, ma'am.

22          THE COURT:  -- or sewer?

23          THE WITNESS:  For sewer.

24          THE COURT:  And how many for water?

25          THE WITNESS:  For water, on the Thompson Road, it's

1  15 --

2         THE COURT:  No, I'm saying in Quemado right now.

3  We'll get to --

4         THE WITNESS:  In Quemado --

5         THE COURT:  -- Thompson Road in just a moment.

6         THE WITNESS:  -- in Quemado it's 15.

7         THE COURT:  Fifty for water?

8         THE WITNESS:  One, Five, yes, Your Honor.

9         THE COURT:  One, five?

10        MR. STERN:  Fifteen.

11        THE COURT:  Fifteen.  One, five?

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  Okay.  One, five in Quemado for water?

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  And then -- now, go to the Thompson Road

16  one.  How many -- how many have either/or service?

17        THE WITNESS:  On -- on the Thompson Road, Your Honor,

18  nobody -- they don't have potable water at all.

19        THE COURT:  Okay, so how many homes?

20        THE WITNESS:  Fifteen, Your Honor.

21        THE COURT:  One, five.  And how many for sewage?

22        THE WITNESS:  No, we're not doing sewer in -- in -- in

23  the --

24        THE COURT:  Just -- just water?

25        THE WITNESS:  Just the water, potable water.

```
 1                THE COURT:  Okay.  How do they do their sewage system
 2    on Thompson Road?
 3                THE WITNESS:  They have -- they have --
 4                THE COURT:  Septic tanks?
 5                THE WITNESS:  -- septic tanks in that area.
 6                THE COURT:  Okay.  And that is not a public nuisance?
 7                THE WITNESS:  I haven't identified that, Your Honor.
 8                THE COURT:  Okay.  And then is there another part to
 9    this?
10                THE WITNESS:  The grant application?
11                THE COURT:  Yes.
12                THE WITNESS:  It's only three projects, the Edwards --
13                THE COURT:  So what's the third one?
14                THE WITNESS:  It's the sewer --
15                THE COURT:  But what's -- you're say -- I'm -- I'm
16    talking property-wise.  Is there another set of properties other
17    than Thompson and Quemado Road?
18                THE WITNESS:  No, ma'am.
19                THE COURT:  Just Quemado and Thompson Road?
20                THE WITNESS:  Correct.
21                THE COURT:  Okay.  All right.  So you're talking
22    about -- I'm assuming the 15 in water in Quemado would be part
23    of the 300.  So we're talking about 315 total served by this
24    syst -- by this grant?
25                THE WITNESS:  Sewer.  For sewer, yes, Your Honor.
```

1          THE COURT:  No, no.  For sewer and water in Quemado --

2    I'm assuming the 15 for the water would also be 15 -- counted in

3    the sewage?

4          THE WITNESS:  Well -- well, yes.

5          THE COURT:  Okay.  So then plus 15 of Thompson Road

6    for water would be 315.

7          THE WITNESS:  Correct.

8          THE COURT:  And you were here in court at the last

9    hearing.  I heard the number of 500 hookups.  Where do the 500

10   hookups come in?

11         THE WITNESS:  Your Honor, the 400 -- 400 hookups is

12   what we currently have serving from the water plant in the

13   community of Quemado.  We have 400 accounts; 415, 420.

14         THE COURT:  You're saying of water?

15         THE WITNESS:  Just water.  Correct.

16         THE COURT:  Okay.  So you have right now 400 hookups

17   already serviced in Quemado for water?

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.

20         THE WITNESS:  I -- I have in -- the exact total --

21         THE COURT:  Okay.  I -- I -- okay.

22         THE WITNESS:  -- in my binder.

23         THE COURT:  No, that's fine.  That's fine.

24         THE WITNESS:  More of less I have the -- I mean, I

25   have the -- the printout for open accounts.

1              THE COURT:  Okay.  And that's fine.  400 to 415.

2    That -- it's an estimate.

3              THE WITNESS:  Uh-huh.

4              THE COURT:  Okay.  Keep going, Mr. Stern.

5              MR. STERN:  We seek to introduce Defendant's Exhibit

6    Number Five into evidence.

7              THE COURT:  I'm sorry, Mr. Stern, I can't hear you.  I

8    don't know if she can hear you.

9              MR. STERN:  I would like to introduce Defendant's

10   Exhibit Number Five into evidence.

11             THE COURT:  It -- Number Five?

12             MR. STERN:  The one that --

13             THE COURT:  Is Five the letter?

14             MR. STERN:  Yes, ma'am.

15             MR. MANNING:  No objection, Your Honor.

16             THE COURT:  So admitted.  Okay.

17        (DEFENDANT'S EXHIBIT NUMBER FIVE ADMITTED)

18             THE COURT:  Okay.  Do you want to -- do you want me to

19   have it?

20             MR. STERN:  Yes, please.

21             THE COURT:  Mr. Stern, did you want to introduce

22   Four-A as well, the all -- the other pages that did not have...

23             MR. STERN:  Could I tender to counsel first?

24             THE COURT:  Sure.  Absolutely.

25        (BRIEF PAUSE)

```
 1              THE COURT:  And, Mr. Stern, I have one other question
 2   once he finishes with that.
 3       (BRIEF PAUSE)
 4              MR. MANNING:  No objection to Defendant's Four-A, Your
 5   Honor.
 6              THE COURT:  So admitted.
 7       (DEFENDANT'S EXHIBIT NUMBER FOUR-A ADMITTED)
 8              MR. STERN:  If I could approach?
 9              THE COURT:  Ms. -- Commissioner -- wait.  I have one
10   more question before you --
11              MR. STERN:  That's fine.
12              THE COURT:  Yeah, that's fine.
13              Commissioner, do you know when those 400-some-odd
14   accounts of water were opened in Quemado?  Do you have an idea?
15              THE WITNESS:  Oh, that was before I took office, Your
16   Honor, I think.  I know that --
17              THE COURT:  Do you happen to have -- well, this letter
18   that you're -- that's being submitted was before you took
19   office.  Do you have any information as to when those hookups
20   came in?
21              THE WITNESS:  I -- I --
22              THE COURT:  Would you have a file that has any --
23              THE WITNESS:  I -- I might have --
24              THE COURT:  Do you want to get --
25              THE WITNESS:  -- something --
```

1          THE COURT:  -- do you want to get your file, see about

2     refreshing your recollection?  Don't speak to anybody, just get

3     your file.

4          (BRIEF PAUSE)

5          THE WITNESS:  No, Your Honor.  It just has the -- when

6     they did the expansion at the water plant.

7          THE COURT:  Which was when?  What year?

8          THE WITNESS:  20 -- it started -- the expansion

9     started in 2017, and they finished that in 2021.  It was a USDA

10    grant for an expansion.

11         THE COURT:  Okay.  So, but you have no idea when

12    the -- I think you said the 300 homes got water in Quemado -- or

13    300 lots.  Not even homes.  Because I think you said there were

14    98 residences.

15         THE WITNESS:  Actually, there were -- we -- we have a

16    total of 442 accounts.

17         THE COURT:  And you don't know when that water when

18    in?

19         THE WITNESS:  I don't -- I don't have that -- that

20    year.  The only thing I have is the expansion that they did --

21         THE COURT:  Okay.

22         THE WITNESS:  -- because the expansion was turned over

23    to --

24         THE COURT:  To you?

25         THE WITNESS:  When I took over -- when -- when I took

1  office, that's when they turned in --

2          THE COURT:  Turned it over to you.

3          THE WITNESS:  -- to me, but I didn't -- I didn't

4  know -- they didn't do waterlines.  All the expansion was just

5  the building --

6          THE COURT:  Okay.  So -- so the waterlines would have

7  had to have been in before this time.

8          THE WITNESS:  Before my time, correct.

9          THE COURT:  Oh, and before that expansion?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.

12          THE WITNESS:  The expansion was only for clarifiers,

13  for filters --

14          THE COURT:  Okay.

15          THE WITNESS:  -- for the building --

16          THE COURT:  Okay.

17          THE WITNESS:  -- for pumps and so forth.

18          THE COURT:  So sometime between 2010 and 2019,

19  waterlines were put into Quemado; is that a safe assumption?

20          THE WITNESS:  I -- I --

21          THE COURT:  Maybe?  Possibly?

22          THE WITNESS:  Maybe, yes.

23          THE COURT:  All right.

24            Go ahead, Mr. Stern.

25  Q    (By MR. STERN) Now, are there any areas in Quemado that are

```
 1   put in places for flies or were subject to excrement --

 2              THE COURT:  Oh, Mr. Stern.  Are you kidding me?

 3   For -- for flies with excrement?

 4              THE WITNESS:  Yes.  We -- we --

 5              THE COURT:  Do you know if it's of a horse or a cow or

 6   any other animal living in Quemado?

 7              MR. STERN:  I never checked.

 8              THE COURT:  Well, why are you raising it then?

 9              MR. STERN:  Well, if I -- if I limit it to human

10   excrement --

11              THE COURT:  That would be better, because isn't that

12   the issue here?

13              MR. STERN:  Correct.

14              THE WITNESS:  Well, I mean, some of the complaints

15   that I've gotten is -- I have one resident that -- Mr. Bobby

16   Garcia, his home -- he has -- his sewer line to the -- from his

17   home, the sewer line goes out to his yard.  He doesn't even have

18   a cesspool out in his --

19                   And I have a picture here.  I don't know if you

20   would like to see that, Mr. Stern.

21                   But there's -- and -- and his daughter, Lisa

22   Alvarez, she got a lot of complaints from the neighbors because

23   of the -- they didn't know how to fumigate the -- the

24   cockroaches, all the animals --

25              THE COURT:  And do you know how long it was like that?
```

1          THE WITNESS:  It's been -- I know the daughter --

2          THE COURT:  Okay, how long has that -- that condition

3   existed at that house; do you know?

4          THE WITNESS:  I -- I didn't -- he just --

5          THE COURT:  You didn't ask.  Okay.

6          THE WITNESS:  -- explained his concern, and --

7          THE COURT:  Okay.  So you didn't ask --

8          THE WITNESS:  -- and he asked me --

9          THE COURT:  -- how long it's existed?

10         THE WITNESS:  No.

11         THE COURT:  Okay.

12         THE WITNESS:  He just asked me for help to see if we

13  could find him some type of funding because the septic tanks

14  were too expensive.  And the -- the daughter just did -- made a

15  hole and that's where her sewer goes to, because of the --

16         THE COURT:  So are we talking about getting --

17  issuance of certificates of obligation to help people that are

18  unable to maintain their own properties?  Is that what we're

19  talking about here?

20         THE WITNESS:  No, ma'am.  It's to public -- to --

21  the -- the sewer line.

22         THE COURT:  I get it, but you're talking about --

23         THE WITNESS:  There's other grant --

24         THE COURT:  -- you're talking about people needing

25  help individually to fix their sewer -- their -- their septic

1   tanks.

2          THE WITNESS:  Those are different grants that are

3   available that we can do that, but we can't help them because

4   speaking to the gentleman with the USDA, they -- those grants

5   are -- they have to have the -- the sewer already so they can

6   connect --

7          THE COURT:  So where are you going to put the pumps

8   for the sewage plant?  Where are you going to put the plant?

9          THE WITNESS:  Well, there's -- we have -- the

10  engineers are working on a --

11         THE COURT:  So where are you going to put the plant

12  that's going to accept the sewage from those lines you're

13  putting into Quemado?

14         THE WITNESS:  Okay, we -- we have two options, Your

15  Honor.  We --

16         THE COURT:  Wait, wait.  I -- where are you putting it

17  in right now?  You don't even know where you're going to put it?

18         THE WITNESS:  Oh, right now we -- we have -- there's

19  only 15 homes that have sewer right now, and -- and -- at the

20  Radar Base.

21         THE COURT:  No, that's not -- I'm asking about

22  Quemado, not the Radar Base.

23         THE WITNESS:  Oh, the -- the Quemado -- we have the --

24         THE COURT:  So where -- so where are you going to pump

25  that sewage to?

1          THE WITNESS:  To the -- the sedimentations.  What we

2     have right now at the Radar Base --

3          THE COURT:  You're going to pump it up -- upstream, so

4     to speak --

5          THE WITNESS:  That's one option, Your Honor.  There's

6     two options that the engineer is looking at.  The other --

7          THE COURT:  But you don't know how much it's going to

8     cost, you don't whether it can be covered by this cost or

9     anything else, do you?

10          THE WITNESS:  That's included in the cost analysis

11     and --

12          THE COURT:  Well, how do you -- how do you know what

13     the cost analysis is, how much you're asking for, if you don't

14     even know what the option is?

15          THE WITNESS:  Well, it's included in the engine --

16     that's -- those were the options that -- that the engineer is

17     giving us.

18          THE COURT:  So what option did y'all pick?

19          THE WITNESS:  The -- we haven't picked.  We're in the

20     plan -- right now we're in the -- in the stage to secure the --

21     the funding, and the --

22          THE COURT:  Okay, but you don't even know if this is

23     sufficient funding because you don't know what the extent of the

24     project is.

25          THE WITNESS:  The Water Development Board authorized

1  some funding for land acquisition and -- because we're looking

2  at if we need to acquire land.  Whatever the -- whatever option

3  --

4              THE COURT:  Wait, wait, wait.

5              Mr. Stern, do y'all have a budget, maybe, on this

6  project?  Is there a budget that I can look at?

7              THE WITNESS:  The engineer -- the engineer has a --

8              THE COURT:  Is there a budget that I can look at?

9              THE WITNESS:  The engineer --

10              MR. STERN:  I haven't seen it yet, if there is.

11              THE COURT:  What I'm hearing is, money is being

12  requested for a project that isn't finalized.  That's what I'm

13  hearing.  We don't even know where the -- where the sewage is

14  going to be pumped to or how.

15              Is that -- that's what I'm hearing.  So maybe a

16  budget might clarify that.  Do we have a budget?

17              THE WITNESS:  They're -- the engineer has that.  It

18  was part of the prerequisite for the application.  We needed

19  to --

20              THE COURT:  So would it be part of the application?

21              THE WITNESS:  It should be in the application.

22              THE COURT:  Okay, I -- I didn't see a budget.

23              Is it possible, Mr. Stern, that it's one of these

24  exhibits that did not go to -- with the application?

25              MR. STERN:  If you're talking --

1          THE COURT:  Is it possible?

2          MR. STERN:  -- about Four-A, I doubt it.

3          THE COURT:  You don't think it's in Four-A?

4          MR. STERN:  No, ma'am, I don't.

5          THE COURT:  Okay.

6          MR. STERN:  I could be wrong, but I don't think so.

7          THE COURT:  Okay.

8          THE WITNESS:  There -- there's different options on

9     the application that -- or -- or stages.  Right now we're in

10    the -- we still need to do a planning phase for the application,

11    and then we do a design, and then a construction.

12          THE COURT:  Okay.  So you have no idea what that's

13    going to cost yet?

14          THE WITNESS:  Well, I've seen --

15          THE COURT:  A final.

16          THE WITNESS:  I've --

17          THE COURT:  You don't have a final number?

18          THE WITNESS:  I have it -- I've seen it from the

19    engineer because Texas Water -- Madea Lowey with the Texas Water

20    Development Board, I talked to her and she's the one we -- that

21    recommended that if it was going to be too expensive to run it

22    all the way to Quemado, to the Radar Base, that she was going to

23    allocate some funding for land acquisition in the event that we

24    needed to do the sedimentation tanks at a closer location to

25    Quemado.  That's how I know about the -- the -- the different

```
 1   options that we have.
 2           THE COURT:  Okay.  Go ahead, Mr. Stern.
 3           MR. STERN:  If I could tender to the Court Defendant's
 4   Exhibit Number Seven, which is the photos of the, I presume,
 5   sewage at the Garcia residence.
 6           MR. MANNING:  No objection, Your Honor.
 7           THE COURT:  So admitted.
 8      (DEFENDANT'S EXHIBIT NUMBER SEVEN ADMITTED)
 9           THE COURT:  And you said this is Five, Mr. Stern?  No,
10   Seven.
11           MR. STERN:  No, I think it's --
12           THE COURT:  You said Seven.
13           MR. STERN:  -- Seven.
14           THE COURT:  Okay.  I've got Five.
15            Just for the record, Five is three photographs.
16           MR. STERN:  Correct, ma'am.
17           THE COURT:  Okay.  I'm going to put a clip around
18   them, Mr. Stern, so that we can keep them together.
19   Q    (By MR. STERN) So when did you first submit your grant
20   application?
21   A    It was -- I'm going to say to -- around May.  I don't have
22   the exact date.  Melba Romero is --
23   Q    Just approximately.
24   A    Approximately.
25   Q    In May of what year; 2022 or 2023?
```

1  A    2020, because, I've been working with them about two years

2  already, so -- but it would be -- she submitted it this year.

3  Q    Okay.  Did you file an initial grant application on

4  May 13th of 2022?

5  A    A what?  I'm sorry.  I didn't hear.

6  Q    An initial -- or an abridged grant application.

7  A    That was -- yes, sir, the first one.

8        THE COURT:  Okay, but you said in May of 2020 to

9  Mr. Stern?

10       MR. STERN:  Yes, ma'am.  May 13th exactly.

11       THE COURT:  And that -- you have it, Mr. Stern?

12       MR. STERN:  Well, I have it from the expedited

13  declaratory judgment, which I guess we're going to have to --

14       THE COURT:  No, we're saying -- you're saying May of

15  2023 is part of the declaratory judgment that was filed in

16  November of this year?

17       MR. STERN:  No, the --

18       THE COURT:  I thought that was based on the May 2023

19  filings.

20       MR. STERN:  No, it --

21       MR. MANNING:  I'll stipulate that the declaratory

22  judgment does say May 2022; May 13th as the date of the

23  application.

24       THE COURT:  Okay.  Wait, wait, wait.

25         Where is that -- is that the one that I have before

1   me, Mr. Stern, or do I --

2           MR. STERN:  No, Judge.

3           THE COURT:  -- have the May 2023 one?

4           MR. STERN:  No, Judge.  I'm -- you don't have the

5   expedited application for --

6           THE COURT:  What expedited application?

7           MR. STERN:  That the county filed with respect to

8   getting a -- I guess, a declaratory judgment with respect to the

9   issuance of --

10          THE COURT:  Okay, but you're talking about the one in

11  November of -- of 2023?

12          MR. STERN:  Yes, ma'am.

13          THE COURT:  Okay.  My -- my question is, though, I

14  thought --

15          MR. STERN:  No, I understand exactly what you're

16  asking.  You want to know if what you have in front of you is

17  the May 13th --

18          THE COURT:  Is it the '22 or '23?

19          MR. STERN:  Exactly.  That's your question.

20          THE COURT:  Right.

21          THE WITNESS:  I'm sorry, I didn't --

22          MR. STERN:  So, is -- if I can show her the

23  application that --

24          THE COURT:  Sure.  The defend -- you -- you just need

25  Four or do you need Four and Four-A?

1            MR. STERN:  Just need Four, Judge.

2            THE COURT:  Okay.  It's right here.

3            THE WITNESS:  I don't have it.

4              Oh, this is the actual application.  Yes.

5            THE COURT:  And that one got filed when; this year or

6    last year?

7            THE WITNESS:  Last year.

8            THE COURT:  In 2022?  Are y'all --

9            THE WITNESS:  Yes.

10           THE COURT:  -- is it possible the declare --

11           THE WITNESS:  Yes.

12           THE COURT:  -- declaratory petition is wrong,

13   Mr. Stern?  And the reason I'm asking is because Four-A, which

14   were the attachments to the proposal, they're all dated in 2023.

15           MR. STERN:  It's possible it's wrong, then, Judge.

16   But I will think -- my understanding is, if she's been working

17   on the grant for two years --

18           THE WITNESS:  Yeah.

19           THE COURT:  Right.  I understand that.  But I'm just

20   saying the public -- well, the publication of the certificate of

21   obligations was in 2023.  I'm just -- let me see if I can find

22   another date.  Because I thought counsel testified that he saw

23   it in May of 2023 before it got filed.

24           THE WITNESS:  This one doesn't have a date.

25           THE COURT:  Right, it doesn't have a date.

1             THE WITNESS:  No, it doesn't.  I know it took us like

2    eight months to work on the application.

3             THE COURT:  Do you want to take a look at any of the

4    Four-A on -- on potential dates that might help, Mr. Stern?  She

5    can take a look at those.

6        (BRIEF PAUSE)

7             THE COURT:  I'm just -- I was looking at the Texas

8    Water Development Board findings to see if that would give us a

9    date.  It just says it was approved June 6th of 2023.

10            MR. STERN:  Correct.

11            THE COURT:  It doesn't include the date that the

12   proposal was submitted.

13            THE WITNESS:  Well, but we started -- we started

14   submitting since last year.  Since last year we started

15   submitting the application.

16            THE COURT:  Okay.  But at some point there has to be

17   one final package.  When was that submitted?  I know y'all were

18   working with the people -- different people along the way,

19   because when I look at the notification by the Texas Water

20   Development Board, it went to Ida Gonzalez of AG Three Group;

21   David Gonzalez, PFM Financial Advisors; Mr. Iracheta, the county

22   attorney; Melba Romero, Black Pearl Publications; and then

23   Mr. Troell.

24            MR. STERN:  Let me see if I can go back and ask the

25   question.

1           THE COURT:  Okay.

2    Q    (By MR. STERN) Did you start the application in '22, and

3    submit the final application --

4    A    In '23.

5    Q    -- in '23?

6           THE COURT:  Okay, that would seem to be --

7           THE WITNESS:  Yes.

8           MR. STERN:  Make the most sense.

9           THE COURT:  Sort of.  If she said they've been working

10   on it for eight months, so that --

11          THE WITNESS:  Yes --

12          THE COURT:  -- would put it in '22.

13          THE WITNESS:  Yes.

14          MR. STERN:  Okay.

15          THE COURT:  So what I have, what you saw, Defendant's

16   Four, is that the final application that was submitted?

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.  All right.

19   Q    (By MR. STERN) Now, the grant application was for three

20   separate sites?

21   A    Correct, sir.

22   Q    And those sites are attached to the grant application as

23   photos, or drawings, or renderings?

24   A    Yes.  We have different -- different projects that were

25   identified in that application.

1   Q    Did you request a nuisance determination for three sites,

2   two sites, or one site?

3   A    Well, it was only one application, so we requested it

4   for -- for the whole application.

5   Q    Okay.  And the first site was the Quemado wastewater main,

6   right?

7   A    Correct.

8            THE COURT:  Is that -- Mr. Stern, and she may take a

9   look at Four.  Is that project -- no, Project One is wastewater

10  main.

11            Is that what you were just saying, wastewater main?

12            MR. STERN:  Yeah, that's correct.

13            THE COURT:  Okay.

14            THE WITNESS:  The wastewater, yes.

15            THE COURT:  Do you need to see the -- the map?

16            Does she need to see the map?

17            MR. STERN:  I don't think so, Judge --

18            THE COURT:  Okay.

19            MR. STERN:  -- at this point.

20  Q    (By MR. STERN) Was the -- was your concern as to Site One

21  exposed cesspools?

22  A    Yes, sir.  I --

23  Q    Okay.

24  A    I have other pictures of different locations in Quemado.  I

25  don't know if you want --

1    Q      No, we'll get there.

2    A      Okay.

3    Q      Now, was Site Two the Quemado waterline?

4    A      Site Two, it's the Days -- Days Road and Edwards Road and

5    271 water, yes.

6    Q      And over there, were you concerned with water not being

7    potable?

8    A      Well, they don't have water there, so the residents are

9    requesting water there.

10   Q      Do they have --

11          THE COURT:  Do they have water wells there?

12          THE WITNESS:  They -- some of them do.

13          THE COURT:  Okay.

14          THE WITNESS:  Yes.  They have tanks.  They haul water,

15   too.

16   Q      (By MR. STERN) Was Site Three the Thompson waterline?

17   A      Yes, sir.

18   Q      Were you concerned that residents there fill their tanks

19   with water contaminated by now-closed coal mines?

20   A      They get -- yes, I was.  They get their water now through

21   the irrigation.

22   Q      Have any boil-water notices gone out to residents of any of

23   these three sites?

24   A      In -- in the Quemado area, yes.

25   Q      Okay.

1          THE COURT:  Wait.  Say that again.  Mr. Sum --
2    Mr. Stern, what was that question?
3    Q    (By MR. STERN) Have any boil-water notices gone out to
4    residents of any of the affected sites?
5    A    Yes.  To -- to Quemado, yes.
6          THE COURT:  Where are those notices, Mr. Stern?
7          MR. STERN:  Should be --
8          THE COURT:  What packet would they be in?
9          MR. STERN:  They're probably in Four-A.
10         THE COURT:  The Four-A.  Okay, hold on.  Let me see if
11   I -- I've got it, Mr. Stern, so you don't have to keep looking
12   for it.
13         And they'd be from the water department, possibly?
14         THE WITNESS:  The -- the --
15         THE COURT:  The notices.
16         THE WITNESS:  From the water plant, the Maverick
17   County Water Plant.
18         MR. STERN:  Community Public Water System.
19         THE COURT:  Okay, the -- is -- I see the -- is it the
20   boil notice from May 13th of 2022?
21         MR. STERN:  Yes, ma'am.
22         THE COURT:  Okay.  I've got it, Mr. Stern.
23         MR. STERN:  All right.
24         THE COURT:  So was this a temporary or long-term?
25         When -- when were the people notified that they no

1    longer had to boil their water?

2              THE WITNESS:  We notify them.  We send them letters.

3              THE COURT:  Okay, but when were they notified they no

4    longer had to boil the water?

5              THE WITNESS:  It's temporary.  Until the --

6              THE COURT:  Okay, so how long was this notice for?

7              THE WITNESS:  It could some -- it depends on how long

8    it takes to remedy the --

9              THE COURT:  So my question is:  How long was this

10   notice for?

11             THE WITNESS:  Was that the '22 notice?

12             THE COURT:  Yes, the May --

13             THE WITNESS:  Because I have one --

14             THE COURT:  -- 13th, 2022.

15             MR. MANNING:  Your Honor, may I take this witness on

16   voir dire as to Defense Eight?

17             THE COURT:  I -- I was -- I was hoping she would have

18   a notification as to when it was over, but go ahead.

19             MR. STERN:  I do have one, Judge.

20             THE COURT:  Huh?

21             MR. STERN:  If -- do you have --

22             THE COURT:  Go -- go ahead, Mr. Manning.

23             MR. STERN:  -- an objection as to Defense Exhibit

24   Eight?

25             MR. MANNING:  I'd like to take her on voir dire before

1    I --

2            THE COURT:  Before she answers that?

3            MR. MANNING:  -- before she answers that.

4            THE COURT:  Okay.  Go ahead.

5            MR. MANNING:  Okay.  May I approach the witness,

6    Your Honor?

7            THE COURT:  You may.

8            MR. MANNING:  Thank you.

9            THE COURT:  If you need to get more documents to

10   refresh your memory, just say so.

11           THE WITNESS:  Okay.

12                   VOIR DIRE EXAMINATION

13   BY MR. MANNING

14   Q    Ms. Ramos, I'm going to show you what's been marked

15   Defendant's Exhibit Number Eight.

16           COURT REPORTER:  Can you speak up, please.

17           MR. MANNING:  Yes, ma'am.

18   Q    (By MR. MANNING) Defendant's Exhibit Number Eight, do you

19   see this?

20   A    May 13, yes.  This one.

21   Q    Okay.  Do you see the top of that page?

22   A    May 13, yes.  Boil-water notice.

23           MR. MANNING:  Your Honor, I'll question from my seat,

24   if that's okay.

25           THE COURT:  Okay, just do it from the -- we need you

1   to do it from the podium just because the acoustics are

2   horrible --

3           MR. MANNING:  Absolutely, Judge.

4           THE COURT:  -- in this courtroom.

5           MR. MANNING:  I apologize.

6   Q    (By MR. MANNING) Very quickly, Ms. Ramos.  This document

7   indicates that the reason for the boil-water notice was the low

8   chlorine residuals, correct?

9   A    Correct.

10  Q    This notice doesn't say anything specifically about the

11  geographical area of Quemado, correct?

12  A    We only service Quemado.

13  Q    Okay.  You would also agree with me, though, that the water

14  department might issue a boil notice if there was a contaminant

15  in the water, any other number of reasons, but not because,

16  particularly, a nuisance?  You'd agree with that?

17  A    I don't know if it's a nuisance or not, but whenever

18  there's an issue like this, we have to notify the -- according

19  to TCEQ, we need to notify the residents.

20  Q    And you'd agree with me you'd do the same thing if there

21  were an issue somewhere else in the county relating to the

22  county's water supply, correct?

23  A    I don't have jurisdiction in the rest of the county, only

24  the Quemado -- that's the only area we service.

25  Q    But you sit on the county's Commissioners Court, correct?

1    A    Yes, sir.

2    Q    So if the county were to issue a -- something to all the

3    residents, saying you need to boil your water, that would not

4    localize it solely to the Quemado area, correct?

5    A    Well, they don't have water.  The -- the City of Eagle Pass

6    handles the water in the rest of the county.

7    Q    Okay.

8              MR. MANNING:  Nothing further on voir dire, Judge.

9              THE COURT:  Okay.

10             MR. MANNING:  I'll -- no objection to Defendant's

11   Eight.

12             THE COURT:  Okay.  So admitted.

13        (DEFENDANT'S EXHIBIT NUMBER EIGHT ADMITTED)

14             THE COURT:  So back to my question --

15             MR. STERN:  If I could tender it to the Court, please.

16             THE COURT:  How long did that -- that notice last?

17               Is that the notice, Mr. Stern, that it's over?

18             MR. STERN:  Yes, ma'am.

19             THE COURT:  Okay.  Because I've got two of the notices

20   for the boil, but I don't have any of the...

21             THE WITNESS:  On the --

22             THE COURT:  No, no, Mr. -- Mr. Stern.  This is the

23   boil notice.  I already have two sets of that.  This -- I'm

24   asking when it ended.

25             MR. STERN:  Okay.

1          THE COURT:  Is -- the -- the boil notice is in -- in

2     Four-A.

3          MR. STERN:  Not a problem.

4          THE COURT:  I'm -- I'm asking when it was over.

5          THE WITNESS:  On the email, Your Honor --

6          THE COURT:  On the what now?

7          THE WITNESS:  -- it shows April 1st, 20 -- 2022

8     through May 12th, 2022.

9          THE COURT:  Which -- which email?

10          MR. STERN:  It may be on the back of that page, Judge.

11          THE COURT:  I see the email, but there's no email

12     from -- it says that the residuals are from April 2022 until

13     May 12th of 2022.  So the boil notice went out May 13th.

14          I'm -- I'm asking:  When did that notice expire?

15          MR. STERN:  No, I understand --

16          THE COURT:  Not when it started, but when it expired.

17          MR. STERN:  No, I understand your question.

18          THE COURT:  Okay, so I'm -- I'm looking for an answer

19     still.  I haven't gotten it yet.

20          When did that boil notice expire, Ms. Ramos?

21          THE WITNESS:  I -- I don't -- oh, it was rescinded

22     June 21st.

23          THE COURT:  Of -- okay, of 2022.

24          THE WITNESS:  June 21st, 2022.

25          THE COURT:  Okay.

```
 1                THE WITNESS:  And I have that boil notice rescinded --

 2                THE COURT:  You have that notice?

 3                THE WITNESS:  -- letter here.  Do you need that?

 4                THE COURT:  Well -- but do you want it in the record?

 5                   Okay, and Mr. Stern --

 6                MR. STERN:  Please, Judge.

 7                THE COURT:  I can hold on to Eight, but I -- this is

 8      the third copy of Eight that I have.

 9                THE WITNESS:  This is the rescind --

10                THE COURT:  I'll put it with -- make it -- make it --

11      put it all together as one so we can keep them together as a

12      set.

13                MR. STERN:  How do you want it numbered, Judge?

14                THE COURT:  What's that?

15                MR. STERN:  How do you wish to have it numbered?

16                THE COURT:  Just -- I would add it as part of Number

17      Eight, Mr. Stern, so it's the notice and then the rescinding of

18      the notice.  That way we keep it together.  Because I do have

19      the other -- the boil notice by itself.

20      Q    (By MR. STERN) Now, did your grant application include a

21      letter from Edna Garza and Liliana Jimenez?

22      A    Yes.

23      Q    What were they complaining about?

24                   Well, first, before you answer that, where do they

25      live?
```

1  A    They live in -- in -- in Thompson Road and they don't have

2  potable water.

3  Q    Is that what they were complaining about?

4  A    Yes, the -- yes, sir.

5  Q    Who's Gabriel De La Cerda?

6  A    Excuse me?

7  Q    Who's Gabriel De La Cerda?

8  A    Gabriel De La Cerda is a resident there in Thompson Road as

9  well.

10 Q    Okay.  And does he have any type of position?

11 A    A position, yes.  He's the --

12 Q    What's --

13        THE COURT:  Mr. Stern, it doesn't matter what his

14 position is.  I -- I don't understand why y'all keep trying to

15 get into that.

16        THE WITNESS:  No, he --

17        THE COURT:  One doesn't have anything to do with the

18 other, I know where you're going.  It -- it -- y'all -- y'all

19 don't understand that all of these side trips make the sleight

20 of hand just that much more obvious.

21 Q    (By MR. STERN) What was he complaining about?

22 A    He's complaining about water, that they -- they haven't had

23 water in years.

24        Do you need the letters from Liliana and Edna Garza?

25 I have two letters that they --

1          THE COURT:  I have them.  They're in Four-A.

2          MR. STERN:  They're in Four-A.  It's fine.

3          THE COURT:  They're in Four-A.

4          THE WITNESS:  There's two letters; one November 20 --

5          THE COURT:  I have -- I know I saw the one -- the --

6     the two that Mr. Stern has indicated.  And then let me see if

7     there's the second one that you're talking about.

8          THE WITNESS:  Novem-- uh-huh.  There's another one.  I

9     don't know if you...

10          THE COURT:  Hold on and I'll -- I'll tell you what

11    dates I have.  I know I saw them in here.

12          I have the Garza-Jimenez letter of February 8th of

13    2023.  I have the one that's signed by four different sets of

14    people, to include Mr. De La Cerda, of February 8th of 2023.

15    And then I don't know that I have the other one.

16          THE WITNESS:  There's one more, Your Honor.

17          THE COURT:  Those are the only ones that I have, those

18    two.

19          MR. STERN:  Judge, I've already offered Defendant's

20    Exhibit Six, correct?

21          THE COURT:  Huh-uh.

22          MR. STERN:  We seek to introduce it.

23          THE COURT:  I have -- I have Four and Four-A, and then

24    it jumps to Five, then Seven.

25          MR. STERN:  If I can introduce Defendant's Exhibit

```
 1   Number Six, which is probably included in Four-A.
 2               THE COURT:  What is it, Mr. Stern?  I can tell you.
 3               MR. STERN:  It's a June 26 letter from the Texas Water
 4   Development Board to --
 5               THE COURT:  It's -- it's with the --
 6               MR. STERN:  -- Monica J. Cruz.
 7               THE COURT:  -- it's already in evidence in the
 8   proposal that is -- hold on.  That is Defendant's Exhibit Three.
 9               Are you talking about the -- the top, to Monica
10   Cruz, Planning Director?
11               MR. STERN:  Yes, ma'am.
12               THE COURT:  Okay, it's part of that one.  It's part of
13   Defendant's Three.
14               MR. STERN:  And is the resolution --
15               THE COURT:  Uh-huh.  It's --
16               MR. STERN:  -- also part of it as well?
17               THE COURT:  -- it's Defendant's Three.
18               MR. STERN:  Not a problem.
19   Q    (By MR. STERN) A few final questions.  Were you present in
20   Commissioners Court on October 30th of this year?
21   A    Yes, sir.
22   Q    Were you present when a disturbance broke out between
23   Ms. Diaz and the county judge?
24   A    Yes, sir.
25   Q    Did the county judge find her in contempt on October 10th
```

1   or October 30th?

2   A     Yes.

3   Q     When did Ms. Diaz present her voters' petition to the

4   Court; on October 10th or October 30th?

5   A     The 10th.  Before the --

6   Q     Okay.  Did the county judge state that he was holding

7   Mrs. Diaz in contempt because she filed a petition or for some

8   other reason?

9   A     For some other reason.

10  Q     Did he give a reason?

11  A     Because she was mumbling stuff to him in the middle of

12  court.

13  Q     Okay.  Did you hear what she said?

14  A     I just saw her three, four times mumbling to the judge.

15  Q     Okay.  Now, who was sitting next to Mrs. Diaz in

16  Commissioners Court when this disturbance went down?  Do you

17  remember?

18  A     I remember, because she was right in front of me.  There

19  was an empty seat next to her, and then bond counsel was sitting

20  right in that seat.

21  Q     All right.  How about Mr. De La Cerda?

22  A     He was sitting on the side to -- me looking at them, to the

23  right --

24  Q     Okay.

25  A     -- of her.

1  Q    And you looking at them, would Mrs. Diaz have been on your

2  left, on your right, or in front of you?

3  A    Mrs. Diaz was in front of me.

4  Q    Okay.

5          MR. STERN:  Pass the witness.

6          THE COURT:  Okay.  Mr. Manning?

7          MR. MANNING:  Yes, Your Honor, may we approach on a

8  quick issue --

9          THE COURT:  Sure.  Uh-huh.

10         MR. MANNING:  -- prior to that?

11         THE COURT:  Anybody need to take a break?

12         MS. DIAZ:  I do.

13         THE COURT:  You may take a break if you need to --

14         THE WITNESS:  Can I --

15         THE COURT:  -- but don't talk to anyone; not the

16 attorneys, not any potential witnesses, anybody, since you're

17 now under oath and on the stand.

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  All right.  You may take a break.

20          Come on forward.

21          Okay, wait.  Get me off white noise.

22          Okay, folks, my instructions are that this witness

23 is not to talk to anyone, have any conversation with anyone.  Do

24 not attempt it.  If you do, her testimony will be stricken.

25          Okay.  Proceed.

1          (12:13:44 TO 12:14:08 P.M., BENCH CONFERENCE)

2          (12:14:08 TO 12:22:29 P.M., OFF THE RECORD)

3               THE COURT:  Is everybody back already?

4                Okay, everybody is back.

5               MR. STERN:  Judge, could we approach?

6               THE COURT:  I know the witness came in and the

7     Commissioner is at --

8               MR. STERN:  Judge, if we could approach before you

9     start.

10              THE COURT:  Uh-huh.  I thought that's what we were

11    doing beforehand, but, okay.  Yes.

12              MR. STERN:  Different reason.

13              THE COURT:  No, that's fine.  Come on.

14         (12:22:59 TO 12:55:40 P.M., BENCH CONFERENCE)

15              THE COURT:  All right.  Ms. Ramos, I know you've been

16    here, you didn't talk to anybody, you're on the witness stand,

17    you're still under oath, and it's going to be cross-examination

18    now.

19              MR. MANNING:  May I proceed, Your Honor?

20              THE COURT:  Uh-huh.

21              MR. MANNING:  Thank you.

22                        CROSS-EXAMINATION

23    BY MR. MANNING

24    Q    Okay, Ms. Ramos, do you own property in the area that would

25    be affected by this project?

1  A    No.

2  Q    Do you have family members that own property in this area?

3  A    I have -- my son bought a, I believe it's a 50 by 130 lot

4  in downtown Quemado.

5  Q    When did he buy that lot?

6  A    I'm not sure.  It was just this past year.

7  Q    So before or after you submitted the abridged application?

8  A    Well, we were in the process, I would say.  But it was just

9  one lot that he bought.

10  Q    Okay.  When you submitted the abridged application in May

11  of last year, there was never any request for the Texas Water

12  Development Board to determine that there was a nuisance; isn't

13  that right?

14  A    Was there any request from our office?

15  Q    From you, yes, ma'am.

16  A    It was established in May when we submitted the request

17  of --

18         THE COURT:  Okay, but May of which year are we talking

19  about?

20         THE WITNESS:  2023.

21         THE COURT:  Okay.

22  Q    (By MR. MANNING) Right.  But in May of 2022 you submitted

23  the original application, right?

24  A    We submitted -- we started the process, the meetings, yes.

25  Q    Right.  When did you say, We need you to determine that

1  this was a nuisance?  Did you do that?

2  A    Well, we established that there was a danger and that we

3  needed to remedy the problem.  I don't know --

4  Q    In May of 2022?

5  A    Well, since we started working on the project.

6  Q    Okay.  In January of 2023, when this submitted application

7  was found -- or was submitted, excuse me, there was no request

8  for a nuisance finding, right?

9  A    I wouldn't say "official written request."  I mean, I don't

10  know what you mean by that.

11  Q    Well, what I mean by that is that the nuisance wasn't found

12  until October of this year.

13  A    The nuisance was established in 2010 by the Texas

14  Department of Health.  From what I saw at the office --

15  Q    Right.

16  A    -- it was established since 2010.

17  Q    Precisely.  And you would agree with me that between 2010

18  and 2022, nothing happened to remedy what was allegedly -- now a

19  public emergency, right?

20  A    I don't know if it's an emergency, but it's a danger to

21  the -- to the community.  I -- I saw the cesspools and --

22  Q    Okay.

23  A    -- and that's why I took action in -- in looking for --

24  trying to find funding for -- to help these residents out.

25  Because they come to my office, and -- and so I had to figure

1  something out to help them out.

2  Q    Okay.  But you would agree with me that "emergency" means

3  it is acute, something's going on right now that has to be

4  fixed, right?

5  A    If I lived like that, it would be an emergency to me.

6  Q    Okay.  And while I appreciate that --

7  A    Yes.

8  Q    -- you would agree with me that it inherently cannot be an

9  emergency if it's been going on for 13 years, right?

10  A    Going on three years, I've considered --

11  Q    Okay.

12  A    -- it was an emergency to try to help these residents out.

13         MR. MANNING:  Objection.  Non-responsive.

14  Q    (By MR. MANNING) I appreciate that, Ms. Ramos, but the

15  question I'm asking you is:  Between 2010 and 2023, there was no

16  determination that it was an emergency; isn't that right?

17  A    I don't know about an emergency, but of public health, yes.

18  Q    Right.  But then it became an emergency when the county

19  needed to pass these certificates of obligation through; isn't

20  that correct?

21  A    I don't know if it became an emergency, but we needed --

22  again, if I lived like that, yes, I would consider it an

23  emergency.

24         THE COURT:  Okay, but you're not living like that.

25  Q    (By MR. MANNING) And while I appreciate that, between the

1  time it wasn't an emergency and the time it became an emergency,

2  one of your own family members bought land in that area,

3  correct?

4  A    Yes.

5  Q    Right.  So it stands to reason that somebody's pockets are

6  going to get lined by this development; wouldn't you agree with

7  that?

8  A    It's 50 lot --

9  Q    Okay.

10 A    -- it's a 50 by a hundred lot.

11 Q    Yes, ma'am.  You --

12 A    And -- so because I'm applying for funding, they can't buy

13 property?

14 Q    Well, isn't it --

15 A    My kids?  I mean --

16 Q    -- isn't it important, though, to consider that your son

17 bought property in an area that you sought to develop that was

18 not considered an emergency until you needed the money to be

19 passed through?

20 A    We were already working on the application.

21 Q    Okay.  All right.

22 A    So, I mean...

23 Q    You -- you would also agree with me that Maverick County

24 has roughly 36,000 people; is that right?

25 A    Roughly.

1    Q    Let's say 36,000 qualified voters --

2    A    Uh-huh.

3    Q    -- somewhere thereabouts.  Okay.  You would also agree with

4    me that you've testified that 98 people live in the area where

5    you're seeking $24 million; is that right?

6    A    No, more than that live in that area.

7    Q    How many people?

8    A    Well, in my precinct alone, I have about over 4,000 homes,

9    but I haven't --

10             THE COURT:  Wait, wait, wait.  Over 4,000 homes in

11   what area?

12             THE WITNESS:  In all over my precinct, which is --

13             THE COURT:  And -- okay, but that includes more than

14   Quemado and Thompson Road?

15             THE WITNESS:  Yes, ma'am, it does.

16             THE COURT:  Okay.

17             THE WITNESS:  It includes --

18             MR. MANNING:  Yeah.

19             THE COURT:  Okay, but in the areas that are going to

20   get this potential service, how many -- how many people live in

21   that area?

22             THE WITNESS:  Three hundred homes.  The ones that have

23   the water already, which are going to get the sewer; and then

24   15, Thompson Road; and 15 in the -- the other project.

25   Q    (By MR. MANNING) So let's say 330, right?

1    A    Correct.

2            THE COURT:  It's exactly -- probably 315 we

3    established earlier, because the 15 of water in Quemado would

4    also be part of the --

5            THE WITNESS:  Correct.

6            THE COURT:  -- 300 of the sewage.

7            THE WITNESS:  Correct.

8    Q    (By MR. MANNING) Okay, if I represent to you that one

9    percent of 36,000 is 360, you would agree with me that you are

10   asking for $24 million for roughly one percent of the people in

11   the entire county?  Would you agree with that?

12   A    It would be seven, because the 16.8 is grant money from --

13   Q    Okay.  Right.

14   A    -- coming -- free money from the state.

15   Q    You're exactly right.

16           THE COURT:  No, wait, wait, wait.  It's not free money

17   if it's a bond.  It still has to be paid by the taxpayers of the

18   state.  So it's not free money.

19           THE WITNESS:  Well, it's a grant from the state,

20   Your Honor.

21           THE COURT:  But it's still paid for by even Maverick

22   County people --

23           THE WITNESS:  Correct.

24           THE COURT:  -- through the state.

25           THE WITNESS:  You're correct.

1          THE COURT:  Okay.

2    Q    (By MR. MANNING) Okay.  Let -- let me clarify.  Maverick

3    County has to raise collateral.  That's essentially what the

4    code -- certificates of obligation are, right?

5    A    Correct.

6    Q    Right?

7    A    Yes.

8    Q    It's a 30 percent match, and then the government -- or the

9    state gives you the other 16 million, is what you're saying?

10   A    Correct.

11   Q    All right.  So even at the lower level, it's your testimony

12   that 360 people you're seeking $7.2 million for, right?

13   A    For water and sewer, yes.

14   Q    Okay.  And the other 35,000-some-odd people will not be

15   serviced by this, but will nonetheless have the tax obligation;

16   isn't that correct?

17   A    That's...

18   Q    Okay.  You would also agree with me that as it relates to

19   the petition, Ms. Villarreal found that at least 1500 signatures

20   on that petition were valid, correct?

21   A    Correct.

22   Q    So that means five times the residents of Maverick County

23   have indicated they want to have an election, as compared to the

24   people you intend to help by virtue of this money; isn't that

25   right?

1  A    Correct.

2  Q    So inherently, as a commissioner, irrespective of the fact

3  that you have one precinct, isn't it correct that your duty to

4  the rest of the county would require you to have an election

5  because five times as many people have told you they want an

6  election?

7  A    My duties are for my precinct.  I work for my precinct --

8  Q    Okay?

9  A    -- and that's who I work for.

10  Q    Right.  But you can't work for your precinct at the

11  exclusion of everyone else in Maverick County, right?

12  A    No, because I make decisions in the Court, yes.

13  Q    Precisely.  And speaking of decisions, you were present on

14  October 30th, 2023?

15  A    Correct.

16  Q    Okay.  And you would agree with me that you're part of the

17  Commissioners Court, right?

18  A    Correct.

19  Q    And you would agree with me that the Commissioners Court

20  did not vote to hold my client, Enriqueta Diaz, in contempt;

21  isn't that right?

22  A    Correct.

23  Q    You would also agree with me that you are a state

24  official -- or rather a local official, but your authority is

25  derived from the state, correct?

1    A    Uh-huh.

2    Q    And prior to you serving as a commissioner, you actually go

3    to the VG Young Institute to be taught how to be a commissioner,

4    correct?

5    A    Correct.

6    Q    All right.  And you would agree with me that when County

7    Judge Ramsey English Cantu held my client into -- in contempt,

8    he did not have the authority to unilaterally do that, did he?

9    A    I -- I couldn't tell you that.

10   Q    Isn't that something you were trained at the institute?

11   A    Not for judges' decisions.

12   Q    Okay.  Was there any point where you intervened and said, I

13   don't think we've had a finding that she should be held in

14   contempt, you can't hold her in contempt?

15   A    No.

16   Q    No?  But as a public servant, isn't it your duty to do

17   that?

18   A    Well, not specifically to do that, to finding somebody in

19   contempt.

20   Q    You say it's not your duty to do that?

21   A    Well, it's -- that particular -- holding somebody in

22   contempt --

23          MR. MANNING:  I'd ask to take -- the Court to take

24   judicial notice of Texas Government Code 81.023, which speaks to

25   contempt in Commissioners Court.

1          THE COURT:  Okay, and I do have that before me since

2     the last hearing.  The -- the county judge testified to that

3     provision.

4          MR. MANNING:  Thank you, Your Honor.

5     Q    (By MR. MANNING) I would represent to you, Ms. Ramos, that

6     that section says the Commissioners Court has to hold someone in

7     contempt.  You'd agree with that?

8     A    Okay.

9     Q    So that would mean that if Judge Ramos -- or rather, Judge

10    Cantu did it on his own, he would be doing it without the

11    authority to do so; isn't that correct?

12         You can answer.

13    A    I -- I couldn't tell you.  I wouldn't --

14    Q    But if the statute says "Commissioners Court," is he the

15    Commissioners Court by himself?

16    A    No.

17         MR. STERN:  Objection.  It calls for a legal

18    conclusion.

19         THE COURT:  Well, let me ask this.  Ms. Ramos, when

20    the Commissioners Court has to vote on a project, do -- do all

21    the members have to vote one way or the other?

22         THE WITNESS:  Correct.  Unilaterally.

23         THE COURT:  Okay.  So that would be Commissioners

24    Court --

25         THE WITNESS:  Yes.

1          THE COURT:  -- action?  Okay.

2          THE WITNESS:  Yes.

3  Q    (By MR. MANNING) Okay.  And Commissioners Court votes on

4  action items, correct?

5  A    Correct.

6  Q    There was no point where Judge English Cantu put an action

7  item forward to hold my client in contempt, correct?

8  A    No, because it happened right in the middle of the meeting.

9  He needed to take action, the judge.

10 Q    Okay.

11 A    Right there and then.  It was very disruptive and he had to

12 make action, take action right there.

13 Q    Do you get training on the First Amendment at the VG Young

14 Institute?

15 A    In the what?  I'm sorry?

16 Q    On the First Amendment of the Constitution.

17 A    Uh-huh.

18 Q    So when people come and they talk to the Commissioners

19 Court, they essentially have a right to talk to the

20 Commissioners Court, correct?

21 A    For three minutes, yes.

22 Q    Okay.  And going forward, are you familiar with the -- the

23 crime under the Texas Penal Code, interference with public

24 duties?  You ever heard of that crime?

25 A    No, sir, I'm not.  I haven't.

1  Q    Okay.  What if I represent to you that there's an

2  affirmative duty that a law enforcement officer cannot arrest

3  someone for solely speech?  If that were the case, then a law

4  enforcement officer, even not -- would not even have been able

5  to arrest her under those circumstances in the Commissioners

6  Court; isn't that right?

7  A    I couldn't --

8           MR. STERN:  Judge, objection.  She's not qualified --

9           THE WITNESS:  -- answer to that.

10          THE COURT:  Okay, if -- if you know, you may answer.

11 But if you don't know, just say you don't know.

12          THE WITNESS:  I don't know, sir.

13 Q    (By MR. MANNING) You don't know?

14 A    I don't know.

15 Q    Okay.  How many meetings have you had prior to requesting

16 this money?  How many meetings have you had with developers,

17 engineers, anyone else who may want to be a part of this

18 project?

19 A    No developers, only the engineers and the community of

20 Quemado.

21 Q    Okay.  And the engineers and the bond counsel and

22 presumably others --

23 A    Yes.

24 Q    -- all get paid a contingency based on whether that

25 contract goes through, correct?

1  A    The engineers will get paid if it goes through, correct.

2  Q    In fact, as it relates to one of the engineers, that

3  engineer provided their services to the Commissioners Court free

4  of charge at one point, correct?

5  A    What services?

6  Q    The services of, I guess, figuring out what needed to be

7  done for this project, and then was ultimately hired later; is

8  that right?

9  A    Well, we haven't hired anybody yet.

10 Q    You have not hired an engineer?

11 A    Well, we've approved them through Commissioners Court, but

12 they haven't gotten paid.

13 Q    Okay.  Is that the same engineer that --

14 A    Contingent --

15 Q    -- provided pro bono services before?

16 A    I don't know if they provided pro bono services.

17 Q    Is there a company out of San Antonio called AG3 that the

18 Commissioners Court --

19 A    Correct.  That's the engineer that we're dealing with.

20 Q    All right.  Isn't it correct that at one point prior to the

21 submission of COs, the Commissioners Court voted to get

22 information from that -- or to get assistance from that person

23 that they were not going to pay for; y'all weren't going to pay

24 for?

25 A    Well, we -- that was part of the application process.  We

1    needed to have an engineer do the cost analysis, the design, and

2    their fees are included in the cost analysis of the application.

3    Q    Okay.  And --

4    A    So that's -- that's part of the prerequisite of the

5    application process.

6    Q    Yes, ma'am.  I apologize for interrupting you.

7              And then does the county customarily then go through

8    a bidding process?

9    A    Yes.  That's -- that's later.

10   Q    Okay.  Did the county go through a bidding process to hire

11   that engineer?

12   A    We are not there yet.  To hire engineers and contractors --

13              MR. STERN:  Judge --

14              THE WITNESS:  -- we're in the planning process --

15              THE COURT:  Okay.  Wait, wait, wait.

16               What?

17              MR. STERN:  Objection.

18              THE COURT:  For what?

19              MR. STERN:  There's no legal requirement for

20   competitive bidding for professional services.

21              MR. MANNING:  Okay.  It --

22              THE COURT:  I think there is, Mr. Stern.  But I

23   thought they were going to get paid out of the grant if it went

24   through.

25              MR. STERN:  That's correct.

1          THE WITNESS:  Uh-huh.

2          THE COURT:  Okay.  What if it doesn't go through?

3          THE WITNESS:  They're going to do it pro bono.

4   They're going to -- they're not -- they're --

5          THE COURT:  They're going to do it for free?

6          THE WITNESS:  -- they're -- they're aware -- they're

7   aware that if the -- that if it doesn't go through --

8          THE COURT:  So -- so it's a contingent -- what we call

9   a contingency thing.

10          THE WITNESS:  Contingent.

11          THE COURT:  Okay.

12          THE WITNESS:  Yes.

13          THE COURT:  So it's in their best interest to help it

14   get through?

15          THE WITNESS:  I would say yes.

16          THE COURT:  Okay.

17   Q    (By MR. MANNING) Okay.  You testified earlier about

18   cesspools and a few other things; is that right?

19   A    Correct.

20   Q    Okay.  How many of your residents in your precinct have

21   contacted you about their desire to have an election on this

22   issue?

23   A    The desire to have an election?  They've contacted me --

24   they have contacted me upset that it -- this is going on, that

25   it's sewer and water that they need, and that there --

```
 1              THE COURT:  Okay, that wasn't the question.  How many

 2    have contacted you about wanting an election?

 3              THE WITNESS:  None.

 4              THE COURT:  Didn't you have a meeting in Quemado?

 5    Didn't you just testify --

 6              THE WITNESS:  Yes.

 7              THE COURT:  And didn't you hear from people there?

 8              THE WITNESS:  They didn't say they wanted it to go to

 9    the election --

10              THE COURT:  Well, what was --

11              THE WITNESS:  -- they just wanted the details of

12    the -- the projects.

13              MR. MANNING:  Okay.

14              THE WITNESS:  What it was going to cover, and I took

15    them copies of the -- of the projects.

16    Q    (By MR. MANNING) Have you had an opportunity to look at the

17    petition that was submitted?

18    A    Petition?

19    Q    Yes, ma'am, the petition to have an election?

20    A    No.

21    Q    Do you know what percentage of the people on that petition

22    live in your precinct?

23    A    I haven't had a chance -- I've -- I requested a copy.  I

24    want to get a copy, but they advised me that I needed to stay

25    away from the petition.
```

1   Q     Is it then your testimony that if you were provided that

2   petition and you determined that some critical mass of people

3   from Quemado and Thompson Road or those areas that I don't know

4   because I don't live anywhere near here -- if those people

5   signed that petition, would it then be your position that you

6   would withdraw the request because now more people have told you

7   they want an election as opposed to the certificates of

8   obligation?

9              MR. STERN:  Objection.  Assumes facts not in evidence.

10             THE WITNESS:  No.

11             THE COURT:  This is a hypothetical.

12  Q    (By MR. MANNING) You can answer.

13  A     No, I don't -- I don't -- I mean, they haven't contacted me

14  to tell me --

15             THE COURT:  Okay, so the question is, though:  What

16  percentage of your constituents would you need to see their

17  signature on the petition to say, I withdraw it?  Is there any

18  amount of --

19             THE WITNESS:  I have --

20             THE COURT:  -- of number of signatures?

21             THE WITNESS:  I have no idea how --

22             THE COURT:  Is there any that -- that would convince

23  you, any percentage?

24             THE WITNESS:  (SHAKES HEAD IN NEGATIVE)

25  Q    (By MR. MANNING) Okay, so the gentleman you talked about

```
 1   earlier was Bobby Garza; is that right?

 2   A    Garcia.  The -- the --

 3   Q    Garcia.  Okay.

 4   A    -- daughters and him.  He was --

 5   Q    Bobby Garcia.  So, you were more concerned about what

 6   Bobby -- Bobby Garcia wants as opposed to the other, I don't

 7   know, 1500 people at least to have signed this petition saying

 8   they want an election?

 9   A    No, no.  There's more residents that --

10   Q    Okay.

11   A    -- that are living in that condition.  I have --

12           THE COURT:  How many more?

13           THE WITNESS:  I have Sergio Morales.

14           THE COURT:  No, I don't need names.  Just give me a

15   member.  How many more?

16           THE WITNESS:  One, two, three, four, five, six, seven,

17   eight, nine, ten -- 12 that I have pictures of their cesspools

18   that can -- dilapidate --

19           THE COURT:  So how many people?  You said --

20           THE WITNESS:  And then the --

21           THE COURT:  -- you said a lot of people have contacted

22   you to complain that they want the services.  I'm just wanting a

23   number.

24           THE WITNESS:  Okay.

25           THE COURT:  I don't need to know names.
```

1          THE WITNESS:  Well, 15 that I can confirm, and then

2   the 15 in Thompson Road, the 15 residents of Thompson Road.

3   So...

4          THE COURT:  So 30?

5   Q    (By MR. MANNING) So -- so maybe 2,000ths of the total

6   number of people who signed the petition saying they want an

7   election?

8   A    I don't know how many --

9   Q    Maybe 30 people, right, as compared to 1500-plus who signed

10  the petition; is that your testimony?

11  A    The -- I don't know who signed the petition.  I don't know

12  if these people signed the petition.  I haven't seen the actual

13  petition.

14         THE COURT:  That's not the question, Ms. Ramos.  Of

15  the people that did sign it, there's 1500-plus -- there were

16  1600 and something that were -- that were accepted; he's asking

17  you 30 people versus 1600.

18         THE WITNESS:  I -- I guess that's --

19         MR. MANNING:  Right.

20         THE WITNESS:  -- it would be correct.

21  Q    (By MR. MANNING) And in your duty as a commissioner,

22  irrespective of the fact that you are elected to one precinct,

23  wouldn't you agree with me that your duty is to do what more

24  people in the county are telling you, which is that they want to

25  have an election, rather than the 30 people, at best, that

1    you've identified might have these issues?

2    A    And that's why we took it to the -- we filed the -- to

3    take -- for the judge to take action.

4              MR. MANNING:  I'll pass the witness.

5              THE COURT:  Which judge?

6              THE WITNESS:  Well, we filed the district -- in

7    district court.

8              THE COURT:  Okay, but you filed that in November.

9              THE WITNESS:  Yes.

10             THE COURT:  Right?  November 6th?

11             THE WITNESS:  No.  We filed that in the --

12             THE COURT:  Are you talking about the declaratory

13   judgment?

14             THE WITNESS:  Yes.  To let the --

15             THE COURT:  That's November 6th.

16             THE WITNESS:  -- judge decide.

17             THE COURT:  Yeah.

18             THE WITNESS:  Yes.

19             THE COURT:  So by the time you filed the declaratory

20   judgment, you already knew that 1600-plus people were wanting an

21   election, versus 30 that had contacted you, right?

22             THE WITNESS:  Correct.

23             THE COURT:  So you knew that then.  So you knew a

24   majority of the people wanted an election before you --

25             THE WITNESS:  Yes.

1          THE COURT:  -- went to the court, right?

2          THE WITNESS:  Correct.

3          THE COURT:  So you were willing to ignore those other

4   1500 and whatever; is that what your test -- that's what he's

5   trying to get to, Ms. Ramos.

6          THE WITNESS:  Yes, but they -- they had signs all over

7   the lake that the taxes were going to go up.

8          THE COURT:  So what does that have to do with

9   anything, Ms. Ramos?

10          THE WITNESS:  I just feel they were misinforming the

11   community on what they were signing.

12          THE COURT:  Ms. Ramos, if you think taxes are not

13   going to be used to pay this grant, you haven't read the

14   resolution from the Texas Water Development Board that requires

15   it.  I don't -- I don't know -- have you read Paragraph 32 --

16          THE WITNESS:  Yes.

17          THE COURT:  -- of the proposal?

18          THE WITNESS:  Well, they had signs in reference to

19   taxes --

20          THE COURT:  Okay, so let me ask you a question.  How

21   do you intend to pay for the -- for the certificates of

22   obligation?  What is your idea of how they're going to be paid?

23          THE WITNESS:  Through the taxes.

24          THE COURT:  Okay.  So how is that incorrect, that

25   taxes are going to be used to pay it?

1          THE WITNESS:  But we -- we have the financial advisers

2    that are helping us in working on --

3          THE COURT:  I get it, but you don't know how much

4    their taxes are going to be raised, do you?  You can't say that

5    they're not, can you?

6          THE WITNESS:  I can't say that they're not.  But this

7    year they're -- they didn't.

8          THE COURT:  Okay.  This year they didn't.  But that

9    doesn't mean -- but the -- did the valuations go up this year?

10         THE WITNESS:  Yes.

11         THE COURT:  And does -- so doesn't that mean their

12   taxes went up?

13         THE WITNESS:  (NO AUDIBLE RESPONSE)

14         THE COURT:  Right?

15         THE WITNESS:  The valuations went up, yes.

16         THE COURT:  Okay.  When the valuations go up, that

17   means -- times the percentage, that means you pay more taxes

18   because the value of your property goes up, right?

19         THE WITNESS:  Correct.

20         THE COURT:  So their taxes went up, right?

21         THE WITNESS:  Correct.

22         THE COURT:  And on top of all of that, it's not just

23   the county taxes that are based on that valuation, it's the city

24   taxes for the city residents, right?

25         THE WITNESS:  Correct.

1          THE COURT:  And the school district, right?  Correct?

2          THE WITNESS:  Correct.

3          THE COURT:  Any other taxes in Maverick County that

4     are based on the ad valorem findings?

5          THE WITNESS:  Just city, county.

6          THE COURT:  Okay, so -- so all of those taxes were

7     affected by the valuation, right?

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  So the bottom line is, they're

10    paying for it with higher taxes.  So what part of that is not

11    correct?

12         THE WITNESS:  We didn't do this for -- to raise the

13    taxes.

14         THE COURT:  I realize that.  I realize that you

15    weren't necessarily --

16         THE WITNESS:  It's just --

17         THE COURT:  -- passing the -- the certificates of

18    obligations to raise taxes.  I -- I get that.  But in reality,

19    well, wouldn't it require it to raise your taxes?

20          You know the county budget; do you not?

21         THE WITNESS:  Yes.

22         THE COURT:  Does it have a surplus of money?

23         THE WITNESS:  I don't know how much it is, but it's --

24         THE COURT:  Okay, how much do you think it has -- how

25    much do you think you have extra in the budget right now that

1   got -- last got approved?

2          THE WITNESS:  The chief executive officer or the judge

3   will -- can probably answer that question.

4          THE COURT:  Okay.  Well, but you read the budget.  You

5   had to vote on it; did you not?

6          THE WITNESS:  Yes, ma'am, I did.

7          THE COURT:  Okay.  So you looked at the budget, right?

8          THE WITNESS:  Yes, but I don't recall right now,

9   Judge.

10         THE COURT:  Well, just give me a ballpark.  You don't

11  have to give me an exact.  Was it 100,000?  200,000?

12         THE WITNESS:  I -- I --

13         THE COURT:  300,000?

14         THE WITNESS:  I -- I couldn't tell you right now,

15  Judge.

16         THE COURT:  So, are you telling me that you had more

17  money than you have to pay out; is what you're telling me?  Or

18  do you owe more than you have in the -- in the treasury?

19         THE WITNESS:  We had to make a lot of cuts.

20         THE COURT:  To meet the -- to meet the budget.

21         THE WITNESS:  To meet --

22         THE COURT:  Okay.

23         THE WITNESS:  -- to meet the budget and so we can plan

24  for this.

25         THE COURT:  Okay, so --

1          THE WITNESS:  For the funding.

2          THE COURT:  So you basically broke even with the cuts?

3          THE WITNESS:  Correct.

4          THE COURT:  Okay.  So if you're going to add debt and

5    you're barely breaking even, aren't you going to have to raise

6    the money somehow to pay it off?

7          THE WITNESS:  But we're still making adjustments on

8    the budget.

9          THE COURT:  I get that.  I understand that you are.

10   And I understand that -- but the bottom line is, you don't know

11   if next year you've got to pay more out on salaries, you've got

12   to pay more out in, say, street projects, anything of that

13   nature than you --

14         THE WITNESS:  Right.

15         THE COURT:  -- take in in taxes right now, correct?

16         THE WITNESS:  Correct.

17         THE COURT:  You don't know that.

18         THE WITNESS:  No, I don't know that.

19         THE COURT:  So you can't say that in the years to come

20   you're not going to have to raise more taxes to pay off this

21   obligation, right?

22         THE WITNESS:  Correct.

23         THE COURT:  Okay.  So, obviously if you had the money

24   already in your treasury you wouldn't have to have these

25   certificates of obligation, right?

1          THE WITNESS:  Correct.

2          THE COURT:  So you don't have this money in your

3   treasury, right?

4          THE WITNESS:  No.

5          THE COURT:  Okay.  So, the bottom line, the realistic

6   possibility -- and I say "possibility," okay -- you're going to

7   have to raise taxes on people.

8          THE WITNESS:  We're working with the financial

9   advisers.  They're --

10         THE COURT:  That doesn't answer my question.

11         THE WITNESS:  I know they're working --

12         THE COURT:  You're the one that has the duty to decide

13   whether people's taxes get raised or not, not the financial

14   adviser.  So the possibility is, in the future, taxes are going

15   to go up.  Is that a fair -- a fair possibility?

16         THE WITNESS:  That's a fair, yes, poss --

17         THE COURT:  And I'm not saying probability, I'm saying

18   possibility, right?

19         THE WITNESS:  Uh-huh.  Possibility.

20         THE COURT:  Okay.  Mr. Stern?

21         MR. STERN:  Just a couple of questions, please.

22                     REDIRECT EXAMINATION

23   BY MR. STERN

24   Q    You're not involved in any land development speculation out

25   in Quemado, are you?

1    A    I'm sorry?

2    Q    Are you involved in any land --

3    A    In the what?

4    Q    Involved --

5         THE COURT:  He's asking if you're involved in any land

6    speculation in Quemado.

7         THE WITNESS:  Land speculation?

8    Q    (By MR. STERN) Speculation.

9    A    What?  Me?

10   Q    Yes.

11   A    Personally, me?

12   Q    Yes, ma'am.

13   A    No.

14   Q    Your family?

15   A    Speculation like what?  I don't --

16   Q    Are y'all developers?

17   A    No.

18   Q    Okay.

19   A    No.  Not whatsoever.

20        MR. STERN:  Okay.  Pass the witness.

21        THE COURT:  Mr. Manning?

22        MR. MANNING:  Yes, Your Honor.  If I may.

23                    RECROSS-EXAMINATION

24   BY MR. MANNING

25   Q    Ms. Ramos, did you tell your family about the project you

```
 1   were trying to get for your residents out in Quemado?

 2   A     Yes.  They know.

 3   Q     All right.  Did you talk to your son about that?

 4   A     No.

 5   Q     Did you talk to your husband about that?

 6   A     My husband knows.

 7   Q     Okay.  So it's your testimony that your son just randomly

 8   purchased property in Quemado in the area that you were seeking

 9   to have money for development?

10   A     Not in the -- he goes to the courthouse and he buys

11   property.  He's --

12               MR. STERN:  Judge, if we could --

13               THE WITNESS:  -- an investor.

14               MR. STERN:  -- define "development."

15               THE COURT:  Wait, wait, wait.  What's that, Mr. Stern?

16               MR. STERN:  To -- I'm trying to find out what he means

17   by "development."  Are we talking like as a developer, or just

18   for the project?

19   Q     (By MR. MANNING) How close --

20               MR. MANNING:  I'll -- I'll rephrase the question.

21               THE COURT:  All right.

22   Q     (By MR. MANNING) How close is the land your son bought

23   to -- geographically, to the area that you intend to put money

24   in to help these Quemado residents?

25   A     It's -- it's an empty lot --
```

1  Q    Okay.

2  A    -- that he purchased at an auction.

3  Q    Okay.  How close is it to that area?

4  A    Well, it's downtown Quemado.

5  Q    So how close is that?  I don't know Quemado.

6  A    Well, it's in the middle of town.

7  Q    Okay.  And is --

8  A    And it's --

9  Q    -- is that going to be affected?

10  A    Yes, sir.

11  Q    Okay.  So your son bought property in an area that's going

12  to be affected by a project that you sought money for; is that

13  right?

14  A    That we're looking at, yes.

15          MR. MANNING:  Pass the witness.

16          THE COURT:  Okay.  Mr. Stern?

17          MR. STERN:  No questions, ma'am.

18          THE COURT:  All right.  But based on what she's

19  testified to, I would like to see the budget for the project,

20  and I'd like to see -- I don't need to see the whole county

21  budget, but kind of see the final numbers.  Anybody have that?

22          MR. STERN:  No, ma'am.  I'm happy to get it for you,

23  but --

24          THE COURT:  But you don't have it right now.  Okay.

25  And you don't have it in your files, right, Ms. Ramos?

1          THE WITNESS:  Not the cost analysis from the engineer,

2   but I can get that to you --

3          THE COURT:  Do you --

4          THE WITNESS:  -- by tomorrow.

5          THE COURT:  -- do you have it with you in one of your

6   files?

7          THE WITNESS:  No, not with me.

8          THE COURT:  No?  Okay.  All right.

9          THE WITNESS:  I have the -- the plan, how long the --

10  the six-year -- that's it's going to take six years --

11         THE COURT:  Okay.  So this -- so this would take six

12  years to do.

13         THE WITNESS:  Six years.

14         THE COURT:  Okay.  That -- that's good to know.

15         THE WITNESS:  Yes, ma'am.

16         THE COURT:  So let me ask you a question, and I'll let

17  the attorneys ask some more.  What if within those six years you

18  find out that you ran out of money; what's going to happen then?

19  What's the plan then?

20         THE WITNESS:  Well, from what I understand from the

21  financial advisers, they work on a plan that is very

22  conservative --

23         THE COURT:  Okay, I get that, but did they tell you

24  what would happen if you got change orders or the price of

25  the -- of material goes up?  What -- what are the plans if you

1  don't have enough money?

2          Like you were saying you don't know yet whether
3  you're going to do pumps for the sewage to go all the way back
4  to the Radar Base, or if you're going to have to acquire land.
5  Let's say you have to acquire land and land is very expensive
6  all of a sudden and you don't have the money for it.  What are
7  you -- what -- what are the plans at that point?

8          THE WITNESS:  Well, they -- that's what -- we would
9  have to have these planning meetings.

10          THE COURT:  And then what -- but how would you pay for
11  the -- any further work?

12          THE WITNESS:  We would have to do what we can with
13  what we have and...

14          THE COURT:  So wouldn't it have been cheaper to just
15  take those 200,000 you save and fix the individual septic tanks
16  and help people get just -- some way to get water --

17          THE WITNESS:  We -- I tried, Your Honor.  I tried
18  getting a Texas Department of Agriculture grant to help those --

19          THE COURT:  No, I'm not talking about a grant.  You're
20  saying the county cut and saved 200,000, right?

21          THE WITNESS:  Oh.

22          THE COURT:  Wouldn't it have been cheaper to use that
23  money to fix the few houses and problems you've got?

24          THE WITNESS:  It was going to take more than that.

25          THE COURT:  It was going to take more than 200,000 to

1    put in a septic tank?

2          THE WITNESS:  Probably.  For -- for everybody that

3    needed one.  Probably.

4          THE COURT:  But you're only talking about 15 people.

5          THE WITNESS:  All over?

6          THE COURT:  You said you had --

7          THE WITNESS:  Cesspools all over Quemado?

8          THE COURT:  No, no.  But only -- but the problems are

9    not all over Quemado.  There's only a few houses, is what you

10   testified to, right?

11         THE WITNESS:  Oh.

12         THE COURT:  Is that correct?

13         THE WITNESS:  Or that I've witnessed, yes.

14         THE COURT:  Okay.  So you said 12 that you have

15   pictures of.

16         THE WITNESS:  Uh-huh.

17         THE COURT:  Okay.  So wouldn't it have been cheaper to

18   take the 200,000 and do cesspools that were good for those 12 --

19         THE WITNESS:  I don't know, Your Honor.

20         THE COURT:  Did you even think of that possibility?

21         THE WITNESS:  We were already in the application

22   process to fund --

23         THE COURT:  So you were in the application process

24   based on a public nuisance that you didn't have evidence of at

25   that point is what you're telling me.  Because you said you

1    didn't know who these 12 people were at that point.

2          THE WITNESS:  We -- when I took office and they

3    started coming to me, that's how --

4          THE COURT:  Okay.  So --

5          THE WITNESS:  -- I identified the problem.

6          THE COURT:  Okay.  I get you.  So, that was in 2021

7    you took office?

8          THE WITNESS:  Correct.

9          THE COURT:  In 2021.

10         THE WITNESS:  January of 2021.

11         THE COURT:  Okay.  So, these 12 homes that you took

12    pictures of, you took those pictures in 2021?

13         THE WITNESS:  No.

14         THE COURT:  2023?

15         THE WITNESS:  No, I talked --

16         THE COURT:  Okay, hold -- hold on.

17         THE WITNESS:  -- to the residents.

18         THE COURT:  2022, did you take pictures in 2022?

19         THE WITNESS:  The pictures?

20         THE COURT:  Yeah.

21         THE WITNESS:  These I took just --

22         THE COURT:  I'm -- did you take them in 2022; yes or

23    no?  That's all.

24         THE WITNESS:  No.  No.

25         THE COURT:  Okay.  You took them in 2023?

1          THE WITNESS:  2023.

2          THE COURT:  Okay.  So in 2021, how many people

3    contacted you that they had sewer problems from Quemado?

4          THE WITNESS:  In --

5          THE COURT:  In 2021.

6          THE WITNESS:  -- in '21?

7          THE COURT:  Uh-huh.

8          THE WITNESS:  Maybe about five.

9          THE COURT:  Okay.  And in 2022, how many additional

10   ones?

11         THE WITNESS:  Maybe another three.

12         THE COURT:  Okay.  So in -- by the beginnings of 2023,

13   you knew of eight.

14         THE WITNESS:  Uh-huh.

15         THE COURT:  Right.  But by then you were already

16   working on this project, right?

17         THE WITNESS:  Uh-huh.  Correct.

18         THE COURT:  Okay.

19         THE WITNESS:  Or trying to find funding.

20         THE COURT:  You were trying to find what?  Funding.

21   Okay.  But you already were working on the project since

22   mid-2022, weren't you?

23         THE WITNESS:  Well, trying to find how to fund -- or

24   how to help them out.

25         THE COURT:  But -- but you were saying -- you said you

1   worked on this proposal for eight months.

2         THE WITNESS:  Yes.

3         THE COURT:  Which took us into 2022.

4         THE WITNESS:  Well -- well, I worked on the

5   application, trying to get -- because I'm not a grant writer.

6         THE COURT:  No, know I know that.  And that's fine.

7         THE WITNESS:  So I -- I had to --

8         THE COURT:  Understood.

9         THE WITNESS:  -- figure out --

10        THE COURT:  Understood.

11        THE WITNESS:  -- how to --

12        THE COURT:  But the proposal started getting put

13   together in 2022, eight months before you submitted it, right?

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  Okay.

16        THE WITNESS:  Yes, I did.

17        THE COURT:  So by that point you knew of eight

18   potential problems --

19        THE WITNESS:  Correct.

20        THE COURT:  -- in Quemado, right?

21        THE WITNESS:  Yes.  Correct.

22        THE COURT:  Okay.  So you were already working on this

23   process to get -- to get 24 million, of which 7.2 million would

24   come from the county, before you knew -- of all of the 15

25   problems, you knew eight, maybe.

1                    THE WITNESS:  Possibly, yes.

2                    THE COURT:  And so you were already looking to cut the

3     budget by 200,000 to --

4                    THE WITNESS:  Yes.

5                    THE COURT:  -- get some money to get started, right?

6                    THE WITNESS:  Correct.

7                    THE COURT:  Okay.  Wouldn't it have been cheaper to

8     take that 200,000 and fix these homes, ameliorate their -- their

9     problems?  Wouldn't it have been cheaper that way?

10                   THE WITNESS:  Possibly.

11                   THE COURT:  Okay.  So y'all didn't think about that

12    why?  Any particular reason or just --

13                   THE WITNESS:  My focus was getting the grant, focusing

14    on different grants.  I looked at USDA grants, Texas Department

15    of Agriculture, and that -- those two failed.  I -- we -- we

16    didn't qualify as a county.  And so my last option --

17                   THE COURT:  Okay, so the -- the -- the part of getting

18    grants had nothing to do with a public nuisance and safety

19    because at that point you could have fixed the problem with what

20    you're saving in the budget.

21                   THE WITNESS:  I don't know if we could have.  I don't

22    know how much --

23                   THE COURT:  Well, you didn't even try to find out, did

24    you?

25                   THE WITNESS:  Well, from what -- I don't have anything

1    in writing that tells me, but from what the residents tell --

2              THE COURT:  Okay, but --

3              THE WITNESS:  -- that it's --

4              THE COURT:  -- you didn't know more than eight when

5    you started working on this proposal itself.

6              THE WITNESS:  Uh-huh.

7              THE COURT:  You knew of eight homes.

8              THE WITNESS:  Uh-huh.

9              THE COURT:  Okay, well, I'll say "homes" instead of

10   "residences."

11             THE WITNESS:  Uh-huh.

12             THE COURT:  Eight homes.  I'm just saying, you didn't

13   find -- try to find out from your engineers whether it would be

14   cheaper to put in good cesspools, tanks for those eight houses

15   with the money you were saving in the budget?

16             THE WITNESS:  Well --

17             THE COURT:  You didn't ask the engineer to think about

18   that?

19             THE WITNESS:  Well, when I spoke to Mr. Apolonio --

20   he's a certified sanitarian -- he -- he --

21             THE COURT:  Mr. Apolonio what?

22             THE WITNESS:  Apolonio Rodriguez.

23             THE COURT:  Uh-huh.

24             THE WITNESS:  He's a certified -- the TCEQ gave me his

25   information.

1          THE COURT:  Uh-huh.

2          THE WITNESS:  He advised me that those homes, the lots

3    were very small, and to put septic tanks in there.

4          THE COURT:  Okay.  But at some point they had septic

5    tanks, right?

6          THE WITNESS:  Who?

7          THE COURT:  All those houses?

8          THE WITNESS:  No, they -- cesspools.

9          THE COURT:  They -- but they had them at one point,

10   right?

11         THE WITNESS:  Yes, they had the -- they had the

12   cesspools.  Yes.

13         THE COURT:  Okay.  So they could have had it again,

14   right?

15         THE WITNESS:  A septic tank?

16         THE COURT:  Or a -- or a cesspool.  They could have

17   had it again, right?

18         THE WITNESS:  Possibly.

19         THE COURT:  Okay.  So my question to you is:  Did

20   anybody think -- and you -- and if you know.  You don't have to

21   speculate.  If you know, did anybody say, Well, it's such a

22   nuisance and it's such a public hazard we're going to take

23   $200,000 and we're going to put it into fixing this problem

24   until we can find appropriate funding?

25              Did y'all ever think of doing that?

1                THE WITNESS:  No.

2                THE COURT:  Okay.  All right.  That's all I was trying

3    to ask.

4                 Mr. Stern, any further questions?

5                MR. STERN:  Please.

6                THE COURT:  Uh-huh.

7    Q    (By MR. STERN) Does the Commissioners Court have the

8    authority to spend taxpayer funds on the homes of specific

9    individuals?

10   A    No.

11               THE COURT:  Well, aren't you doing that with this,

12   Mr. Stern?  Isn't that exactly what we're doing here?  Isn't

13   that exactly what we're doing here?  Isn't that the public

14   health issue that y'all are claiming under certifies -- the

15   certificates of obligation?

16                Mr. Aracheta is saying "no" with his head.  And if

17   it's not, then you don't have a public health nuisance.

18                Well, what is it?  Y'all need to pick what is --

19               MR. STERN:  It's for --

20               THE COURT:  -- what position y'all are taking.

21               MR. STERN:  It's for public purposes.

22               THE COURT:  I -- I get it, Mr. Stern, but y'all

23   have -- I have heard all day today with --

24                And I may to -- if I need to give anybody a lunch

25   break, please let me know.  I'll give you a lunch break.  I know

1   I haven't in the past, but I will.

2           All I've heard this morning is how horrible the

3   situation is in Quemado that y'all need to put these lines in

4   and you need to get these certificate of obligations out because

5   it's a nuisance and a hazard and a public health situation

6   because of pictures of individual open sewage in particular

7   houses.  And now you're telling me this money is not for that.

8           So what is it?

9           MR. STERN:  The grant money is for that.

10          THE COURT:  That's what I'm asking.  But -- so aren't

11  you going to spend county money to pay back a grant to do just

12  what you're saying they can't spend county money on?

13          MR. STERN:  In the same way --

14          THE COURT:  So what is it?  I mean, you -- you're

15  doing it, but you're doing it through the back door.  You're

16  doing the same thing through the back door.

17          MR. STERN:  On -- no, but in the same way that if I

18  don't have children, but there's a sports complex in Eagle

19  Pass --

20          THE COURT:  I get it, but that's why it usually goes

21  to an election, so the people can -- the will of the people --

22  and if the will of the people is that they vote these

23  certificates of obligations or a bond, so be it.  That's fine.

24  It's up to the will of the people.

25          But what I'm saying is, you're going to be spending

1   county tax money on this project with a 7.2 million repayment

2   that you're saying can't be done up front cheaper by just fixing

3   the nuisance in 12 homes -- or 12 or 15 homes.  Doesn't make any

4   sense.

5           So that's -- I mean, you -- you're using county

6   money anyway, you're just using it through tax money in the back

7   door.

8           MR. STERN:  Judge, I think the point is that we're

9   providing public utilities, not making individual expenditures

10  on specific taxpayers' residences.

11          THE COURT:  I get it, but you're -- you're providing

12  these public utilities on the basis of these individual homes

13  that you're claiming are a nuisance and a hazard.  Twelve of

14  them.  Okay?  You're -- you're spending taxpayer money on 12

15  that you can't find a better way or a cheaper way of fixing?

16          I mean, that doesn't make any sense.  Because you're

17  still going to be spending taxpayer money to pay for the utility

18  hookups anyway, aren't you?

19          MR. STERN:  Agreed.

20          THE COURT:  Okay.  You're just paying it in a

21  different forum than up front.  But you're still spending --

22  Commissioners Court is still spending money of the taxpayer.

23  Right?  So, isn't there any other options?  The -- the county

24  residents have to -- have to pay back 7.2 million, plus whatever

25  they pay to the state for whatever bonds the state's issuing --

1  which I have a feeling this isn't bond money from the state.  I

2  have a feeling it's from another source, but I don't have any

3  evidence of that.

4          They're going to be paying for this stuff because

5  there's -- and you're not letting them have a vote and a voice

6  because 12 homes may need sewage hookup.  That's what I'm

7  hearing.  That's the emergency.  Is that what I'm hearing?

8          MR. STERN:  I can't speak for the Court.

9          THE COURT:  Well, I -- no, I'm saying, is that what

10 I'm hearing?  Is that the evidence that I've been hearing that

11 has been presented to the Court?

12          And it's -- it's -- you're providing hookups to 300

13 locations in Quemado.  Everything I see says 98 dwellings, but

14 I'm assuming there's more than that.

15          THE WITNESS:  Yes.

16          THE COURT:  There's more than 98 dwellings?

17          THE WITNESS:  Yes.

18          THE COURT:  How many dwellings?

19          THE WITNESS:  Well, at least the 300 and --

20          THE COURT:  Dwell -- dwellings?

21          THE WITNESS:  -- 15.

22          THE COURT:  There's 300 houses in Quemado; is what

23 you're saying?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  So that -- so let -- 300 houses.

1   You're going to -- you're saying it's an emergency to put in

2   these items for 300 homes because 12 may have a problem; and

3   that's the emergency?  Or that's the -- the nuisance?

4               Come on, folks.  What game are we playing here?

5               MR. STERN:  The only thing I'm informed of is that

6   the -- we would provide the --

7               THE COURT:  Mr. Stern, come to this other microphone,

8   please.

9               MR. STERN:  Let me -- let me just withdraw it and call

10  a witness and we can take care of it that way.

11              THE COURT:  I'm sorry, say that again.

12              MR. STERN:  Let me just withdraw my question and then

13  call a different witness, and maybe we can get to --

14              THE COURT:  Okay, but do you have any more questions

15  of her?

16              MR. STERN:  No, not --

17              THE COURT:  Based on what I asked, any other questions

18  of her?

19              MR. STERN:  No, ma'am.

20              THE COURT:  Okay.  Mr. Manning?

21              MR. MANNING:  No, Your Honor, no further questions --

22              THE COURT:  Okay.

23              MR. MANNING:  -- but I would ask to approach the bench

24  very quickly.

25              THE COURT:  Okay, approach the bench.

1          MR. MANNING:  Thank you.

2          THE COURT:  Ms. Ramos, hold on just a quick second.

3       (1:34:11 TO 1:35:03 P.M., BENCH CONFERENCE)

4          THE COURT:  Ms. Ramos, I'm going -- you're -- you're

5    released.  You may step down.

6               And we're going to have a one-hour lunch break.  You

7    may be excused until, say, 2:30.

8       (1:35:24 TO 2:33:28 P.M., OFF THE RECORD)

9          THE COURT:  Okay, Mr. Stern and Mr. Manning, where are

10   the other parties?

11         MR. STERN:  They were right outside, Your Honor.  They

12   may be coming through security.

13      (PAUSE WHILE WAITING FOR ALL PARTIES TO ARRIVE)

14         THE COURT:  DR-23-CV-60.  All parties are present now.

15           Mr. Stern, call your next witness.

16           That's okay, the parties are -- it's fine.

17         MR. MANNING:  Your Honor, just for the Court's

18   edification, my client is not here.  She may have been detained

19   at lunch.

20         MR. STERN:  She's in the elevator.

21         MR. MANNING:  Oh, okay.

22         THE COURT:  That -- that's fine.  We're okay to

23   proceed, because I -- I know I excused some of the other folks,

24   which is fine.  No problem.

25         MR. STERN:  If we could approach, Judge?

1          THE COURT:  You may.

2      (2:36:41 TO 2:59:04 P.M., BENCH CONFERENCE)

3          THE COURT:  Okay.  So, Mr. Stern is going to take --

4  needs -- y'all can step out with Mr. Stern.  He wanted to speak

5  with everybody.

6              So that case will be on a short pause.

7              In the meantime, Mr. Spurgin, I'll take your case --

8  or begin your case.

9      (2:59:21 TO 4:14:39 P.M., OFF THE RECORD)

10         THE COURT:  Let me recall DR-23-CV-60.

11         INTERPRETER:  May the interpreter be excused,

12  Your Honor?

13         THE COURT:  Yes, sir.

14          And I know the parties were outside.

15     (BRIEF PAUSE)

16         MR. MANNING:  Your Honor, would you allow us to

17  approach very quickly, please.

18         THE COURT:  Sure.

19         MR. MANNING:  Thank you, Judge.

20     (4:15:55 TO 4:22:17 P.M., BENCH CONFERENCE)

21     (4:22:17 TO 4:34:08 P.M., OFF THE RECORD)

22         THE COURT:  All right, we're back on the record in

23  DR-23-CV-60.  Parties are present and -- especially the

24  attorneys.

25              All right, Mr. Stern, you had a third witness you

1  were going to call.

2          MR. STERN:  No, ma'am.  I think we may have -- may

3  have resolved temporary matters.

4          THE COURT:  All right.  How were they -- how would

5  they be resolved?

6          MR. STERN:  First, the defendants would agree not to

7  take any further action to issue certificates of obligation for

8  the project that is before the Court.

9          Secondly, they would dismiss their expedited

10 declaratory judgment in state district court in Maverick County.

11         The -- the parties would then enter into an

12 agreement --

13     (PHONE RINGING)

14         MR. STERN:  I apologize.

15         THE COURT:  All right.  That's fine.

16         MR. STERN:  Sorry, the Indians are bothering me today.

17         THE COURT:  That's fine.  Enter -- the parties would

18 enter an agreement, and what, Mr. Stern?

19         MR. STERN:  The agreement would be that the plaintiff

20 would be allowed to amend her petition, and that would enable us

21 to bring in TAC counsel or insurance counsel, and then try to

22 work out a settlement of all matters in controversy.

23         THE COURT:  Okay.  And this is the plaintiff's

24 understanding, Mr. Manning?

25         MR. MANNING:  Yes, Your Honor.  That tracks our

1    agreement.

2            THE COURT:  So, let me -- let me make sure I have

3    the -- the -- and I will issue a written order to this effect.

4    The -- so the parties agree that the defendants will agree not

5    to take any further order -- any further action on the

6    certificates of obligations for the project that is the subject

7    of the controversy in this court, which is the water and sewage

8    project.

9            And let me -- let me make sure that I can give it a

10   title so we all know what we're talking about.  And I'm going --

11   I'm looking at the petition filed by the county.

12           MR. STERN:  I think it only refers to affected

13   properties, the subject of the COs.

14           THE COURT:  Right.  And -- and the affected properties

15   in -- and it's in Paragraph Ten of the declaratory injunction

16   request.  It's the request by Commissioner Ramos that the

17   conditions of water and wastewater system for the residents of

18   Thompson Road, Maverick County, Texas, called the "Thompson Road

19   residents" -- and they keep calling it the Colonia Quemado, but

20   I'm just going to say Quemado, Maverick County, Texas, Quemado

21   residents, together with the Thompson Road residents, all being

22   the affected residents.

23           The -- it would be the project that deals with the

24   installation of new systems of water and wastewater systems to

25   serve the affected residents, to be called the projects, to be

1  funded by the Economically Distressed Areas Program of the Texas

2  Water Development Board.

3          Can I also -- will the -- would the parties be okay

4  if I referred to it by the -- also the -- looks like in the

5  budget it's defined as G1001648.

6          MR. STERN:  That's not a problem for us, Judge.

7          THE COURT:  Okay.  That's -- and I'm look -- just

8  looking at the budget just so that everybody has an idea of what

9  we're talking about.  I think the application number is 14660.

10         Okay.  And then the dismissal of the pending state

11 case filed by the defendants, the allowance of an amended

12 petition as to the remaining matter, which would be the 1983

13 claim.  So that then the county could bring in the insurance

14 counsel on behalf of the county.

15         Any other parts of this?

16         MR. MANNING:  Your Honor, we would ask expressly that

17 the Court issue it as a preliminary injunction through the time

18 of trial on the merits on the 1983 case.

19         THE COURT:  Well, and I was going to -- I was going to

20 say, what I'm going to do is I'm going to entitle it a

21 preliminary injunction until the trial of the merits of the

22 case.

23         So it's not a final injunctive matter, it's a

24 preliminary injunction is being issued with -- based on the

25 stipulated agreement of the parties.

1          All right, anything further, then, that I need to

2   take up on this matter?

3          You can go ahead and tell Mr. Manning.

4          Mr. Manning, go ahead and speak to your client.

5       MR. MANNING:  Thank you.

6   (BRIEF PAUSE FOR ATTORNEY/CLIENT CONFERENCE)

7       MR. MANNING:  We've conferred, Your Honor, but no

8   further matters.

9       THE COURT:  No?  Okay.  So for the record, I also

10  have -- because I'm going to keep them for the record since they

11  were introduced, I have Plaintiff's Exhibits One, Two, and Four.

12  I have Defense Exhibits One, Two, Three, Four, Four-A, Five,

13  Seven, and Eight.  And then I have the budget.  Do you want me

14  to number it Number Nine?

15      MR. STERN:  Please.

16  (DEFENDANT'S EXHIBIT NUMBER NINE ADMITTED)

17      THE COURT:  Okay.  So I have those exhibits.

18          Any other exhibits that I should have and I don't

19  have?

20      MR. MANNING:  Not from plaintiff, Your Honor.

21      THE COURT:  Okay.  Mr. Stern, any other exhibits that

22  I should have that I don't --

23      MR. STERN:  No, that --

24      THE COURT:  -- that you want to make sure is part of

25  the record as -- as of this point?

1           MR. STERN:  No, not that we're -- or no other ones to

2  be introduced --

3           THE COURT:  Okay.

4           MR. STERN:  -- into evidence.

5           THE COURT:  Okay.  All right.

6           So then with those understandings, the preliminary

7  injunction will issue.

8           MR. MANNING:  Thank you, Your Honor.  May we be

9  excused?

10          THE COURT:  You may.

11          MR. MANNING:  Thank you, Judge.

12          THE COURT:  All right, then we are adjourned.

13          COURT SECURITY OFFICER:  All rise.

14      (4:40:24 P.M., OFF THE RECORD)

15

16                          -oOo-

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

U.S. DISTRICT COURT          )

WESTERN DISTRICT OF TEXAS )

DEL RIO DIVISION             )

       I, Vickie-Lee Garza, Certified Shorthand Reporter, do hereby certify that the above-styled proceedings were reported by me, later reduced to typewritten form, and that the foregoing pages are a true and correct transcript of the original notes to the best of my ability.

       In addition, it is hereby noted that bench conferences held within this hearing are deemed confidential and are therefore contained in a separate **SEALED** transcript, per order of the Court.

       Certified to by me this 30th day of January, 2024.

       /s/  VICKIE-LEE GARZA
       TX CSR #9062, Expires 10/31/25
       P.O. Box 2276
       Del Rio, Texas  78841